(g)    Checks from us to you will be payable to _____

_____

(h)    The Weekly Draw we agree to remit to you on a weekly basis will be $_____, unless you and we change the Weekly Draw by mutual written agreement.

(i)    7-Eleven Charge:

    (1)    For a 24-Hour Operation:

        The 7-Eleven Charge for the Store is 50% of the Gross Profit (except as otherwise provided in Paragraphs 10(b) and/or (c) of the Franchise Agreement).

    (2)    For permitted reduction in hours of operation:

        If you have our permission to operate the Store as less than a 24-Hour Operation, the 7-Eleven Charge for the Store will be 50% of the Gross Profit plus 0.1% of the Gross Profit for each hour during a normal week of operation that the Store is closed.

    (3)    For non-permitted reduction in hours of operation:

        If you operate the Store less than the required number of hours at any time without our permission, the 7-Eleven Charge for that Accounting Period will be the 7-Eleven Charge as determined by (i)(1) or (2) above, as applicable, plus 4% of the Gross Profit if you operate at least 136 hours per week or 6% of the Gross Profit if you operate less than 136 hours per week.  This increase in the 7-Eleven Charge is not our only remedy, and is in addition to other remedies available to us.

(j)    Other special provisions (specify):

| | | |
|---|---|---|
| 4400835 | 1/04 | Automated Teller Machine Amendment (Uniform) |
| 4400228 | 1/04 | Money Order Amendment |
| 4400242 | 1/04 | Integrated Payment Systems Agreement |
| 4401020 | 1/04 | Verizon Pay Telephone Amendment |
| 4400853 | 1/04 | Authorization For Revenue And Contract Disclosure |
| 4401000 | 1/04 | Security System and Monitoring Amendment |
| 4400911 | 1/04 | Sylvania Lighting Services Amendment |
| 4401036 | 1/04 | Patco Sanitation System Amendment |
| 4400907 | 1/04 | Lease Expiration Date Acknowledgement |
| 4400854 | 1/04 | Release Of Vendor Information |
| 4400981 | 1/04 | Microsoft Amendment |
| 4400212 | 1/04 | Notice Of Designation Of Successor Franchisee |
| 4400237 | 1/04 | Alcoholic Beverage Amendment |
| 4400406 | 1/04 | TSC Financing Amendment |
| 4400407 | 1/04 | TSC Revolving Credit Amendment |
| 4400408 | 1/04 | TSC Security Agreement |
| 2400025 | 1/04 | Uniform Power Of Attorney - State |
| 4401063 | 2/04 | NON-OFFF Existing Franchisee Amendment |
| 4400288 | 1/04 | Storage Tank Amendment |
| 4400062 | 1/04 | Consigned Gasoline Ammendment |
| 4400855 | 1/04 | Coin Operated Vending Equipment Amendment |
| 4400268 | 1/04 | Credit Card Amendment |
| 4400852 | 1/04 | Check Collection Amendment |

MARKET/STORE #2131 - 22818 B

7-ELEVEN, INC.

By _Tom Lesser_____

Name  Tom Lesser

Title  Market Manager

Date  3/24/04

**FRANCHISEE**

By _____    By _Jami Tucker_____

Name  Michael  Tucker            Name  Jami Tucker

Date  3-13-04                    Date  3-13-04

Form 4400019  1/04  Uniform
Page 3 of 3 – Exhibit D

7-ELEVEN-00289

MARKET/STORE #2131 - 22818 B

# EXHIBIT E

# DEFINITIONS

"Accounting Period" means a calendar month during your operation of the Store, except that if the Effective Date, expiration, termination or surrender of the Store and 7-Eleven Equipment occurs during any calendar month, the portion of that month which follows the Effective Date or precedes the other events will be an Accounting Period. We have the right to change the Accounting Period at any time upon written notice to you.

"Advertising Fee" means an amount equal to the percentage of Gross Profit specified in Paragraph 22.

"Advertising Materials and Programs" means all materials, programs and promotions advertising or promoting the 7-Eleven System, 7-Eleven Stores and/or the products or services provided by 7-Eleven Stores, including the following: in-Store and out-of-Store advertising and promotional materials and displays; point-of-sale display materials; window, counter and other promotional signage; billboards; direct mail, newspaper and print advertising; other advertising and promotional materials; Internet website(s); television and radio media; Store grand opening/ re-opening events and promotions; and national, regional, local, and Store-specific advertising and promotional campaigns and events, including with respect to each of the foregoing, creation, development, maintenance, administration, space and time charges, agency planning, selection, and placement.

"Affiliate" means, with respect to any person or entity, any other person or entity controlling, controlled by, or under common control with such person or entity.

"Agreement" or "Franchise Agreement" means this agreement between you and us for the operation of the Store under the 7-Eleven System and Service Mark.

"Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war.

"Audit" means a physical count of the Inventory (priced at retail value determined as provided in this Agreement), Receipts, Cash Register Fund, cash, bank drafts, and supplies of items for which you earn a commission (e.g., lottery tickets and money order blanks), pursuant to our normal procedures.

"Bank" means the bank or similar institution that we designate for the Store and, specifically, the account established for the Store.

"Base Period Gross Profit" means the Gross Profit of the Store for the immediately preceding twelve (12) month period, regardless of who operated the Store during such twelve (12) month period.

"Bona Fide Suppliers" means persons or entities regularly conducting the business of supplying or distributing merchandise, supplies or services to retail businesses and performing all of the functions normally associated with such activities; provided that, unless you obtain our prior written consent, neither you, your Affiliate, nor any other 7-Eleven franchisee may be a Bona Fide Supplier.

"Bookkeeping Records" means the Financial Summaries and other records and reports that we prepare or that we require you to prepare relating to the operation of the Store. We may, at our option, change the format, manner or timing of the records we prepare and the procedures for collecting or compiling data for the reports. The Bookkeeping Records will be based upon information you supply to us, information obtained by us from Audits, Store inspections and vendors, and, where necessary or appropriate, information based upon estimates or factors

7-ELEVEN-00290

concerning Store transactions. We prepare the Bookkeeping Records in accordance with the terms of this Agreement, and such terms will control over any external accounting rules. We currently maintain the inventory records and reports derived from these records by using the Retail Method (see definition of "Retail Book Inventory"), and adjust the retail value to cost as described in Exhibit D. However, we reserve the right to change our method of Inventory valuation from the Retail Method to the Cost Method either for the entire Store or for one (1) or more product categories. If we exercise this right, you agree to enter an amendment to this Agreement which contemplates reasonable conforming changes to this Agreement to address conversion from the Retail Method to the Cost Method. Such conforming amendment will be designed to have no material effect on you or us.

"Burglary" means the stealing of Inventory from within the Store during a period of time when the Store is closed, as permitted by this Agreement, all doors are properly closed and locked, and entry is by actual force evidenced by visible marks made by tools, explosives, electricity, or chemicals.

"Business Day" means any day other than Saturday, Sunday or the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving and Christmas.

"Cash Register Fund" means the amount agreed to in writing by you and us for change in the Store.

"Cash Report" means the electronic form or other method of reporting your Receipts and/or Net Sales and/or any other information that we require from time to time. You agree to complete a Cash Report for each Collection Period. Each Cash Report must indicate the time and date at which the Collection Period ended.

"Cash Variation" means the unaccounted for difference between Receipts required to be deposited or delivered to us and the actual Receipts deposited or delivered to us as reflected in the Cash Report.

"Category" means a distinct, measurable and manageable group of products and/or services sold from a 7-Eleven Store as specified by us.

"Collateral" has the meaning given such term in the Security Agreement.

"Collection Period" means each time period for which you report Receipts. Your first Collection Period will start when you begin operating the Store, and may end, at your discretion, at any time within your first 24 hours of operation. Each subsequent Collection Period will begin as soon as the immediately preceding Collection Period ends and must be 24 hours in length (unless we agree otherwise).

"Competitive Business" means any business that is the same as or similar to a 7-Eleven Store (except 7-Eleven Stores operated under valid agreements with us), including a convenience store or other store not designated as a convenience store in which the product mix is fifty percent (50%) or more of goods or services substantially similar to those then-currently offered by a 7-Eleven Store.

"Confidential Information" means knowledge, know-how (for example, methods and processes) and other information concerning the operation or another aspect of a 7-Eleven Store which may be communicated to you or of which you may be apprised in connection with the operation of the Store under the terms of this Agreement, including all information contained in the On-Line Systems Support Guide; all information, knowledge, know-how, techniques and materials used in or related to the 7-Eleven System which we provide to you in connection with this Agreement; and information or data compiled by or stored in the 7-Eleven Store Information System.

"Cost of Goods Sold" means the Cost Value of Inventory at the beginning of the Accounting Period plus the cost of Purchases during the Accounting Period (including delivery charges and cost equalization), and minus the Cost Value of the Inventory at the end of the Accounting Period. We will make adjustment so that any bad merchandise (caused by you or your employees) and Inventory Variation will not be included in Cost of Goods Sold. We will

Form 4400019 2/04 Uniform
Page 2 of 10 - Exhibit E

credit to Cost of Goods Sold all discounts and allowances (including promotional and display allowances) paid to us and allocated or reasonably traceable to Purchases, except for:

(a)  Wholesale Vendor discounts and allowances (that is, discounts and allowances customarily offered by vendors to wholesalers; provided, however, that in the event we become a wholesaler to you, for any products or services that we sell to you for which we receive wholesaler discounts or allowances, the wholesale prices to you will be competitive with the other wholesalers of those products on a Market Basket Basis); and

(b)  reimbursements to us for our expenditures under vendors' co-operative advertising or other similar programs where the vendor partially or wholly reimburses us (or where costs are shared) for advertising expenditure programs, so long as we actually spend the money in accordance with the vendor's criteria for advertising the vendor's product.

We will credit discounts and allowances, not allocated or reasonably traceable to individual store Purchases, to Cost of Goods Sold on the basis of Store sales or Purchases compared with sales or purchases of all affected stores. We will credit discounts, allowances and the value of premiums you receive to Cost of Goods Sold. We will not be obligated to credit any uncollected discounts or allowances to Cost of Goods Sold. We are not required to credit System Transaction Amounts to Cost of Goods Sold. We are not required to credit vendor-supplied equipment or equipment reimbursements to Cost of Goods sold if:

(a)  the equipment is part of a vendor's standard provision of services to its customers in general (for example, where a vendor generally offers merchandise racks to its customers);

(b)  a vendor provides equipment as an integral part of a service for which you receive a commission, rental fee or royalty (for example, ATM's, copier machines, telephones, etc.); or,

(c)  we made a commercially reasonable effort to negotiate with the vendor to obtain a lower product cost instead of the equipment.

We are also not required to credit monies paid to us by vendors to purchase equipment to Cost of Goods Sold if the monies are actually used by us to purchase equipment as designated by the vendor.

"Cost Method" means a method of inventory valuation whereby (a) a perpetual unit inventory is maintained (as confirmed by a periodic physical count of the inventory) and (b) inventory at cost is computed as the unit inventory times net unit cost.

"Cost Value" means the cost value of the Inventory at any time, determined by: (a) deducting from the Retail Book Inventory the included retail value of all consigned merchandise, and designated Special Items; (b) adjusting from retail value to cost as specified in Exhibit D; and (c) adding the cost value of the designated Special Items.

"Current Deposit" means all Receipts obtained during the immediately preceding Collection Period and accounted for by the proper completion of the most recent 7-Eleven Cash Report relating to those Receipts.

"Down Payment" means the initial amount you actually pay us related to the operation of the Store as stated in Exhibit D. The Down Payment is separate and apart from the Franchise Fee.

"Effective Date" means the date you first begin operating the Store for business under this Agreement.

"Electronic Invoice" means an electronic invoice or other electronic or online billing systems invoice.

"Excess Investment Draw" means an amount paid to you which equals the amount by which your Net Worth exceeds your total assets (as reflected on the balance sheet that we prepare for the Store for each Accounting Period from the Bookkeeping Records).

7-ELEVEN-00292

"Expiration Date" means the earlier of the date which is fifteen (15) years from the Effective Date or the expiration of the current term of the lease or the master lease on the real estate.

"Final Inventory" means the Inventory of the Store that you agree to transfer to us or a third-party that we designate upon the expiration or termination of this Agreement in accordance with Paragraph 28(a)(2) of this Agreement, excluding any portion of the Inventory which, in our sole and reasonable opinion, is of a type, quantity, quality, or variety that is not consistent with the 7-Eleven Image or standards.

"Financial Summaries" means summaries of financial information for the Store that we prepare from the Bookkeeping Records in the form of income statements, balance sheets, reports reflecting credits and debits to your Open Account, inventory records and other records and reports relating to Store income, expenses, profits and losses, assets and liabilities. The Financial Summaries are prepared in the manner we deem appropriate and are prepared for each Accounting Period.

"Foodservice" means our system for retailing a menu of prepared food products and related items, with such changes approved and adopted by us from time to time.

"Foodservice Facility" means the area or areas of the Store and related 7-Eleven Equipment from time to time used for the Foodservice operation.

"Foodservice Operations Manual" means a compilation of the 7-Eleven Foodservice Standards, whether in electronic or written form.

"Franchise Fee" means the initial amount that you agree to pay to us, as set forth in Exhibit D, in consideration for the grant of the 7-Eleven Store franchise.

"Franchisee" means the person(s) named as the Franchisee on the signature page and signing this Agreement as the Franchisee (or subsequently added as a "Franchisee" in a writing signed by each of the parties). If there is more than one Franchisee, they will be jointly and severally liable for the obligations of the "Franchisee" under this Agreement.

"Fresh Food" means perishable food products offered in 7-Eleven Stores, including sandwiches, roller grill items, baked goods, salads, foods served or taken hot, dairy (including milk, flavored milk, and yogurt), bread, and any other similar perishable food product as reasonably determined by us; provided, however, that any "Fresh Food" cannot have a shelf life of more than two (2) weeks, unless through technology or other means the freshness of the product can be extended past two (2) weeks.

"Gross Profit" means Net Sales less Cost of Goods Sold.

"HVAC Equipment" means the heating, ventilation and air conditioning unit and related equipment, duct work, filters and refrigerant gas for the air conditioning unit, but does not include water heaters, equipment and refrigerant gases for refrigerated vaults and cases, and other equipment used in connection with the sale of Inventory from the Store.

"Interim Financial Summaries" means Financial Summaries that we prepare during, but not at the end of, any Accounting Period. All components of Interim Financial Summaries will be prorated based on the number of days during the Accounting Period for which such Interim Financial Summaries are prepared.

"Internet" means a global computer-based communications network.

"Inventory" means all merchandise for sale from the Store, including deposit bottles, Special Items, and consigned merchandise (other than consigned gasoline).

7-ELEVEN-00293

"Inventory Overage" means the amount by which the retail value of the Inventory as reflected by an Audit is greater than Retail Book Inventory.

"Inventory Shortage" means the amount by which the retail value of the Inventory as reflected by an Audit is less than the Retail Book Inventory.

"Inventory Variation" means any Inventory Overage or Inventory Shortage, adjusted from retail value to cost as specified in Exhibit D. Inventory Variation is debited or credited, as applicable, to Operating Expenses.

"Lease" means our lease to you of the Store and adjoining property as described in Exhibit A, and, separately, the 7-Eleven Equipment. Except as otherwise provided in this Agreement, if an allocation of the 7-Eleven Charge to the lease of 7-Eleven Equipment is required by law or ordinance, or for taxation purposes, the amount of the 7-Eleven Charge allocable to the lease of the 7-Eleven Equipment will be equal to the monthly straight line depreciation of the 7-Eleven Equipment, unless provided otherwise elsewhere in this Agreement.

"Leasehold Rights" means our rights to possession of the Store under any pre-existing or subsequent lease of the Store, whether pursuant to the current term of a lease, an option we exercise, or our re-negotiation of the lease. We have no obligation to exercise any options or other contractual rights, or otherwise enter into any agreement for the purpose of retaining Leasehold Rights.

"Maintenance Contracts" means contracts that you are required to obtain with reputable firms for maintenance and repair of the Store and 7-Eleven Equipment and, if we consider it appropriate or necessary, for the landscaped areas outside the Store as provided in Paragraph 20(b).

"Market Basket Basis" means a vendor's standard product mix that meets our Stores' purchase needs (excluding Proprietary Products), and is sold under terms that include a balanced comparison of payment terms and methods, in-store services, product mix, service area, frequency of delivery and delivery windows.

"Material Breach" means those breaches of this Agreement specifically set forth in Paragraph 26 or a breach of any amendment to this Agreement.

"Minimum Net Worth" means the minimum amount of Net Worth that you agree to maintain in accordance with Paragraph 13(d).

"Monthly Draw" means an amount equal to 70% of the total increase in Net Worth over the three (3) Accounting Periods immediately before the date upon which Monthly Draw is calculated, divided by three, minus any amounts reflected on your most recent Bookkeeping Records as distributions to you of additional draw, unauthorized draw or Excess Investment Draw; provided however, you will not be entitled to a Monthly Draw if it will result in reducing in your Net Worth to any amount below the Minimum Net Worth required pursuant to Paragraph 13(d) of this Agreement.

"Net Sales" means the total value charged to customers and received by the Store for the sale of Inventory and all other products and services sold, except (a) sales tax and (b) the value of those products and services for which you earn a commission or fee, provided that Net Sales will include the value of such commissions or fees but will not include the value of commissions that you receive for the sale of gasoline.

"Net Worth" means the difference between the Store's total assets and the Store's total liabilities, all of which are as reflected on the balance sheet that we prepare for the Store each Accounting Period as derived from the Bookkeeping Records.

7-ELEVEN-00294

"On-Line Systems Support Guide" means our on-line confidential support guide containing training and informational material related to the operation of a 7-Eleven Store, including any additions to, deletions from or revisions of the On-Line Systems Support Guide.

"Open Account" means an account that we agree to establish and maintain for you as part of the Bookkeeping Records. References to debits (charges) to the Open Account in this Agreement mean increases in the amounts you owe us (for example, when we pay a vendor's invoice on your behalf the Open Account is debited or charged) and credits to the Open Account mean decreases in the amounts you owe us (for example, when Receipts are deposited in the Bank, such amount is credited to the Open Account).

"Operating Expenses" means the expenses (or credits) you incur in operating the Store for: (a) payroll; (b) payroll taxes (including unemployment, worker's compensation, payroll insurance, and social security contributions); (c) Inventory Variation; (d) Cash Variation; (e) maintenance, repairs, replacements, laundry expense, and janitorial services; (f) telephone; (g) Store supplies, including grocery bags and other Store-use items; (h) governmental fees and others fees or costs for licenses, permits, and bonds; (i) interest; (j) returned checks; (k) inventory and business taxes; (l) bad merchandise caused by you or your employees; (m) Advertising Fees and other advertising; and (n) other miscellaneous expenditures which we (in our reasonable judgment and regardless of the classification by you or the Internal Revenue Service) determine to be Operating Expenses.

"Proprietary Products" means products or services we develop or designate which are: (i) unique to us because of their (a) ingredients, (b) formulas, (c) manufacturing or distribution processes, or the manner in which they are presented or marketed to consumers; and (ii) which we support and control through (a) trademarks and/or packaging that bears one or more trademarks, any of which are owned by or licensed to us, (b) copyrights, (c) quality control, and/or (d) advertising.. The currently required Proprietary Products are listed on Exhibit G to this Agreement.

"Purchases" means all your purchases of Inventory for sale from the Store.

"Reasonable and Representative Quantity" means the minimum number of units for each SKU that you are required to carry as specified by us from time to time. After the initial order of any particular product, such quantity may be adjusted upon the mutual agreement by you and our local representative based on information from sales of the initial Inventory of such product using the 7-Eleven Store Information System.

"Receipts" means all sales proceeds (whether cash, check, credit instrument, or other evidence of receipt), commission revenues on items for which you earn a commission (e.g., lottery tickets and money order blanks), discounts or allowances you receive, and miscellaneous income (including rentals, royalties, fees, commissions and amounts you receive from on-site currency operated machines) and the value of premiums received from your operation of the Store. (Receipts from on-site currency operated machines are considered received at the time the proceeds are collected from the machine).

"Recommended Vendor(s)" are those Bona Fide Suppliers described in Paragraph 15(h) and which are listed on the 7-Eleven Intranet. The list of Recommended Vendors may be changed from time to time.

"Recommended Vendor Purchase Requirement" means you agree to purchase at least eighty-five percent (85%) of your total Purchases and, separately, eighty-five percent (85%) of your cigarette purchases, both computed monthly at cost, from Recommended Vendors. No purchase will be credited towards your Recommended Vendor Purchase Requirement unless the purchase is from a Recommended Vendor we have approved and your purchase was made from such Recommended Vendor in its capacity as a Recommended Vendor which includes compliance with our requirements for Recommended Vendors, including the recommended method of distribution. The cost value used to calculate the percent of Purchases and cigarette purchases from Recommended Vendors will only include cost as reflected on vendor invoices. Cost for purposes of calculating this requirement will exclude allowances, rebates and discounts not reflected on vendor invoices. In order to count towards your Recommended Vendor Purchase Requirement, the products must be ordered and paid for through our recommended method for

Form 4400019 2/04 Uniform
Page 6 of 10 – Exhibit E

ordering and paying for that vendor. Notwithstanding the above, your Purchases of products from non-Recommended Vendors will be deemed to be purchases from Recommended Vendors if you provide us with written substantiation that: (i) you ordered a product carried by a Recommended Vendor and were advised in writing by that Recommended Vendor that such product was out of stock; or (ii) you purchased products or services from a non-Recommended Vendor that were also available from a Recommended Vendor, and the non-Recommended Vendor provided written evidence of a bona fide offer to sell on a Market Basket Basis to all 7-Eleven stores in the geographic area serviced by the Recommended Vendor all products or services that are available from the Recommended Vendor, on a Market Basket Basis, at a lower cost than the Recommended Vendor. For example, if a Recommended Vendor has made a bona fide offer to sell a group of products or services to all 7-Eleven stores in the Recommended Vendor's service area at specific prices, the non-Recommended Vendor must make a similar bona fide offer to sell all products that are available from the Recommended Vendor, on a Market Basket Basis to all 7-Eleven stores in the same geographic area, at a lower cost than the Recommended Vendor.

"Related Trademarks" means the trademarks, service marks, trade names, trade dress and other trade indicia, except for the Service Mark, which we may authorize you to use from time to time as part of the 7-Eleven System. "Related Trademarks" also includes all other combinations of the word or numeral "7" and the word or numeral "Eleven," in any language, other than those comprising the Service Mark. For example only, Related Trademarks include the trademarks BIG GULP and BIG BITE, as well as the distinctive trade dress of 7-Eleven Stores.

"Retail Book Inventory" means the book Inventory maintained as part of the Bookkeeping Records which reflects the retail value of the Inventory. We will initially determine the Retail Book Inventory by an Audit of the initial Inventory. After that, we will adjust the Retail Book Inventory by: (a) adding the retail value (based on your then-current retail selling prices) of subsequent Purchases (other than gasoline); (b) subtracting Net Sales of items reflected in the Retail Book Inventory; (c) adding or subtracting the retail value of all retail selling price increases or decreases of items reflected in the Retail Book Inventory, as reported by you to us, or determined from surveys of the Inventory by us; (d) subtracting the included retail value of any merchandise used as Store supplies and out-of-date date-coded merchandise or merchandise which is damaged or deteriorated as reported by you to us and verified by us; and (e) subtracting any Inventory Shortage or adding any Inventory Overage. We will determine the Retail Book Inventory at expiration or termination of this Agreement by an Audit we conduct. We will appropriately adjust the Retail Book Inventory to reflect the results of each binding Audit. For the initial Audit and the Audit on expiration or termination, we will determine the retail value of the Inventory at our then-current suggested retail selling prices. For any other Audit, we will determine the retail value of the Inventory at your then-current retail selling prices.

"Retail Method" means a method of inventory valuation whereby inventory transactions and the perpetual inventory records are maintained using retail values and the total retail value of inventory is converted to cost using a cost complement percentage. For purposes of this Agreement, the percentage to convert retail value to cost value is as set forth in Exhibit D.

"Robbery" means the theft of Receipts and/or Cash Register Fund (other than a Safe Robbery), Inventory, or Store supplies from you, your agents or employees by acts or threat of violence in the Store; while Receipts and/or Cash Register Fund are being transported directly from the Store to the Bank; between two (2) or more 7-Eleven Stores franchised by you while in route to the Bank and in the presence of you, your agents or employees, if not committed by you or your agents or employees.

"Safe Burglary" means the theft of Receipts or Cash Register Fund from a vault, safe, or security drop box in the Store and approved by us during a period of time when the Store is closed as permitted by this Agreement and when all doors of the Store and of the vault, safe, or security drop box are closed and locked and entry is by actual force evidenced by visible marks made by tools, explosives, electricity, or chemicals if not committed by you or your agents or employees.

"Safe Robbery" means the theft of Receipts from a vault, safe, security drop box, or vending tubes in a safe in the Store and approved by us by acts or threat of violence committed in you presence or the presence of your agents or employees, if not committed by you or your agents or employees.

"Security Agreement" means a security agreement substantially in the form attached to this Agreement as Exhibit I.

"Service Mark" means the service mark logo and design registered in the United States Patent and Trademark Office (as Registration No. 920,897) and the 7-Eleven service mark registered in the United States Patent and Trademark Office (as Registration No. 798,036).

"7-ELEVEN," "7-Eleven," "we", "us", and "our" means 7-Eleven, Inc., a Texas corporation.

"7-Eleven Charge" means an amount equal to the percentage of Gross Profit specified in Exhibit D.

"7-Eleven Equipment" means all pieces of equipment and related items, whether mechanical, electronic or otherwise, leased or otherwise provided by us to you, including the 7-Eleven Store Information System and any other equipment provided by third parties.

"7-Eleven Foodservice Standards" means mandatory and suggested quality, foodservice and other reasonable operating standards as may from time to time be established by us and set out in the Foodservice Operations Manual.

"7-Eleven Image" means the acceptance, reputation and goodwill achieved by us and our franchisees in the U.S. and elsewhere that is represented by the Service Mark, and the Related Trademarks for 7-Eleven Stores operated pursuant to the 7-Eleven System and the products and services offered in them.

"7-Eleven Intranet" is our restricted global computer-based communications network.

"7-Eleven Payroll System" means our system for recording, preparing and distributing payroll to you and/or your employees.

"7-Eleven Store Information System" means the proprietary electronic store operations system that provides for scanning, ordering and completing other 7-Eleven Store operations related tasks. The 7-Eleven Store Information System includes POS scanners, computers and any other hardware we use and all software associated with it, including any replacement or modified computer or other electronic system used in connection with 7-Eleven Store operations.

"7-Eleven System" means the system for the fixturization, equipping (including the development and use of computer information systems hardware and software), layout, merchandising, promotion (sometimes through products or services consisting of, including or identified by trademarks, service marks, trade names, trade dress symbols, other trade indicia, copyrightable works, including advertising owned or licensed by us), and operation of extended-hour retail stores operated by us or our franchisees in the U.S. and elsewhere and identified by the Service Mark and the Related Trademarks. The 7-Eleven System provides beverages, non-food merchandise, specialty items, various services, take-out foods, dairy products and groceries, and emphasizes convenience to the customer. We have developed the 7-Eleven System and are continually refining, modifying and updating the System based on experience and new developments to meet and serve the preferences of the customer. The distinguishing characteristics of the 7-Eleven System include use of the Service Mark and Related Trademarks, distinctive exterior and interior design, decor, color scheme, and furnishings; standards, specifications, policies and procedures for operations; quality and uniformity of products and services offered; procedures for inventory, management and financial control; training and assistance; and advertising and promotional programs, all of which may be changed, deleted, improved, and further developed by us from time to time.

Form 4400019 2/04 Uniform
Page 8 of 10 – Exhibit E

"SKU" means stockkeeping unit, the common understanding for individual items of merchandise, each with a unique Universal Product Code.

"Special Items" means the containers, ingredients, condiments, and other items used or furnished in connection with the preparation or sale of a specific product and so designated by us. We reserve the right to determine which Special Items will be included in the monthly Inventory. All Special Items will be inventoried and accounted for upon termination or expiration of this Agreement.

"Store" means the 7-Eleven convenience store described on Exhibit A.

"System Transaction Amounts" means amounts that vendors or others pay us or third parties for the use of the 7-Eleven Store Information System or data collected by the 7-Eleven Store Information System or any replacement or modified computer information system used in connection with Store operations. Where the third party is a Recommended Vendor, we will obtain System Transaction Amounts only if such vendor represents to us in writing that (a) the vendor will not increase the cost of services and products to 7-Eleven Stores to recoup the System Transaction Amounts paid, and (b) the vendor would not apply the System Transaction Amounts to lower the cost of goods for services and products sold to 7-Eleven Stores.

"Term" means the initial term of this Agreement as set forth in Paragraph 9.

"Trade Secrets" means the On-Line Systems Support Guide; the 7-Eleven System; all manuals, directives, forms, information and materials included in the 7-Eleven System in any form, whether electronic or otherwise. The Trade Secrets are restricted proprietary information and are our sole property. The Trade Secrets are exclusively for our benefit and the benefit of our franchisees.

"Transferring Franchisee" means a franchisee who is executing a franchise agreement as a result of choosing a Transfer (as defined in Paragraph 25 of this Agreement) under the provisions of a 7-Eleven Store Franchise Agreement or an amendment to a 7-Eleven Store Franchise Agreement.

"24-Hour Operation" means your operation of the Store 24 hours a day, 7 days a week (except, at your option, Christmas day).

"Weekly Draw" means the amount that we agree to remit to you once every week indicated in subsection (h) in Exhibit D.

"Wholesale Vendor" means a Bona Fide Supplier who regularly supplies merchandise or provides services to convenience or similar stores.

"Withdrawal Notice" means the notice that we agree to provide you pursuant to Paragraph 26(d) if we determine to cease operation of all 7-Eleven Stores in the geographic market area in which your Store is located.

7-ELEVEN-00298

**7-ELEVEN, INC.**

By _Tom Lesser_

Name _Tom Lesser_

Title _Market Manager_

Date _3/14/04_

**FRANCHISEE**

By _____

Name _Michael Tucker_

Date _3-13-04_

By _Jami Tucker_

Name _Jami Tucker_

Date _3-13-04_

Form 4400019  2/04  Uniform
Page 10 of 10 – Exhibit E

7-ELEVEN-00299

MARKET/STORE #2131 - 22818 B

# EXHIBIT F

# SURVIVORSHIP

7-ELEVEN STORE NO.  2131 - 22818 B

Notwithstanding anything in the Franchise Agreement or the Exhibits to the Franchise Agreement to the contrary:

1.   As used in this Survivorship Agreement, "Death of the Franchisee" means the death of the individual Franchisee, if there is only one Franchisee or, if there is more than one Franchisee under the Franchise Agreement, the "simultaneous death of all the Franchisees" as defined below. If a Death of the Franchisee occurs, we agree to operate the Store for the benefit of the Franchisee's estate from the period beginning on the Death of the Franchisee and ending on the earliest of the following events:

(a) The sale of the franchise by the estate and mutual termination of the Franchise Agreement in accordance with the terms of this Survivorship Agreement and the Franchise Agreement;

(b) The Effective Date of a new 7-Eleven Store Franchise Agreement with a designated individual as provided in this Survivorship Agreement; or,

(c) The expiration of 30 days, or any longer notice period provided in the Franchise Agreement. If any of these events occur, the Franchise Agreement will terminate as provided in this Survivorship Agreement. "Simultaneous death of all the Franchisees" means the death, within a 72 consecutive hour period (whether or not the deaths arise from the same casualty or occurrence) of all the individuals who executed the Franchise Agreement and/or were subsequently added as "Franchisee(s)" in a writing signed by the parties.

The "Notice Period" is the period beginning with the Death of the Franchisee and ending upon the occurrence of one of the above referenced events. If a Death of the Franchisee occurs, then for any Accounting Period during the Notice Period, we will not charge the Open Account for Inventory Variation, payroll or payroll taxes (including your draw amount) an amount more than the average experience of the Store for the category in question for the three calendar months before the Death of the Franchisee (or any shorter period the Franchise Agreement was in effect). We agree to indemnify the Franchisee's estate from any claims which arise during this period and pay any balance due you from us to the Franchisee's estate in accordance with the Franchise Agreement.

2.   You may designate in writing and notify us of (pursuant to the notice provision in the Franchise Agreement) up to three individuals, listed alternatively and in order of preference, whom you believe qualified to franchise the Store after the Death of the Franchisee and each of whom individually would like the opportunity to do so. You acknowledge and agree that we will offer the opportunity to franchise the Store to one individual (and his or her spouse) only, and that we will make this offer to one individual at a time, in accordance with the order in which you designated the individuals on the notice you provided to us. To be effective, the notice of designation must be either personally delivered or postmarked not later than one day before the date of the Death of the Franchisee. You may change the designation in writing to us, effective upon receipt, up to the day before the date of the Death of the Franchisee.

If you have designated individuals in this way, then, after the Death of the Franchisee, we agree to promptly attempt to locate and arrange an interview with the designated individual and we will advise the estate whether or not that designated individual has been located and is qualified in accordance with our then-

7-ELEVEN-00300

current qualification procedures. If more than one individual is designated and the first designated individual cannot be reasonably located, is not qualified under our then-current qualification procedures or is not interested in obtaining a franchise for the Store, we agree to attempt to locate and determine the qualifications and interest of the second designated individual, and likewise for the third individual, if necessary, and we will advise the estate accordingly.

If, before the Notice Period expires, one of the designated individuals qualifies and wishes to franchise the Store; the estate agrees with us to mutually terminate the Franchise Agreement; the estate waives (in a form satisfactory to us) any claim it may have to sell the franchise; the estate pays or makes arrangements satisfactory to us for payment of any amount due us under the Franchise Agreement; and, if the Franchisee is a corporation, the designated individual acquires ownership or control of all of the authorized, issued and outstanding shares of the Franchisee corporation, then we agree to sign a new 7-Eleven Store Franchise Agreement for the Store in the then-current form with the designated individual. In addition, if the Franchisee is a corporation, after the designated individual has acquired ownership or control of all of the authorized, issued and outstanding shares of the Franchisee corporation and signed a new 7-Eleven Store Franchise Agreement for the Store in the then-current form, we will have the new 7-Eleven Store Franchise Agreement assigned to the former Franchisee corporation or another corporation named by the designated individual, if all our then-current conditions for assignment have been satisfied. We agree not to charge any Franchise Fee. There will be no change in the financial terms from those in the Franchise Agreement until the expiration date of the original Franchise Agreement if it had not terminated earlier. At the expiration date of the original Franchise Agreement, the financial terms in the new 7-Eleven Store Franchise Agreement executed by the designated individual will become effective for the remainder of the term of the then-effective Franchise Agreement.

3. If, before the Notice Period expires, neither of the first two events specified in Paragraph 1 (a) and (b) above occurs; and the estate delivers to us a written request indicating that it desires to arrange a sale of the franchise and has made and will continue to make good faith efforts to find a qualified purchaser and the estate pays or makes arrangements satisfactory to us for the payment of any amount due us under the Franchise Agreement, then we agree to give the estate the opportunity to arrange a sale of the franchise for a total of 120 days from the Death of the Franchisee (including the Notice Period). We agree not to refranchise the Store during that time unless the estate waives in writing any claim it may have to sell the franchise, even though the Franchise Agreement has terminated. However, from the 31st through the 120th day, we will operate the Store for our benefit alone.

4. One of our officers must review and approve any arrangement between us and the estate, including application of the terms of this Survivorship Agreement, before the arrangement can be implemented.

5. As consideration of our allowing you to designate a successor to your interest, and as a condition before we agree to be bound by the terms of this Survivorship Agreement, you agree with us:

   (a) That notwithstanding any probate or estate administration proceedings involving you or your state, or disputes by, among or between your designees, heirs, legatees, beneficiaries, successors in interest or the like, the time limits established by the terms of this Survivorship Agreement will control and govern our obligations and the rights of any party arising from the terms of this Survivorship Agreement, and

   (b) That if a dispute arises concerning the disposition of the franchise pursuant to this Survivorship Agreement and/or the Franchise Agreement, and the dispute involves us or our rights or obligations, then any expenses we reasonably incur in that dispute, including attorneys' fees and court costs, will either be borne by the Open Account or your estate, or both (at our option).

7-ELEVEN-00301

MARKET/STORE #2131 - 22818 B

6.  You agree that, if the Franchisee operates more than one (1) 7-Eleven Store, the survivorship rights contained in this Survivorship Agreement will apply to only one (1) of Franchisee's 7-Eleven Stores, notwithstanding the fact that an agreement the same as or similar to this Survivorship Agreement may have been signed in connection with the execution of 7-Eleven Store Franchise Agreements for each of Franchisee's 7-Eleven Stores.

Except for terms defined in this Survivorship Agreement, the terms used in this Survivorship Agreement will have the meanings defined in the Franchise Agreement.

**7-ELEVEN, INC.**

By _____

Name ___ Tom Lesser _____

Title ___ Market Manager _____

Date ___ 3/14/04 _____

**FRANCHISEE**

By _____

Name ___ Michael Tucker _____

Date ___ 3-13-04 _____

By _____

Name ___ Jami Tucker _____

Date ___ 3-13-04 _____

Form 4400019  1/04  Uniform
Page 3 of 3 - Exhibit F

7-ELEVEN-00302

MARKET/STORE #2131 - 22818 B

# EXHIBIT G

# REQUIRED PROPRIETARY PRODUCTS

Following is a list of the Proprietary Products that you are required to carry in the Store at all times. We may delete any of these items or add any new items at any time upon reasonable notice.

| Product | Description and Presentation |
| --- | --- |
| SLURPEE®: Frozen Carbonated Beverage | Frozen carbonated beverage, prepared with a variety of high-quality syrups, properly mixed, and served in standardized, trademarked cups. |
| SLURPEE®: candy, gum, frozen treats other products | Candy, gum, frozen treats and other products prepared using 7-Eleven approved specifications and packaged using SLURPEE® Marks |
| GULP®, BIG GULP®, SUPER BIG GULP®, XTREME GULP®, DOUBLE GULP®: beverages | Fountain soft drink beverages, prepared with a variety of high-quality syrups, properly mixed, and served in standardized, trademarked cups and mugs of various sizes. |
| 7-ELEVEN®: coffee | Fresh brewed coffee, prepared with the 7-Eleven regionally approved coffee blend, and served in standardized, trademarked coffee cups of various sizes. |
| BIG BITE®¼ POUND BIG BITE ®BIGGEST BIG BITE® | High quality, all-beef hot dog, prepared using spice mix approved by us, offered in both 8:1 lb. and 1/4 lb. sizes, and served in standardized, trademarked hot dog containers. |
| 7-ELEVEN GO-GO TAQUITOS™ snack product | High quality line of Mexican snacking products, with proprietary fillings wrapped inside a tortilla, served from the grill in a standardized, trademarked bag. |
| 7-ELEVEN SPEAK OUT® CONNECTIONS FROM 7-ELEVEN® 7-ELEVEN VALUE+™ 7-ELEVEN CONVENIENCE CARD™ Prepaid Cards and Stored Value Cards | Prepaid long distance, wireless and local telephone products and stored value products with trademarked 7-ELEVEN® identification and packaging that is designated as part of the 7-Eleven Prepaid Card or Stored Value Card Programs. |
| QUALITY CLASSIC SELECTION®: Water/Beverages | High quality, proprietary trademarked bottled spring water, sparkling water, soft drinks in various sizes. |
| BIG EATS DELI™: food products | High quality, proprietary recipe, BIG EATS DELI branded products, and other commissary produced products, displayed in standardized and trademarked packaging. |
| BIG EATS BAKERY™ products | High quality, proprietary and other fresh baked goods delivered through the CDC. |
| 7-ELEVEN® Nachos: chips | High quality nacho chips served in standardized, trademarked Nacho trays. |

Form 4400019 1/04 Uniform
Page 1 of 2 - Exhibit G

7-ELEVEN-00303

**7-ELEVEN, INC.**

By _Tom Lesser_

Name _Tom Lesser_

Title _Market Manager_

Date _3/14/04_

**FRANCHISEE**

By _____     By _Jami Tucker_

Name _Michael Tucker_     Name _Jami Tucker_

Date _3-13-04_     Date _3-13-04_

Form 4400019 1/04 Uniform
Page 2 of 2 – Exhibit G

7-ELEVEN-00304

MARKET/STORE #2131 - 22818 B

# EXHIBIT I

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "**Security Agreement**"), dated _3 / 14_, 20_08_, is executed by the undersigned debtor Franchisee(s) jointly and severally if more than one ( such debtor(s) are referred to individually or collectively as "**you**" or "**your**"), to and for the benefit of 7-Eleven, Inc. ("**we**", "**us**" or "**our**").

### RECITALS

A.    Pursuant to a Store Franchise Agreement, dated _____, 20____ (the "**Franchise Agreement**"), between you and us, we have, among other things, agreed to make loans and other financial accommodations to you upon the terms and subject to the conditions set forth in the Franchise Agreement.

B.    Our obligation to make such loans and other financial accommodations to you under the Franchise Agreement is subject, among other conditions, to receipt by us of this Security Agreement, duly executed by you.

### AGREEMENT

NOW, THEREFORE, in consideration of the above recitals and for other good and valuable consideration, the receipt and adequacy of which are acknowledged, you agree as follows:

1.    **Definitions and Interpretation.**  When used in this Security Agreement and the Attachments to this Security Agreement, (a) the terms Equipment, Fixtures, Goods, Inventory, and Proceeds, have the respective meanings assigned to them in the UCC (as defined below); (b) capitalized terms which are not otherwise defined in this Security Agreement have the respective meanings assigned to them in the Franchise Agreement; and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

"**Collateral**" means, with respect to you, all of your property and rights in which a security interest is granted under this Security Agreement.

"**Event of Default**" means (i) a Material Breach; (ii) your failure to perform or observe any term, promise, condition or obligation contained in this Security Agreement; or (iii) your breach of any representation or warranty made by you to us in or in connection with the Store, the Franchise Agreement or this Security Agreement.

"**Obligations**" means and includes all loans, advances, debts, liabilities and obligations, howsoever arising, owed by you to us of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or arising, in the future pursuant to the terms of the Franchise Agreement or any other agreement by or among you and us, and/or modification, renewal, or extensions of any of the foregoing, including all interest, fees, charges, expenses, attorneys' fees and accountants' fees chargeable to and payable by you under this Security Agreement or under the Franchise Agreement or any other

7-ELEVEN-00305

agreement by or among you and us, and including the Open Account Balance and any outstanding Excess Investment Draw, Monthly Draw or 7-Eleven Charge, or rentals due under any Lease.

"**Store**" means 7-Eleven Store No. __2131 - 22818 B__ located at _____ 580 S 1St St, Brawley, CA 922272317

"**UCC**" means the Uniform Commercial Code as in effect in the State of __CA on the date of this Security Agreement, as may be amended or modified from time.

2.    **Grant of Security Interest**. As security for the Obligations, you pledge and assign to us and grant to us a continuing security interest in and lien on, all of the present and hereafter acquired Goods (including Equipment, Fixtures and Inventory) held or maintained at the Store or otherwise used in the ownership or operation of the Store and all Proceeds thereof, and all present and hereafter acquired rights, title and interest relating to the Store, including, but not limited to, all premium and going concern value, if any, of the Store, and your right, if any, to effect a premium sale, and all proceeds thereof, whether now owned, or acquired in the future or arising, and wherever located, including those types of property described on Attachment 1 to this Security Agreement.

3.    **Representations and Warranties**. You represent and warrant to us that:

(a)    We have (or in the case of afteracquired Collateral, at the time you acquire rights in the Collateral, will have) a first priority perfected security interest in the Collateral.

(b)    Your chief executive office and principal place of business are as set forth on Attachment 2 to this Security Agreement, and each other location where you maintain a place of business is also set forth on Attachment 2 to this Security Agreement.

[USE FOR ENTITY FRANCHISEE: (c) You are a _____, duly organized, validly existing and in good standing under the laws of the state set forth on Attachment 2 to this Security Agreement, and are a "registered organization" (as such term is defined in the UCC) in such state.]

*California* [USE FOR INDIVIDUAL FRANCHISEE: (c)    You are an individual located in _____.]

(d)    You are duly qualified, licensed to do business and in good standing in all jurisdictions in which such qualification or licensing is required.

(e)    Your exact legal name is as set forth on the signature pages of this Agreement, and during the five years preceding the date of this Security Agreement you have not been known by any different legal name nor have you been the subject of any merger or other corporate reorganization.

4.    **Covenants**. You agree to:

(a)    Perform all acts that may be necessary to maintain, continue, preserve, protect and perfect the Collateral, the security interest granted to us in the Collateral and the first perfected priority of such security interest.

7-ELEVEN-00306

MARKET/STORE #2131 - 22818 B

(b)    Not use or permit any Collateral to be used in violation of any provision of the Franchise Agreement or this Security Agreement.

(c)    Pay promptly when due all taxes and other governmental charges, all liens and all other charges now or imposed in the future upon or affecting any Collateral.

(d)    Without 30 days' prior written notice to us, not (i) change your name or place of business (or, if you have more than one place of business, your chief executive office), (ii) keep Collateral consisting of Equipment at any location other than the Store; or (iii) adopt a plan of conversion or reorganize under the laws of a state other than your state of organization as set forth on Attachment 2 to this Security Agreement.

(e)    If we give value to enable you to acquire rights in or the use of any Collateral, use such value for such purpose.

(f)    Take other action we reasonably request to insure the attachment, perfection and first priority of, and our ability to enforce, the security interests in all of the Collateral.

(g)    Keep separate, accurate and complete records of the Collateral and must provide us with such records and such other reports and information relating to the Collateral as we may reasonably request from time to time.

(h)    Not sell, encumber, lease, rent, or otherwise dispose of or transfer any Collateral or right or interest in such Collateral except as expressly permitted in the Franchise Agreement and you agree to keep the Collateral free of all liens.

(i)    Comply with all material legal requirements applicable to you which relate to the production, possession, operation, maintenance and control of the Collateral and operation of the Store (including the Fair Labor Standards Act).

5.    **Authorized Action by Agent**. You irrevocably appoint us as your attorney in fact and agree that we may, on or after an Event of Default, perform (but we will not be obligated to and will incur no liability to you or any third party for failure to so perform) any act which you are obligated by this Security Agreement to perform, and to exercise such rights and powers as you might exercise with respect to the Collateral. You acknowledge and agree that this Security Agreement is an "authenticated record" for purposes of UCC Articles 9.509(a) and (b), and you authorize the filing by us of UCC financing statements naming you as the "debtor(s)" in such financing statements.

6.    **Default and Remedies**. In addition to all other rights and remedies granted us by this Security Agreement, the Franchise Agreement, the UCC and other applicable law, we may, upon the occurrence and during the continuance of an Event of Default, exercise any one or more of the following rights and remedies: (a) foreclose or otherwise enforce our security interests in any or all Collateral in any manner permitted by applicable law, the Franchise Agreement or this Security Agreement; (b) sell or otherwise dispose of any or all Collateral at one or more public or private sales, whether or not such Collateral is present at the place of sale, for cash or credit or future delivery, on such terms and in such manner as we may determine; (c) require you to assemble the Collateral and make it available to us at a place to be designated by us; (d) enter onto any property where any Collateral is located and take possession of such Collateral with or without judicial process; and (e) prior to the disposition of the Collateral, store,

7-ELEVEN-00307

process, repair or recondition any Collateral consisting of Goods, or otherwise prepare and preserve Collateral for disposition in any manner and to the extent we deem appropriate. You agree that 10 days' notice of any intended sale or disposition of any Collateral is reasonable. We will have no duty as to collection or protection of the Collateral or any income on such Collateral, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining to prior parties beyond, in the case of any Collateral in our possession, the same safe custody of such Collateral to the extent afforded to our property. All of our rights and remedies whether or not granted under this Security Agreement will be cumulative and may be exercised singularly or concurrently.

## 7.    Miscellaneous.

(a)    **Notices.** All notices, requests, demands, consents, instructions or other communications to or upon you or us under this Security Agreement must be in writing and must be delivered in accordance with the terms and provisions of Paragraph 31(e) of the Franchise Agreement.

(b)    **Waivers; Amendments.** Any term, promise, agreement or condition of this Security Agreement may be amended or waived if such amendment or waiver is in writing and is signed by you and us. No failure or delay by us in exercising any right under this Security Agreement will operate as a waiver of such right or of any other right nor will any single or partial exercise of any such right preclude any other further exercise of such right or of any other right. Unless otherwise specified in any such waiver or consent, a waiver or consent given under this Security Agreement will be effective only in the specific instance and for the specific purpose for which given.

(c)    **Successors and Assignments.** This Security Agreement will be binding upon and inure to our benefit and your benefit and to the benefit of our respective successors and assigns, including all persons and entities that become bound by this Security Agreement; provided, however, that you may sell, assign and delegate your respective rights and obligations under this Security Agreement only as permitted by the Franchise Agreement. We may disclose this Security Agreement, the Franchise Agreement and any financial or other information relating to you to any assignee or potential assignee.

(d)    **JURY TRIAL.** YOU AND WE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY AS TO ANY ISSUE RELATING TO THIS SECURITY AGREEMENT IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT.

(e)    **Cumulative Rights, Etc.** Our rights, powers and remedies under this Security Agreement will be in addition to all rights, powers and remedies given to us by applicable law, the Franchise Agreement or any other agreement, all of which rights, powers, and remedies will be cumulative and may be exercised successively or concurrently without impairing our rights under this Security Agreement. You waive any right to require us to proceed against any person or to exhaust any Collateral or to pursue any remedy in our power.

(f)    **Governing Law, Construction.** This Security Agreement will be governed by and construed according to the laws of the state in which you are located from time to time in effect except to the extent preempted by United States federal law. It is expressly stipulated and agreed to be your intent and our intent at all times to comply with applicable law governing the highest lawful rate or amount of interest payable on the Obligations. If the applicable law is ever judicially interpreted so as to render usurious any amount called for under the Franchise Agreement, or contracted for, charged, taken,

MARKET/STORE #2131 - 22818 B

reserved or received with respect to the Obligations, or if our exercise of our remedies under this Security Agreement or the Franchise Agreement or if any payment by you results in you having paid any interest in excess of that permitted by applicable law, then it is your and our express intent that all excess amounts previously collected by us be credited on the principal balance of the Obligations (or, if the Obligations have been or would be paid in full, refunded to you), and the provisions of the Franchise Agreement immediately be deemed reformed and the amounts collectible thereafter under this Security Agreement and under the Franchise Agreement reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for under this Security Agreement or under the Franchise Agreement. All sums paid or agreed to be paid to us for the use, forbearance or detention of the Obligations will, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the Obligations until payment in full so that the rate or amount of interest on account of the Obligations does not exceed the usury ceiling from time to time in effect and applicable to the Obligations for so long as the Obligations are outstanding.

(g) **Conflicting Provisions.** To the extent there exists any conflict or inconsistency between the terms of this Security Agreement and the terms of the Franchise Agreement, the terms of the Franchise Agreement will govern.

(h) **Counterparts.** This Security Agreement may be executed in any number of identical counterparts, any set of which signed by all the parties to this Security Agreement will be deemed to constitute a complete, executed original for all purposes.

IN WITNESS WHEREOF, you have caused this Security Agreement to be executed as of the day and year first above written.

**7-ELEVEN, INC.**

By _Tom Lesser_

Name _Tom Lesser_

Title _Market Manager_

Date _3/14/04_

**FRANCHISEE**

By _[signature]_        By _Jami Tucker_

Name _Michael Tucker_        Name _Jami Tucker_

Date _3 - 13 - 04_        Date _3-13-04_

## ATTACHMENT 1
## TO SECURITY AGREEMENT

All Goods (including Equipment, Fixtures and Inventory) held or maintained on the Store or otherwise used in the ownership or operation of the Store, including money order blanks, bank drafts and store supplies, and all embedded software, accessions, additions, attachments, improvements, substitutions and replacements to such Goods and for such Goods;

All premium or going concern value of the franchise interest in the Store;

All licenses and permits used in connection with the operation of the Store; and

All proceeds of the foregoing (including whatever is receivable or received when Collateral or proceeds are sold, collected, exchanged, returned, substituted or otherwise disposed of, whether such disposition is voluntary or involuntary, including rights to payment and return premiums and insurance proceeds under insurance with respect to any Collateral, and all rights to payment with respect to any cause of action affecting or relating to the Collateral).

7-ELEVEN-00310

MARKET/STORE #2131 - 22818 B

## ATTACHMENT 2
## TO SECURITY AGREEMENT

[Complete for each Franchisee]

Exact Legal Name:

State or Organization:

Type of Organization:

Place of Business (or, if more than one, the Chief Executive Office):

7-ELEVEN-00311

MARKET/STORE #2131 - 22818 B

# EXHIBIT J

### Procedures for Selection of Third Party Reviewer and
### for Reviewing Vendor Negotiating Practices

**A.    Qualifications and Selection of Franchisee Selection Committee Members:**

1.    <u>Qualifications</u>. The "Franchisee Selection Committee" will be made up of five franchisees who, at the time of their selection and at all times during the Committee's deliberations, (i) are current 7-Eleven franchisees; (ii) are not in breach of their 7-Eleven franchise agreement; (iii) are local Franchise Owners Association Presidents, but not officers of any national 7-Eleven franchisee association or coalition of associations; (iv) agree to serve voluntarily; and (v) agree to be bound by this Exhibit J, including the dispute resolution procedures set forth in Section C. The Franchisee Selection Committee will select the Third Party Reviewer as provided in Section B. below and will be a party to any dispute resolution proceedings contemplated by Section D. below.

2.    <u>Selection</u>. The initial members of the Franchisee Selection Committee meeting the requirements set forth above will be selected by the Allowance Review Committee ("ARC") established pursuant to the settlement of the following matters: *7-Eleven Owners for Fair Franchising, et al v. The Southland Corporation, et al,* Superior Court of Alameda County, California (ASC No. 722272-6 OH) or *Clyde Valente, et al v. The Southland Corporation, et al,* District Court for Dallas County, Texas (14th Judicial District) (Docket No. 96-11972-A). In the event the ARC has not selected all the members of the Franchisee Selection Committee by July 1, 2004, we will select the initial members of the Franchisee Selection Committee.

3.    <u>Replacement</u>. Any Franchisee Selection Committee member who (i) resigns or (ii) no longer meets the qualifications set forth in Section A.1(i)-(iv) above, will, as of the date of such occurrence, no longer be a member of the Franchisee Selection Committee. We will advise the Franchisee Selection Committee of the occurrence of Section A.3.(i) or (ii) above, within a reasonable time after we learn of it. The remaining members of the Franchisee Selection Committee, will promptly select a replacement member, provided that we may select a replacement member if the remaining members of the Franchisee Selection Committee have not acted within 45 days after one or more members becoming ineligible to act as a member of the Franchisee Selection Committee.

4.    <u>Costs</u>. Except for the $75,000 per calendar year (adjusted based upon the consumer price index, for each year after 2004) that we will provide pursuant to Paragraph 15(k) for the costs associated with the selection of the Third Party Reviewer and for such Third Party Reviewer to conduct the review contemplated by Paragraph 15(k) and this Exhibit J and related costs, the Franchisee Selection Committee shall bear all costs and expenses incurred by it relating to the review and any other actions contemplated by Paragraph 15(k) and this Exhibit J.

**B.    Qualifications and Selection of Third Party Reviewer:**

The selection of the Third Party Reviewer described in Paragraph 15(k) of the Franchise Agreement will be made by the Franchisee Selection Committee, as set out in Section A.1. above, within 90 days after the first day of each calendar year during the term of the Franchise Agreement, beginning on January 1, 2005. The Third Party Reviewer (i) should be an individual or entity that has experience in reviewing and identifying discounts and allowances provided by manufacturers and other vendors to retail companies; (ii) will not be disqualified solely based on the fact that such individual or entity has been engaged by us to review discounts and allowances obtained by or available to us outside of the context of the review contemplated by this Exhibit J; (iii) may (but need not) continue to be selected in subsequent years; and (iv) must agree to be bound by this Exhibit J, including the dispute resolution procedures set forth in Section D. The Franchisee Selection Committee shall notify us in writing promptly upon the selection of a Third Party Reviewer, and the notice shall include a statement explaining how the Third Party Reviewer satisfies each of the qualifications set forth above.

**C.     Procedures for and Scope of Review of Vendor Negotiating Practices and Treatment of Discounts and Allowances:**

1.     Vendor Agreements.  Beginning effective January 1, 2005, within 60 days after the beginning of each calendar year during the Term of the Franchise Agreement, we will provide to the Franchisee Selection Committee a list of all Vendor agreements (including maintenance vendors recommended by us) entered into during the immediately preceding calendar year.  Promptly following the selection of the Third Party Reviewer, the Franchisee Selection Committee shall identify to us in writing any such Vendor agreements which it wishes the Third Party Reviewer to review.  The Third Party Reviewer may continue to review any Vendor agreements that continue from year to year for the years they are operative, as outlined above.  The Third Party Reviewer will be entitled to obtain the total amount paid to us by any Vendor whose agreement it is reviewing including verifying with the Vendor the total amount paid, if it desires.

2.     Confidentiality.  Before reviewing any Vendor agreement under which we are required to maintain the confidentiality of the terms of such agreement, the Third Party Reviewer and each member of the Franchisee Selection Committee must sign a confidentiality agreement in the form that we require.  The Third Party Reviewer will then be given access to the subject Vendor agreement and, if requested, to our personnel who were directly involved in the negotiation of the agreement which is the subject of the review.  The review of all Vendor agreements identified by the Franchisee Selection Committee must be completed within 145 days after the date on which the Third Party Reviewer is selected each year.

3.     Scope of Review.  In conducting its review of the Vendor agreements identified as set forth above, the sole question before the Third Party Reviewer shall be whether we satisfied our obligations under Paragraph 15(j)(1) and (2) of the Franchise Agreement.  In order to determine whether we met our obligations under Paragraph 15(j)(1), the Third Party Reviewer and, if applicable, the Arbitrator under Section D, (i) shall be directed to consider the limitations, restrictions and conditions placed on the discount, allowance or other opportunity for price adjustment by the Vendor and (ii) shall take into consideration whether the nature and requirements of a particular Vendor's offer of a lower cost of products and services is consistent with our business concept and strategies.  The Third Party Reviewer may also review and report the actions we took to meet the requirements for dealing with Vendors listed in the definition of System Transaction Amounts in Exhibit E.

**D.     Dispute Resolution Procedures:**

1.     **LIMITATIONS PERIOD.  ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO OUR OBLIGATIONS UNDER PARAGRAPHS 15(j) AND (k) OR THE REVIEW CONDUCTED UNDER THIS EXHIBIT J WILL BE BARRED UNLESS AN ACTION IS COMMENCED UNDER THESE DISPUTE RESOLUTION PROCEDURES WITHIN THE CALENDAR YEAR IMMEDIATELY FOLLOWING THE CALENDAR YEAR IN WHICH THE THIRD PARTY REVIEWER CONDUCTED THE REVIEW AT ISSUE.**

2.     Negotiation.  In the event the Third Party Reviewer reasonably believes that we did not meet our obligations under Paragraph 15(j) (1) or (2) of the Franchise Agreement, then the Third Party Reviewer shall so advise our legal department and the head of our merchandising department and the Franchisee Selection Committee.  The Franchisee Selection Committee and the head of our merchandising department (or his or her designee) shall endeavor in good faith to resolve any such disputes within 30 days following the date on which it is referred to them.  If, after such 30 day period, the Franchisee Selection Committee reasonably believes that we have failed to meet our obligations under Paragraph 15(j) (1) or (2) of the Franchise Agreement and have not taken or agreed to take action to remedy such failure, then the Franchisee Selection Committee may bring a claim against us under the procedures set out in Section D.3. below.  You agree that this procedure shall be your sole remedy for any breach or alleged breach of Paragraphs 15(j) and (k).

7-ELEVEN-00313

MARKET/STORE #2131 - 22818 B

3.   Non-Binding Mediation.  Any claim arising under Paragraph 15(j) (1) or (2), Paragraph 15 (k) and/or Exhibit J to the Franchise Agreement not resolved under Section D.2. of this Exhibit J shall be submitted to non-binding mediation in accordance with the procedures set forth in Paragraph 29 of the Franchise Agreement, except that the mediator's fees and expenses and the fees charged by the American Arbitration Association (or any other organization used for the mediation), will be shared by the Franchisee Selection Committee and us, with one-half of those expenses and fees being paid by us and one-half of those expenses and fees being paid by the Franchisee Selection Committee.  We and the Franchisee Selection Committee will be responsible for our respective expenses incurred in connection with the mediation.  You and we agree that good faith participation in this mediation procedure is obligatory.  If the dispute cannot be finally resolved through mediation within 30 days after the mediation demand is made, the dispute shall be submitted for binding arbitration by the Franchisee Selection Committee, or by us, upon demand of either party, to the American Arbitration Association in accordance with Section D.4. of this Exhibit J.

4.   Arbitration.

a.   The arbitration proceedings will be conducted by one arbitrator ("Arbitrator"), and, except as this subsection otherwise provides, according to the then-current commercial arbitration rules of the American Arbitration Association.  Unless otherwise agreed by the Franchisee Selection Committee and us, the Arbitrator will be an individual who has experience in the availability and use of product and service discounts and allowances provided by vendors in the retail industry.  All proceedings will be conducted at a suitable location chosen by the Arbitrator in the city where our principal business address is then located.  All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.).  Judgment upon the Arbitrator's award may be entered in any court of competent jurisdiction.

b.   Within a reasonable time after the issuance of a final arbitrator's award that is not subject to appeal or final judgment of a court of competent jurisdiction enforcing an arbitrator's award and awarding an amount to be paid to franchisees under this procedure, we will pay that award by crediting to your Open Account an amount equal to your allocable share of the award based on your purchases of the Vendor's products or services.  If purchase data is unavailable, we will estimate payments based upon the best available data.  For franchisees that have left the system, we will mail the payments to their last known address.  We will pay out the entire award to franchisees, and you agree that our determination regarding payment will be final and that you have no right to, and waive, any contest with respect to the determination of the amounts to be paid.

c.   Limitation on Damages.

(i)   You and we agree that the Arbitrator will be instructed by the parties to the arbitration that:

· with respect to a finding that we failed to meet our obligations under Paragraph 15(j)(1) or under the definition of System Transaction Amounts in Exhibit E, no damages, including money damages, specific performance, injunctive relief, or attorneys' fees and costs, may be awarded;
· with respect to a finding that we failed to satisfy our obligations under Paragraph 15 (j) (2), the damages that can be awarded to you are limited to an amount equal to the amount of the discount or allowance attributable to your purchases of the goods or services on which the allowance was given multiplied by the percentage equal to the difference between 100% and the percentage used to calculate the 7-Eleven Charge for the year in question.

(ii)   In addition and notwithstanding anything to the contrary herein, the Arbitrator may not award any punitive or exemplary damages against either party under any circumstances.  We and you agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or the Franchise Agreement (including this Exhibit J), whichever expires earlier.

7-ELEVEN-00314

d.    Arbitration Costs. The Arbitrator's fees and expenses and the fees charged by American Arbitration Association (or any other organization used for the arbitration) will be shared by the Franchisee Selection Committee and us, with one-half of those expenses and fees being paid by us and one-half of those expenses and fees being paid by the Franchisee Selection Committee. We and the Franchisee Selection Committee will be responsible for our respective expenses incurred in connection with the arbitration.

e.    Acknowledgements Regarding Arbitration. The parties acknowledge that any dispute arising out of or related to a violation or alleged violation of Paragraph 15(j) or arising out of or related to Paragraph 15(k) or Exhibit J is solely between you and us, that no Vendor will be a necessary party to any such dispute, and that you will have no remedy against any Vendor for a violation of Paragraph 15(j). The parties further acknowledge that the provisions of Section D.4 will continue in full force and effect subsequent to and notwithstanding the Franchise Agreement's expiration or termination.

**7-ELEVEN, INC.**

By _Tom Lesser_

Name _Tom Lesser_

Title _Market Manager_

Date _3/14/04_

**FRANCHISEE**

By _(signature)_                    By _Jami Tucker_

Name _Michael Tucker_             Name _Jami Tucker_

Date _3-13-04_                      Date _3-13-04_

7-ELEVEN-00315

MARKET/STORE #2131 - 22818 B

# AUTOMATED TELLER MACHINE AMENDMENT

THIS AUTOMATED TELLER MACHINE AMENDMENT (the "Amendment") is signed by the undersigned franchisee ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in the last paragraph of this Amendment.

BACKGROUND INFORMATION:

You and we signed a 7-Eleven Store Franchise Agreement (the "Agreement") covering 7-Eleven Store No. 2131 - 22818 B                    (the "Store"); and

We have arranged with an ATM service provider (the "ATM Operator"), through a formal agreement (the "ATM Agreement"), to install, maintain, and operate a network of automated teller machines ("ATM"), and other equipment, fixtures, furnishings and signage affixed to the ATMs or provided pursuant to the ATM Agreement (together, the "ATM Facility"), owned or leased by ATM Operator, in our corporate and franchised stores; and

We and ATM Operator, and you, as an independent contractor, desire to have an ATM Facility installed in the Store in order to offer automated teller services to 7-Eleven customers pursuant to, and in accordance with, the terms and conditions of this; and

You and we desire to amend the Agreement to describe the terms and conditions for the installation, maintenance, operation, use, replacement and removal of the ATM Facility.

The parties agree as follows:

(1) CONSENTS. You will cooperate fully with us in our efforts to obtain all consents or waivers from all persons or entities we deem necessary to install, relocate, maintain, operate and replace an ATM Facility in the Store, to remodel the Store to accommodate the ATM Facility, or to remove of the ATM Facility upon the termination of this Amendment. Subject to obtaining such consents, you agree to the installation and, if applicable, the remodeling of the Store to accommodate the ATM Facility, and the relocation of an ATM Facility within the Store at a location we designate (after consultation with you), including any changes in merchandise or equipment layout which may be required as a result of the relocation. You must make available any space in the Store and in the Store's parking area that we determine is necessary to install, relocate, maintain, operate, replace or remove the ATM Facility.

(2) COMPENSATION. We will credit your Open Account at the end of each Accounting Period with the fees that ATM Operator pays us for financial services that are performed by the ATM in the Store. These fees, which constitute Receipts, shall be subject to the 7-Eleven Charge pursuant to the terms of the Agreement. Such fees and the terms pertaining to their adjustments, if any, are set forth on Exhibit I to this ATM Amendment, which is incorporated into this ATM Amendment for all purposes. Except as provided in Exhibit I, you acknowledge and agree that any sum the ATM Operator pays us is intended to reimburse us for expenses we incurred for the installation, maintenance, operation, use, or removal of the ATM Facility will not be part of said fees and will not be defined as Receipts under the Agreement, nor credited to your Open Account.

7-ELEVEN-00316

We and you agree that ATM Operator will not be obligated to make any payment directly to you in connection with the installation, maintenance or operation of the ATM in the Store or its removal.

(3) EQUIPMENT. ATM Operator will retain Aall ownership or leasehold interests and rights to the ATM. ATM Operator may replace the ATM or any component, capability or function of the ATM in order to keep the ATM "state of the art" (as such term is defined in the ATM Agreement). You must not cause to be filed, or grant permission of the filing of, any lien or other encumbrance upon the ATM, and you agree that the ATM is personal property, and is not, and will not become, a fixture. You must comply with our security policies in connection with the ATM, including immediately reporting to us, ATM Operator, and the local police the efforts of any party to injure, vandalize, break into, tamper with, or damage the ATM, and you must fully cooperate in any investigation with respect to such efforts.

(4) MAINTENANCE OF THE ATM. The terms and conditions of the Agreement notwithstanding, you are not responsible for the maintenance, repair, or replacement of the ATM unless caused, directly or indirectly, by your breach of this Amendment or the Agreement or the negligent or intentional acts or omissions of you or your agents or employees. We will provide you with information regarding ATM Operator's network control, service agents or subcontractors responsible for service to the ATM. Any agent or employee of ATM Operator must have access to the Store and the ATM during the hours the Store is open for business to install, maintain, replace, operate, and, upon termination or expiration of this Amendment, remove the ATM from the Store. You must maintain the space surrounding the ATM in a neat and orderly condition and keep such space free of obstructions. You must not use the ATM area for storage or as a sales area. You must promptly notify ATM Operator of any service interruption, malfunction, or other problem with, or damage to, the ATM. We will supply you with the training and information that we deem necessary for such notification.

(5) PROMOTION. Any of our agents or employees or any of ATM Operator's agents or employees must have access to the Store during the hours the Store is open for business to put signage at the Store, advertising the presence of the ATM in the Store. The signage will be put in the Store only with our prior consent. We will provide you with all decals and other promotional materials we deem necessary to promote the ATM in the Store. Such promotional material must be continuously and prominently displayed in the Store in the manner for which it was designed. You must not otherwise utilize or display any name, logo, or trademark used or registered in connection with the ATM or the ATM Operator.

(6) TERM.
(A) This Amendment will be effective from the later of the date of execution of this amendment or the Effective Date of the Franchise Agreement. This Amendment will terminate on the earlier of: (i) the date the ATM Agreement expires or terminates, in whole or in part, as it applies to the Store; (ii) the date that ATM Operator declines to install the ATM Facility as provided in the ATM Agreement; (iii) the date the Agreement expires or terminates; or (iv) the date this Amendment terminates in accordance with its terms. The ATM Agreement is scheduled to expire on December 31, 2009, unless earlier terminated, and may be extended at our sole discretion. We will notify you of the termination or expiration of this Amendment in accordance with the terms of the ATM Agreement. If we make arrangements with a different ATM Operator for the same or other financial services (including but not limited to, a Vcom unit), we will require you to sign a new ATM Amendment, Vcom Amendment or other financial services agreement as a replacement for this Amendment.

7-ELEVEN-00317

MARKET/STORE #2131 - 22818 B

(B) After being installed for 24 calendar months, if the ATM Facility is completing less than 2,000 Transactions a month for at least 3 prior consecutive calendar months, ATM Operator may elect among the following options:

(i)   Retain the ATM Facility at the Store and allow it to continue to operate under the terms and conditions of the ATM Agreement;

(ii)  Upon 1 month's advance written notice, replace the ATM Facility with a less costly alternative ATM-like device, subject to our and your approval; or

(iii) Upon 3 months' advance written notice, terminate the ATM Agreement with respect to the ATM, removal of which will be conducted in accordance with the ATM Agreement.

If ATM Operator elects either (ii) or (iii) above, but the ATM Facility is averaging more than (1,300) Transactions per month over the same period, you may keep the ATM Facility in the Store if you elect to forego the Fixed Component Fee. Notwithstanding any of the foregoing, any month that the ATM Facility fails to meet the "Availability Percentage" (as defined in the ATM Agreement) will not be included in any of the foregoing calculations.

(7) TERMINATION OF AMENDMENT. We may immediately terminate this Amendment upon 3 Business Days notice to you if you fail to comply with any term or condition of this Amendment and you fail to cure or cease such non-compliance within the 3 Business Day Period. Upon the termination or expiration of this Amendment, you must return all promotional, training, and miscellaneous materials provided pursuant to the terms of this Amendment, and we (or our agents ) and ATM Operator (or its agents) will have the right to enter the Store and its surrounding premises for the purpose of removing the ATM from the Store. You must fully cooperate with our representatives or the representatives of ATM Operator regarding such removal. Any expense associated with the removal of the ATM must be borne by us or ATM Operator unless such removal is a result of the termination of this Amendment due to your breach of the ATM Amendment, in which case you will be responsible for all direct expenses related to the removal of the ATM.

(8) TRAINING. We or our agents, in conjunction with ATM Operator, will provide you with the training we deem necessary for instructing 7-Eleven customers to operate the ATM.

(9) INDEMNITY. You must, to the extent consistent with the ATM Agreement and the Agreement, indemnify, defend and hold ATM Operator and its respective officers, directors, shareholders, agents, employees, affiliates and assigns harmless from all losses, claims, damages, liabilities or expenses (including reasonable attorney's fees) of any kind or nature arising from your normal operation of the Store; except such claims, demands or liabilities which arise from or are related to the negligence or other wrongful conduct of third parties, or the wrongful conduct or breach of the ATM Agreement by ATM Operator, its employees, agents and subcontractors. You agree to indemnify us for all claims arising directly or indirectly from your breach of this Amendment, notwithstanding the terms and conditions of the Agreement and Exhibit C to the Agreement to the contrary.

(10) NOTICES. Unless otherwise provided in this ATM Amendment, any notices, when required or permitted under this ATM Amendment, must be delivered as provided for in the Agreement.

7-ELEVEN-00318

(11)  DEFINITIONS. Unless otherwise defined in this Amendment, the terms used in this Amendment will have the meanings set forth in the Agreement.

(12)  COMPLIANCE WITH LAW. You must comply with all federal, state, and local laws, regulations, rules, and ordinances applicable to the operation of the ATM in the Store.

(13)  SEVERABILITY. The parties agree that if any provision of this Amendment is determined to be void by any court or tribunal of competent jurisdiction, then such a determination will not affect any other provision of this Amendment, all of which provisions will remain in effect and, if the provision is capable of 2 constructions, one of which would render it void and the other of which would render it valid, then the provision will have the meaning which renders it valid.

You and we have signed this Amendment effective as of _____ 3/14/04 _____

### 7-ELEVEN, INC.

By _____ Tom Lesser _____

Name _____ Tom Lesser _____

Title _____ Market Manager _____

Date _____ 3/14/04 _____

### FRANCHISEE

By _____ Michael Tucker _____          By _____ Jami Tucker _____

Name _____ Michael Tucker _____         Name _____ Jami Tucker _____

Date _____ 3-13-04 _____               Date _____ 3-13-04 _____

7-ELEVEN-00319

MARKET/STORE #2131 – 22818 B

# EXHIBIT I

## FEES

Beginning with the first month that the ATM Facility is operational, we will credit your Open Account with the following fees, provided such fees are paid to us, on or before the last day of the Accounting Period during which we receive such fees:

**UTILITY FEE:**                    $30.00 per calendar month.

The Store must have at least 500 Transactions per month to be eligible for a Utility Fee.

**FIXED COMPONENT FEE:**          $50.00 per calendar month.

If the Store did not have an ATM prior to March 12, 1993, the Fixed Component Fee will not be paid until the ATM Facility reaches 1,000 Transactions per month. From the sixth to eleventh month following installation, the Fixed Component Fee must not be paid for any month in which there are less than 1,000 Transactions, and after the eleventh month following installation, the Fixed Component Fee must not be paid if there are less than 1,500 Transactions; provided, however, that such Transaction requirements will be reduced pro rata by the percentage of a month that the ATM is inoperable due to repairs, the need for repairs, or other circumstances not including cash replenishment or tape replacement.

**TRANSACTION FEE:** The Store must have at least 500 Transactions per month to be eligible for a Transaction Fee.

If the Store did not have an ATM prior to March 12, 1993, or if the Store does not complete 3,000 Transactions in a month, the following Transaction Fee schedule applies:

| Number of Transactions In a Month | Monthly Fee |
|---|---|
| 0   -   1,000 | $.02 per Transaction |
| 1001  -  2,000 | $20 plus $.03 per Transaction over 1,000 |
| 2001  -  4,000 | $50 plus $.05 per Transaction over 2,000 |
| 4001  -  8,000 | $150 plus $.06 per Transaction over 4,000 |
| 8001  - | $390 plus $.07 per Transaction over 8,000 |

Beginning with the 36th calendar month after installation of an ATM in a Store that did not have an ATM prior to March 12, 1993, or for a Store that did have an ATM prior to March 12, 1993, if the ATM Facility in that Store completes at least 3,000 Transactions in a month, then the following Transaction Fee schedule applies:

| Number of Transactions In a Month | Monthly Fee |
|---|---|
| 0    - 3,000 | $.05 per Transaction |
| 3,001   - 5,000 | $150.00 plus $.06 per Transaction over 3,000 |
| 5,001   - 7,500 | $270.00 plus $.075 per Transaction over 5,000 |
| 7,501   - 10,000 | $457.50 plus $.09 per Transaction over 7,500 |
| 10,001  - 15,000 | $682.50 plus $.10 per Transaction over 10,000 |
| 15,001  - | $1,182.50 plus $.12 per Transaction over 15,000 |

7-ELEVEN-00320

**VARIABLE COMPONENT FEE:** 50% of the excess over $.48 per Transaction (net of any applicable sales taxes due by ATM Operator) received by ATM Operator for surcharges (such charges to be subject to your consent), network fees and other amounts to which ATM Operator is entitled per Transaction at the ATM Facility in the Store. The Store must have at least 500 Transactions per month to be eligible for the Variable Component Fee.

For purposes of this Amendment, "Transaction" will mean (i) cash withdrawal from a checking or savings account; (ii) balance inquiry; (iii) account transfer, (iv) credit and/or debit card cash advance; (v) transaction denials; (vi) deposit capability (at ATM Operator's sole option); and (vii) any additional capability added to the ATM.

In addition, we will credit your Open Account with any payments made by ATM Operator to us representing the Store, based on ATM Operator's failure to timely install or repair the ATM Facility, or based on the ATM's failure to achieve the Availability Percentage, all as more fully set forth in the ATM Agreement. Further, we will credit your Open Account with a pro rata share of any payments made by ATM Operator to us representing liquidated damages reasonably applicable to the ATM Facility in the Store, based on ATM Operator's failure to saturate the market in which the Store operates, all as more fully set forth in the ATM Agreement. Such pro rata share will be determined by us, in our sole discretion.

We may change the amount or the method of calculating any of the fees designated in this Exhibit at any time in our sole discretion. Such changes will be effective 30 days after written notification to you of such changes.

7-ELEVEN-00321

MARKET/STORE #2131 - 22818 B

# MONEY ORDER AMENDMENT

THIS MONEY ORDER AMENDMENT ("Amendment") is signed by the undersigned Franchisee(s) ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in the last paragraph of this Amendment;

BACKGROUND INFORMATION

You and we signed a 7-Eleven Store Franchise Agreement (the "Agreement") covering 7-Eleven Store No.   2131 - 22818 B         (the "Store");

We and Integrated Payment Systems, Inc. ("IPS") signed an agreement that allows us and our franchisees to sell Western Union® money orders ("Money Orders") in 7-Eleven Stores, and to provide certain services and materials related to the sale of Money Orders (the "IPS Agreement");

You, as an independent contractor, want to sell Money Orders to your customers under this Amendment, and any agreement between you and IPS; and

You and we desire to amend the Agreement to allow you to sell Money Orders in your Store.

The parties agree as follows:

(1) You will use your best efforts to promote and sell Money Orders in the Store at all times. You must use the Money Orders only for retail sale to your customers, and you may not use them to pay vendors or for any other purpose unless we agree in writing to such use.

(2) You will report daily the sale of all Money Orders, and deposit daily all proceeds from the sale of Money Orders, in the same manner that you deposit all other receipts under the Agreement. The Money Order proceeds, for purposes of the Agreement only, will be defined as Receipts.

(3) We will deliver blank Money Orders to you as we deem necessary.

(4) We will provide you with all equipment necessary to sell Money Orders and all decals and other point-of-sale promotional materials we deem necessary. You must prominently display the promotional materials in the Store as they were designed to be used. You will not otherwise use or display the name, logo, or trademark of IPS or any other business name, trade name or trademark owned or controlled by IPS, its corporate parents or affiliates.

(5) We will charge your Cost of Goods Sold account 1.3 cents per Money Order sold as consideration for the blank Money Orders and all related services and materials provided by IPS and us. The 1.3 cent charge covers, among other things, the maintenance of all Money Order equipment and a loss reserve ("Loss Reserve") that we provide. We may adjust the 1.3 cent charge at any time to reflect any increase in charge to us by IPS, our actual loss experience for all franchised 7-Eleven Stores for maintaining the Loss Reserve, our projected charges to the Loss Reserve, and any increase in general and administrative expenses related to the Money Order program. Any surplus or deficit in the Loss Reserve at the end of the calendar year will be carried forward into the Loss Reserve for the following year and considered in any

Form 4400228 1/04 Uniform
Page 1 of 3 Money Order

7-ELEVEN-00322

redetermination of the charge per Money Order for that year. We will keep all interest on funds maintained in the Loss Reserve.

(6) Any losses directly resulting from the loss of Money Orders, whether by burglary, robbery, employee malfeasance, mysterious disappearance, or otherwise, will be charged to the Loss Reserve, as long as you have complied with the terms and conditions of this Amendment and no breach of this Amendment, resulted, directly or indirectly, in the loss. You (or a representative you designate) must report any loss to the 7-Eleven Market Manager (or a representative the Market Manager designates) by the morning of the next business day. Any loss which is the direct or indirect result of any breach of this Money Order Amendment will be charged to your Open Account and will not be covered by the Loss Reserve or the contractual indemnification provided for in the Agreement. Any loss resulting from the payment by IPS on any raised or counterfeited Money Order will be borne by IPS unless IPS can provide satisfactory evidence that such Money Order was raised or counterfeited by you or your employees. If there is satisfactory evidence that a Money Order was raised or counterfeited by your employees, any loss resulting directly from the raising or counterfeiting will be charged to the Loss Reserve.

(7) You must comply with all procedures required by us or IPS, as may be amended from time to time, for the reporting, handling, safe keeping, processing, and sale of all Money Orders. You must take all measures to safeguard and protect all unsold Money Orders and all proceeds that a prudent person would take to safeguard and protect a like amount of his/her own cash. We will give you instructions and/or training as we deem necessary for complying with these procedures.

(8) You (or a representative you designate) must request a stop payment on a Money Order that is known to be stolen, by notifying one of our representatives or an IPS representative (as we direct) by the morning of the next business day following the theft of the Money Order. Notification may be by telephone or in person and must be confirmed in writing, by providing any reports required by us or IPS, as soon after the theft as is reasonably possible. You must also comply with all additional procedures established by us or IPS to stop payment on Money Orders. Failure to timely notify us or IPS of the theft or suspected theft of a Money Order, which prevents the timely placement of a stop payment on that Money Order by us or IPS, will result in a charge to your Open Account for any amount for which we are responsible in connection with the Money Order.

(9) You must fully cooperate with us and IPS in any investigation conducted relating to any lost, stolen, missing, altered, raised, or counterfeited Money Order and must fill out all reports required in connection with any investigation.

(10) This Money Order Amendment will continue to apply until the earlier of: (i) the date the IPS Agreement expires or terminates (unless the IPS Agreement is extended or replaced with a new money order program); (ii) the date the Agreement terminates or expires; (iii) the date any agreement between you and IPS terminates or expires; or (iv) the date this Amendment terminates or expires by its terms.

(11) You may terminate this Amendment at any time by notifying us in writing, which notice will be effective when we receive it. We may terminate this Money Order Amendment with or without cause upon 90 days' prior written notice to you. The terms and provisions of this Amendment will continue to apply during the 90 day notice period.

7-ELEVEN-00323

MARKET/STORE #2131 - 22818 B

(12) We may immediately terminate this Amendment if you fail to comply with any term or condition of this Amendment or if your financial stability and circumstances create a substantial credit risk for IPS and/or us, as we or IPS determine in our sole discretion.

(13) When this Amendment terminates or expires, you must immediately return all unsold Money Orders and any equipment and related promotional and miscellaneous materials we provide under this Amendment, and otherwise comply with any and all procedures we establish covering the expiration or termination of this Amendment. Your failure to comply with the terms of this Paragraph will constitute a Material Breach of the Agreement.

(14) If the Agreement is terminated or expires, we will charge your Open Account the maximum face amount for each Money Order not immediately returned to us or reported as either sold, missing, or stolen. We will credit your Open Account with the difference between the face value of such Money Order and the maximum face amount charged for each such Money Order when it is received and paid upon by IPS prior to the delivery of the final Financial Summaries. If the Money Order has not been presented within 3 months of delivery of the final Financial Summaries, you will receive a check for the charges in addition to the difference between the charge and the face amount of any Money Order presented during the 3 months.

(15) You must comply with all federal, state, and local laws, regulations, rules, and ordinances applicable to the sale of Money Orders and your performance of the terms and conditions of this Amendment.

You may not contract with IPS or any other financial service vendor to sell money orders in your Store without our consent.

In all other respects the Agreement is ratified and reaffirmed.

The terms in this Amendment and its Exhibits, if any, will have the meanings defined in the Agreement.

You and we have signed this Amendment effective as of ____3/13/04____.

**7-ELEVEN, INC.**

By ___Tom Lesser___

Name ___Tom Lesser___

Title ___Market Manager___

Date ___3/14/04___

By ___[signature]___                    **FRANCHISEE**

Name ___Michael Tucker___          By ___Jami Tucker___

Date ___3.13-04___                    Name ___Jami Tucker___

                                      Date ___3-13-04___

Form 4400228 1/04 Uniform
Page 3 of 3 Money Order

7-ELEVEN-00324

MARKET/STORE #2131 - 22818 B

# AGREEMENT
### ("Agreement")

On this *13* day of *March* 20*04*, Integrated Payment Systems, Inc., a Delaware corporation, having a principal office at 6200 South Quebec, Englewood, CO 80111 ("IPS") and Michael Tucker and Jami Tucker , ("Franchisee") having a principal office at 580 S 1St St, Brawley, CA 922272317 agree as follows:

## STATEMENT OF PURPOSE

A.    IPS and 7-Eleven, Inc. entered into an Amended and Restated Money Order Trust Agreement dated as of February 5, 2001 (the "Trust Agreement").

B.    Franchisee desires to offer Western Union Money Orders ("Money Orders") for sale to his/her customers.

C.    IPS has agreed, subject to the terms and conditions of this Agreement, to permit Franchisee to offer Money Orders for sale to his/her customers.

**NOW THEREFORE,** in consideration of the foregoing premises and of the mutual covenants and conditions hereinafter set forth, the parties agree as follows:

1.    Trust Relationship. (a) As of the date first written above, IPS appoints Franchisee as its agent and trustee for the limited purpose of being authorized to hold and sell Money Orders and Trust Funds in accordance with the provisions of this Agreement. The parties agree that: (i) the agency granted pursuant to this Section 1(a) is for the limited purpose of holding and selling Money Orders and collecting the Trust Funds (in an amount equal to the dollar amount imprinted on any Money Orders used and sold by Franchisee ("Trust Funds"); and (ii) except as set forth in previous sentence, the relationship between IPS and Franchisee is that of independent contractors. (b) Franchisee shall be a trustee for IPS and act in a fiduciary capacity for the benefit of IPS with respect to any Money Orders and Trust Funds. Franchisee shall hold the Money Orders and Trust Funds in its possession in trust for the benefit of IPS and shall maintain and account for all Trust Funds separate and apart from all other funds and monies of Franchisee. All actions taken by Franchisee with respect to the Trust Funds shall be in accordance with maintaining the character of a trust pursuant to applicable state and Federal law. Without limiting the generality of the foregoing, all cash in kind held by Franchisee and the balance in all bank and other accounts into which the Trust Funds may have been deposited and commingled with other funds, shall constitute Trust Funds to the extent of the amount of all Trust Funds deposited or contained therein after the date hereof and not paid over to IPS. Franchisee shall not acquire by operation of this Agreement or otherwise, any right, title or interest of any kind in the Money Orders or Trust Funds. All Money Orders and Trust Funds remain the sole and exclusive property of IPS. Franchisee acknowledges and agrees that the imposition of the requirements contained in this Section 1(b) constitute action (as such term is used in 11 U.S.C. § 541(b)(5)) taken by IPS to require compliance with the commingling prohibition. (c) It is expressly understood that Franchisee does not, by operation of this Agreement, acquire any right, title or equitable interest in the Money Order or the Trust Funds.

2.    Sales and Remittance Procedures. Franchisee shall sell the Money Orders and remit the Trust

7-ELEVEN-00325

Funds in accordance with this Agreement and the Money Order Amendment signed by 7-Eleven, Inc. ("7-Eleven") and Franchisee which is annexed hereto as Exhibit A and made a part hereof ("Exhibit A").

3. Policies and Procedures. Franchisee shall comply with any and all policies and procedures provided by 7-Eleven and IPS, as the same may be amended or replaced from time to time, for the reporting, handling, safe keeping, record keeping, processing, sale and use of all Money Orders and Trust Funds. A copy of IPS's policies and procedures as of the Effective Date are set forth in Exhibit B. Franchisee agrees that IPS may disclose to 7-Eleven from time to time information that IPS deems reasonably necessary relating to the sale or use of Money Orders by Franchisee.

4. Compliance with Law. Franchisee shall comply with all Federal, state and local laws, regulations, rules and ordinances applicable to the sale and use of Money Orders and Franchisee's performance of this Agreement. To the extent that this Agreement contains more restrictive requirements than such statutes or regulations, this Agreement shall control.

5. Safekeeping and Liability for Loss. Franchisee shall take such measures to safeguard and protect all unsold Money Orders and all Trust Funds as a prudent person would take to safeguard and protect a like amount of his or her own cash.

6. Payment for Money Orders. Franchisee shall accept only cash or debit cards in payment for Money Orders. Anything to the contrary notwithstanding, if Franchisee fails to strictly comply with the preceding sentence and accepts any other form of payment, then such acceptance shall be at Franchisee's sole and exclusive risk. The consumer fee collected for any non-cash sale shall not exceed the consumer fee collected for cash Money Order sales. Unless otherwise agreed in writing by 7-Eleven and IPS, the face value of each Money Order issued by Franchisee shall not exceed $500.

7. Bailment. (a) IPS has or agrees to furnish or cause to be furnished to Franchisee a device for storing and imprinting Money Orders and an associated input device (collectively, a "Machine") for Franchisee's use in connection with the sale and use of Money Orders. Franchisee shall only use the Machine to print Money Orders and for such other uses as IPS or its affiliates may specify in writing from time to time. Franchisee shall have and shall assume the exclusive care, custody, and control of the Machines. Franchisee shall ensure that Machine is secure to the reasonable satisfaction of IPS. Franchisee shall safeguard and use the Machine located in a careful and proper manner and shall comply with and conform to all laws and regulations applicable to such Machines, Franchisee's business, and the sale of Money Orders. Franchisee shall not permit any abuse, deterioration, wreckage, dilapidation, or waste of any Machine. Franchisee shall operate the Machines in accordance with all applicable operating instructions and procedures provided by IPS. Subject to the terms and conditions of this Agreement, Franchisee shall be entitled to possess, use and operate the Machine at any time during the Agreement term for such purposes and functions. (b) This Agreement creates a bailment solely for temporary possession and use of the Machine and no other right, title, or interest in or to the Machine shall hereby pass to Franchisee. Franchisee shall have no lien or charge upon, or ownership interest in, the Machine. Franchisee shall cooperate with IPS and shall execute and deliver any further documents, instruments and certificates as IPS may reasonably deem necessary or convenient to protect the title and interests of IPS in the Machine. Franchisee shall keep the Machine free and clear from any and all claims, liens, and encumbrances, except claims, liens or encumbrances arising from acts or omissions of IPS. Franchisee shall not

7-ELEVEN-00326

MARKET/STORE #2131 - 22818 B

remove any label affixed to any Machine that states that the Machine is owned by IPS. In order to protect IPS's trade secrets, except as permitted by applicable law, Franchisee shall not reverse engineer, decompile, copy, modify, create derivative works of, transfer, sell, publish or disclose the software contained in the Machines provided by IPS.

8.   Limitation of Liability. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IPS'S CUMULATIVE AGGREGATE MONETARY LIABILITY UNDER THIS AGREEMENT SHALL BE LIMITED TO THE LESSER OF: (a) FIVE THOUSAND DOLLARS; OR (b) THE ACTUAL DIRECT DAMAGES SUFFERED BY FRANCHISEE.

9.   Disclaimer of Damages.   IN NO EVENT SHALL IPS, ITS AFFILIATES, OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS BE LIABLE TO FRANCHISEE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR EXEMPLARY, PUNITIVE, SPECIAL, LOST PROFITS, CONSEQUENTIAL OR SIMILAR DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES REGARDLESS OF WHETHER OR NOT IPS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

10.  Term of Agreement. The term of this Agreement shall be for a period of one year after the date hereof ("Initial Term"), and upon expiration of the Initial Term shall be automatically renewed for additional periods each equal to the Initial Term unless earlier terminated at any time, by the happening of any of the following events: (a) the expiration or termination of the Trust Agreement; (b) the expiration or termination of Franchisee's agreement with 7-Eleven; (c) the expiration or termination of Exhibit A; or (d) either party's receipt of written notice of termination to the other party thirty (30) days prior to the desired termination date. During such thirty (30) day period, the terms and provisions of this Agreement shall remain in full force and effect.

11.  Termination/Survival. (a) If there is a material adverse change in the financial condition of Franchisee or Franchisee performs, voluntarily or involuntarily, any of the recognized acts of bankruptcy or insolvency, then IPS may, in IPS's sole discretion, immediately terminate this Agreement and/or suspend Franchisee's rights to sell Money Orders. (b) IPS may immediately suspend or terminate this Agreement for Franchisee's failure to comply with any term or condition of this Agreement and/or for 7-Eleven's failure to comply with the Trust Agreement. (c) IPS may immediately terminate this Agreement and require Franchisee to return the Machines to IPS if the Machines become subject to a claim that the they infringe or violate the rights of a third party. (d) In the event of termination for any cause, Franchisee shall immediately remit to 7-Eleven the Trust Funds received by Franchisee from the sale or use of Money Orders. Franchisee shall also return all unsold and unused Money Orders and any equipment, Machines, display material or other property furnished to Franchisee by 7-Eleven and/or IPS with respect thereto.  IPS reserves the right to take possession from Franchisee of any unsold Money Orders and Trust Funds and/or Machines if 7-Eleven is unable to do so.  All such Trust Funds and Money Orders shall, until remitted to 7-Eleven or IPS, continue to be held in trust by Franchisee for IPS.

12.  Assignment. This Agreement, or any of the rights hereunder, including any payments due, may not be assigned by Franchisee by operation of law or otherwise without the prior written consent of IPS. The parties hereto agree that IPS may assign any or all of its rights or delegate any of its obligations under this Agreement without the consent of Franchisee and Franchisee hereby agrees that any such assignee may issue money orders in a new name. Additionally, IPS may designate

7-ELEVEN-00327

any other person or entity as its agent to perform or render assistance to IPS in the performance of the services to be provided by IPS hereunder.

13. <u>Law Governing</u>. This Agreement shall be construed and enforced in accordance with, and shall be governed by the laws of the state of New York without regard to such state's conflict of law provisions.

14. <u>Survival</u>. Sections 1, 3, 4, 6, 7, 8, 9, 11 and 13 through 16 shall survive the expiration or termination of this Agreement.

15. <u>Entire Agreement</u>. This Agreement constitutes the entire and sole agreement between the undersigned parties with respect to the subject matter herein. Prior agreements between the parties, if any, are terminated immediately. This Agreement supersedes all prior understandings, arrangements or agreements between the parties hereto not contained in this Agreement, all of which are merged herein, including any prior agreements with respect to Franchisee's sale of Money Orders. No modification, renewal, extension or waiver of any of the provision of this Agreement (other than the policies and procedures) supplied by IPS and/or 7-Eleven shall be binding upon either party unless made in writing and signed by the parties to be bound.

16. <u>Notice</u>. Any notices required or permitted hereunder to IPS shall be sent by certified mail, to 6200 S. Quebec Street, Englewood, Colorado 80111, attention: General Manager for Retail Money Order Operations, with a copy to General Counsel at the same address. All notices required or permitted to Franchisee hereunder shall be sent by certified mail to the address set forth above. Either party may change the address to which notices are to be sent by written notice to the other party. All such notices if communicated as set forth above shall be effective when received.

**IN WITNESS WHEREOF**, the parties have caused their authorized representatives to sign this Agreement as of the day and year first above written.

Franchisee  Michael Tucker

Franchisee  Jami Tucker

Date: _____ 3-13-04

Market: ____ 2131 ____  Store: ____ 22818 B

Integrated Payment Systems, Inc.

By:_____

Title_____

Date:_____

7-ELEVEN-00328

MARKET/STORE #2131 - 22818 B

# VERIZON PAY TELEPHONE AMENDMENT

THIS VERIZON PAY TELEPHONE AMENDMENT (the "Amendment") is signed by the undersigned franchisee(s) ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in the last paragraph of this Amendment,

## BACKGROUND INFORMATION

We signed a Payphone Agreement (the "Payphone Agreement") with the Verizon companies ("Verizon") for our company-operated stores;

The terms of the Payphone Agreement are now available to 7-Eleven franchisees in this area who wish to participate. A copy of the Payphone Agreement is available for your review upon request;

To assist you in determining whether you wish to participate in this program at your franchised 7-Eleven store ("Store"), the basic terms of the Payphone Agreement, as it would affect the Store, are summarized below.

The parties agree as follows:

(1)      Verizon will install its payphone equipment (the "Equipment"), at the Store after receiving all necessary approvals, licenses, and permits, and a letter of agency properly executed by you. You agree that Verizon will have the exclusive right to install, operate, and maintain at least one payphone on the premises of your Store and to select all carriers for the payphones, including the primary interexchange carrier (PIC). Prior to installing the Equipment, Verizon will obtain our approval of a location for the Equipment at the Store, and agree with you on a date for installing the Equipment. The date will normally be within 30 days after Verizon has received this signed Franchisee Consent Letter from you and has access to the available space at the Store. For new Stores, Verizon will arrange for installation before the Store opening.

(2)      The Equipment will consist of payphones and associated equipment approved by us. Verizon is required to maintain its Equipment in good working order and in accordance with industry standards throughout the term of the Payphone Agreement.

(3)      Verizon will, at its expense, service and maintain the Equipment to keep it in a clean condition and in good working order. Verizon will accept repair and refund requests 7 days per week and will respond to service calls no later than the second business day following the report. You must allow Verizon reasonable space and access to the Store to fulfill its responsibilities.

(4)      Verizon will collect all coins from the Equipment at intervals to be determined by usage of the applicable payphone. Revenues from the Equipment will be shared by the parties as follows: we will receive;: (i) 35% of coin and 0+ local and intraLATA calls; (ii) 41% of 0+ interLATA calls; (iii) 25% of PCC revenues; and (iv) a mutually agreed upon percentage of all other revenue generated by or through the use of the Equipment and not otherwise specified in this Franchisee Consent Letter (collectively the "Commission"). PCC revenues, which are received quarterly, will be allocated to the month in which PCC is received for purposes of calculating the revenue amounts due to us. Beginning in year 3 of the

Form 4401020  1/04  Uniform
Page 1 of 3  - Verizon

7-ELEVEN-00329

Term and each following anniversary date, the Commission may be adjusted as follows: if the average monthly Revenue per phone for the previous 12 months fluctuates more than 10% from the average for the twelve 12 months prior to that, the Commission rates will be adjusted up or down by one percentage point per percentage point change in excess of 10%, and any such adjustments will be capped at 5 percentage points per year and a maximum adjustment of 15% over the entire Term. Verizon will pay Commissions monthly to us and provide a full accounting of such payments to us. Any Commission due for Equipment installed at Participating Franchisee Stores will be paid to us, on behalf of our franchisees, and we will credit and administer the Commissions in accordance with the Open Account procedures. An authorized 7-Eleven representative will have the right to inspect Verizon's records relating to the Equipment for an individual franchisee during normal business hours upon 10 days prior written notice to Verizon.

(5)     The term of the Payphone Agreement as to the Store will begin on the date that the Equipment is installed by Verizon and will terminate on the earlier of: (i) March 31, 2007, or (ii) the expiration or termination of the 7-Eleven Store Franchise Agreement between you and us for the Store. If you are the franchisee of a former company owned store and the Equipment is already installed, the term of the Payphone Agreement will begin when this signed Franchisee Consent Letter is received and end on the same termination date for newly installed payphones. You and Verizon each also have certain rights to terminate the Payphone Agreement as to the Store in the event that the other defaults in its obligations pursuant to the Payphone Agreement. Upon expiration or termination of the Payphone Agreement as to the Store, Verizon will, at its expense, and within a reasonable time, remove the Equipment and restore the Store to its condition prior to installation, normal wear and tear excepted.

(6)     Each Franchised Store will be paid a signing bonus on a per store basis. The signing bonus will be paid based on Average Monthly Revenue for your Location ("AMRL") which consists of the average monthly revenue for the location for the most recent 12 month period prior to expiration of the existing contract for that particular store, or in the event of a transfer of a Company Store to a franchisee or a transfer of a Participating Franchised Store, the AMRL will be measured by the most recent 12 months immediately preceding the transfer. The amount of the Signing Bonus will be determined as follows:

(i)     For AMRL equal to or greater than $500, the Signing Bonus is $1,000;
(ii)    For AMRL between $300 and $499.99, the Signing Bonus is $750;
(iii)   For AMRL between $200 and $299.99, the Signing Bonus is $500;
(iv)    For AMRL between $150 and $199.99, the Signing Bonus is $250;
(v)     For AMRL of $149.99 or less, no Signing Bonus will be paid;
(vi)    For all new Stores, the Signing Bonus is $750.

(7)     A check for the signing bonus made payable to us on your behalf will be sent to us or our designated representative within 30 days of installation of the pay telephone equipment. We will credit the signing bonus to your Open Account and it will be subject to the 7-Eleven Charge.

(8)     You agree to notify Verizon 30 days prior to the sale of your Store.

(9)     If you wish to participate in this program please indicate your desire to do so, as well as your acceptance and approval of all provisions of the Payphone Agreement by signing in the space provided below and returning this letter to your 7-Eleven representative

7-ELEVEN-00330

MARKET/STORE #2131 - 22818 B

(10)   NOTE: THIS AGREEMENT WILL NOT BE EFFECTIVE UNTIL THE EXPIRATION OR TERMINATION OF YOUR CURRENT PAY TELEPHONE PROVIDER AGREEMENT.

You and we have signed this Amendment effective as of ___3/13/04___.

## 7-ELEVEN, INC.

By ___Tom Lesser___

Name ___Tom Lesser___

Title ___Market Manager___

Date ___3/14/04___

**FRANCHISEE**

By _____          By ___Jami Tucker___

Name ___Michael Tucker___    Name ___Jami Tucker___

Date ___3-13-04___           Date ___3-13-04___

Form 4401020  1/04  Uniform
Page 3 of 3 – Verizon

7-ELEVEN-00331

MARKET/STORE #2131 - 22818 B

# AUTHORIZATION FOR REVENUE
# AND CONTRACT DISCLOSURE

To:    Pay Telephone Vendor            Date: _3/13/04_____

All commission revenue and related documentation, including a copy of the contract concerning the pay telephones for the 7-Eleven Store listed below will be immediately directed to Verizon Communications Corporation or our designated provider.

**7-Eleven Store Number:** _____2131 - 22818 B_____

**7-Eleven Store Telephone Number:** _____

**Pay Phone Provider's Name:** _____

FRANCHISEE: _____
(Signature)        Michael Tucker

FRANCHISEE: _____
(Signature)        Jami Tucker

7-ELEVEN: _____
(Signature)        Tom Lesser

DATE: _____3-13-04_____

__X__ New Franchisee    _____ Current Franchisee Enrolling in Verizon Pay Phone Program

Form 4400853  1/04  Uniform
Pay Phone Provider

7-ELEVEN-00332

MARKET/STORE #2131 - 22818 B

# SECURITY SYSTEM AND MONITORING AMENDMENT

The undersigned Franchisee ("you" or "your") has been made aware of the Master Surveillance, Alarm and Services Agreement ("Master Agreement") and the Surveillance and Alarm Equipment Repair and Maintenance Agreement ("Repair Agreement") between 7-Eleven, Inc. ("we", "us" or "our") and one or more Security Equipment Service Providers. By signing this Franchisee Participation Agreement ("the Agreement"), you agree to contract with the Security Equipment Service Providers on the terms established by the Master Agreement and Repair Agreement for your franchised 7-Eleven Store, (the "Store"), for certain services to be provided in connection with the electronic surveillance and alarm systems ("Systems") to be provided by us. We have advised you of the date that the System was installed in the Store. If the System has not yet been installed, we have advised you that the System will be installed in the future. You understand that the term of this Amendment, the duration of any warranties from the Security Equipment Service Providers, and the effective period for the charges referred to in this Amendment, the Master Agreement and Repair Agreement are based on the installation date of the Security System and not on the Effective Date of your Franchise Agreement. You understand that by signing this Amendment, you will assume the same obligations, and will be entitled to the same rights and privileges established for a Subscriber in the Master Agreement and under the Repair Agreement, except as specifically provided in this Amendment.

## TERMS AND CONDITIONS

(1)    <u>Term of Agreement</u>. The term of this Amendment will be for 5 years beginning on the date the System (as defined in Section 1.1 of the Master Agreement) is (or was) installed in the Store, unless earlier terminated under the Master Agreement, or the expiration, without renewal, or termination of the 7-Eleven Store Franchise Agreement between you and us with respect to the Store. This Agreement may be renewed or extended after the initial 5-year period upon the mutual agreement of us and the Security Equipment Service Providers. The Security Equipment Service Providers may assign their interest in the Master Agreement and/or Repair Agreement to any bona fide service provider, and such assignment will have no impact on this Amendment. If this Amendment terminates for any reason, you understand that you will have to sign a new Agreement with a service provider designated by us.

(2)    <u>Services to be Performed</u>. During the term of this Amendment, the Security Equipment Service Providers will perform Monitoring Services (as defined in Sections 2.1 through 2.3 of the Master Agreement) for the System. The obligation to perform the Monitoring Services may be assigned to a different entity by the Security Equipment Service Providers.

(3)    <u>Monitoring Service Charge</u>. You agree to pay a Monitoring Service Charge of $10.00 a month. We will pay this amount on your behalf to the alarm monitoring service provider and then charge the amount to your Open Account in accordance with the terms of the Franchise Agreement. You understand that, after the initial 5-year period, the alarm monitoring service provider has the right to increase the Monitoring Service Charge upon notice, but at no more than 10% per year of the then-current price. You further understand that, depending upon when you franchise the Store, you may not receive the benefit of the full 5 years of the $10.00 monitoring service charge.

7-ELEVEN-00333

(4)    <u>Repair and Scheduled Maintenance Charge Services</u>. You agree to pay for Repair and Scheduled Maintenance Services at $14.00 per month (or at a higher rate to be determined if you decide to purchase additional equipment or services from the Security Equipment Service Providers or integrate your own system into the System), beginning after the expiration of the 1-year warranty period following the installation of the System in the Store (during which all repairs and maintenance will be the Security Equipment Service Providers' expense). This amount will be paid on your behalf to the Security Equipment Service Providers by us and then charged to your Open Account in accordance with the terms of your 7-Eleven Store Franchise Agreement. The charge will remain at $14.00 per month for the first 3 years following the 1-year warranty period. After this period, the charge may be increased by the Security Equipment Service Provider. You understand that, depending upon when you franchise the Store, you may not receive the benefit of the 1-year warranty period, or the full 3 year benefit of the $14.00 Repair and Scheduled Maintenance Services. After the end of the term of the Repair Agreement, you understand that this charge may be increased or decreased. You further agree to pay any extra charge Services as set forth in the Repair Agreement.

(5)    <u>Franchisee Obligations</u>. You agree to assume the obligations of a Subscriber as set forth in the Master Agreement, specifically including, but not limited to: (1) furnishing to the alarm monitoring service provider, in writing, a list of the names and telephone numbers of persons to be notified upon receipt of an alarm signal, to be kept current at all times; (2) promptly replacing recording tapes in accordance with the directions provided by the alarm monitoring service provider; (3) upon detecting any defects in the alarm system, promptly notifying the alarm monitoring service provider in accordance with the terms of this Agreement or as instructed by us; and (4) not damaging or interfering with the operation of the System in any way.

(6)    <u>Termination of Monitoring and Repair Services</u>. You agree not to terminate the Monitoring Services or the Repair Services without our prior written approval.

(7)    <u>Additional Obligations</u>. You agree to cooperate fully with us to obtain any consents or waivers from all persons or entities having an interest in the Store to install, maintain, and operate the System in the Store. You will allow us and the Security Equipment Service Providers to install the System at a location designated by us and allow any changes in merchandise or equipment layout necessary to install the System and allow access to the System for its maintenance and operation. You agree to display any decals or signs related to the System at locations specified by the Security Equipment Service Providers and us. You agree not to remove or disconnect the System without our prior written approval. If a robbery or other criminal incident occurs in the Store, you agree to allow us access to the tapes and the System, and you agree to cooperate with us and any law enforcement authorities or investigators regarding any such incident.

(8)    <u>Obligations upon Termination</u>. You agree that the System will remain our property, and that this Amendment will terminate upon the termination of the Master Agreement with the Security Equipment Services Providers, or upon the termination or expiration of the 7-Eleven Store Franchise Agreement, whichever occurs first. Upon a termination or expiration of the 7-Eleven Store Franchise Agreement, you agree to return the System, and all of its components, to us, and to cooperate fully in transferring any necessary licenses or permits to us.

7-ELEVEN-00334

(9)    <u>Our Right to Continuous Operation</u>.  The Security Equipment Service Providers have the right to terminate the Master Agreement at a particular location if the obligations related to that location are not being fulfilled.  Because of our interest in maintaining each Store location as to the Master Agreement with the Security Equipment Services Providers, you agree that we will have the right to take any action necessary to ensure that your Store is in compliance with the requirements of the Master Agreement, and to charge your Open Account for the cost of any such necessary actions.

(10)    <u>Governmental Fines or Penalties</u>.  You agree that any governmental fine or penalty imposed upon the Store due to false alarms in connection with the System, or misuse of the System, will be your sole responsibility.

(11)    <u>Indemnification and Limitation of Liability</u>.  You agree to accept the terms regarding indemnification as set forth in the Master Agreement and Repair Agreement.

(12)    <u>Additional Equipment/Services</u>.  If you decide to purchase any additional equipment or services from the Security Equipment Service Providers on your own behalf, you agree that the Security Equipment Service Providers may send the bill directly to you for payment.  Any additional equipment not part of the System provided by us and purchased by you will remain your property upon the termination of the Franchise Agreement; however, you agree to bear any costs of removing the equipment and restoring the System to working order following the removal of any such equipment.

You and we have signed this Amendment effective as of ___3/13/04___.

**7-ELEVEN, INC.**

By ___Tom Lesser___

Name ___Tom Lesser___

Title ___Market Manager___

Date ___3/14/04___

**FRANCHISEE**

By ___[signature]___          By ___Jami Tucker___

Name ___Michael Tucker___     Name ___Jami Tucker___

Date ___3-13-04___            Date ___3-13-04___

Form 4401000  1/04  Uniform
Page 3 of 3 – Security Surveillance

7-ELEVEN-00335

MARKET/STORE #2131 - 22818 B

# SYLVANIA LIGHTING SERVICES AMENDMENT

THIS SYLVANIA LIGHTING SERVICES AMENDMENT (the "Amendment") is signed by the undersigned franchisee(s) ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in the last paragraph of this Amendment,

BACKGROUND INFORMATION

We signed a Store Lighting Service Agreement with Sylvania Lighting Services Corp. ("Contractor"), effective as of March 1, 2002, and an Addendum to the Store Lighting Service Agreement (collectively, the "Master Agreement"),

You want to contract with Contractor on the terms established by the Master Agreement. You understand that this Amendment contains only a general description of certain parts of the Master Agreement and that you will be bound by the terms of the Master Agreement otherwise applicable to us and will be entitled to the same rights and privileges established for us, except as specifically provided in this Amendment.

The parties agree as follows:

(1)     Services to be Performed. During the term of this Agreement, Contractor will perform the Basic Services, Additional Basic Services, and Extra Charge Services (collectively, the "Service(s)"), as described in Section 2 and on Exhibit B to the Master Agreement, for Interior Store Lighting Equipment and Exterior Lighting Equipment for which you bear maintenance responsibility at your franchised 7-Eleven Store No.    2131 - 22818 B            (the "Store"). You understand that the Master Agreement specifically excludes any services for exit lights, incandescent lighting (walk-in cooler/toilets, time clocks, photo cells and contactors, and tube guards (materials)).

(2) Priority Response and Completion Requirements. You understand that requests for Service at the Store will be responded to, together with those requests for other area 7-Eleven Stores, according to the time frames established in Section 2 and Exhibit 2 to the Master Agreement.

(3)     Payment for Services. The Basic Services will be provided at the Monthly Rate, exclusive of any applicable state and local tax, of $47.00 (we are responsible for any incremental costs relating to the Gasoline Lighting and we have also agreed to pay any additional amounts owing under the Addendum to the Master Agreement). Additionally, when the Interior Ceiling Lighting is relamped, you agree to pay $451.00 plus the cost of the tube guards required in your Store.

Except as set forth on Exhibit B and in 3.01(a), 3.01 (b), 3.01 (c), the Monthly Rate includes all labor and materials used to perform the Services requested in this Amendment except Extra Charge Services. Except as otherwise set forth in Section 3.01(b) for signs over 50 feet high, Contractor will provide, free of charge, all tools, equipment and service vehicles necessary to perform the Services required of it in the Master Agreement; however, if you want Contractor to repair any electrical problem found by Contractor while performing the Services, you understand that such repair will be deemed an Extra Charge Service and invoiced accordingly. You hereby authorize us to pay for all Services on your behalf. You

7-ELEVEN-00336

understand that we will charge the cost of the Services to your Open Account, as defined in the 7-Eleven Store Franchise Agreement between you and us covering the Store (the "Franchise Agreement"), for the month in which we are invoiced for same, or if the Franchise Agreement expires or is terminated prior to that time, any remaining cost will be charged to your Open Account on your final financial summaries.

(4)    Term of Agreement.  The term of this Amendment will begin on the Effective Date (the date this Amendment is delivered to Contractor as prescribed in Section 15.03 of the Master Agreement), and continue for 36 months, unless earlier terminated pursuant to Section 8 or 11 of the Master Agreement, or the expiration, without renewal, or termination of the Franchise Agreement.

(5)    Exceptions to Master Agreement.  Contractor's obligations under Sections 7.02, 19.01, of the Master Agreement will extend only to us. Furthermore, if your Franchise Agreement for the Store is terminated during the term of this Amendment, you will not be responsible for the applicable termination fee pursuant to Section 8.01 and 8.02 of the Master Agreement.  You will, however, be responsible for such termination fee if you terminate this Amendment during the term of your Franchise Agreement.

(6)    Notices.  Any notices under the Master Agreement covering the Store must be personally delivered or sent by registered or certified mail, return receipt requested, to you at the Store, with copies to us at the addresses set forth in the Master Agreement.

You and we have signed this Amendment effective as of _____3/13/04_____

### 7-ELEVEN, INC.

By _____

Name ___Tom Lesser___

Title ___Market Manager___

Date ___3/14/04___

By _____

Name ___Michael Tucker___

Date ___3-13-04___

### FRANCHISEE

By _____

Name ___Jami Tucker___

Date ___3-13-04___

Form 4400911  1/04  Uniform
Page 2 of 2 - Sylvania Lighting

7-ELEVEN-00337

# PATCO SANITATION SYSTEM AMENDMENT

Franchisee(s) ("you" or "your") have discussed the advantages of the Patco Sanitation System with 7-Eleven, Inc. ("we" or "our"), and we have agreed to install the necessary Patco equipment (the "Equipment") in your store. You acknowledge that the Equipment will operate properly only with compatible Patco chemicals. You have agreed to use only approved chemicals with the Patco Equipment, in consideration for our installation of the Equipment.

Please sign below to indicate your agreement to use the Equipment and to use only Patco approved chemicals with the Equipment.

You acknowledge the advantages of the Equipment and agree to use the Equipment for its intended sanitation purposes and to use only Patco approved chemicals with the Equipment. We have agreed to install the Patco Equipment at our sole expense in consideration for this agreement.

You and we have signed this Amendment effective as of _____ 3/13/04 _____.

## 7-ELEVEN, INC.

By _Tom Lesser_

Name _Tom Lesser_

Title _Market Manager_

Date _3/14/04_

### FRANCHISEE

By _____     By _Jami Tucker_

Name _Michael Tucker_     Name _Jami Tucker_

Date _3-13-04_             Date _3-13-04_

Form 4401036  3/03  Uniform
Patco Sanitation

7-ELEVEN-00338

MARKET/STORE #2131 - 22818 B

## LEASE EXPIRATION DATE ACKNOWLEDGMENT

7-Eleven Store No. ___2131 - 22818 B___ (the "Store")

As a prospective franchisee ("you"), we informed you that the term of the 7-Eleven Store Franchise Agreement (the "Agreement") which you will execute if you are approved as a 7-Eleven Franchisee, will expire on the earlier of 15 years from the Effective Date, or, if the property is or becomes leased, the expiration of our leasehold rights. Exhibit A to the Agreement will specify that the current term of the lease covering the Store will expire on October     31          2006          . We have no obligation to renew or exercise any options to extend our leasehold rights, and we expressly deny any warranties or representations regarding whether our leasehold rights will be renewed, or that any options to extend our leasehold rights will be exercised. If our leasehold rights in and to the Store expire before 15 years from the Effective Date, you may have certain rights under the Agreement.

Some of our store sites may be subject to one or more "synthetic lease" arrangements. All store sites that we operate under the synthetic lease arrangements are subject to a lease term. We have the option of purchasing the store site, extending the lease term for an additional period of time, or returning the store site to the landlord and discontinuing operation of the store. If the store site is a new store, we will make a substantial investment in each of the new store sites acquired under the synthetic lease arrangements, and the intention is to continue to operate the new store sites after the initial lease termination. If this site is subject to a synthetic lease, the synthetic lease arrangements are scheduled to expire on _____. However, we cannot guarantee that the store sites acquired under the synthetic lease arrangements will continue to operate after the initial lease termination date.

This site _____ is __X__ is not a site acquired under the synthetic lease arrangements.

Acknowledged this _13_ day of _March_____, _2004_

### 7-ELEVEN, INC.

By _____

Name __Tom Lesser_____

Title __Market Manager_____

Date __3/14/04_____

### FRANCHISEE

By _____           By __Jami Tucker_____

Name __Michael Tucker_____           Name __Jami Tucker_____

Date __3-13-04_____           Date __3-13-04_____

Form 4400907 1/04 Uniform
Leasehold Expiration Date

7-ELEVEN-00339

**MARKET/STORE #2131 - 22818 B**

# RELEASE OF INFORMATION

I am the current 7-Eleven Franchisee for Store    2131 - 22818 B             located at
580 S 1St St, Brawley, CA 922272317                              (the "Store").  With
the execution of this Release, I hereby authorize and direct you to release to 7-Eleven, Inc. ("7-Eleven") at
its office located at _9771 Clairemont Mesa Blvd., Ste. G, San Diego, CA 92124-1331_                          ;
Attention:   Tom Lesser                                      , a copy of any agree-
ments between your company/agency and myself and all financial information and other information
connected with the Store including, but not limited to, all purchase-related financial information and
related documentation, all commission revenue and related documentation, and all allowance, premium
or bonus revenue information and related documentation that may be requested by 7-Eleven.  Further, I
hereby authorize 7-Eleven to contact you directly on my behalf, for the purpose of immediately obtaining
from you any information pertaining to the Store.  This Release shall be effective immediately and is
intended to be as broad as possible.


FRANCHISEE:  _____
             (Signature)   Michael Tucker

FRANCHISEE:  _____
             (Signature)   Jami Tucker

7-ELEVEN:    _____
             (Signature)   Tom Lesser

DATE:        _____3-13-07_____


Form 4400854  1/04  Uniform
Release of Vendor

7-ELEVEN-00340

# MICROSOFT AMENDMENT

The undersigned franchisee ("you" or "your") acknowledges that MSLI, GP ("Microsoft") and 7-Eleven, Inc. ("we", "us" or "our") have entered into Microsoft Select Enrollment, No. _____ (the "agreement"), under which you desire to run certain Microsoft products installed in computers owned by us and provided to you by us under lease. As used in this Participation Agreement, the term to "run" a product means to use, access, display, run or otherwise interact with it. You acknowledge that your right to run a copy of any version of any product licensed to us under the agreement is governed by the applicable product use rights for the product and version licensed to customer as of the date you first run that copy. Such product use rights will be made available to you by us, or by publication at a designated site on the World Wide Web, or by some other means. Microsoft does not transfer any ownership rights in any licensed product and it reserves all rights not expressly granted.

**I.    Acknowledgment and Agreement.** You acknowledge that you have received a copy of the product use rights applicable to the products acquired under the above-referenced agreement; you have read and understood the terms and conditions as they relate to your obligations; and you agree to be bound by such terms and conditions, as well as to the following provisions:

**a.    Restrictions on use.** You may not:

- Make copies of a product yourself, but must instead have such copies made for you by the customer or their representative;

- Separate the components of a product made up of multiple components by running them on different computers, by upgrading or downgrading them at different times, or by transferring them separately, except as otherwise provided in the product use rights;

- Rent, lease, lend or host products without the express written consent of Microsoft;

- Reverse engineer, de-compile or disassemble products, except to the extent expressly permitted by applicable law despite this limitation;

- Transfer licenses to, or sublicense, products to the U.S. Government.

You acknowledge that products licensed to us under the agreement are of U.S. origin. You agree to comply with all applicable international and national laws that apply to these products, including the U.S. Export Administration Regulations, as well as end-user, end-use and country destination restrictions issued by U.S. and other governments. For additional information on exporting Microsoft products, see http://www.microsoft.com/exporting/.

**b.    Limited product warranty.** Microsoft warrants that each version of a commercial product will perform substantially in accordance with its user documentation. This warranty is valid for a period of 90 days from the date you first run a copy of the version. Any warranties imposed by law concerning the products are limited to the same 90-day period. This warranty does not apply to components of products which you are permitted to

redistribute under applicable product use rights, or if failure of the product has resulted from accident, abuse or misapplication. If you notify Microsoft within the warranty period that a product does not meet this warranty, then Microsoft will, at its option, either (i) return the price paid for the product or (ii) repair or replace the product. This is your exclusive remedy for any failure of any commercial product to function as described in this paragraph.

c.  **Free and beta products.**  Free and beta products, if any, are provided "as-is," without any warranties.

d.  **NO OTHER WARRANTIES. TO THE EXTENT PERMITTED BY APPLICABLE LAW,** MICROSOFT DISCLAIMS ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS, IMPLIED OR STATUTORY, OTHER THAN THOSE IDENTIFIED EXPRESSLY IN THIS SECTION, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE PRODUCTS AND RELATED MATERIALS.

e.  **Limitation of liability.** There may be situations in which you have a right to claim damages or payment from Microsoft.  Except as otherwise specifically provided in this paragraph, whatever the legal basis for your claim, Microsoft's liability will be limited, to the maximum extent permitted by applicable law, to direct damages up to the amount you have paid for the product giving rise to the claim.  In the case of free product, or code you are authorized to redistribute to third parties without separate payment to Microsoft, Microsoft's total liability to you will not exceed U.S. $5,000, or its equivalent in local currency.

f.  **No liability for certain damages.**   To the maximum extent permitted by applicable law, neither you, your affiliates or suppliers, nor Microsoft, its affiliates or suppliers will be liable for any indirect damages (including, without limitation, consequential, special or incidental damages, damages for loss of profits or revenues, business interruption, or loss of business information) arising in connection with any agreement, product or service, even if advised of the possibility of such damages or if such possibility was reasonably foreseeable.

g.  **Application.** The limitations on and exclusions of liability for damages set forth in this Participation Agreement apply regardless of whether the liability is based on breach of contract, tort (including negligence), strict liability, breach of warranties, or any other legal theory.

h.  **Verifying compliance.** You must keep records relating to the products you run. Microsoft has the right to verify compliance with these terms and any applicable product use rights, at its expense, during the term of the agreement and for a period of one year after the agreement.  To do so, Microsoft will engage an independent accountant from a nationally recognized public accounting firm, which will be subject to a confidentiality obligation. Verification will take place upon not fewer than 15 days notice, during normal business hours and in a manner that does not interfere unreasonably with your operations.  As an alternative, Microsoft may require you to accurately complete its self-audit questionnaire

7-ELEVEN-00342

MARKET/STORE #2131 - 22818 B

relating to the products you use. If verification or self-audit reveals unlicensed use of products, you must promptly order sufficient licenses to permit all product usage disclosed. If material unlicensed use is found (license shortage of 5% or more), you must reimburse Microsoft for the costs it has incurred in verification and acquire the necessary additional licenses as single retail licenses within 30 days. If Microsoft undertakes such verification and does not find material unlicensed use of products, it will not undertake another such verification for at least one year. Microsoft and its auditors will use the information obtained in compliance verification only to enforce its rights and to determine whether you are in compliance with these terms and the product use rights. By invoking the rights and procedures described above, Microsoft does not waive its rights to enforce these terms or the product use rights, or to protect its intellectual property by any other means permitted by law.

Your violation of the above-referenced terms and conditions will be deemed to be a breach of this Participation Agreement and will be grounds for immediate termination of all rights granted under this Participation Agreement.

Dated as of the ___*13*___ day of ___*March*___, *2004*.

CUSTOMER AFFILIATE:

FRANCHISEE: _____
(Signature)   Michael Tucker

FRANCHISEE: _____
(Signature)   Jami Tucker

7-ELEVEN: _____
(Signature)   Tom Lesser

DATE: ___*3-13-04*___

Form 4400981 4/04 Uniform
Page 3 of 28  - Microsoft

7-ELEVEN-00343

# Microsoft Licensing Product Use Rights

Microsoft Applications ............................................................................................... 2

Microsoft Systems ..................................................................................................... 3

Microsoft Servers ...................................................................................................... 4

Microsoft Developer Tools ...................................................................................... 16

These are common defined terms:

"License Confirmation" means evidence of your license provided by Microsoft.

"Microsoft" (also referred to as "we" or "us" in this document) means the Microsoft company which is issuing or has issued licenses under your volume license agreement.

"Product," except as otherwise provided, means the software products for which we issue licenses under your volume license agreement.

"Software" means the software portion of the products you may license under your volume license agreement.

"You" means the entity which has entered into the volume license agreement with us under which a copy of the Software is being licensed and, if applicable, its affiliates or users.

These are general use rights and restrictions for all products: Microsoft grants you specific use rights for each product you license provided you comply with all terms and conditions applicable to that product. Product warranties do not apply to components of products which you are permitted to redistribute under applicable product use rights. Prerelease Code. Portions of the Software may be identified as prerelease code ("Prerelease Code"). Such Prerelease Code is not at the level of performance and compatibility of the final, generally available product offering. The Prerelease Code may not operate correctly and may be substantially modified prior to first commercial shipment. Microsoft is not obligated to make the Prerelease Code or any later version commercially available. Your license to use any Prerelease Code expires when the product is commercially available from Microsoft. Updates and Supplements. These rights and restrictions apply to updates or supplements to the original Product provided by Microsoft (for example, subsequent installments of MSDN), unless we provide other terms along with the update or supplement. Application Sharing. The Software may contain technology that enables applications to be shared between two or more single computers, workstations, terminals, handheld PCs, pagers, "smart phones," or other digital electronic devices (each, a "Computer"), even if an application is installed on only one of the Computers. You may use this technology with all Microsoft application products for multi-party conferences. For non-Microsoft applications, you should consult the accompanying license agreement or contact the licensor to determine whether or not application sharing is permitted by the licensor. Consent to Use Data. You agree that Microsoft and its affiliates may collect and use technical information you provide Microsoft as a part of support services related to the Software. Microsoft agrees not to use this information in a form that personally identifies you. Note on Java Support. The Software may contain support for programs written in Java. Java technology is not fault tolerant and is not designed, manufactured, or intended for use or resale as online control equipment in hazardous environments requiring fail-safe performance, such as in the operation of nuclear facilities, aircraft navigation or communications systems, air traffic control, direct life support machines, or weapons systems, in which the failure of Java technology could lead directly to death, personal injury, or severe physical or environmental damage. Sun Microsystems, Inc. has contractually obligated Microsoft to make this disclaimer. No "Multiplexing" or "Pooling." Use of software or hardware that reduces the number of electronic devices directly accessing or utilizing the Software (sometimes called "multiplexing" or "pooling" software or hardware) does not reduce the number of licenses required; the required number of licenses would equal the number of distinct inputs to the multiplexing or pooling software or hardware "front end." No Commercial Hosting. You may not provide commercial hosting services with the Products. Termination. Microsoft may terminate your rights under a given license if you do not abide by these terms and conditions, in which case you must destroy all copies of the Product and all of its component parts.

Microsoft reserves all rights not expressly granted to you. The Software is protected by copyright laws and international copyright treaties, as well as other intellectual property laws and treaties. The Software is licensed, not sold.

» You will see this arrow to help guide you through this document.

7-ELEVEN-00344

## Microsoft Applications

>> This section covers products listed in the Product List as belonging to the applications pool, with the exception of the developer tools products. See the "Developer Tools" section for use rights for those products.

### General License Grant

This grant applies to all applications products except as otherwise noted below.

For each license acquired, you may install, use, access, display, run, or otherwise interact with ("Run") one copy of the Software, and any prior version or any component product of the Software, on a single computer, workstation, terminal, handheld PC, pager, "smart phone," or other digital electronic device ("Computer"). The primary user of the Computer on which a copy of the Software Runs may make a second copy for his or her exclusive use on a portable computer.

### Exceptions

The following use rights and restrictions supplement or replace the General License Grant for the products identified below.

### 1. Encarta Online Deluxe

For each license you acquire, you may access and use the secure web site known as Microsoft Encarta Online Deluxe (the "Product") in accordance with the Product's Terms of Use, which are presently set forth at http://encarta.msn.com/shared/corpcitizen/tou.shtm. You will be entitled to any Components and Updates made available under the Encarta Online Deluxe Subscription Program during the subscription term. You agree to restrict access to the Product to computer workstations physically located within your facility. You may not allow remote or dial-in access to the Product. Microsoft retains the right to audit you monthly for unauthorized uses of or access to the Product. In the event of any unauthorized use by an Authorized User, you will take all reasonable steps to cause such Authorized User to cease such activity and to prevent any recurrence thereof. Microsoft reserves the right to immediately terminate the agreement under which the license is obtained or access to the Web Site by you or Authorized User(s) for violation of any applicable terms and conditions.

### 2. Mail Remote Client and Schedule+ Starter Kit

For each license acquired, you may use Software designated as Server software on a single computer system (i.e., a network server) and may use Software designated as Workstation software on a single computer or workstation. If any licensed copy of the Workstation software is permanently installed on the hard disk or other storage device of a computer (other than a network server) and one person uses that computer more than

80% of the time it is in use, then that person may also use the Workstation software on a portable computer.

### 3. Microsoft Press Step by Step Courseware

For each license you acquire, you must designate one individual in your organization who will have a personal, nonexclusive license to make and use copies of the Software. For purposes of these rights and restrictions, the Software will include the product in printed form.

### 4. Multi-Language Pack and (Non-English Versions) English Language Pack

Use of Multi-Language and (Non-English Versions) English Language Packs (the "Multi-Language Components") is subject to the terms and conditions of the end user license agreement (the "Product EULA") under which you have licensed your Microsoft application product (the "Product") and these terms and conditions. If you do not have a valid Product EULA, you are not authorized to install, copy, or otherwise use the Multi-Language Components. Capitalized terms used and not otherwise defined here have the meanings assigned to them in the Product EULA. To the extent that these terms conflict with terms in the Product EULA, these terms control solely with respect to the Multi-Language Components. The Multi-Language Components add either English or multi-language functionality to your copy of the Product. The Multi-Language Components are a part of the Product and are intended for use by you solely in conjunction with the Product.

### 5. Project 2000

In addition to the General License Grant above, Microsoft grants you a license to use the Microsoft Project 2000 Templates located in Program Files/Microsoft Office/Templates directory (the "Components"), or any portion thereof, subject to the General License Grant and these terms and conditions. To the extent that these terms conflict with terms of the General License Grant, these terms control solely with respect to the Components. **Derivative Works; Redistribution Rights.** Microsoft grants you the non-exclusive, royalty-free rights to use, modify and create derivative works of the Components (but not Microsoft Project 2000) for the purpose of designing, developing and marketing a product or service by you ("Application"). You may reproduce, sublicense and distribute the Components (and any modifications thereto made by you) provided that you agree: (a) not to use Microsoft's name, logo, or trademark to market any software product or services developed by you; (b) to indemnify, hold harmless, and defend Microsoft from and against any claims or lawsuits, including attorneys' fees and costs, that arise or result from the use or distribution of the Components or Applications; and (c) to permit further redistribution of the Components by your end-user customers only under the same restrictions imposed on you.

7-ELEVEN-00345

### 6. Project 98

**Handler.** In addition to the General License Grant above, you may reproduce and distribute an unlimited number of copies of the Handler which is comprised of those files designated in the Software as: wgsetup.stf, wgsetup.lst, wgsetup.exe, mfc42.dll, msvcrt.dll, openmail.exe, olmenu.ecf, opml32.dll, olmenu.dll, msflxgrd.ocx, olepro32.dll, regwiz.exe, oleaut32.dll, stdole2.tlb, extract.exe, setup.ini, prj98_ca.dll, acmsetup.exe, msetup.dll, acmsetup.hlp; provided that each copy must be a true and complete copy, including all copyright and trademark notices. **Web Server.** In addition to the General License Grant above, you may use the Software to post the file designated in the Software as mspjhttp.exe to a computer acting as a server to create a TeamInbox. Any number of other users may then connect to the server and use the file mspjhttp.exe for the purpose of viewing your TeamInbox and related Task Lists.

### 7. Project Central

In addition to the General License Grant above, for each license acquired, you may log one user onto your Microsoft Project Central Server for the purpose of enabling such user to participate in project workgroup communication for projects managed through your use of Microsoft Project 2000.

### 8. Work at Home

Subject to the limitations, requirements and restrictions identified below, for each license acquired, you may permit one Work-at-Home Employee to install, use, access, display, run, or otherwise interact with ("Run") from a single home computer, workstation, terminal, handheld PC, pager, "smart phone", or other electronic device ("Home Computer") one copy of the Software. As used in this provision, the term "Work-at-Home Employee" means an employee of yours (or an independent contractor providing substantially full-time services to you of the type that are customarily performed by your employees) who is the primary user of an At-Work Computer. As used herein the term "At-Work Computer" means a computer, workstation, terminal, handheld PC, pager, "smart phone", or other electronic device provided by you on which a properly licensed copy of the Software Runs. In place of the version of the Software identified on the License Confirmation (or equivalent evidence of license), the Work-at-Home Employee may use any later version of the Software he or she may properly use on his or her At-Work Computer pursuant to a license or upgrade right (e.g., under Upgrade Advantage or an Enterprise Enrollment/Enterprise Agreement). You must maintain records adequate to permit identification of the number and identity of Work-at-Home Employees permitted to Run a copy of the Software pursuant to these provisions. In addition to the notice to user requirements described in your license agreement, you will notify each Work-at-Home Employee that Runs a copy of the Software on a Home Computer pursuant to these provisions that such copy must be deleted and removed from the temporary memory (RAM) and permanent memory (e.g. hard disk) of such Home Computer immediately upon any event which causes him or her no longer to be a Work-at-Home Employee (as that term is defined herein). Notwithstanding anything to the contrary in your license agreement, Work-at-Home licenses are not transferable under any circumstances without the prior written consent of Microsoft. Your Work-at-Home Employees' use of the Software is subject to product specific restrictions, if any, noted above.

## Microsoft Systems

>> This section covers products listed in the Product List as belonging to the systems pool, with the exception of IEAK. See the "Developer Tools" section for use rights for IEAK. See the "Microsoft Applications" section of this document for use rights for Microsoft Press products.

### General License Grant

This grant applies to all systems products except as otherwise noted below.

For each license acquired, you may install and use one copy of the Software on the single computer, workstation, terminal or other digital electronic device ("Computer") on which it is first installed.

### Exceptions

The following use rights and restrictions supplement or replace the General License Grant for the products identified below.

### 1. Windows 95 (and prior versions) and MS-DOS

In addition to the General License Grant above, if the Software enables your single Computer to act as a network server, any number of computers may access or utilize the basic network services of that server.

### 2. Windows 98, Plus 98 and Windows Millennium Edition

In addition to the General License Grant above:
**Internet Connection Sharing Feature.** You may permit a maximum of five (5) Computers to connect to the single Computer running the Software solely to access the Internet. You may not allow these connected computers to use any other components of the Software (except File and Print and Peer Web Services as described below), nor to invoke application sharing. The five (5) connection maximum includes any indirect connections made through software or hardware which pools or aggregates connections. **File and Print and Peer Web Services.** Any number of Computers may access or otherwise utilize the file and print services and peer web services of the Software. **Internet Games (Windows Millennium Edition).** If you choose to access the Internet Games

7-ELEVEN-00346

feature from within the Software, certain system information and a computer identifier necessary for the administration of game play will be uploaded to the Internet Games web site. By accessing the Internet Games feature, you explicitly authorize Microsoft or its designated agent to access and utilize that information for that purpose.

### 3. Windows NT Workstation

In addition to the General License Grant above, the Software may not be used by more than two (2) processors at any one time on the single computer on which it is running. You may install the Software on a single Computer for use as interactive workstation software, but not as server software. You may permit a maximum of ten (10) computers to connect to the computer to access and use services of the Software, such as file and print services and peer web services. The ten connection maximum includes any indirect connections made through software or hardware which pools or aggregates connections.

### 4. Windows 2000 Professional and Encryption Pack

For each license acquired:
**Installation and Use.** The Software may not be used by more than two (2) processors at any one time on any single Computer. Internet Connection Sharing and Telephony Services. You may permit a maximum of ten (10) computers or other electronic devices (each a "Device") to connect to the Computer running the Software ("Workstation Computer") to utilize the services of the Product solely for file and print services, internet information services, and remote access (including connection sharing and telephony services). The ten connection maximum includes any indirect connections made through "multiplexing" or other software or hardware which pools or aggregates connections. You may not use the Software to permit any Device to use, access, display or run other executable software residing on the Workstation Computer, nor may you permit any Device to display the Product's user interface, unless the Device has a separate license for the Software. **MultiLanguage Versions.** Use of MultiLanguage Versions ("OS Components") is subject to the terms and conditions of the agreement ("EULA") under which you have licensed Windows 2000 Professional ("OS Product") and these terms and conditions. If you do not have a valid EULA for the OS Product, you are not authorized to install, copy or otherwise use the OS Components. Capitalized terms used and not otherwise defined here have the meanings assigned to them in the applicable OS Product EULA. To the extent that these terms conflict with terms in the applicable OS Product EULA, these terms control solely with respect to the OS Components. **General.** The OS Components are provided to you by Microsoft to update, supplement, or replace existing functionality of the OS Product. **Additional Rights and Limitations.** If you have multiple validly licensed copies of the OS Product, you may reproduce, install and use one copy of the OS Components as part of the OS

Product on all of your computers running validly licensed copies of the OS Product, provided that you use such additional copies of the OS Components in accordance with the terms and conditions above.

---

## Microsoft Servers

≫ For all products listed in the Product List as belonging to the Servers pool, these rights and restrictions apply. Be sure to read the first section and then go directly to your specific product listed below.

Application Center 2000
BackOffice 2000 Server
BackOffice Server 4.5
BackOffice Small Business Server 4.5 ("SBS 4.5")
BizTalk Server 2000 ("BizTalk 2000")
Commerce Server 2000
Exchange 2000 Conferencing Server
Exchange 2000 Server
Exchange 5.5 Server
Host Integration Server 2000 ("HIS")
Internet Security and Acceleration Server 2000 ("ISA")
Proxy Server 2.0
Services for Netware
Site Server 3.0
Site Server Commerce Edition 3.0
Small Business Server 2000 ("SBS 2000")
SNA Server 4.0
SQL Server 2000
SQL Server 2000 Runtime
SQL Server 7.0
System Management Server 2.0 ("SMS")
Windows 2000 Advanced Server
Windows 2000 Server
Windows NT 4.0 Server
Windows Services for Unix and Interix

≫ Some products have redistributables with associated rights and restrictions. See the "Microsoft Applications" section of this document for use rights for Microsoft Press products.

**The Product may contain the following software:**
- "Server Software" provides services or functionality on your computers capable of running the Server Software ("Servers");
- "Client Software" allows an electronic device ("Device") to access or utilize the Server Software.

**Client Access License ("CAL") Restrictions.** You may only use CALs in conjunction with your Server Software except as otherwise noted. **Version Matching.** Any CAL must have the same or later version number than the corresponding version number of the Server Software being used. **Per Seat or Per Server.** For some products, you may use the Product in "Per Seat" or "Per

7-ELEVEN-00347

Server" mode where specified. In "Per Seat" mode, you need a separate CAL for each unique Device that accesses or utilizes the Server Software. If you choose "Per Seat" mode, your choice is permanent. In "Per Server" mode, the maximum number of Devices which may access or utilize the Server Software at a given point is equal to the number of CALs that you acquired and designate for use exclusively with that Server. "Per Seat" mode CALs may also access Server Software running in the Per Server Mode, provided the additional access is within that Server's maximum licensed capacity. ~~You may permanently change your deployment of a "Per Server" mode CAL to "Per Seat" mode. Transfer. You may make a one-time transfer of a Per Seat CAL to~~ another of your Devices. **Benchmark Testing.** You may not disclose the results of any benchmark test of either the Microsoft Server Software or Client Software for Application Center, BizTalk, Commerce Server, Exchange Server 5.5, HIS, IIS, ISA, Message Queue Server, Proxy Server, SQL Server, Site Server, Site Server Commerce Edition, or Transaction Server to any third party without Microsoft's prior written approval. **Administration.** You do not need a CAL for administration of the Server Software (including remote administration), for up to two connections to the Server. In the case of BackOffice Server 4.5 and SBS 4.5, any number of Devices may be used for administration of the Server Software. **Other Licenses.** Your use of software applications installed on the Server, or accessed through the Server Software may require additional licenses -- please consult the license agreement accompanying such software. **"Internet User."** Except as otherwise provided below, "Internet User" means any person connected to the Internet, other than a person (i) employed by you (as an employee, independent contractor, agent, or in any other capacity); or (ii) otherwise providing goods or services to you (for example, one of your suppliers) or on your behalf (for example, one of your distributors or resellers, agents, or a consulting firm hired by you).

Except as otherwise provided below, you must acquire a license for each Server or Device on or from which a copy of the Server Software or Client Software is installed, used, accessed, displayed, run, or otherwise utilized. Except as otherwise specifically identified, the terms "license" and "CAL", as they are used in any given Product section, refer to licenses and CALs for that Product or, where applicable, for the corresponding BackOffice Server or SBS suite.

## 1. Application Center 2000, BizTalk 2000 Commerce Server 2000, HIS and ISA Servers

**Installation -- Server Software.** Except when licensed in the BackOffice Server 2000 or SBS 2000 suite, for each license you have acquired, you may install one copy of the Server Software on a single Server. If the Server has more than one processor, you must obtain a separate license for each processor on that Server. You may use the Server Software only with that number of

processors for which you are properly licensed. **BizTalk 2000 Standard Edition.** Each copy of the Server Software may only be used by one processor of the computer on which such copy is installed. You need only one valid processor license to utilize the Server Software. The Server Software may not be used in a group beyond one machine, e.g. multiple machines all processing the same application or purpose. In addition, the Server Software may not be used to connect to more than five (5) external organizations and may not be used to connect to more than five (5) internal applications. ~~ISA Server. The following listed files: H.323 Gatekeeper, Message Screener, and ISA Server Management, may be installed on a separate server for use solely in~~ conjunction with the Server Software. **Client Software.** You may install and use the Client Software on any number of internal Devices so long as it is being used only in conjunction with the Server Software.

**Device Access.** Except when licensed in the BackOffice Server 2000 or SBS 2000 suite, any number of Devices may use or access the services of the Server running the Server Software so long as you have acquired a valid license for each processor running the Server Software. **BizTalk 2000, Commerce, HIS and ISA Servers Use of Redistributable Software ("SDK Software").** If included, you may install and use copies of the SDK Software on one or more computers located at your premises solely for the purpose of building applications that work in conjunction with the Server Software ("Applications"). You may modify the Sample Code (identified in the "samples" directories) to design, develop, and test your Applications, and may reproduce and use the Sample Code, as modified, on one or more computers located at your premises. You may also reproduce and distribute the Sample Code, along with any modifications you make thereto (for purposes of this section, "modifications" mean enhancements to the functionality of the Sample Code), and any other files that may be listed and identified in a REDIST.TXT file as "redistributable" (collectively, the "Redistributable Code") provided that you comply with the requirements in section (I)(C)(1) of the Developer Tools section of this document. **HIS Client Access.** For HIS licensed within the BackOffice Server 2000 suite, you do not need a CAL in order to access or utilize the following HIS services solely as server-based processes: AFTP Client and Server, FTP-AFTP Gateway Service, VSAM File Transfer Utility, Shared Folders Gateway Service, Host Print Service, OLE DB Provider for AS/400 and VSAM, OLE DB Provider for DB2, ODBC Driver for DB2, COM Transaction Integrator for CICS and IMS, Host Security Integration Services, MSMQ-MQ Series Bridge, and NetView Integration Services. **Client Software.** If you are using the HIS 2000 Client Software to access a product other than HIS 2000, you may only install and use the HIS Client Software on each Device to which a valid CAL has been dedicated. The 3270 and 5250 terminal emulation applets ("Applets") of the HIS Client Software may be used by only one user per licensed copy of the HIS Server Software. Licenses for additional users must be acquired separately. Additionally, the Applets may only be used to access or otherwise utilize

*Microsoft Licensing Product Use Rights (Americas English January 1, 2001)*

7-ELEVEN-00348

the services of HIS.  **Use of Host Security Integration Feature.** You may install and use the software identified as "Windows NT Account Synchronization Service" and "Host Account Cache" on any computer running a validly licensed copy of Windows NT Server within your organization.

## 2. BackOffice Server 2000

>> BackOffice is a suite of various server products. Be sure to read the sections for each component.

### A. Server Use Rights
Use rights and restrictions specific to the individual components are identified in component sections.  In the case of inconsistencies between this section and any section specific to an individual component, this section controls only with regard to your use of the component within the BackOffice suite.

**Installation--Server Software.**  For each license you acquire, you may install one copy of each Server Software component of the Product on a single Server. You may allocate the Server Software components of the Product among up to three Servers ("MultiServer Configuration") provided that:

(i)     You use the BackOffice Server 2000 Setup feature to implement the MultiServer Configuration,

(ii)    Each of the Servers in the MultiServer Configuration are geographically co-located and configured within the same Microsoft Windows 2000 Active Directory Organizational Unit,

(iii)   Each of the Server Software components is only installed once in the MultiServer Configuration, and

(iv)    A separate Windows 2000 Server license is in place for each Server in the MultiServer Configuration (the Product contains only a single license for Windows 2000 Server).

**Client Software.**  Except as otherwise provided in the sections covering individual components below, you may install the Client Software on any Device.

### CAL Requirements.
**(i) General.**  Except as otherwise provided below or in the component sections, you must acquire CALs in order to access or otherwise utilize the services or functionality of the Server Software, whether you use the Client Software or any other software to do so.  BackOffice Server 2000 CALs authorize access and use of each of the Server Software components of the Product that require a CAL.  You may also access and use individual Server Software components of the Product by acquiring CALs for those individual Server Software components.

**(ii) Mode of Deployment.**  You may deploy CALs for Microsoft Windows 2000 Server in either "Per Seat" or "Per Server" mode.  CALs for Microsoft BackOffice Server 2000, Exchange 2000 Server, HIS, ISA, SQL

Server 2000 and SMS may only be deployed in "Per Seat" mode.  **Health Monitor 2.1.   Permitted Use.**  You may use Health Monitor 2.1 to (i) monitor any Server on which a Server Software component of the Product is installed as provided for above and (ii) monitor any Device to which you have dedicated a CAL.   **Client Access.**  No CAL is required for any Device used as the administrative console for Health Monitor 2.1 provided such Device is not itself being monitored by Health Monitor 2.1.   **Shared Fax Service and Shared Modem Service.  Client Access.**  You must have a CAL for each unique Device that accesses or uses the Shared Fax Service or Shared Modem Service.  **Server Software.  Use of Administrator Tools.**  You may install and use the integrated BackOffice Server Management Console and related tools on any Device within your organization for the sole purpose of administering Server Software and Client Software components of the Product acquired in connection with the Product.  **Use of Redistributable Components.**  You may modify, reproduce or distribute the files listed in the REDIST.TXT file (collectively referred to as "Redistributable Components") provided that you comply with the Modification and Distribution Terms listed in such REDIST.TXT file.  You may move the Server Software to a different Server; provided, however, that if the Server Software components of the Product are installed in a MultiServer Configuration, you may only move the Server Software to another Server in the MultiServer Configuration.  **Prior Versions.**  Any right you have to install and use prior versions of the Software extends to the individual components of the Server Software, so long as they are installed and used on a single Server or within the same MultiServer Configuration.   **Upgrades of a Component of the Microsoft BackOffice Server 2000 Suite.**  You may upgrade a component within the BackOffice Server suite, so long as the upgraded component is run on the same Server on which the component being upgraded is installed, unless the upgraded component is an Enterprise or Commerce Edition, in which case you may use the upgraded component as a stand-alone product. Subject to the immediately preceding sentence, when you install the upgraded component, (i) the upgraded component replaces the component in the suite being upgraded, (ii) your use of the upgraded component is subject to the terms of use associated with that component, and (iii) the remaining components of BackOffice Server may only be used in accordance with these use terms.

### B. CAL Use Rights
Unless otherwise noted, defined terms have the same meaning as in the section covering BackOffice Server above.  For each CAL acquired, you may access or otherwise use the services or functionality of licensed Server Software in the manner provided for in the section covering BackOffice Server above.

## 3. BackOffice Server 4.5

>> BackOffice is a suite of various server products. Be sure to read the sections for each component.

*Microsoft Licensing Product Use Rights (Americas English January 1, 2001)*

Form 4400981 4/04 Uniform
Page 9 of 28  - Microsoft

## A. Server Use Rights

Use rights and restrictions specific to the individual components are identified in component sections below. In the case of inconsistencies between this section and any section specific to an individual component, this section controls only with regard to your use of the component within the BackOffice suite.

**Installation—Server Software.** Several copies of the Server Software and the Connector Software (applicable to Microsoft Exchange Server only), each of which is compatible with a different microprocessor architecture (such as the x86 architecture or various RISC architectures), may be provided. At any given time, you may install one copy of the Server Software for only one of those architectures on a single computer. You may not separate component parts of the Server Software for use on more than one Server. **Client Software.** You may install the Client Software on any Device.

**Use of the Server Software.** For each license acquired, you may use one copy of the Server Software on one Server. You must acquire a separate CAL for each unique Device which accesses or otherwise utilizes the services or functionality of the Server Software, whether you use the Client Software or any other software to do so, unless otherwise provided in this section or any of the component sections. This is known as using the Server Software in Per Seat Mode. However, you may elect to use the Server Software for Microsoft SQL Server, Windows NT Server (except as specified below), Site Server, Site Server Commerce Edition or SNA Server (but not Microsoft Exchange Server, Windows NT Server, Terminal Server Edition, SMS, or BackOffice Server) in Per Server Mode. You also need a Windows NT Workstation license to access or utilize certain services or functionality of Windows NT Server as described in the Windows NT Server component section. **Use of the Client Software.** You may use the Client Software provided that you acquire CALs as required above, and subject to any limitations set forth in this section or any component section. **Installation on a Single Server.** The Software is licensed as a single product. The Server Software components may not be separated for use on more than one Server, unless otherwise provided in this section. Use of Redistributable Components. You may modify, reproduce and/or distribute the files listed in the REDIST.TXT file (collectively referred to as "Redistributable Components") provided that you comply with the Modification and Distribution Terms listed in such REDIST.TXT file. **Upgrades of a Component of the Microsoft BackOffice Server 4.5 Suite.** You may upgrade a component within the BackOffice Server suite, so long as the upgraded component is run on the same Server on which the component being upgraded is installed, unless the upgraded component is an Enterprise or Commerce Edition, in which case you may use the upgraded component as a stand-alone product. Subject to the immediately preceding sentence, when you install the upgraded component, (i) the upgraded component replaces the component in the suite being upgraded, (ii) your use of the upgraded component is subject to the terms of use associated with that component, and (iii) the remaining components of BackOffice Server may only be used in accordance with these use terms.

## B. CAL Use Rights

For each CAL acquired, you may access or otherwise use the services or functionality of licensed Server Software in the manner provided for in the section covering BackOffice Server 4.5 above. The services or functionality of the Server Software are considered to be accessed or utilized when there is a direct or indirect connection between a Device and the Server Software.

**Use of the CAL in conjunction with the Enterprise Edition or Commerce Edition of the Server Software.** You may also use a given CAL to access or otherwise use the services or functionality of the Enterprise Edition or Commerce Edition of the Server Software, provided that you comply with these terms and conditions. Each CAL for BackOffice Server also functions as a CAL used in the Per Seat Mode for each individual Server Software component of BackOffice Server product suite; consequently such CAL may also be used to access an Enterprise, Commerce or Terminal Server Edition of such Server Software components. By way of example, if BackOffice Server version 4.0 includes Microsoft SQL Server version 6.5, then the CAL for BackOffice Server version 4.0 entitles you to access or utilize the services or functionality of SQL Server and SQL Server Enterprise Edition version 6.5 or lower used in Per Seat Mode that you acquired separately.

## 4. (BackOffice) SBS 2000

》》 SBS is a suite of various server products. Be sure to read the sections for each component.

## A. Server Use Rights

Use rights and restrictions specific to the individual components are identified in component sections. In the case of inconsistencies between this section and any section specific to an individual component, this section controls only with regard to your use of the component within the SBS suite.

**Installation and Use--Server Software.** For each license acquired, you may install and use one copy of the Server Software on a single Server, provided that such Server may not be connected to more than fifty (50) Devices. You may not separate the Server Software components for use on more than one Server. Regardless of the number of licenses you acquire for the Product, only a single instance of the Product may run in a single domain (other than for data migration purposes for the period of time necessary to complete the data migration). **Client Software.** Subject to the Component product limitations, you may install and use the Client Software on up to fifty (50) Devices, provided that you have dedicated a CAL to each such Device.

**SBS 2000 CAL Requirements.** Except as otherwise provided in this Section or in the Component Sections, you must acquire a separate CAL for each unique Device that accesses or utilizes the Server Software. BackOffice Server 2000 CALs and CALs for the individual Server Software components do not authorize you to access and use such individual Server Software components when

7-ELEVEN-00350

such components are acquired as part of the SBS 2000 suite; only the SBS 2000 CAL provides you with such access and use rights. **Health Monitor 2.1. Permitted Use.** You may use Health Monitor 2.1 to (i) monitor any Server on which a Server Software component of the Product is installed as provided for above and (ii) monitor any Device to which you have dedicated a CAL. **Client Access.** No CAL is required for any Device used as the administrative console for Health Monitor 2.1 provided such Device is not itself being monitored by Health Monitor 2.1. **Shared Fax Service and Shared Modem Service.** Client Access. You must have a CAL for each unique Device that accesses or uses the Shared Fax Service and/or Shared Modem Service Server Software. **Use of Administrator Tools.** You may install and use the integrated SBS Management Console and related tools and snap-ins on any Device within your organization for the sole purpose of administering the Server Software or Client Software components acquired as part of the Product. **Use of Redistributable Components.** You may modify, reproduce or distribute the files listed in the REDIST.TXT file (collectively referred to as "Redistributable Components") provided that you comply with the Modification and Distribution Terms listed in such REDIST.TXT file.

**B. CAL Use Rights.**
Unless otherwise noted, defined terms have the same meaning as in the Server use rights section above.
For each license acquired, you may access or otherwise use the services or functionality of licensed Server Software in the manner provided for in the Server use rights section above. SBS 2000 CALs grant you access to the Server Software only when it is acquired as part of the SBS suite.

## 5. BackOffice SBS 4.5

≫ SBS is a suite of various server products. Be sure to read the sections for each component.

**A. Server Use Terms**
Use rights and restrictions specific to the individual components are identified in sections below. In the case of inconsistencies between this section and any section specific to an individual component, this section controls only with regard to your use of the component within the SBS suite.

**Installation —Server Software.** Several copies of the Server Software, each of which is compatible with a different microprocessor architecture (such as the x86 architecture or various RISC architectures), may be provided. At any given time, for each license acquired, you may install one copy of the Server Software for only one of those architectures on a single computer. Client Software. You may install the Client Software on any Device to which a valid CAL has been dedicated.

**Use of the Server Software.** You may use one copy of the Server Software on one Server, which may be

connected to a maximum number of fifty (50) authenticated Devices, provided that you have obtained the necessary CALs for such Devices. You must acquire a separate CAL for the Software for each unique Device which accesses or otherwise utilizes the services or functionality of the Server Software, whether you use the Client Software or any other Software to do so, unless otherwise noted below or in any component section. You also need a Windows NT Workstation license to access or utilize certain services or functionality of the Windows NT Server component of the Software as described below. BackOffice Server 4.5 CALs and CALs for the individual Server Software components do not authorize you to access and use such individual Server Software components when such components are acquired as part of the SBS 4.5 suite; only the SBS 4.5 CAL provides you with such access and use rights. **Anonymous Access.** You do not need a CAL for Anonymous Access to the following Server Software components of the Software: Microsoft Internet Information Server and Microsoft Exchange Server. "Anonymous Access" occurs when a Device accesses or utilizes the Software and is not validated by a Windows NT Server domain ID. **Use of the Client Software.** You may use the Client Software provided that you acquire CALs as required above, and subject to any limitations set forth here or in the component sections. **Upgrades of SBS 4.5.** If you upgrade a component within the SBS 4.5 suite, the upgraded component replaces the component(s) within the suite being upgraded, and you may use the upgraded component only in accordance with the terms of use associated with such component; provided that the component(s) being upgraded are deemed removed from the SBS suite and you may no longer use any such components; and provided further that the SBS suite, as it exists subsequent to the upgrade, may be used only in accordance with the use terms that accompanied the original product suite, except as provided below with respect to its fax and modem pooling server software components ("Fax and Modem Software"). If the upgraded product you acquired as an upgrade of SBS is Microsoft BackOffice Server product suite, then each Server Software component of the Software will be deemed to have "upgraded" the applicable component of SBS as set forth above only upon your installation of such Server Software component of the Software. If the upgraded component is either (a) Microsoft Windows NT Server or (b) BackOffice Server product suite (and the Windows NT Server component of SBS is deemed upgraded as described above), then the Fax and Modem Software is no longer subject to the connection limitation in the SBS use terms and you do not need to acquire a CAL for SBS for each Device that accesses or utilizes the Fax and Modem Software.

**B. CAL Use Rights**
The services or functionality of the Server Software are considered to be accessed or utilized when there is a direct or indirect connection between a Device and the Server Software running on a Server.

7-ELEVEN-00351

Use of the CAL. Each CAL must be dedicated to one unique Device. It permits that Device to access or otherwise utilize the services or functionality of the Server Software running on one (1) Server which you must designate. For each CAL acquired, you may access or utilize only Microsoft BackOffice SBS and may not access or utilize any Server Software components of Microsoft BackOffice SBS which you have acquired separately or as part of any other Microsoft BackOffice product suite.

Use of the CAL on a Device (for the Microsoft Exchange Server Software component only). Each CAL for the Server Software may be used for any other Device that you use less than twenty percent (20%) of your total connection time; provided that you may use such other Device to access or utilize only the Microsoft Exchange Server component of the Server Software. The term "total connection time" has the meaning noted in the Exchange 2000 Server section below. Transfers. You may change the Server that a given CAL has been designated to access only in conjunction with a transfer of the Server Software to another computer or a permanent transfer of the Server Software, in accordance with the terms of the Server License for SBS. Upgrades of CALs for SBS 4.5. After you have upgraded the server software component(s) of SBS, the SBS CAL cannot be used to access such server software component(s) of SBS that you have upgraded.

## 6. Exchange 2000 Server and Exchange 2000 Conferencing Server**
**Not available in BackOffice or SBS suites

### A. Exchange 2000 Server Use Rights.
Installation-Server Software. For each license acquired, you may install one copy of the Server Software on a single Server. You may not separate component parts of the Server Software for use on more than one Server. Client Software. You may install the Client Software on any Device for which you have acquired a CAL. Exchange Server 5.5 Software may accompany the Server Software. In the event it does, you may install one copy of the Exchange Server 5.5 Software on the same server on which you install the Server Software solely for the purpose of enabling the functioning of the Server Software.
Exchange 2000 Server CAL Requirements.
You must acquire a separate CAL for each Device which accesses the services or functionality of the Server Software, whether you use the Client Software or any other software to do so, unless otherwise noted below:

- **Anonymous Access.** You do not need a CAL for anonymous access to the Server Software. Anonymous access occurs when an Unauthenticated Device accesses information held in the Server without having a mailbox or custom recipient object which identifies the Device. "Unauthenticated Device" means a Device that (i) does not directly or indirectly utilize Windows 2000 Server Integrated Sign-On

Service and (ii) does not receive credentials from Windows 2000 Directory Services.
- **Limited Access by Other Devices.** Each CAL you acquire for a Device may also be used by the primary user of that Device ("Primary User") to enable access or use of the Server Software by any other Device that the Primary User uses less than twenty percent (20%) of the Primary User's total connection time. The term "total connection time" means the total amount of time the Primary User uses Microsoft Client Software to access or otherwise use the Server Software from a Device.

Upgrades from BackOffice Server or SBS. When you install the Server Software, the Server Software replaces the server software component of Microsoft BackOffice Server or Microsoft SBS being upgraded, and you may use the Server Software in accordance with these terms. The remaining components of BackOffice Server or SBS may only be used in accordance with the terms of the end-user license agreement that accompanied the original product suite.

### B. Exchange 2000 Conferencing Server - Server Use Rights.
Server Software. For each license acquired, you may install one copy of the Server Software on a single Server. You may not separate component parts of the Server Software for use on more than one Server. Client Software. You may install the Client Software on any Device.

Exchange 2000 Conferencing Server CAL Requirements. You must acquire a separate CAL for each Device which accesses the services or functionality of the Server Software, whether you use the Client Software or any other software to do so, unless otherwise noted below. Limited Access by Other Devices. Each CAL you acquire for a Device may also be used by the primary user of that Device ("Primary User") to enable access or use of the Server Software by any other Device that the Primary User uses less than twenty percent (20%) of the Primary User's total connection time. The term "total connection time" has the meaning provided in the Exchange 2000 Server section above. Installation of Server Software on Fail-over Server. Each Server used in a clustered environment for fail-over purposes requires a separate licensed copy of the Server Software.

### C. CAL Use Rights.
Unless otherwise noted, defined terms have the same meaning as in the Server use rights sections above. For each CAL acquired, you may access or otherwise use the services or functionality of licensed copies of Exchange 2000 and Exchange 2000 Conferencing Server in the manner provided for in the respective Server use rights sections.

7-ELEVEN-00352

## 7. Exchange Server 5.5

### A. Server Use Rights

You may install and use of Server Software and Client Software as provided in the BackOffice Server 4.5 section above (except in the case of Server Software and Client Software licensed within the SBS 4.5 suite, which may be installed and used as provided in the SBS 4.5 section above), subject to the restrictions noted here.

Connector Software. If applicable, at any given time, for each license acquired, you may install and use on one Server only one copy of the Connector Software for one of the provided architectures. If you choose to make the Connector Software a usable feature, you must also acquire a separate license or licenses (whether as part of the license for Microsoft Exchange Server or as a separate license for the Connector Software) to install and use the Connector Software on every other Microsoft Exchange Server in the same "Microsoft Exchange Organization." A "Microsoft Exchange Organization" is the group of all Microsoft Exchange Servers with the same organization name specified during the Microsoft Exchange Server installation process for the express purpose of connecting the servers. Except when the Product is licensed within the SBS suite, Microsoft Outlook is part of the Microsoft Client Software for Microsoft Exchange Server. You may only install and use Microsoft Outlook on each Device to which a valid CAL for any version of Microsoft Exchange Server has been dedicated.

Exchange Server CAL Requirements. You must acquire a separate CAL for each Device that is used by an "Authenticated User" to access Exchange Server and for every device that has a mailbox or custom recipient object that identifies it. Each CAL for Microsoft Exchange may also be used for any other Device that you use less than twenty percent (20%) of your total connection time. The term "total connection time" has the meaning provided in the Exchange Server 2000 section above. Exchange Server, Enterprise Edition—Use in a Clustered Environment. If you are using the Server Software in a clustered environment and the Server on which the Server Software is installed fails over to one other computer in the cluster ("Fail-Over Computer"), you may use the Server Software on such Fail-Over Computer provided that you: (i) have acquired a separate licensed copy of the Server Software for such Fail-Over Computer, and (ii) use the Server Software on the Fail-Over Computer only for so long as the Server on which the Server Software is installed has failed over to such Fail-Over Computer. At any point in time, however, the Server Software may be used only on one computer. Use of the Sample Applications. Microsoft grants you the non-exclusive right to use and modify the source code version of the files designated as Sample Applications ("Sample Applications") and to reproduce and distribute the object code versions of such modifications in conjunction with your application that utilizes the services

of Microsoft Exchange Server ("Application"). You are granted the foregoing distribution rights provided that you comply with the requirements listed in Section (I)(C)(1) of the Developer Tools section of this document. Note on Outlook Web Access Software. You may customize, reproduce and distribute the Outlook Web Access software internally, and incorporate it into any other software, provided you comply with the requirements in Section (I)(C)(1) of the Developer Tools section of this document. Source Extractor, Administrator and Microsoft Mail Connector. You may install and use the Source Extractor, Administrator and Microsoft Mail Connector components on additional computers. Microsoft also grants you the right to modify the source code version of the Source Extractor. The Source Extractor may only be used to migrate data to Microsoft Exchange Server. Upgrades of a Component of the BackOffice Server 4.5 or SBS 4.5 Suites. See conditions noted in the BackOffice Server 4.5 and SBS 4.5 sections above.

### B. CAL Use Rights.

Unless otherwise noted, defined terms have the same meaning as in the Server use rights section above. For each CAL acquired, you may access or otherwise use the services or functionality of licensed copies of the Exchange Server 5.5 and in the manner provided for in the Server use rights section. Upgrades of CALs for SBS 4.5 Suite. See conditions noted in the SBS 4.5 section above.

## 8. Proxy Server

You may install and use of Server Software and Client Software as provided in the BackOffice Server 4.5 section above, except you do not need a CAL to access or otherwise utilize the services or functionality of Proxy Server.

## 9. Services for NetWare

Installation—Server Software. You may install an unlimited number of copies of the Server Software on Servers residing on your premises that are running the appropriate Microsoft Windows operating system as described in the user documentation published by Microsoft. Client Software. You may install the Client Software on any Devices.

## 10. Site Server and Site Server Commerce Edition 3.0

### A. Server Use Rights

Installation—Server Software. For each license acquired, you may use one copy of the Server Software to support a single "domain" (the description of a computer's location on the Internet) on a single Server. An Internet domain is comprised of a second-level domain name (e.g., microsoft) and a top-level domain name (e.g., com). The single domain restriction shall not apply to intranet usage of the Server Software within and

7-ELEVEN-00353