for a single organization. **Per Server Mode.** When a Device "visits" a Server, it is deemed to be accessing, utilizing and/or simultaneously connecting to the Server Software. A "visit" means a series of one or more requests from a Device to a Server. A visit ends when such Device does not make any additional requests of the Server Software for a period of time that exceeds the default setting for a visit, as described in the Site Server documentation. A "request" means a hit that successfully retrieves content. **Commercial Use.** Site Server is licensed for your use and you may not use Site Server to provide Commercial Services to third parties. Each of the following is a "Commercial Service":

- A product or service that uses one or more services of Site Server and alleviates any third party from the obligation to obtain a separate license to Site Server for his, her or itself; and
- A product or service that uses Site Server as part of an Internet access and/or carriage service for any third party.

Examples of Commercial Services include, but are not limited to, the following:

- Hosting of Internet, Extranet or Intranet sites on behalf of any third party, whether or not the sites are registered as separate domains;
- Hosting of applications that use the services of Site Server on behalf of any third party, or
- Hosting of commerce or other services of Site Server on behalf of any third party.

**CAL Requirement.** You do not need a CAL in order to solely execute Site Server-to-Site Server communications.

**Internet Connector.** For each Internet Connector license acquired, you may permit any number of Devices to access and otherwise utilize the services of a single Server running the Server Software, without the need to acquire CALs only:

- When such Devices are deployed for use by users accessing or utilizing the Server via the Internet or as part of an Extranet; and
- As long as such access or use via the Internet or an Extranet is not effectively substituting for access to an Intranet.
- You must obtain CALs for Devices that access or otherwise utilize the Server Software when deployed as part of an Intranet or when accessed or used via the Internet or an Extranet as a substitute for an Intranet.

**Content Deployment Software.** For each license acquired, you may install and use one copy of Content Deployment software included in the Server Software on a single computer for staging and on a second computer for production, provided that at least one of such computers is running a licensed copy of the Server Software. **Software Development Kits ("SDK Software").** If included, you may install and use copies of the SDK Software on one or more computers located at your premises solely for the purpose of building applications that work in conjunction with Microsoft Site

Server ("Applications"). You may modify the Sample Code to design, develop, and test your applications, and may reproduce and use the Sample Code, as modified, on one or more computers located at your premises. For the purposes of this section, "Sample Code" shall mean the sample source, HTML and Active Server Page (ASP) code located in Site Server's "SDK" and "samples" directories. You may also reproduce and distribute the Sample Code, along with any modifications you make thereto, provided that you comply with the Distribution Requirements described in the REDIST.TXT file. For purposes of this section, "modifications" shall mean enhancements to the functionality of the Sample Code. **Upgrades of a Component of the BackOffice Server 4.5 or SBS 4.5 suites.** See conditions noted in the BackOffice 4.5 and SBS 4.5 sections above.

**B. CAL Use Rights.**
Unless otherwise noted, defined terms have the same meaning as in the Server use rights section above. For each CAL acquired, you may access or otherwise use the services or functionality of licensed copies of Site Server or Site Server Commerce Edition in the manner provided for in the Server use rights section. **Upgrades of CALs for SBS 4.5 Suite.** See conditions noted in the SBS 4.5 section above.

## 11. SNA Server 4.0

**A. Server Use Rights.**
You may install and use of Server Software and Client Software as provided in the BackOffice Server 4.5 section above (except in the case of Server Software and Client Software licensed within the SBS 4.5 suite, which may be installed and used as provided in the SBS 4.5 section above), subject to the restrictions noted here. **Client Software.** If you are using the Client Software to access a product other than the Software, you may only install and use the Client Software on each Device to which a valid CAL for the Server Software has been dedicated. The SNA Server 3270 and 5250 terminal emulation applets ("Applets") of the Client Software may be used by only one user per licensed copy of the Server Software to access or otherwise utilize the services of Microsoft SNA Server. Licenses for additional users must be acquired separately. In addition, you may use copies of the Applets on any Device for which you have acquired a valid CAL.

**CAL Requirements.** For copies licensed outside the SBS suite, you do not need a CAL in order to access or utilize the following SNA Server services solely as server-based processes: AFTP Client and Server, FTP-AFTP Gateway Service, VSAM File Transfer Utility, Shared Folders Gateway Service, Host Print Service, OLE DB Provider for VSAM and AS/400, OLE DB Provider for DB2, ODBC Driver for DB2, COM Transaction Integrator for CICS and IMS, Host Security Integration Services, MSMQ-MQ Series Bridge, and NetView Integration Services. **Use of Host Security Integration Feature.** You may install and use the software identified as "Windows NT Account Synchronization Service" and

"Host Account Cache" on any computer running a validly licensed copy of Windows NT Server within your organization.

**Additional Rights for Development.** For copies licensed outside the SBS suite, you may also install and use copies of the OLE DB Provider for VSAM and AS/400, OLE DB Provider for DB2, ODBC Driver for DB2 or the COM Transaction Integrator for CICS and IMS or the Software Development Kit, if included, on one or more computers located at your premises solely for the purpose of developing applications that work in conjunction with Microsoft SNA Server ("Applications"). You may use and modify the source code designated as "Sample Code" in the SAMPLES.TXT file for the sole purposes of designing, developing, and testing your Applications. You may also reproduce and distribute the Sample Code, along with any modifications you make thereto, provided that you comply with the Distribution Terms described in the REDIST.TXT file. For purposes of this section, "modifications" mean enhancements to the functionality of the Sample Code. Portions of SNA Server are also designated as "Redistributable Code". The text file named REDIST.TXT contains a list of such files, as well as the distribution rights associated with the Redistributable Code. Upgrades of a Component of the BackOffice Server 4.5 or SBS 4.5 Suites. See conditions noted in the BackOffice Server 4.5 and SBS 4.5 sections above.

**B. CAL Use Rights.**
Unless otherwise noted, defined terms have the same meaning as in the Server use rights section above. For each CAL acquired, you may access or otherwise use the services or functionality of licensed copies of SNA Server in the manner provided for in the Server use rights section. Upgrades of CALs for SBS 4.5 Suite. See conditions noted in the SBS 4.5 section above.

## 12. SQL Server 2000 and SQL Server 2000 Runtime-Restricted Use ("SQL 2000 Runtime")***

≫   SQL Server 2000 is available in per seat or per processor licenses. ***SQL 2000 Runtime is not available in the BackOffice or SBS suites.

**A. Server Use Terms**
For SQL Server 2000 acquired outside the BackOffice Server 2000 and SBS suites and SQL Server 2000 Runtime, you may use the Product either in "Per Seat" (with CALs) or "Per Processor" mode, and you may not change the type of use. For SQL Server 2000 acquired within the BackOffice Server 2000 or SBS suite, you may only use the Product in "Per Seat" (with CALs) mode.

**Per Seat**

**Installation -- Server Software.** For each license acquired, you may install and use one copy of the Server Software on a single Server. **SQL Server, Enterprise Edition.** If you have acquired the Enterprise Edition of the Server Software, you may install any number of instances of the Server Software on that Server. An "instance" means a running copy of the Server Software. **Client Software.** You may install the Client Software (SQL Server Personal Edition) on any internal Device.

**SQL Server 2000 CAL Requirements.** You must acquire a separate CAL for each Device that:

- Accesses or otherwise utilizes the services of the Server Software (including Devices using MSDE for such access), or
- Installs and uses SQL Server Personal Edition, or
- Uses the Management Tools, Books-Online, and Development Tools components of Microsoft SQL Server (collectively "Tools"). You may only use the Tools for internal use in conjunction with your Server Software.

**Installation of Server Software on Passive Fail-Over Server.** If the Server Software is used in a clustered environment, you may use the Server Software on a temporary basis on a Server that is employed only for fail-over support.

≫   Or you may acquire the per processor license:

**Per Processor**
**Server Software.** For each license acquired, you may install one copy of the Server Software on a single Server. If the Server has more than one processor, you must obtain a separate license for each processor on that Server. You may use the Server Software only with that number of processors for which you are properly licensed. You may use the Management Tools, Books-Online, and Development Tools components of Microsoft SQL Server (collectively "Tools") solely for internal use in conjunction with your Server Software. **SQL Server, Enterprise Edition.** If you have acquired the Enterprise Edition of the Server Software, you may also install any number of instances of the Server Software on the Server for use by any processor for which you have acquired a license. An "instance" means a running copy of the Server Software. **Client Software.** You may install and use the Client Software (SQL Server Personal Edition) on any number of internal Devices so long as it is being used only in conjunction with the Server Software, and, in the case of SQL 2000 Runtime, the integrated software turnkey application or suite of applications delivered with the Product ("Integrated Application"). **SQL Server 2000 Device Access.** Any number of Devices may use or access the services of a Server running the Server Software so long as you have acquired a valid license for each processor running the Server Software. **SQL Server 2000 Runtime Device Access.** Any number of Devices may use or access the services of the Server Software in conjunction with the Integrated Application so long as you have acquired a valid license for each processor running such Server Software. You may

*Microsoft Licensing Product Use Rights (Americas English January 1, 2001)*

permit Devices to access or use only the services of the Server Software provided with the Integrated Application. **Installation of Server Software on Passive Fail-Over Server.** If the Server Software is used in a clustered environment, you may use the Server Software on a temporary basis on a Server that is employed only for fail-over support (the "Passive Server") so long as the number of processors on the Passive Server does not exceed the number of processors on your primary active Server.

---

>> The following redistributable section applies to SQL Server 2000 products.

---

**Redistributable Code.** In addition to the rights granted above, Microsoft grants you the nonexclusive, royalty-free right to use, reproduce and distribute the Microsoft SQL Server Desktop Engine ("MSDE") and the files listed in the REDIST.TXT contained in the Product (collectively, the "Redistributable Code"), provided that you also comply with sections (1)(C)(1) and (2)(b)(i) of the Developer Tools section of this document. **Runtime-Restricted Use Software.** You may use SQL 2000 Runtime solely as part of the Integrated Application solely to run the Integrated Application. SQL 2000 Runtime may not be used either (i) to develop or (ii) in conjunction with, new applications, databases or tables other than those contained in the Integrated Application. You may, however, use a tool to run queries or reports from existing tables, or use a development environment or workbench which is part of the Integrated Application to configure or extend such Integrated Application. Notwithstanding anything to the contrary in these use rights, you may only transfer a given license for SQL 2000 Runtime as part of the Integrated Application, subject to the transfer restrictions in your license agreement.

**B. CAL Use Rights.**
Unless otherwise noted, defined terms have the same meaning as in the Server use rights section above.
For each CAL acquired, you may access or otherwise use the services or functionality of licensed Server Software in the manner provided for in the Server use rights section above. SQL 2000 Runtime CALs permit you to access or otherwise utilize the services or functionality of only a Runtime-Restricted Use version of the Server Software. Notwithstanding anything to the contrary in these use rights, you may only transfer a given SQL 2000 Runtime CAL as part of the Integrated Application, subject to the transfer restrictions in your license agreement.

### 13. SQL Server 7.0

**A. Server Use Terms.**
You may install and use Server Software and Client Software as provided in the BackOffice Server 4.5 section above (except in the case of Server Software and Client Software licensed within the SBS 4.5 suite, which may be installed and used as provided in the SBS 4.5 section above), subject to the restrictions noted here.

**Client Access.** You do not need a CAL in order for a Microsoft SQL Server or Microsoft SQL Server, Enterprise Edition to solely interact with another Microsoft SQL Server or Microsoft SQL Server, Enterprise Edition.

**SQL Server, Enterprise Edition—Use in a Clustered Environment.** If you are using the Server Software in a clustered environment and the Server on which the Server Software is installed fails over to one other computer in the cluster ("Fail-over Computer"), you may use the Server Software on such Fail-over Computer if you comply with the requirements noted in Exchange Server 5.5 section above regarding use in a clustered environment.    **Interaction between Microsoft SQL Server and Microsoft Data Engine ("MSDE") and Use of SQL Server Desktop.** You may only install and use the SQL Server Desktop component of Microsoft SQL Server on each Device to which a valid CAL for the Server Software has been dedicated. If you use SQL Server Desktop to access or use the services of any version of Microsoft SQL Server (for example, replication, data transformation or heterogeneous query services), or if you use MSDE to access or use the services of Microsoft SQL Server (for example, replication, data transformation or heterogeneous query services), you must use Microsoft SQL Server in Per Seat Mode (that is, each unique Device accessing SQL Server must have a CAL dedicated to it). **Use of SQL Server Tools.** You may only use the Management Tools, Books-Online, and Development Tools components of Microsoft SQL Server (collectively "Tools") on each Device for which you have a valid CAL for the Server Software. **Use of Redistributable Components.** You may reproduce and distribute the files listed in the REDIST.TXT file (collectively referred to as "Redistributable Components") provided that you comply with the Distribution Terms listed in such REDIST.TXT file.    **Upgrades of a Component of the BackOffice Server 4.5 or SBS 4.5 Suites.** See conditions noted in the BackOffice Server 4.5 and SBS 4.5 sections above.

**B. CAL Use Rights**
Unless otherwise noted, defined terms have the same meaning as in the Server use rights section above. For each CAL acquired, you may access or otherwise use the services or functionality of licensed copies of the SQL Server 7.0 in the manner provided for in the Server use rights section. **Upgrades of CALs for SBS 4.5 Suite.** See conditions noted in the SBS 4.5 section above.

### 14. SMS Server

**A. Server Use Terms**
You may install and use of Server Software and Client Software as provided in the BackOffice Server 2000 section above (except in the case of Server Software and Client Software licensed within the BackOffice Server 4.5 or SBS 4.5 suite, which may be installed and used as provided in the BackOffice Server 4.5 or SBS 4.5 section above, respectively), subject to the restrictions noted

7-ELEVEN-00356

here. **Client Software.** You may install and use the Installer component of the Client Software ("SMS Installer") only on Devices within your organization and only for the purpose of creating installation programs through the use of SMS Installer ("Setup Programs"). You may also use and modify the source code designated as "Sample Code" in the SAMPLES.TXT file for the sole purposes of designing, developing, and testing your Setup Programs. You may also install and use in object code form the Redistributable Components (as defined below), along with any modifications you may make to the Sample Code, only on Devices within your organization for a purpose other than creation of Setup Programs, so long as you comply with the requirements set forth in section (I)(E)(3)(g) of the Developer Tools section of this document. **Client Access.** You do not need a CAL in order to solely execute Systems Management Server-to-Systems Management Server communications that are solely managing a third Device. **Use of the Redistributable Components.** You may reproduce and distribute the files listed in the REDIST.TXT file (collectively referred to as "Redistributable Components"), along with any modifications you may make to the Sample Code, provided that you comply with the Distribution Terms listed in such REDIST.TXT file. Note that the Distribution Terms include, among other conditions, terms similar to those described in subsections (i) - (iii) of the Client Software note above. **Administration Console or Utilities.** You also do not need to acquire a CAL for Microsoft SQL Server to use the administration console or utilities provided with Systems Management Server to access or otherwise utilize the services of Microsoft SQL Server. **Software Metering, Logon Point, and Client Access Points.** For SMS Server licensed outside the BackOffice Server 2000 suite, you may install and use the Metering Services and Client Access Points components of the Server Software on any computer running a validly licensed copy of Windows NT Server within your organization. For SMS Server licensed within the BackOffice Server 2000 suite, you may install and use the Software Metering, Logon Point, and Client Access Point components of the Server Software on any computer running a validly licensed copy of any version of Windows NT Server or Window 2000 Server products within your organization. **Upgrades of a Component of the BackOffice Server 4.5 or SBS 4.5 Suites.** See conditions noted in the BackOffice Server 4.5 and SBS 4.5 sections above.

**B. CAL Use Rights.**
Unless otherwise noted, defined terms have the same meaning as in the Server use rights section above. For each CAL acquired, you may access or otherwise use the services or functionality of licensed Server Software in the manner provided for in the Server use rights section above. **Upgrades of CALs for SBS 4.5 Suite.** See conditions noted in the SBS 4.5 section above.

## 15. Windows 2000 Server and Windows 2000 Advanced Server*
*Not available in the BackOffice Server or SBS suites.

**A. Server Use Rights**
**Installation—Server Software.** For each license acquired, you may install one copy of the Server Software on a single Server. You may not separate component parts of the Server Software for use on more than one Server. **Client Software.** You may install the Client Software on any Devices. **Processor Limits.** You may use the Server Software for Microsoft Windows 2000 Server with up to four CPUs of the Server at any one time. You may use the Server Software for Microsoft Windows 2000 Advanced Server with up to eight CPUs of the Server at one time.

**Windows 2000 Server CAL Requirements.** You must acquire a separate CAL for each Device that is used by an "Authenticated User" or that uses "Windows 2000 Server Services" regardless of what software you use. **Terminal Services.** In addition to a CAL, you must acquire a Terminal Services CAL for each Device that uses "Terminal Services." You do not need a Terminal Services CAL to utilize Terminal Services for Devices running a licensed copy of Windows 2000 Professional. **"Authenticated User"** is a user who directly or indirectly utilizes the Windows 2000 Server Integrated Sign-On Service or receives credentials from the Windows 2000 Directory Services. **"Windows 2000 Server Services"** include File Services (accessing or managing files or disk storage), Printing Services (printing to a printer managed by the Product), Remote Access Service (accessing the Server from a remote location through a communications link, including a virtual private network), and Terminal Services. **"Terminal Services"** means (i) using the terminal services feature of the Server Software to enable Devices to use software residing on the Server, or (ii) using other software in conjunction with the Server Software to provide similar services. **Deploying CALs.** Except when the Product is licensed within the SBS 2000 suite, you may deploy CALs in either "Per Seat" or "Per Server" mode. In "Per Seat," you need a separate CAL for each unique Device that accesses or utilizes the Server Software, as described in the Windows 2000 Server CAL Requirements section above. You can deploy Windows 2000 Server CALs in Per Seat or Per Server mode as defined above. When using Terminal Services, the Product may not be used in Per Server. **Upgrades from BackOffice Server or SBS.** When you install the Product, the Product replaces the component being upgraded, and you may use the Product in accordance with these use terms. The remaining components of BackOffice Server or SBS may only be used in accordance with the terms of the Microsoft End User License Agreement that accompanied the original product suite. After an upgrade of BackOffice Server, all products must run on the same Server on which the BackOffice Server is installed, unless the upgrade is an Enterprise or Commerce Edition, in which case you may

use the Product as a stand-alone product in accordance with these use terms. After an upgrade of SBS, the Fax and Modem Software is no longer subject to the connection limitation for the SBS.

**Internet Connector.**    For each Internet Connector license you have acquired, you have the right to permit any number of Devices that are used by Authenticated Users or that use Windows 2000 Server Services to access a single copy of Windows 2000 Server or Windows 2000 Advanced Server, without the need to acquire Windows 2000 Server CALs for each Device, provided such Devices are used only by Internet Users.

**Terminal Services Internet Connector.**    For each Internet Connector license you have acquired, you have the right to permit any number of Devices to access the Terminal Services of a single copy of Windows 2000 Server or Windows 2000 Advanced Server, without the need to acquire Terminal Server CALs, Microsoft Windows 2000 Server CALs or Microsoft Windows 2000 Professional Licenses for each Device, provided that such Devices are used only by Internet Users and a maximum of 200 Devices are connected to the Product and using Terminal Services at any one time.

**B. CAL Use Rights.**
Unless otherwise noted, defined terms have the same meaning as in the Server use rights section above. For each CAL acquired, you may access or otherwise use the services or functionality of licensed Server Software in the manner provided for in the Server use rights section above.

**C. MultiLanguage Versions**
Use of MultiLanguage Versions ("OS Components") is subject to the terms and conditions of the agreement ("EULA") under which you have licensed the applicable Microsoft operating system product ("OS Product") described below and these terms and conditions. If you do not have a valid EULA for any OS Product (Microsoft Windows 2000 Server, or Microsoft Windows 2000 Advanced Server), you are not authorized to install, copy or otherwise use the OS Components. Capitalized terms used and not otherwise defined here have the meanings assigned to them in the applicable OS Product EULA. To the extent that these terms conflict with terms in the applicable OS Product EULA, these terms control solely with respect to the OS Components.

**General.**    The OS Components are provided to you by Microsoft to update, supplement, or replace existing functionality of the applicable OS Product. **Additional Rights and Limitations.**    If you have multiple validly licensed copies of the applicable OS Product, you may reproduce, install and use one copy of the OS Components as part of the applicable OS Product on all of your computers running validly licensed copies of the applicable OS Product, provided that you use such additional copies of the OS Components in accordance with the terms and conditions above.

### 16. Windows NT Server

**A. Server Use Rights**
You may install and use of Server Software and Client Software as provided in the BackOffice Server 4.5 section above (except in the case of Server Software and Client Software licensed within the SBS 4.5 suite, which may be installed and used as provided in the SBS 4.5 section above), subject to the restrictions noted here.

**Processor Limitation.**    The Server Software may be used by no more than four (4) processors of the Server at any one time, unless you have Windows NT Server, Enterprise Edition, in which case the Server Software may be used by no more than eight (8) processors of the Server at any one time. **Client Access.** You need a separate CAL in order to access or otherwise utilize the following Windows NT Server basic network/application services, components or functionality: File Services (accessing or managing files or disk storage), Printing Services (printing to a server managed by a Windows NT Server), Microsoft Message Queue Server (sending or receiving messages from Microsoft Message Queue Server), Microsoft Transaction Server (invoking component-based applications managed by Microsoft Transaction Server), Remote Access Service (accessing the server from a remote location through a communications link), and Terminal Server Services (as defined below). Note: Remote Access Service includes the use of Internet Connection Services, including Internet Authentication Services (validation or transference of a remote access request) or Connection Point Services (remotely configuring the Microsoft Connection Manager Client with new phone numbers or other data).    You do not need a CAL for Windows NT Server to access or otherwise utilize any other Windows NT Server services or functionality. **Note on Microsoft FrontPage Software.** Windows NT Server contains Microsoft FrontPage software, which allows a single user to develop and maintain an Internet/intranet Web site. For each license acquired, you may install and use one copy of Microsoft FrontPage on a single Device.    **Microsoft Site Server Express.** You may freely copy and distribute Microsoft Site Server Express for your use on any computer within your organization.    **SQL Server Feature.** Windows NT Server, Enterprise Edition may install an additional feature which is a restricted version of Microsoft SQL Server. If such feature is installed, you may use it solely in support of the Microsoft Message Queue Server directory functions. You do not need to acquire a separate CAL for Microsoft SQL Server to use the services of Microsoft Message Queue Server to access or otherwise utilize the services of the restricted Microsoft SQL Server feature of Microsoft Windows NT Server, Enterprise Edition.    **Windows NT Load Balancing Service (the "OS Component").** You may reproduce, install and use one copy of the OS Component on a single computer that is validly licensed to run Windows NT Server, Enterprise Edition 4.0. If you have multiple validly licensed copies of Windows NT Server, Enterprise Edition 4.0, you may reproduce, install and use one copy of the OS Component on all of your

7-ELEVEN-00358

computers that are validly licensed to run Windows NT Server, Enterprise Edition 4.0 provided that you use such additional copies of the OS Component in accordance with the terms and conditions set forth above. **Upgrades of a Component of the BackOffice Server 4.5 or SBS 4.5 Suites.** See conditions noted in the BackOffice Server 4.5 and SBS 4.5 sections above.

**B. Windows NT CAL Use Rights**

Unless otherwise noted, defined terms have the same meaning as in the Server use rights section above. For each CAL acquired, you may access or otherwise use the services or functionality of licensed copies of Windows NT Server in the manner provided for in the Server use rights section. Each CAL for Microsoft Windows NT Server used in the Per Seat Mode may also be used to access or otherwise use the services or functionality of Microsoft Windows NT Server, Terminal Server Edition, provided that you comply with the terms and conditions set forth in the Server Use Rights section above. **Upgrades of CALs for SBS 4.5 Suite.** See conditions noted in the SBS 4.5 section above.

## 17. Windows Services for UNIX and Interix

**Installation--Server Software.** For each license acquired, you may install and use one copy of the Server Software on a single Server. You may not separate component parts of the Server Software for use on more than one Server.

**Installation on Microsoft Windows Products—** If you install the Server Software on a Server that is running Microsoft Windows NT Server (any version), Windows 2000 Server, or Windows 2000 Advanced Server ("Microsoft Server Products"), you must use the Server Software in the same mode (i.e., Per Seat or Per Server mode) in which you are using the Microsoft Server Product on such Server. If you have already acquired a CAL to access or otherwise utilize the basic services of the Microsoft Server Product, that CAL gives you the right to access and utilize the Server Software.

**Installation on Windows NT Workstation or Windows 2000 Professional —** If you install the Server Software on a Device that is running Microsoft Windows NT Workstation or Windows 2000 Professional, you may permit a maximum of ten (10) Devices to simultaneously access or use the Server Software. A Device which "visits" the Server Software is accessing or using the Server Software. For purposes of the previous sentence, a "visit" means a series of one or more requests from a Device to the Server Software. A visit ends when such Device does not make any additional requests of the Server Software for a period of five (5) minutes or more. The ten (10) use maximum includes any indirect connections made through software or hardware which pools or aggregates connections.

**Server for NFS Authentication.** You may install and use the "Server for NFS Authentication" portion of the Server Software on any Device which is running a validly licensed copy of Microsoft Server Products and acting as a primary or backup domain controller, for the purpose of enabling user authentication and access to the services of the Server Software. **Server for NIS.** You may install and use the "Server for NIS" portion of the Server Software on any Device which is running a validly licensed copy of Microsoft Windows 2000 Server or Microsoft Windows 2000 Advanced Server acting as a domain controller, solely for the purpose of enabling a Windows 2000-based domain-controller computer to be a master NIS server, or a slave NIS server to another Windows 2000 Server running Server for NIS. **Windows Services for UNIX Password Synchronization—**You may install and use the "Password Synchronization" portion of the Software ("Password Synchronization Component") on any Device which is running a validly licensed copy of UNIX operating system software, for the purpose of enabling the compatibility of such UNIX operating system with the Microsoft Server Products password synchronization service. You may modify the source code for this UNIX Synchronization Service to port it to any version of a UNIX operating system. You may also use, reproduce, and distribute (and sublicense these rights to third parties, including the right to sublicense to further third parties) the UNIX Synchronization Service, as modified ("Distributables"), in source or object code forms, solely for the purpose of receiving password updates to and from Devices running Microsoft Server Products, provided that (i) you do not use Microsoft's name, logo, or trademarks to advertise, market or promote your Distributables without the express written permission of Microsoft; (ii) you include a valid copyright notice on your Distributables; (iii) you agree to indemnify, hold harmless, and defend Microsoft from and against any claims or lawsuits, including attorney's fees, that arise or result from the use or distribution of your Distributables. **Interix Component Products.** The Software includes certain components licensed to Microsoft from third parties (each, a "Component Product"). A Component Product may contain its own license agreement or copyright notice (each, a "Component Agreement"). The Component Agreements are located on the Software media at \PUBS\CPYRIGHT.TXT and \PUBS\GPL.TXT. In the event of inconsistencies between this Section or your license agreement and any Component Agreement, the terms of the Component Agreement control solely with respect to that Component Product.

## Microsoft Developer Tools

≫ It is important to read the entire section to understand how developer tools are licensed. This section starts out being very general and becomes more specific towards the end. The Microsoft developer tools covered by this section are listed below. We may add to this list from time to time as new products are made available.

*Microsoft Licensing Product Use Rights (Americas English January 1, 2001)*

Form 4400981 4/04 Uniform
Page 19 of 28 - Microsoft

For **Project 2000** templates and Project 98 redistributables, see the Applications section.

For the **Interix** developer tool, see the Servers section.

For **VBA, IEAK, TechNet, TechNet Plus and Windows NT Option Pack** (licensed within the Visual Studio Enterprise Edition), see the end of this section.

1. ~~BizTalk Server 2000 Developer Edition~~
2. ~~Commerce Server 2000 Developer Edition~~
3. ~~Internet Explorer Administration Kit ("IEAK")~~
4. Microsoft Office Developer ("MOD")
5. MSDN
6. SQL Server 2000 Developer Edition
7. Visual Basic (Learning, Professional and Enterprise Editions)
8. Visual Basic for Applications ("VBA")
9. Visual C++ (Standard, Professional and Enterprise Editions)
10. Visual FoxPro
11. Visual Interdev
12. Visual J++
13. Visual SourceSafe
14. Visual Studio (Professional and Enterprise Editions)

## I. Except as otherwise noted, for all products listed above, these rights and restrictions apply:

**A. General License Grant.** For each license acquired, you must designate one individual within your organization (the "Designated User") who will have the personal, nonexclusive license to make and use copies of the Software for the sole purpose of designing, developing, and testing your Application (as defined in General Requirements in Distribution Requirements below). The Designated User may install copies of the Software on any number of computers provided that such individual is the only person who uses each such copy of the Software.

**Documentation.** In addition, Microsoft grants you a worldwide, nonexclusive, nontransferable, royalty-free right to make, use, and install any number of copies of the documentation solely for internal use by any number of end users so long as:
a. Such end users are persons who are generally granted access to your internal network; and
b. Such copies are used only for internal purposes and are not to be republished or distributed (either in hard copy or electronic form) beyond your premises.

**B. Redistributable Code License Grant.**
**1. Sample Code.** Microsoft grants you the right to use and modify the source code version of those portions of the Software identified as "Samples" in REDIST.TXT or elsewhere in the Software ("Sample Code") for the sole purposes of designing, developing, testing and demonstrating your software product(s), and to reproduce and distribute the Sample Code, along with any modifications, only in object code form.

**2. Redistributable Code—Standard.** Microsoft grants you a nonexclusive, royalty-free right to reproduce and distribute the object code form of any portion of the Software listed in REDIST.TXT ("Redistributable Code"). Note: Certain Redistributable Code may be subject to additional restrictions below if it is also identified as "Limited Use Redistributable Code" or "Extended Use Redistributable Code."

**3. Visual C++ and Visual Studio—Microsoft Foundation Classes (MFC), Template Libraries (ATL), and C Runtimes (CRTs).** In addition, Microsoft grants you the right to use and modify the source code version of those portions of the Software that are identified as MFC, ATL, or CRTs (the "VC Redistributables"), for the sole purposes of designing, developing, and testing your Application. Microsoft further grants you a nonexclusive, royalty-free right to reproduce and distribute the object code version of the VC Redistributables, including any modifications (or enhancements to the functionality of the VC Redistributables), so long as you rename any files created by you that are included in your Application.

**C. Distribution Requirements.**
**1. General Requirements.** If you are authorized and choose to redistribute Sample Code, Redistributable Code, Limited Use Redistributable Code, or Extended Use Redistributable Code (collectively, the "Redistributables"), you agree to:
a. Distribute the Redistributables in object code form and only in conjunction with and as a part of a software application product developed by you that adds significant and primary functionality to the Redistributables ("Application");
b. In the Application, the Redistributables only operate in conjunction with other Microsoft products;
c. Not use Microsoft's name, logo, or trademarks to market the Application;
d. Include a valid copyright notice in your name on the Application;
e. Indemnify, hold harmless, and defend Microsoft from and against any claims or lawsuits, including attorney's fees, that arise or result from the use or distribution of the Application;
f. Otherwise comply with these terms and conditions;
g. Agree that Microsoft reserves all rights not expressly granted; and
h. You also agree not to permit further distribution of the Redistributables by your end users except you may permit further redistribution of the Redistributables by your distributors to your end-user customers if your distributors only distribute the Redistributables in conjunction with, and as part of, the Application and you and your distributors comply with all other terms of this license agreement. (Note: see exception regarding "Extended Use Code" below.)

7-ELEVEN-00360

## 2. Additional Rights or Restrictions

a. **Extended Use Redistributable Code.** You may permit your end users to reproduce and distribute the object code form of certain portions of the Software (as listed in REDIST.TXT as "Extended Use Redistributable Code") only in conjunction with and as a part of your Application or Web page that adds significant and primary functionality to the Extended Use Redistributable Code. You are authorized to exercise the foregoing rights provided that you and ~~your end users agree to comply with all terms and conditions of Section (II)(C)(1) above.~~

b. ~~**Limited Use Redistributable Code.** The Limited Use Redistributable Code is comprised of "Jet Files,"~~ the Microsoft SQL Server Desktop Engine ("MSDE"), Microsoft Data Access Components ("MDAC_TYP.EXE"), and Run-Time Files from MOD.

(i) **"Jet" Files or MSDE.** If you redistribute the "Jet Files" (as identified in the Software) or MSDE (individually and collectively, the "MS DB Files"), you agree to comply with the following additional requirements: (a) your Application does not substantially duplicate the capabilities of Microsoft Access or, in the reasonable opinion of Microsoft, compete with same; and (b) unless your Application requires your customers to license Microsoft Access in order to operate, you do not reproduce or use any of the MS DB Files for commercial distribution in conjunction with a general purpose word processing, spreadsheet or database management software product, or an integrated work or product suite whose components include a general purpose word processing, spreadsheet, or database management software product except for the exclusive use of importing data to the various formats supported by Microsoft Access. Note: A product that includes limited word processing, spreadsheet or database components along with other components which provide significant and primary value, such as an accounting product with limited spreadsheet capability, is not considered to be a "general purpose" product.

(ii) **Microsoft Data Access Components.** If you redistribute the Microsoft Data Access Component file identified as MDAC_TYP.EXE, you also agree to redistribute such file in object code only in conjunction with and as a part of an Application developed by you with a Microsoft development tool product that adds significant and primary functionality to MDAC_TYP.EXE.

## 3. Microsoft Platform Software Development Kit ("Platform SDK").

If you are authorized and choose to redistribute Redistributables found in the Platform SDK, in addition to compliance with Section C.1. above, you also agree:

a. That in your Application the Redistributables only operate in conjunction with a Microsoft operating system product; and

b. To distribute your Application containing the Redistributables pursuant to an End-User License Agreement (which may be "break-the-seal", "click-wrap" or signed), with terms no less protective than these terms.

## D. Additional Rights and Restrictions for MOD.

1. **Microsoft Office License.** In addition, solely with respect to Microsoft Office, Microsoft further grants you a personal, nonexclusive license to make, use, and install one copy of Microsoft Office, or any prior version for the same operating system, on a single computer for general business purposes provided that the Designated User is the only individual using such copy of Microsoft Office. ~~Registration. You may be required to register your copy of Microsoft Office to continue using it. This registration obligation is further described in the Microsoft Office~~ documentation.

2. **Use of Access Workflow Designer.** If you choose to design, develop, and redistribute software solutions that incorporate the portion of the Software identified as the "Access Workflow Designer" (the "AWD Software") into solutions created by you ("Solution"), then your use of the AWD Software is subject to the following terms: The AWD Software consists of certain software components ("Server Software") that provide Microsoft SQL Server-compatible back-end database services or functionality on a computer acting as a server (and, the computer running the Server Software is referred to as the "Server"). You may install a single copy of the Server Software on each of any number of Servers for purposes of enabling your Solution over a network. The Server Software portion of the AWD Software has technological dependencies on certain portions of Microsoft Office. As such, on each Server on which the Server Software is installed, a validly licensed copy of Microsoft Office must also be installed. If, for purposes of distributing your Solution on a network, you choose to install the Server Software on Microsoft SQL Server, a CAL is required for each device that utilizes such Microsoft SQL Server to interact with your Solution. Certain Solutions created with AWD Software may have technological dependencies on certain portions of Microsoft Office, based on your development choices. As such, any device accessing or using such a Solution must have a license for Microsoft Office. Note: If you are creating a Solution for commercial use or external distribution, you must notify your end users of the foregoing license rights and restrictions.

3. **Microsoft Exchange Server Developer Edition ("Exchange Dev Software").**

a. **General.** The Exchange Dev Software consists of software programs that provide services on a computer called a server ("Server Software") and software programs that allow an electronic device ("Device") to access or utilize the services or functionality provided by the Server Software ("Client Software").

b. **Server Software.** Solely for purposes of designing, developing and testing your software product(s):

(i) You may make, use and install the Server Software on a single Server;

(ii) All components of the Server Software may only be installed and used on one and the same Server;

(iii) You may allow a maximum of five users to access and use the Server Software; and

(iv) You may allow any number of simultaneous connections to be made to access the services of the Server Software.

c. **Client Software.** You may make, use and install the Client Software on any number of Devices solely for use in accordance with section (b) above.

**E. Additional Rights and Restrictions for SQL Server 2000 Developer Edition ("SQL Dev Software").**

1. **General.** The SQL Dev Software may contain the following software:

- "Server Software" provides services or functionality on your server (your computers capable of running the Server Software are "Servers");
- "Client Software" allows an electronic device ("Device") to access or utilize the Server Software.

2. **Server Software.** Solely for purposes of designing, developing and testing your software product(s): (i) you may make, use and install the Server Software on individual Servers; all components of the Server Software may only be installed and used on one and the same Server; (ii) you may allow a maximum of five users to access and use the Server Software; and (iii) you may allow an unlimited number of simultaneous connections to be made to access the services of the Server Software.

3. **Client Software.** You may make, use and install the Client Software on an unlimited number of Devices solely for use in conjunction with designing, developing and testing your software products.

4. **Benchmark Testing.** The restrictions on benchmark testing in Section [G] below apply.

5. **SQL Server 2000 Windows CE Edition.** The files listed in REDIST.TXT contained in the SQL Server Components are licensed as described in sections B and C above; however, you may not distribute any of the files as part of a Device (e.g., in ROM or firmware). You may not distribute the SQL Server Components so that they connect to any edition of a Microsoft SQL Server 2000 product (such as SQL Server 2000 Enterprise Edition or SQL Server 2000 Standard Edition) unless you have a proper license for such SQL Server 2000 product, and such license allows such deployment. Notwithstanding the foregoing, under no circumstances may you deploy the SQL Server Components so that they connect to the Microsoft SQL Server 2000 Developer Edition.

**F. Additional Rights for Commerce Server 2000 Developer Edition and BizTalk Server 2000 Developer Edition.**

Use and installation of server software and client software.

1. **General.** The Product may contain the following software:

- "Server Software" provides services or functionality on your server (your computers capable of running the Server Software are "Servers");
- "Client Software" allows an electronic device ("Device") to access or utilize the Server Software.

2. **Server Software.** Solely for purposes of designing, developing and testing your software product(s) that work in conjunction with the Server Software ("Server Applications"): (i) you may make, use and install the Server Software on individual Servers; and (ii) you may allow any number of simultaneous connections to be made by any number of users to access the services of the Server Software.

3. **Client Software.** You may make, use and install the Client Software on any number of Devices solely for use in conjunction with designing, developing and testing your software products.

4. **Benchmark Testing.** The restrictions on benchmark testing in Section [G] below apply.

**Device Access.** Any number of Devices may use or access the services of a Server running the Server Software so long as you have acquired a valid license for the Server Software. **Use of Redistributable Code/SDK Software.** If included, you may install and use copies of the SDK Software on one or more computers located at your premises solely for the purpose of building Server Applications.

**G. Additional Rights for Visual Studio Enterprise Edition and MSDN.**

1. **Use of BackOffice and .NET Server Application Components—General.**

The Software may include certain components of Microsoft BackOffice Server (the "BackOffice Components") or .NET Server Applications (".NET Components") that consist of software programs that provide services on a computer acting as a server ("Server Software") and software programs that allow an electronic device ("Device") to access or utilize the services provided by the Server Software ("Client Software").

a. **Production Use.** The Components of the Software may only be used for development purposes and may not be used in a production environment. Note: this provision does not apply to software components identified as "BackOffice Components" in the Visual InterDev portion of the Software.

b. **Separation of Components.** The Product is license as a single product. Its Component parts may not be separated for use by more than one user (or for use on more than one computer for Server Software).

c. **Version Limitation.** Any CAL must have the same or later version number than the corresponding version number of the Server Software being used.

d. **Performance or Benchmark Testing.** You may not disclose the results of any benchmark test of either the Microsoft Server Software or Client Software for Application Center, BizTalk, Commerce Server, Exchange Server, HIS, IIS, ISA, Message Queue Server, Proxy Server, SQL Server, Site Server, Site Server Commerce Edition, or Transaction Server to

*Microsoft Licensing Product Use Rights (Americas English January 1, 2001)*

7-ELEVEN-00362

any third party without Microsoft's prior written approval.

**2. The BackOffice Components.** Solely for the purposes of designing, developing, testing and demonstrating software applications created by you:
You may make, use, and install the Server Software on a single Server; all components of the Server Software must be installed on one and the same Server.
You may allow a maximum of 10 simultaneous connections to access the services of the Server (except for SQL Server where you may allow any number of simultaneous connections to access the services of the Microsoft SQL Server, Server Software).
You may make, use, and install the Client Software on any number of Devices.
The media on which the Server Software resides may contain several versions of the Server Software, each of which is compatible with a different microprocessor architecture (such as the x86 architecture or various RISC architectures). These multiple-architecture versions may be installed and used on different Servers solely for use by a licensed end user. The Server Software may not be used as the software on the server that supports your development of your Application(s) (e.g., as a repository for source code).
BackOffice Component Specific Rights and Restrictions.
**Microsoft SNA Server (BackOffice Server 4.5 only).** In addition, the 3270 and 5250 terminal emulation applets and the ODBC/DRDA driver provided with SNA Server are licensed for use only by one user per licensed copy of SNA Server. The applets may only be used to access or otherwise utilize the services of Microsoft SNA Server.
**Windows NT Server and Windows 2000 Server.** The Server Software may be used by no more than four (4) processors of the Server at any one time. You may permit up to 200 anonymous concurrent connections to access your software applications using the Terminal Services component of Windows 2000 Server Software, so long as (i) such use is limited to the demonstration of your software applications over the Internet for evaluation purposes, and (ii) it does not utilize production data.
**Microsoft Windows for Workgroups or Windows 95 Software.** The media on which Windows NT Server resides may contain a copy of Windows for Workgroups or Windows 95 software. In order to install or use this software, you must acquire a separate Windows for Workgroups or Windows 95 license.
**Microsoft Exchange Server (BackOffice Server 4.5 only).** Microsoft Exchange Server also includes the Source Extractor, Administrator, and Microsoft Mail Connector software. The Source Extractor, Administrator, and Microsoft Mail Connector programs contain components that may be installed on additional computers (i.e., other than the Server on which the Server Software resides). Microsoft grants you the additional right to modify the source code version of the Source Extractor programs. The Source Extractor may only be used to migrate data to Microsoft Exchange Server.
**Microsoft SQL Server.** A maximum of five users may access and use the Server Software for the sole purposes of designing, developing, and testing your

software product(s) that are designed to operate in conjunction with Microsoft SQL Server; and any number of simultaneous connections may be made to access the services of the Microsoft SQL Server, Server Software.
**Microsoft Windows NT and Windows 2000 Professional.** Each copy of this Component may be used by no more than two processors of each computer on which such copy is installed. You may use the Component as interactive workstation software on each computer on which the Component is installed ("Workstation Computer"), but not as server software.

**3. Redistributable Code.**
a. **Microsoft SQL Server (all versions prior to SQL Server 2000)—Note Regarding the Use of Run-Time Software.** Provided that you comply with the terms of Section (I)(C)(1) above, Microsoft grants you the nonexclusive, royalty-free right to reproduce and distribute those DB-Library, Net-Library, and ODBC files required for run-time execution of compiled applications ("SQL Run-Time Files") in conjunction with and as a part of your application software product that is created using the Microsoft SQL Server Software ("SQL Application"), provided that if your SQL Application contains ODBC Run-Time Files: (a) your SQL Application must operate in conjunction with Microsoft SQL Server; and (b) you agree to distribute all ODBC components specified in the Readme file in conjunction with your SQL Application. **Note Regarding SQL Redistributable Code (applicable to SQL Server portion of Microsoft BackOffice 4.5 Developer Edition).** In the event that the SQL Server portion of the Software contains a file identified as REDIST.TXT, Microsoft grants you the nonexclusive, royalty-free right to use, reproduce and distribute the files listed in the REDIST.TXT file of the SQL Server software (the "SQL Redistributable Code"), provided that you also comply with the terms of Section (I)(C)(1).
b. **SQL Server 2000.** Microsoft grants you the nonexclusive, royalty-free right to use, reproduce and distribute the Microsoft SQL Server Desktop Engine ("MSDE") and the files listed in the REDIST.TXT file (collectively referred to as "Redistributable Code") provided that you comply with the Distribution Terms listed in the REDIST.TXT file. If you choose to redistribute MSDE, you also agree:
(i) That your Application does not substantially duplicate the capabilities of Microsoft Access or, in the reasonable opinion of Microsoft, compete with same; and
(ii) That unless your Application requires your customers to license Microsoft Access in order to operate, you do not reproduce or use MSDE for commercial distribution in conjunction with a general purpose word processing, spreadsheet or database management software product, or an integrated work or product suite whose components include a general purpose word processing spreadsheet, or database management software product except for the exclusive use of importing data to the various formats supported by Microsoft Access. Note: A product that includes

7-ELEVEN-00363

limited word processing, spreadsheet or database components along with other components which provide significant and primary value, such as an accounting product with limited spreadsheet capability, is not considered to be a "general purpose" product.

c. **SNA Server Development Software (for BackOffice 4.5 only).** Microsoft grants you the following nonexclusive, royalty-free right to install and use copies of the OLE DB Data Provider for VSAM and AS/400 ("OLE DB Provider") or the COM Transaction Integrator for CICS and IMS ("COM Transaction Integrator") on one or more computers located at your premises solely for the purpose of designing, developing, testing and demonstrating your applications that work in conjunction with Microsoft SNA Server. Portions of the SNA Server portion of the Software are also designated as "Redistributable Code." The text file named REDIS.TXT in the SNA Server portion of the Software contains a list of such files, as well as the distribution rights associated with the SNA Server Redistributable Code.

d. **Host Integration Server 2000, Commerce Server 2000, and ISA Server 2000 ("SDK Software").** If included, you may install and use copies of the SDK Software on one or more computers located at your premises solely for the purpose of building applications that work in conjunction with the Server Software ("Applications"). You may modify the Sample Code (identified in the "samples" directories) to design, develop, and test your Applications, and may reproduce and use the Sample Code, as modified, on one or more computers located at your premises. You may also reproduce and distribute the Sample code, along with any modifications you make thereto (for purposes of this section, "modifications" mean enhancements to the functionality of the Sample Code), and any other files that may be listed and identified in a REDIST.TXT file as "redistributable" (collectively, the "Redistributable Code") provided that you agree: (a) to distribute the Redistributable Code in object code form and only in conjunction with your Application, which Application adds significant and primary functionality to the Redistributable Code; (b) not to use Microsoft's name, logo, or trademarks to market the Application; (c) to include a valid copyright notice in your name on the Application; (d) to indemnify, hold harmless, and defend Microsoft from and against any claims or lawsuits, including attorney's fees, that arise or result from the use or distribution of the application; (e) to otherwise comply with these terms and conditions; and (f) that Microsoft reserves all rights not expressly granted.

e. **Site Server Software Development Kits ("Site Server SDK Software") (BackOffice Server 4.5 only).** Microsoft grants you the nonexclusive, royalty-free right to install and use copies of the Site Server SDK Software on one or more computers located at your premises solely for the purpose of designing, developing, testing and demonstrating your applications that work in conjunction with Microsoft

Site Server. You may modify the Site Server Sample Code to design, develop, and test your applications. "Site Server Sample Code" means the sample source, HTML, and Active Server Pages (ASP) code located in Site Server "SDK" and "samples" directories. Portions of Site Server are designated as "Redistributable Code." The text files named REDIST.TXT and LICENSE.TXT located in the Site Server portion of the Software, describe the distribution rights associated with each file of the Site Server Redistributable Code.

f. **Microsoft Exchange—Note Regarding the Use of the Sample Applications and Outlook Web Access Software (BackOffice 4.5 Developer Edition only). Sample Applications.** Provided that you comply with the terms of Section (I)(C)(1) above, Microsoft grants you the nonexclusive, royalty-free right to use and modify the source code version of the Sample Applications and to reproduce and distribute the object code versions of such modifications in conjunction with your application that utilizes the services of Microsoft Exchange Server. **Outlook Web Access Software ("OWA Software").** Microsoft grants you the nonexclusive, royalty-free right to use, customize, reproduce and distribute the OWA Software, provided that (a) you comply with the terms Section (I)(C)(1) above; and (b) you include an end-user license agreement with the OWA Software that grants a limited license to use the OWA Software and otherwise protects Microsoft's and its suppliers' intellectual property rights in the OWA Software.

g. **Systems Management Server (BackOffice 4.5 Developer Edition only).** You may install and use the Installer component of the Client Software ("SMS Installer") only on Devices within your organization and only for the purpose of creating installation programs through the use of SMS Installer ("Setup Programs"). You may also use and modify the source code designated as "Sample Code" in the SAMPLES.TXT file for the sole purposes of designing, developing, testing and demonstrating your Setup Programs. You may also install and use in object code form the Redistributable Components (as defined below), along with any modifications you may make to the Sample Code, only on Devices within your organization for a purpose other than creation of Setup Programs, provided that you: (a) reproduce and use the Redistributable Components only in conjunction with or as part of a Setup Program; (b) have a valid CAL for any version of Microsoft Systems Management Server for each Device that uses the Redistributable Components; and (c) indemnify, hold harmless and defend Microsoft and its suppliers from and against any claims or lawsuits, including attorneys' fees, that arise or result from the use of your Setup Program or any software installed by your Setup Program. You do not have any other right to install or use SMS Installer. You may reproduce and distribute the files listed in the REDIST.TXT file (collectively referred to as "Redistributable Components"), along with any modifications you may make to the Sample Code,

7-ELEVEN-00364

provided that you comply with the Distribution Terms listed in such REDIST.TXT file. Note that the Distribution Terms include, among other conditions, terms similar to those described above.

h. **Microsoft BackOffice Server (BackOffice 4.5 Developer Edition only). Use of Administrator Tools.** You may install and use the administrator tools on any Device within your organization. **Redistributable Components.** You may modify, reproduce or distribute the files listed in the REDIST.TXT file (collectively referred to as "Redistributable Components") provided that you comply with the Modification and Distribution Terms listed in such REDIST.TXT file.

### H. Additional Rights for MSDN.

The Software provided through MSDN, the Microsoft Developer Network Subscription ("MSDN Subscription Program") include(s) computer software and may include 'online" or electronic documentation, associated media, and printed materials ("Product"). Depending on the subscription level you have purchased, the Product may consist of product documentation, sample applications, books and periodicals, tools and utilities, miscellaneous technical information, operating systems, development toolkits, server applications, and development tools (each, a "Component," of the Product). The Product may include groups of Components identified as any one or more of the following: Library, Platforms, Server Products, Applications, and Developer Tools. For each license acquired, you must designate one individual within your organization to make and use copies of the Product according to the terms outlined below. Each MSDN license must be dedicated to use of the Product by one individual.

**General.** Microsoft grants you a personal, nonexclusive license to make and use up to ten copies of each of the following software programs for the sole purposes of designing, developing, testing and demonstrating your software product(s): Library, Platforms, Applications (consisting of Office Developer, Project) and Developer Tools (consisting of Visual Studio Enterprise Edition, and Microsoft Team Manager). In addition, solely with respect to the Microsoft Office Component, for each license acquired, the individual designated by you will have a personal, nonexclusive license to make, use, and install one additional copy of Microsoft Office on a single computer for general business purposes provided that he or she is the only individual using such copy of Microsoft Office. Certain Components of the Product may include software programs that limit the number of copies that can be made for use by you to less than the ten copies authorized above.

## II. IEAK Redistributables and Customization

Microsoft grants to you a nonexclusive, worldwide, royalty-free license to use, reproduce and distribute the Software solely for use by your employees (or in the case of educational institutions, students and faculty) and staff within your organization and affiliated companies through your Intranet so long as:

a. You may not permit redistribution of the Software to or for use by third parties other than for third parties such as temporary guests or staff, consultants and contractors accessing your Intranet.

b. You maintain and not alter or remove any copyright, trademark, and other protective notices contained in the Software, including the end user license agreement which is included in the setup/installation of the Software.

c. You also comply with Microsoft's trademark guidelines with respect to the proper use of Microsoft trademarks associated with the Software.

d. In the event that you choose to use the IEAK logo, your use is governed by the IEAK Logo License Agreement. You are responsible for providing end-user support for your users of the Software.

### IEAK Customization

In addition, Microsoft grants to you a nonexclusive, limited, worldwide, royalty-free license to customize Internet Explorer using the IEAK in accordance with the instructions provided in the Internet Explorer "Customization Wizard." You acknowledge and agree that your use of the IEAK to customize Internet Explorer requires the rightful receipt from Microsoft of the Customization Code allocated to you. You agree that you will only use the IEAK in accordance with the instructions provided in the Internet Explorer Customization Wizard that is available to you upon input of the allocated Customization Code and the Logo Guidelines provided by Microsoft.

## III. TechNet and TechNet Plus

» For purposes of this section, "Product" includes software and may include associated media, printed materials, and "online" or electronic documentation. The Product is comprised of the following:

• **"Content Software"** provides content, services or functionality on a computer capable of running the Content Software; and

• **"Viewer Application"** allows an electronic device ("Device") to access or utilize the Content Software.

The Product may contain certain components (each, a "Component") that include a separate end user license agreement (a "Component Agreement"). In the event of any inconsistencies between this section and any Component Agreement, the terms of the Component Agreement control. **Per Processor License.** For each license acquired, you may install one copy of the Content Software on a single server (the "Server"). If the Server has more than one processor, you must obtain a separate license for each processor on that Server. You may use the Product only with that number of processors for which you are properly licensed. **Device Access.** You may install and use the Viewer Application on any number of

7-ELEVEN-00365

Devices to access the services of the Server running the Product so long as (1) you have acquired a valid license for each processor running the Product; and (2) your use of the Viewer Application is solely in conjunction with the Content Software. **Copies.** The Product may contain materials, including without limitation, technical documentation, white papers, and printed materials ("Documentation"). You may make any number of copies of Documentation accompanying the Product, so long as the copies are used only for internal purposes or are provided to your customer(s) as part of software or hardware support, provided that (1) the Documentation accompanying the Product (a) is not distributed for profit; (b) is not modified; and (c) contains all copyright notices; and (2) you do not authorize any redistribution by your end users, except as provided below. **TechNet Plus.** You also agree to the terms and conditions of the Microsoft Master License Agreement for Beta Software, and any other applicable terms and conditions accompanying the beta software, which document(s) govern your rights and obligations with respect to any beta software you receive. **Redistributable Components.** The Product may contain software components, including without limitation drivers, utilities, tools, and patches ("Files"), as well as .DLL files, the use of which is not governed by a Component Agreement. For such Files and .DLL files, Microsoft grants you a non-exclusive royalty-free right to reproduce and distribute the Files, provided that you:

a. Distribute the Files for your internal use only or to your customer(s) as part of software or hardware support, provided that (i) the Files are not distributed for profit, (ii) the Files are used only in conjunction with licensed copies of Microsoft products, (iii) the Files may not be modified, (iv) the Files contain all copyright notices, and (v) you do not authorize any redistribution by your licensees or end users;

b. Distribute the .DLL files only in conjunction with and as a part of your software product;

c. Do not use Microsoft's name, logo, or trademarks to market your software product;

d. Agree to indemnify, hold harmless, and defend Microsoft and its suppliers from and against any claims or lawsuits, including attorneys' fees, that arise or result from the use of the Files or .DLL files or use or distribution of your software product containing the Files or .DLL files; and

e. Otherwise comply with the terms of your license agreement.

**Transfers.** In connection with any permitted transfer, you must provide Microsoft in writing the name, company, and address of any person or entity to whom you are transferring these rights. You may not retain copies of the Product and Documentation. If the Product is an update or has been updated, any transfer of the license to use the Product must include the most recent update and all prior ve   ns.

## IV. VBA, Software Development Kit

» The Software includes computer software and the associated media, printed materials, and "online" or electronic documentation (collectively, the "Licensed Technology").

### A. License Grant
**Use of the Licensed Technology and Redistributable Components.** The Licensed Technology contains a subset of software (the "Redistributable Components") identified in a REDIST.TXT located in the Licensed Technology. Microsoft grants you a limited, nonexclusive license to install and use any number of copies of the Licensed Technology for the purposes of Integrating, and testing the Redistributable Components with your Product(s). Solely for purposes of this Section (IV) and Section (V) below, "Product(s)" mean applications created by you that: (a) integrate the Redistributable Components, (b) add significant and primary value to the Redistributable Components; and (c) operate on the Microsoft Windows, Microsoft Windows NT, or Microsoft Windows CE, or any future Microsoft operating system products on which the Licensed Technology is commercially released by Microsoft. For purposes of this Section (IV), "Integrate," "Integration" or "Integrating" means the inclusion of one or more Redistributable Components as part of an application created by you and copied onto your application's installation media along with your software.

### B. Additional Rights and Restrictions – Commercial Distribution
**No Commercial Use Rights.** This Section (IV) does not grant you any rights for commercial distribution of the Licensed Technology, its Redistributable Components or any other portion of the Licensed Technology. In the event that you wish to integrate the Redistributable Components into a software product created by you for commercial distribution, you are authorized to evaluate the Licensed Technology only for the purpose of deciding whether to enter into an ongoing license agreement with Microsoft for the Licensed Technology.

» For licensing terms associated with commercial distribution of the Licensed Technology, its Redistributable Components or any other portion of the Licensed Technology, please visit the VBA web site at http://msdn.microsoft.com/vba.

### C. Additional Rights And Restrictions – Non-Commercial/Internal Use and Distribution of Product
**Non-Commercial Use Rights.** This subsection C describes your rights to use the Licensed Technology for non-commercial purposes and to redistribute Product that Integrates the Redistributable Components internally solely for use by End Users; for licensing terms associated with any other purposes, see subsection B above or contact Microsoft Corporation. For purposes of this Section (IV), "End Users" mean your employees or contractors.

a. **License to Redistribute the Redistributable Components.** Upon completion of your Integration

7-ELEVEN-00366

of Licensed Technology into Product(s), Microsoft grants you a nonexclusive, worldwide, royalty-free license to use, reproduce and internally distribute the object code form of the Redistributable Components as incorporated in the Product(s) solely to your authorized End Users provided that you acquire a separate VBA Device License ("Device License") for each unique Device on which you (or your authorized End Users) install, use, access, display, run or otherwise interact with each unique Product (each of the foregoing interactions are referred to in this Section (IV) as, "RUN"). You may RUN each individual Product created under this Section (IV) on any Device, so long as you have acquired a Device License for each such Device that RUNS each such Product. Device Licenses are not included with VBA Software Development Kit, they are licensed by Microsoft under a separate end user license agreement. [See Section (V).] For purposes of this Section (IV), a "Device" means any single computer, workstation, terminal, handheld PC, pager, "smart phone," or other digital electronic device.

b. **Redistribution Requirements.** The rights granted in this subsection C are subject to the following restrictions:

(i) You agree to comply with the terms of this subsection C, including, without limitation the restrictions in this paragraph b;

(ii) You agree to distribute the Redistributable Components only in object code form and only in conjunction with and as an Integrated part of your Product as defined in Section (IV)(A) above;

(iii) You agree to not license or distribute the Redistributable Components as part of any product or bundle of products that compete, directly or indirectly, with Microsoft Visual Basic;

(iv) You agree to only access documented function calls when Integrating the Redistributable Components with the Product;

(v) You agree that your Integration of the Redistributable Components included in the Product will not adversely affect the full functionality of the Redistributable Components, e.g., Integration does not disable any features of the Redistributable Components included in Product.

(vi) You agree to include the following acknowledgment in the credit screen of the Product and in the documentation: "Portions ©Copyright 1996-1999, Microsoft Corporation. All rights reserved."

(vii) You agree to indemnify, hold harmless, and defend Microsoft from and against any claims or lawsuits, including attorneys' fees, that arise or result from the use or distribution of the Product;

(viii) You agree to not remove any copyright, trademark or patent notic · that appear in · the Licensed Technology.

c. **Documentation.** This Section (IV) grants you, limited, nonexclusive license to make and use an unlimited number of copies of any documentation, provided that such copies are used only for internal purposes by End Users in conjunction with their use of the Product(s) and are not to be republished or distributed (either in hard copy or electronic form) to third parties.

## V. *VBA, Device License*

Before using or otherwise accessing a Product created by you that Integrates Visual Basic for Applications you agree to be bound by the terms of this Section (V). If you do not agree to the terms of this Section (V), you are not authorized to access or otherwise utilize your Product that Integrates Visual Basic for Applications.

1. **License Grant.**

a. This Section (V) describes your rights to access or otherwise utilize the services or functionality of Product(s) created by you in accordance with the terms and conditions of Section (IV) above. Section (IV) allows Integration of certain VBA-related Redistributable Components. Except as otherwise noted, all capitalized terms used in this Section (V) have the same meaning as in Section (IV) above. This Section (V) does not apply to any VBA-enabled products created by third parties or otherwise available through commercial channels.

b. **Grant of License.** This Section (V) grants you the right to install, use, access, display, run or otherwise interact with ("Run") one copy of a unique Product (as defined in Section (IV) above) on a single computer, workstation, terminal, handheld PC, pager, "smart phone," or other digital electronic device (each, a "Device") operated internally by an End User (as defined in Section (IV) above). Each Visual Basic for Applications Device License ("Device License") must be dedicated to a single Device and you must obtain a separate Device License for each individual Product that Runs on a Device; however, an End User who is the primary user of a validly licensed Device on which a Product is Run may make a second copy of the Product for his or her exclusive use on either a home or portable computer.

## VI. *Windows NT 4.0 Option Pack*

》 Your use of the Windows NT Option Pack Components is subject to your prior acquisition of a validly licensed copy of certain Microsoft operating system or server products as provided below. All capitalized terms in this section refer to those terms as defined in the end user license agreement for the relevant Windows NT Option Pack Component:

**A. For use with Microsoft Windows NT Server 4.0, Microsoft Windows NT Server Enterprise Edition 4.0 or Microsoft BackOffice 2.5, the following terms apply:**
The "Windows NT Software Components" mean: Microsoft Message Queue Server, Microsoft Transaction

*Microsoft Licensing Product Use Rights (Americas English January 1, 2001)*

7-ELEVEN-00367

Server, Microsoft Internet Information Server and the Internet Connection Services for Microsoft Remote Access Service. You may use the Windows NT Software Components so long as you comply with the sections of this document governing their use as set forth in the Windows NT Server section. **Additional Rights and Restrictions.** You may make a number of copies of the Windows NT Software Components equal to the number of validly licensed copies of each Product which you have, and you may use each copy in the manner specified above. If you do not have a valid license for Microsoft Windows NT Server 4.0, Microsoft Windows NT Server Enterprise Edition 4.0 or Microsoft BackOffice 2.5, you have no rights under this subsection (A).

**B. For use with Microsoft Windows NT Workstation 4.0, the following terms apply:**
The "Windows NT Workstation Software Components" mean: Microsoft Transaction Server and Microsoft Personal Web Server. **General.** The Windows NT Workstation Software Components are deemed part of Windows NT Workstation 4.0, and are therefore subject to the terms and conditions of its end user license agreement, except as otherwise provided. **Use Limitation.** At any point in time, only a maximum of two (2) computers [instead of ten (10)] are permitted to use the services of the Microsoft Transaction Server component. The two (2) computer maximum includes any indirect uses made through software or hardware which pools or aggregates uses. **Additional Rights and Restrictions.** You may make a number of copies of the Windows NT Workstation Software Components equal to the number of validly licensed copies of Microsoft Windows NT Workstation 4.0 you have, and you may use each copy in the manner specified above. If you do not have a valid license for Microsoft Windows NT Workstation 4.0, you have no rights under this subsection (B).

**C. For use with Microsoft BackOffice SBS 4.0 ("SBS 4.0"), the following terms apply:**
**General.** The Windows NT Software Components contain server software and client software which is deemed part of the Server Software and Client Software, respectively, of SBS 4.0, and is therefore subject to the terms and conditions of its end user license agreement, except as otherwise provided. **Microsoft Site Server Express.** You may freely copy and distribute Microsoft Site Server Express for your use on any computer within your organization. **Additional Rights and Restrictions.** You may make a number of copies of the Windows NT Software Components equal to the number of validly licensed copies of SBS 4.0 you have, and you may use each copy in the manner specified above. If you do not have a valid license for SBS 4.0, you have no rights under this subsection (C).

**D. For use with Microsoft Windows 95, the following terms apply:**
The "Windows 95 Software Components" mean: Microsoft Personal Web Server and Microsoft Transaction Server for Windows 95. **General.** The Windows 95 Software Components are deemed part of

Microsoft Windows 95, and are therefore subject to the terms and conditions of its end user license agreement, except as otherwise provided. **Use Limitation.** At any point in time, a maximum of ten (10) computers are permitted to use the services of the Microsoft Personal Web Server component. The ten (10) computer maximum includes any indirect uses made through software or hardware which pools or aggregates uses. The Microsoft Transaction Server for Windows 95 component may not be used as a network server; that is, no computers or workstations may access or utilize any network services of that component. **Additional Rights and Restrictions.** You may make a number of copies of the Windows 95 Software Components equal to the number of validly licensed copies of Microsoft Windows 95 you have, and you may use each copy in the manner specified above. If you do not have a valid license for Microsoft Windows 95, you have no rights under this subsection (D).

*Microsoft Licensing Product Use Rights (Americas English January 1, 2001)*

Form 4400981 4/04 Uniform
Page 28 of 28  - Microsoft

MARKET/STORE #2131 - 22818 B

## NOTICE OF DESIGNATION OF SUCCESSOR FRANCHISEE

The 7-Eleven Store Franchise Agreement (the "Agreement"), between 7-Eleven, Inc. ("we", "us", or "our ") and the undersigned Franchisee ("you", or "your"), for 7-Eleven Store No. _2131 - 22818 B_ (the "Store"), allows you to designate individuals that can attempt to qualify as franchisees pursuant to the provisions in the survivorship Exhibit to your Agreement. In connection with the survivorship provisions, you designate the following named individual(s), subject to his or her meeting our qualification requirements, in accordance with our then current qualification procedures, as your successor to the franchise covering the Store:

**FIRST DESIGNEE:**
PRINT NAME: _Dianne K. Tucker_
MAILING ADDRESS: _4201 Dogwood Road   Brawley CA 92227_
RELATIONSHIP TO THE UNDERSIGNED: _mom / mother-in-law_

**SECOND DESIGNEE:**
(If First Designee is not qualified, as determined in our sole discretion, cannot reasonably be located, or does not wish to have the opportunity to franchise the Store):
PRINT NAME: _James M. James_
MAILING ADDRESS: _25 Ray   Hollister CA_
RELATIONSHIP TO THE UNDERSIGNED: _brother / brother-in-law_

**THIRD DESIGNEE:**
(If First and Second Designees are not qualified, as determined in our sole discretion, cannot reasonably be located, or do not wish to have the opportunity to franchise the Store):
PRINT NAME: _James Tucker_
MAILING ADDRESS: _575 Silverwood   Imperial CA 92251_
RELATIONSHIP TO THE UNDERSIGNED: _brother / brother-in-law_

You understand that you may revoke any of the designations at any time, and from time to time, by filing with us a new designation or revocation in writing, and that receipt of instruction from either of you is effective to notify us of such new designation or revocation. You revoke all prior designations, if any, which you have made. If you operate more than one 7-Eleven Franchise, you understand that your designee will not be able to qualify for more than one franchise (unless the designee is currently a 7-Eleven Franchisee and qualifies as a multiple Franchisee).

Dated: _3-13-04_

_[signature]_
Signature of Franchisee
Michael Tucker
Print Name

_[signature] Jami Tucker_
Signature of Franchisee
Jami Tucker
Print Name

Subscribed and Sworn to before me by both parties this _13_ day of _March_ , _2004_

My Commission Expires: _July 2 2004_

Notary Public _[signature]_

ESTHER GOMEZ ALEMAN
Commission # 1268962
Notary Public - California
Imperial County
My Comm. Expires Jul 2, 2004

We acknowledge receipt of the designation of potential successor and have retained the original for our files. Retain an executed copy for your files.

**7-Eleven, Inc.**

By: _[signature]_          Dated: _3/14/04_

Form 4400212 1/04 Uniform
Designation of Successor

7-ELEVEN-00369

## ALCOHOLIC BEVERAGE AMENDMENT
## UNIFORM

THIS UNIFORM ALCOHOLIC BEVERAGE AMENDMENT (the "Amendment") is signed by the undersigned franchisee(s) ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in the last paragraph of this Amendment,

BACKGROUND INFORMATION

You and we signed a 7-Eleven Store Franchise Agreement (the "Agreement") covering 7-Eleven Store No. _____ 2131 - 22818 B _____ (the "Store");

You and we desire to amend the Agreement to cover your acquisition of an alcoholic beverage license and your sale of alcoholic beverages at the Store.

The parties agree as follows:

An offsale (general alcoholic beverage license) is available for the Store. You must pay all costs related in any way to the license as specified in the Agreement, except for $1 which we will pay. Upon any transfer of the license, our interest in the proceeds will be limited to $1.

You and we have signed this Amendment effective as of ___3/13/04___.

### 7-ELEVEN, INC.

By _____

Name __Tom Lesser__

Title __Market Manager__

Date __3/14/04__

### FRANCHISEE

By _____          By _____

Name __Michael Tucker__          Name __Jami Tucker__

Date __3/13/04__                 Date __3-13-04__

Form 4400237 1/04 Uniform
Alcoholic Beverages

7-ELEVEN-00370

# TSC FINANCING AMENDMENT
# CALIFORNIA

THIS TSC FINANCING AMENDMENT ("Amendment") is signed by the undersigned Franchisee(s) ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in the last paragraph of this Amendment.

## BACKGROUND INFORMATION

You and we signed a 7-Eleven Store Franchise Agreement (the "Agreement") covering 7-Eleven Store No. ___2131 - 22818 B_____ (the "Store");

You and we desire to amend the Franchise Agreement to provide for certain changes to the financing we provide.

The parties agree as follows:

A.    Notwithstanding anything in the Franchise Agreement to the contrary:

(1)    We will transfer the financing obligations and rights under the Franchise Agreement to TSC Lending Group, Inc. ("TSC Group"), one of our subsidiaries. TSC Group is licensed under the California Finance Lenders Law contained in Division 9 of the California Financial Code to make commercial loans, and it will make open-end commercial loans to you. Contemporaneously with the execution of this Amendment, you will execute a Revolving Credit Agreement (the "Credit Agreement") with TSC Group. You will also execute a Security Agreement (the "TSC Security Agreement") and such renewal, assignment and continuation financing statements or other documents relating to the TSC Security Agreement as are requested by and acceptable to TSC Group. Your execution of the TSC Security Agreement will not be a breach of the existing security agreement between us and you (the "7-Eleven Security Agreement"). The transfer of the financing obligations and rights under the Franchise Agreement to TSC Group will take effect upon written notice from us to you stating the effective date of such transfer ("Financing Effective Date").

(2)    As soon as practicable after the Financing Effective Date, TSC Group will make an initial loan advance to us on your behalf in an amount equal to the unpaid balance in your Open Account, as shown on your most recent Financial Summaries for the Store. The amount advanced to us on your behalf will be charged to your loan account with TSC Group.

(3)    If you are not in material breach of the Franchise Agreement, the Credit Agreement, the TSC Security Agreement, or the 7-Eleven Security Agreement, and subject to the conditions set forth in the Franchise Agreement, your Receipts, Operating Expenses, regular draws, Purchases, discounts, allowances, and other items affecting Cost of Goods Sold, will be credited and charged to the Open Account during each Accounting Period, pursuant to our usual procedures, and the balance in the Open Account will be computed at the end of each Accounting Period. We will not charge or pay interest on any balance in the Open Account, either debit or credit. If there is an unpaid balance in the Open Account at the end of an Accounting Period, as soon as practicable after Financial Summaries for such Accounting Period become available, TSC Group will advance to us, and charge the loan account with, the amount

7-ELEVEN-00371

needed to reduce the balance in the Open Account to zero. If there is a credit balance in the Open Account at the end of an Accounting Period, we will transfer the balance to TSC Group as soon as practicable after Financial Summaries for the Accounting Period become available, and TSC Group will credit such amount to your loan account.

(4)    The Accounting Period for your loan account with TSC Group will be the same as the Accounting Period specified in the Franchise Agreement. The unpaid balance in the TSC Group loan account will bear interest at the rate provided in the Credit Agreement computed on the average daily balance in the loan account. During an Accounting Period, the balance in the loan account will be increased for advances made by TSC Group to you on your behalf, including, (i) the net debit balance resulting from the monthly activity in the Open Account as described in A.3. above, as soon as practicable after the date that Financial Summaries become available; and (ii) any special or additional draws paid to you by us, or any unauthorized draws taken by you, on the date paid or taken. During an Accounting Period, the balance in the loan account will be reduced by, (i) an advance to TSC Group by us of a credit balance in the Open Account as soon as practicable after the date that Financial Summaries become available; and (ii) any payment made by you to us or TSC Group for the purpose of repaying part or all of the loan balance, on the date of receipt by either us or TSC Group. Interest for the Accounting Period will be charged to the loan account as of the last day of the Accounting Period. The daily balance in the loan account will be computed by taking the beginning balance each day and adding or subtracting, as appropriate, the charges and credits as described above. The average daily balance will be computed by totalling the daily balances for each day in the Accounting Period, and dividing the total by the number of days in the Accounting Period. If the average daily balance reflects a credit balance, TSC Group will credit the loan account with interest as provided in the Credit Agreement.

(5)    We consent to you granting TSC Group a security interest in the Inventory, and premium or going concern value, if any in the franchise.

(6)    For purposes of computing your Net Worth under the Franchise Agreement, your loan balance with TSC Group will be treated as a liability and will be reflected as such on the Financial Summaries.

(7)    TSC Group's obligation to provide financing will be subject to the terms and conditions set forth in the Franchise Agreement and TSC Security Agreement. Upon expiration or termination of the Franchise Agreement, your indebtedness to TSC Group will be immediately due and payable.

(8)    You agree that we and TSC Group can exchange all financing information necessary to effectuate this agreement.

(9)    TSC Group may assign the financing obligations and rights under the Franchise Agreement back to us at any time, at which time this Amendment will terminate and the financing provisions of the Franchise Agreement will apply.

B.    Unless otherwise defined in this Financing Amendment or in context, the terms used in this Financing Amendment have the meaning defined for them in the Franchise Agreement.

7-ELEVEN-00372

In all other respects, the Franchise Agreement is ratified and reaffirmed.

The parties have signed this Amendment the _13_ day of _March_ _2004_; to be effective as of the Financing Effective Date.

### 7-ELEVEN, INC.

By _Tom Lesser_

Name  Tom Lesser

Title  Market Manager

Date  3/14/04

**FRANCHISEE**

By _Michael Tucker_          By _Jami Tucker_

Name  Michael Tucker          Name  Jami Tucker

Date  3-13-04          Date  3-13-04

Form 4400406  1/04  California
Page 3 of 3 - TSC Financing

7-ELEVEN-00373

# TSC REVOLVING CREDIT AMENDMENT
## CALIFORNIA

THIS TSC REVOLVING CREDIT AMENDMENT (the "Amendment") is signed by TSC Lending Group, Inc. ("we", "us" or "our") and the undersigned borrower, ("you" or "your"), to be effective as of the Financing Effective Date (as defined in this Agreement).

### RECITALS

You and 7-Eleven, Inc. ("7-Eleven") have signed a 7-Eleven Store Franchise Agreement (the "Franchise Agreement"), covering 7-Eleven Store No.____2131 - 22818 B_____ (the "Store");

You and 7-Eleven signed a TSC Financing Amendment, dated _____ (the "Amendment") in which you and 7-Eleven agreed to allow us to provide you certain financing in connection with your operation of the Store.

You desire to obtain a revolving loan (the "Loan") from us to finance the repayment of certain amounts You owe to 7-Eleven and to finance certain expenses you will incur in operating the Store.

The parties agree as follows:

(1)    Any capitalized terms in this Agreement and not specifically defined in this Agreement will have the definitions given them in the Franchise Agreement.

(2)    As provided in the Amendment, this Agreement will take effect when 7-Eleven delivers written notice to you stating the effective date of 7-Eleven's transfer of its financing obligations and rights under the Franchise Agreement to us (the "Financing Effective Date").

(3)    As soon as practicable after the Financing Effective Date, we will make an initial loan advance on your behalf to 7-Eleven in an amount equal to the unpaid balance in your Open Account, as shown on your most recent Financial Statements or Summaries (the "Financial Summaries") for the Store. The amount advanced on your behalf to 7-Eleven will be charged to your Loan account under this Agreement.

(4)    Subject to the terms of this Agreement, as soon as practicable after the end of each Accounting Period and as soon as Financial Summaries for each Accounting Period are available, we will make a loan advance on your behalf to 7-Eleven in an amount equal to any unpaid balance in your Open Account for that Accounting Period, as shown on your Financial Summaries for each such Accounting Period. Loan advances may be made by us on your behalf to 7-Eleven after the termination or expiration of the Franchise Agreement if there are any unpaid balances in your Open Account after such termination or expiration.

(5)    Any special, additional or unauthorized draws paid to or taken by you from 7-Eleven during an Accounting Period will be deemed to be a request by you to us to make additional loan advances

7-ELEVEN-00374

on your behalf to 7-Eleven in the amount of such draws. If we agree to make such loan advances, the loan advances will be made as of the date such draws are paid to or taken by you. You authorize us to make all such advances to 7-Eleven on your behalf.

(6)    If, at the end of an Accounting Period, your Open Account has a credit balance, as shown on the Financial Summaries for such Accounting Period, you authorize the transfer of the credit balance by 7-Eleven to us, as soon as practicable after the end of the applicable Accounting Period and as soon as Financial Summaries for such Accounting Period are available, to reduce the unpaid balance of the Loan. Any other payment made by you to 7-Eleven or us, for the purpose of repaying part or all of the Loan balance, will reduce the unpaid balance of the Loan on the date such payment is received by either 7-Eleven or us. You also must make such repayments on the Loan as may be necessary to maintain the minimum Net Worth required under and pursuant to the Franchise Agreement.

(7)    You agree to repay the Loan, with interest charges, as provided in this Agreement. If not sooner paid, the entire unpaid balance of the Loan will be due and payable immediately upon expiration or termination of the Franchise Agreement for any reason, without any further notice of any type whatsoever being required.

(8)    You must execute a Security Agreement (the "TSC Security Agreement"), financing statement and all necessary continuations and renewals, and all such other documents as are requested by and acceptable to us to grant us a security interest in the Inventory and premium or going concern value, if any, and to establish and maintain the perfection of such security interest. The TSC Security Agreement will be subject only to the existing security agreement between you and 7-Eleven (the "7-Eleven Security Agreement"), and you will not grant any security interest in the Inventory or goodwill or going concern value other than as provided in this paragraph. We will have the right to enter the Store at all reasonable times to inspect and audit the Inventory.

(9)    Our obligation to provide financing is subject to the terms and conditions set forth in the Franchise Agreement and the TSC Security Agreement. You will be in default under this Agreement if, at any time, (i) you fail to perform your obligations under this Agreement, (ii) there is a default under the TSC Security Agreement or the 7-Eleven Security Agreement, or (iii) there is a Material Breach or default under the Franchise Agreement. If a default occurs, we may stop making advances on the Loan and declare the unpaid balance of the Loan to be immediately due and payable.

(10)    The Accounting Period for the Loan will be the same as the Accounting Period specified in the Franchise Agreement. We will assess an interest charge each Accounting Period at an initial annual rate of interest of ____6.25____%. The annual interest rate will be adjusted, effective each March 1, and continuing in effect through the last day of February of the succeeding year, to equal the rate which is 2% in excess of the prime rate charged by Bank of America ("Bank of America") (or any successor) as of the first business day of the calendar year during which such adjustment becomes effective. The interest charge will be based on an average daily balance of the Loan and will be added to the unpaid balance of the Loan as of the last date of each Accounting Period. The average daily balance for each Accounting Period will be computed by taking the beginning balance each day of the Accounting Period and adding or subtracting, as appropriate, the loan advances we made and the payments we received for each day during the Accounting Period. All of the daily balances will then be totaled and divided by the number of days in the Accounting Period to determine an average daily balance. Since the unpaid balance of the Loan will include prior interest charges, you will be required to pay compound interest (or interest on interest).

7-ELEVEN-00375

MARKET/STORE #2131 - 22818 B

(11)   If there is an average daily credit balance for the Loan during any Accounting Period, we will credit the Loan account with interest at an annual interest rate equal to the prime rate at Bank of America (or any successor), as of the first business day of each calendar year, minus 2 percentage points, effective each subsequent March 1. We may, at our option, limit the credit balance amount upon which we will pay interest upon notice to you.

(12)   You consent to the disclosure between 7-Eleven and us of all information regarding you, the Loan and the operation of the Store.

(13)   If more than one individual signs this Agreement, the obligations of such persons will be joint and several.

(14)   You must not agree to an amendment of the Franchise Agreement which would affect any of the terms or provisions of this Agreement without our prior written consent.

(15)   This Agreement will be governed by and construed according to the laws of the state of California.

(16)   You may not assign any rights or obligations under this Agreement without our prior written consent.

(17)   This Agreement, the TSC Security Agreement, the 7-Eleven Security Agreement, the Amendment and any other agreements referenced in this Agreement (including, but not limited to the Franchise Agreement and all addenda and amendments to the Franchise Agreement), contain all agreements concerning the Loan, all prior or contemporaneous promises, representations, agreements or understandings being expressly merged and superseded.

The parties have executed this Agreement this ___13___ day of __March__ _____, __2004__, to be effective as of the Financing Effective Date.

Lender: TSC Lending Group, Inc.

By: _____
       Steve Bonnville

Its: Vice President/Assistant Secretary

Borrower:

_____
Michael Tucker

_____
Jami Tucker

7-ELEVEN-00376

MARKET/STORE #2131 - 22818 B

# TSC SECURITY AGREEMENT
## CALIFORNIA

THIS TSC SECURITY AGREEMENT (the "**Security Agreement**"), dated _March_ _____ _13_ , 20 _04_ , is executed by the undersigned debtor Franchise(s) jointly and severally if more than one ( such debtor(s) are referred to individually or collectively as "**you**" or "**your**"), to and for the benefit of TSC Lending Group, Inc. ("**we**", "**us**" or "**our**").

### RECITALS

A.    You and 7-Eleven, Inc. ("7-Eleven") signed a 7-Eleven Store Franchise Agreement, dated _____, 20_____ (the "**Franchise Agreement**"), under which 7-Eleven granted you the right to operate a 7-Eleven convenience store franchise.  7-Eleven agreed to make loans and other financial accommodations to you upon the terms and subject to the conditions set forth in the Franchise Agreement.

B.    You and 7-Eleven signed a Financing Amendment under which you agreed that 7-Eleven would assign its financing obligations under the Franchise Agreement to us.  You and we signed a Revolving Credit Agreement (the "Credit Agreement") covering the terms of the loans and other financial accommodations we will make to you pursuant to 7-Eleven's assignment of its financing obligations to us.

C.    Our obligation to make such loans and other financial accommodations to you under the Credit Agreement is subject, among other conditions, to receipt by us of this Security Agreement, duly executed by you.

### AGREEMENT

NOW, THEREFORE, in consideration of the above recitals and for other good and valuable consideration, the receipt and adequacy of which are acknowledged, you agree as follows:

1.    **Definitions and Interpretation.**  When used in this Security Agreement and the Attachments to this Security Agreement, (a) the terms Account, Chattel Paper, Commercial Tort Claim, Deposit Account, Document, Electronic Chattel Paper, Equipment, Fixtures, Goods, Inventory, Instrument, Payment Intangible and Proceeds, have the respective meanings assigned to them in the UCC (as defined below); (b) capitalized terms which are not otherwise defined in this Security Agreement have the respective meanings assigned to them in the Franchise Agreement and the Credit Agreement; and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

"**Collateral**" means, with respect to you, all of your property and rights in which a security interest is granted under this Security Agreement.

"**Computer Hardware and Software**" means, with respect to you, all of your rights (including rights as licensee and lessee) with respect to:  (i) computer and other electronic data processing hardware; (ii) all software programs designed for use on the computers and electronic data processing hardware described in clause (i) above, (iii) any firmware associated with any of the foregoing; and (iv) any documentation for hardware, software and firmware described in clauses (i), (ii) and (iii) above.

"**Event of Default**" means (i) a Material Breach; (ii) your failure to perform or observe any term, promise, condition or obligation contained in this Security Agreement; or (iii) your breach of any representation or warranty made by you to us in or in connection with the Store, the Franchise Agreement, the Credit Agreement or this Security Agreement.

7-ELEVEN-00377

"**General Intangibles**" means, with respect to you, all of your "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of your premium and going concern value and goodwill, registrations, licenses, franchises, tax refund claims, guarantee claims, Payment Intangibles (including Receipts as defined in the Franchise Agreement), security interests and rights to reimbursement and/or indemnification.

"**Obligations**" means and includes all loans, advances, debts, liabilities and obligations, howsoever arising, owed by you to us of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or arising, in the future pursuant to the terms of the Credit Agreement or any other agreement by or among you and us, and/or modification, renewal, or extensions of any of the foregoing, including (without limitation) all interest, fees, charges, expenses, attorneys' fees and accountants' fees chargeable to and payable by you under this Security Agreement or under the Franchise Agreement or any other agreement by or among you and us.

"**Related Contracts**" means the meaning given to that term in Attachment 1 attached to this Security Agreement and incorporated into this Security Agreement.

"**Store**" means 7-Eleven Store No. _____2131 - 22818 B_____

"**UCC**" means the Uniform Commercial Code as in effect in the State of California on the date of this Security Agreement, as may be amended or modified from time.

2.    **Grant of Security Interest**. As security for the Obligations, you pledge and assign to us and grant to us a continuing security interest in and lien on, all of your property, whether now owned, or acquired in the future or arising, and wherever located, including (without limitation) those types of property described on Attachment 1 to this Security Agreement.

3.    **Representations and Warranties**. You represent and warrant to us that:

(a)    We have (or in the case of after-acquired Collateral, at the time you acquire rights in the Collateral, will have) a first priority perfected security interest in the Collateral, subject only to the security interest you granted to 7-Eleven.

(b)    Your chief executive office and principal place of business are as set forth on Attachment 2 to this Security Agreement, and each other location where you maintain a place of business is also set forth on Attachment 2 to this Security Agreement.

[USE FOR ENTITY FRANCHISEE: (c)    You are a _____, duly organized, validly existing and in good standing under the laws of the state set forth on Attachment 2 to this Security Agreement, and are a "registered organization" (as such term is defined in the UCC) in such state.]

[USE FOR INDIVIDUAL FRANCHISEE: (c)    You are an individual located in _____California_____.]

(d)    You are duly qualified, licensed to do business and in good standing in all jurisdictions in which such qualification or licensing is required.

(e)    Your exact legal name is as set forth on the signature pages of this Agreement, and during the five years preceding the date of this Security Agreement you have not been known by any different legal name nor have you been the subject of any merger or other corporate reorganization.

7-ELEVEN-00378

(f)    Attachment 3 to this Security Agreement contains a complete listing of all of your Instruments, Deposit Accounts, Chattel Paper, Documents and Commercial Tort Claims.

4.    **Covenants**. You agree as follows:

(a)    You must perform all acts that may be necessary to maintain, continue, preserve, protect and perfect the Collateral, the security interest granted to us in the Collateral and the first perfected priority of such security interest, subject only to the security interest you granted to 7-Eleven.

(b)    You may not use or permit any Collateral to be used in violation of any provision of the Franchise Agreement, the Credit Agreement or this Security Agreement.

(c)    You must pay promptly when due all taxes and other governmental charges, all liens and all other charges now or imposed in the future upon or affecting any Collateral.

(d)    Without 30 days' prior written notice to us, you may not (i) change your name or place of business (or, if you have more than one place of business, your chief executive office), (ii) keep Collateral consisting of Chattel Paper at any location other than at your chief executive office, (iii) keep Collateral consisting of Equipment at any location other than the Store; or (iv) adopt a plan of conversion or reorganize under the laws of a state other than your state of organization as set forth on Attachment 2 to this Security Agreement.

(e)    If we give value to enable you to acquire rights in or the use of any Collateral, you must use such value for such purpose.

(f)    You must promptly notify us in writing upon acquiring or otherwise obtaining any Collateral after the date of this Security Agreement consisting of Deposit Accounts or Electronic Chattel Paper and, upon our request, you will promptly execute such other documents, and do such other acts or things we deem appropriate to deliver control to us with respect to such Collateral.

(g)    You must promptly notify us in writing upon acquiring or otherwise obtaining any Collateral after the date of this Security Agreement consisting of Documents or Instruments and, upon our request, will promptly execute such other documents, and do such other acts or things we deem appropriate to deliver possession to us of such Documents which are negotiable and Instruments, and, with respect to nonnegotiable Documents, to have such nonnegotiable Documents issued in our name.

(h)    You must promptly notify us in writing upon incurring or otherwise obtaining a Commercial Tort Claim related to the Store or your operations at the Store after the date of this Security Agreement against any third party, and, upon our request, will promptly enter into an amendment to this Security Agreement, and do such other acts or things we deem appropriate to give us a security interest in such Commercial Tort Claim.

(i)    You further agree to take other action we reasonably request to insure the attachment, perfection and first priority of, and our ability to enforce, the security interests in all of the Collateral.

(j)    You must keep separate, accurate and complete records of the Collateral and must provide us with such records and such other reports and information relating to the Collateral as we may reasonably request from time to time.

(k)    You may not sell, encumber, lease, rent, or otherwise dispose of or transfer any Collateral or right or interest in such Collateral except as expressly permitted in the Franchise Agreement and you must keep the Collateral free of all liens.

7-ELEVEN-00379

(l)    You must comply with all material legal requirements applicable to you which relate to the production, possession, operation, maintenance and control of the Collateral and operation of the Store (including (without limitation) the Fair Labor Standards Act).

5.    **Authorized Action by Agent**. You irrevocably appoint us as your attorney-in-fact and agree that we may, on or after an Event of Default, perform (but we will not be obligated to and will incur no liability to you or any third party for failure to so perform) any act which you are obligated by this Security Agreement to perform, and to exercise such rights and powers as you might exercise with respect to the Collateral. You acknowledge and agree that this Security Agreement is an "authenticated record" for purposes of UCC Articles 9.509(a) and (b), and you authorize the filing by us of UCC financing statements naming you as the "debtor(s)" in such financing statements.

6.    **Default and Remedies**. In addition to all other rights and remedies granted us by this Security Agreement, the Franchise Agreement, the Credit Agreement, the UCC and other applicable law, we may, upon the occurrence and during the continuance of an Event of Default, exercise any one or more of the following rights and remedies: (a) foreclose or otherwise enforce our security interests in any or all Collateral in any manner permitted by applicable law, the Franchise Agreement, the Credit Agreement or this Security Agreement; (b) notify any or all Account debtors to make payments on Receivables directly to us and enforce your rights against such Account debtors; (c) sell or otherwise dispose of any or all Collateral at one or more public or private sales, whether or not such Collateral is present at the place of sale, for cash or credit or future delivery, on such terms and in such manner as we may determine; (d) require you to assemble the Collateral and make it available to us at a place to be designated by us; (e) enter onto any property where any Collateral is located and take possession of such Collateral with or without judicial process; and (f) prior to the disposition of the Collateral, store, process, repair or recondition any Collateral consisting of Goods, perform any obligations and enforce any of your rights under any Related Contracts or otherwise prepare and preserve Collateral for disposition in any manner and to the extent we deem appropriate. You agree that 10 days' notice of any intended sale or disposition of any Collateral is reasonable. We will have no duty as to collection or protection of the Collateral or any income on such Collateral, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining to prior parties beyond, in the case of any Collateral in our possession, the same safe custody of such Collateral to the extent afforded to our property. All of our rights and remedies whether or not granted under this Security Agreement will be cumulative and may be exercised singularly or concurrently.

7.    **California Law**. You acknowledge that you have read Section 504(b) of the California Penal Code which provides:

"Where under the terms of a security agreement, as defined in Section 9105 of the Commercial Code, the debtor has the right to sell the property covered thereby and is to account to the secured party for, and pay to the secured party the indebtedness secured by the security agreement from, the proceeds of the sale of any of the said property, and where such debtor, having sold the property covered by the security agreement and having received the proceeds of such sale, willfully and wrongfully, and with the intent to defraud, fails to pay to the secured party the amounts due under the security agreement, or the proceeds of such sale, whichever is the lesser amount and appropriates such money to his own use, said debtor shall be guilty of embezzlement and shall be punishable as provided in Section 514".

8.    **Miscellaneous**.

(a)    **Notices**. All notices, requests, demands, consents, instructions or other communications to or upon you or us under this Security Agreement must be in writing.

(b)    **Waivers; Amendments**. Any term, promise, agreement or condition of this Security Agreement may be amended or waived if such amendment or waiver is in writing and is signed by you and us. No

7-ELEVEN-00380

MARKET/STORE #2131 - 22818 B

failure or delay by us in exercising any right under this Security Agreement will operate as a waiver of such right or of any other right nor will any single or partial exercise of any such right preclude any other further exercise of such right or of any other right. Unless otherwise specified in any such waiver or consent, a waiver or consent given under this Security Agreement will be effective only in the specific instance and for the specific purpose for which given.

(c)    <u>Successors and Assignments</u>. This Security Agreement will be binding upon and inure to our benefit and your benefit and to the benefit of our respective successors and assigns, including all persons and entities that become bound by this Security Agreement; provided, however, that you may sell, assign and delegate your respective rights and obligations under this Security Agreement only as permitted by the Franchise Agreement. We may disclose this Security Agreement, the Franchise Agreement, the Credit Agreement and any financial or other information relating to you to any assignee or potential assignee.

(d)    <u>JURY TRIAL</u>. YOU AND WE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY AS TO ANY ISSUE RELATING TO THIS SECURITY AGREEMENT IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT.

(e)    <u>Cumulative Rights, Etc.</u> Our rights, powers and remedies under this Security Agreement will be in addition to all rights, powers and remedies given to us by applicable law, the Franchise Agreement or any other agreement, all of which rights, powers, and remedies will be cumulative and may be exercised successively or concurrently without impairing our rights under this Security Agreement. You waive any right to require us to proceed against any person or to exhaust any Collateral or to pursue any remedy in our power.

(f)    <u>Governing Law, Construction</u>. This Security Agreement will be governed by and construed according to the laws of the state in which you are located from time to time in effect except to the extent preempted by United States Federal law. It is expressly stipulated and agreed to be your intent and our intent at all times to comply with applicable law governing the highest lawful rate or amount of interest payable on the Obligations. If the applicable law is ever judicially interpreted so as to render usurious any amount called for under the Franchise Agreement or the Credit Agreement, or contracted for, charged, taken, reserved or received with respect to the Obligations, or if our exercise of our remedies under this Security Agreement, the Franchise Agreement or the Credit Agreement or if any payment by you results in you having paid any interest in excess of that permitted by applicable law, then it is your and our express intent that all excess amounts previously collected by us be credited on the principal balance of the Obligations (or, if the Obligations have been or would be paid in full, refunded to you), and the provisions of the Franchise Agreement immediately be deemed reformed and the amounts collectible thereafter under this Security Agreement, the Franchise Agreement or the Credit Agreement reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for under this Security Agreement, the Franchise Agreement or the Credit Agreement. All sums paid or agreed to be paid to us for the use, forbearance or detention of the Obligations will, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the Obligations until payment in full so that the rate or amount of interest on account of the Obligations does not exceed the usury ceiling from time to time in effect and applicable to the Obligations for so long as the Obligations are outstanding.

(g)    <u>Conflicting Provisions</u>. To the extent there exists any conflict or inconsistency between the terms of this Security Agreement and the terms of the Franchise Agreement, the terms of the Franchise Agreement will govern. To the extent there exists any conflict or inconsistency between the terms of this Security Agreement and terms of the Credit Agreement, the terms of the Credit Agreement will govern.

7-ELEVEN-00381

(h)    **Counterparts**. This Security Agreement may be executed in any number of identical counterparts, any set of which signed by all the parties to this Security Agreement will be deemed to constitute a complete, executed original for all purposes.

IN WITNESS WHEREOF, you have caused this Security Agreement to be executed as of the day and year first above written.

BORROWER(S)

By: _____    By: _____

Name:  Michael Tucker    Name:  Jami Tucker

Title:  Franchisee    Title:  Franchisee

ACCEPTED this _13_ day of _March_ , 20 _04_ .

LENDER: TSC LENDING GROUP INC.,

By: _____

Name:  Steve Bonnville

Title:  Vice President/Assistant Secretary

# ATTACHMENT 1
## TO SECURITY AGREEMENT

All Goods (including Equipment, Fixtures and Inventory) held or maintained on the Store or otherwise used in the ownership or operation of the Store, including (without limitation) money order blanks, bank drafts and store supplies, and all embedded software, accessions, additions, attachments, improvements, substitutions and replacements to such Goods and for such Goods;

All premium or going concern value of the franchise interest in the Store;

All Computer Hardware and Software and all rights with respect to such Computer Hardware and Software, including, all licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing;

All Accounts, Chattel Paper (including Electronic Chattel Paper), Commercial Tort Claims, Deposit Accounts, Documents, Instruments, money (of every jurisdiction whatsoever), and other rights to the payment of money (including (without limitation) General Intangibles and contract rights) arising as a result of any activities conducted by, through or at the Store, and all contracts, security agreements, leases, guaranties and other agreements evidencing, securing or otherwise relating to any of the foregoing (collectively, the "**Related Contracts**");

All other General Intangibles and contract rights not otherwise described above acquired, held, used, sold or consumed in connection with the Store or relating to or arising out of the Store (including (without limitation) customer and supplier lists and contracts, books and records, computer programs and other intellectual property, insurance policies, and tax refunds and all of your goodwill);

All other property not otherwise described above acquired, held, used, sold or consumed in connection with the Store or relating to the Store or the management of the Store (including (without limitation) all money, documents and goods); and

All proceeds of the foregoing (including (without limitation) whatever is receivable or received when Collateral or proceeds are sold, collected, exchanged, returned, substituted or otherwise disposed of, whether such disposition is voluntary or involuntary, including rights to payment and return premiums and insurance proceeds under insurance with respect to any Collateral, and all rights to payment with respect to any cause of action affecting or relating to the Collateral).

7-ELEVEN-00383

# ATTACHMENT 2
# TO SECURITY AGREEMENT

(Complete for each Incorporated Franchisee)

Exact Legal Name:

State or Organization

Type of Organization:

Place of Business (or, if more than one, the Chief Executive Office):

7-ELEVEN-00384

# ATTACHMENT 3
## TO SECURITY AGREEMENT

(To be Completed by each Franchisee)

Instruments:

Deposit Accounts:

Chattel Paper:

Documents:

Commercial Torts:

Form 4400408  1/04  California
Page 9 of 9 – TSC Security

7-ELEVEN-00385

MARKET/STORE #2131 - 22818 B

## UNIFORM POWER OF ATTORNEY - STATE

The undersigned Franchisee ("you" or "your"), signed a 7-Eleven Store Franchise Agreement (the "Agreement") with 7-Eleven, Inc. ("we", "us" or "our"), under which you are an independent contractor(s); and

We agree to provide certain bookkeeping services under the Agreement, including, but not limited to, paying certain specified taxes on your behalf and charging them to your Open Account (as defined in the Agreement) with us, and to negotiate with taxing authorities on your behalf; and

We need a Power of Attorney from you in order to perform the services described above.

NOW THEREFORE, you appoint each individual who from time to time is designated as our employee to perform the duties associated with filing tax returns related to the operation of your 7-Eleven store, as your attorney-in-fact for all state (and political subdivisions of the state) purposes with full powers on your behalf to sign all tax returns related to the operation of your 7-Eleven store, except income tax returns, to file the same, to cause the taxes to be paid from your Open Account with us, to negotiate with taxing authorities, and to take all other actions necessary or desirable in connection with such taxes, deficiencies in such taxes, refunds of such taxes, and interest and penalties on such taxes.

Michael Tucker
_____
Typed Name(s) of Franchisee(s)

Signature(s) _____

Jami Tucker
_____
Typed Name(s) of Franchisee(s)

Signature(s) _____

Date: _____3-13-04_____

Market/Store No.: ____2131 - 22818 B____

Market Office Address: ___9771 Clairemont Mesa Blvd., Ste. G, San Diego, CA 92124-1331___

Store Address: ___580 S 1St St, Brawley, CA 922272317___

SUBSCRIBED AND SWORN to this __13__ day of __March__, __2004__

_____
Notary Public

ESTHER GOMEZ ALEMAN
Commission # 1268962
Notary Public - California
Imperial County
My Comm. Expires Jul 2, 2004

Form 2400025  1/04 Uniform
Power of Attorney - State

7-ELEVEN-00386

MARKET/STORE #2131 - 22818 B

[NOTE: FOR USE WITH 2004 VERSION OF FRANCHISE AGREEMENT]

## NON-OFFF EXISTING FRANCHISEE AMENDMENT
## TO FRANCHISE AGREEMENT

The 7-Eleven, Inc. Store Franchise Agreement dated ___3 / 1 3___, 2004 ("Franchise Agreement") by and between 7-Eleven, Inc. ("we", "us", or "our") and the undersigned Franchisee ("you" or "your"), is hereby amended as set forth in this Existing Franchisee Amendment to Franchise Agreement ("Amendment") of even date. The terms of this Amendment supersede any inconsistent or conflicting provisions in the Franchise Agreement, are for your benefit, and are not transferable without our prior written consent. Capitalized terms used but not defined in this Amendment shall have the meanings given to such terms in the Franchise Agreement.

### RECITALS

You and we are parties to that certain 7-Eleven Store Franchise Agreement dated _____ (the "Old Agreement") and covering 7-Eleven Store Number ___2131 - 22818 B___, located at 580 S 1St St _____ Brawley, CA 922272317 _____ (the "Store").

The Old Agreement will expire on the Effective Date of the Franchise Agreement.

You and we are signing a Franchise Agreement covering the Store which will replace the Old Agreement and have agreed to make various modifications to the Franchise Agreement.

You and we also wish to set forth our agreement concerning the expiration of the Old Agreement and the commencement of the Franchise Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, you and we agree to modify the terms of the Franchise Agreement as follows:

1.    Expiration of Old Agreement; Effective Date.

a.    You and we agree that the Old Agreement expires on the Effective Date (defined below).

b.    The definition of "Effective Date" in Exhibit E to the Franchise Agreement is hereby deleted in its entirety and is replaced by the following:

"Effective Date" means 12:01 a.m. on the first day of the month immediately following the month in which the Franchise Agreement is executed. The first Collection Period under the Franchise Agreement begins after the last Collection Period under the Old Agreement. For example, if your last Collection Period under the Old Agreement ends at 7:00 a.m. on April 1, 2004, the first Collection Period under this Agreement will begin at 7:01 a.m. on that date."

7-ELEVEN-00387

2.   Recommended Vendor Purchase Requirement.

a.   Paragraph 15(g)(2) is hereby deleted in its entirety and is replaced by the following:

"(2)  Beginning on October 1, 2004 and continuing throughout the remainder of the Term, you will comply with the Recommended Vendor Purchase Requirement."

b.   The definition of "Recommended Vendor Purchase Requirement" in Exhibit E to the Franchise Agreement is hereby deleted in its entirety and is replaced by the following:

"'Recommended Vendor Purchase Requirement' means you will purchase at least the following percentages of your total Purchases and, separately, your cigarette purchases, both computed monthly at cost, from Recommended Vendors:  from October 1, 2004 until December 31, 2004, seventy-five percent (75%), from January 1, 2005 until March 31, 2005, eighty percent (80%) and from April 1, 2005 and continuing throughout the remainder of the Term, eighty-five percent (85%).  Notwithstanding the phase-in periods provided for above, the scheduled percentage increases from 75% to 80% and from 80% to 85% will not occur until aggregate franchisee Gross Profit dollars (reflected as "Franchisee Gross Profit Expenses" in our income statement) for the entire franchise system, for the most recent then-available 12-month period, have increased as compared to aggregate franchisee Gross Profit dollars (reflected as "Franchisee Gross Profit Expenses" in our income statement) for the comparable prior 12-month period.  The percentage increases will take effect as scheduled if such aggregate Gross Profit increase occurs (or as soon as such increase does occur if the initial comparison does not reflect an increase), and the percentage will not be reduced once an increase occurs.

No purchase will be credited towards your Recommended Vendor Purchase Requirement unless the purchase is from a Recommended Vendor we have approved and your purchase was made from such Recommended Vendor in its capacity as a Recommended Vendor which includes compliance with our requirements for Recommended Vendors, including the recommended method of distribution.  The cost value used to calculate the percent of Purchases and cigarette purchases from Recommended Vendors will only include cost as reflected on vendor invoices.  Cost for purposes of calculating this requirement will exclude allowances, rebates and discounts not reflected on vendor invoices.  In order to count towards your Recommended Vendor Purchase Requirement, the products must be ordered and paid for through our recommended method for ordering and paying for that vendor.

7-ELEVEN-00388

Notwithstanding the above, your Purchases of products from non-Recommended Vendors will be deemed to be purchases from Recommended Vendors if you provide us with written substantiation that: (i) you ordered a product carried by a Recommended Vendor and were advised in writing by that Recommended Vendor that such product was out of stock; or (ii) you purchased products or services from a non-Recommended Vendor that were also available from a Recommended Vendor, and the non-Recommended Vendor provided written evidence of a bona fide offer to sell on a Market Basket Basis to all 7-Eleven stores in a geographic area serviced by the Recommended Vendor all products or services that are available from the Recommended Vendor, on a Market Basket Basis, at a lower cost than the Recommended Vendor. For example, if a Recommended Vendor has made a bona fide offer to sell a group of products or services to all 7-Eleven stores in the Recommended Vendor's service area at specific prices, the non-Recommended Vendor must make a similar bona fide offer to sell all products that are available from the Recommended Vendor, on a Market Basket Basis to all 7-Eleven stores in the same geographic area, at a lower cost than the Recommended Vendor."

3.    Non-contractual Policies.    We will not change the current terms of our non-contractual One-Half Mile Option Policy until January 1, 2006. We will not reduce the commission we pay franchisees as reflected in our current non-contractual Consigned Gasoline Policy for stores with a consigned gasoline arrangement as of May 1, 2003, until January 1, 2005. We will not change our policy of paying for the portion of credit card fees for which you are responsible with respect to non-gasoline sales at your Store until January 1, 2005. Copies of our One-Half Mile Option Policy and Consigned Gasoline Policy are attached to this Amendment. You agree that at any time after such dates we can change such policies in any manner we determine, and we can change any of our other non-contractual policies at any time in our sole discretion.

4.    Minimum Net Worth. The first sentence of Paragraph 13(d) is hereby deleted in its entirety and is replaced by the following:

"You will maintain at all times during the Term of this Agreement a Minimum Net Worth of at least ten thousand dollars ($10,000)."

5.    Bona Fide Suppliers. Anything in Paragraph 15(g)(1) of the Franchise Agreement to the contrary notwithstanding, you will not be deemed to be in violation of the prohibition on having or maintaining an ownership or voting interest in vendors from which your Store purchases Inventory, provided that you divest yourself of any such interest within six (6) months following the Effective Date.

6.    Designated Service Vendors. Anything in Paragraph 15(i) of the Franchise Agreement to the contrary notwithstanding, you will not be deemed to be in violation of the requirement to use only designated vendors that provide equipment as an integral part of certain services offered at your 7-Eleven Store with respect to services you obtain during the current term of contracts that are in effect as of the Effective Date with vendors that provide substantially the same services as those provided by our designated service vendors. You agree not to exercise any rights to renew or extend the current term of any such

7-ELEVEN-00389

7.    <u>Complete Agreement</u>. Anything in Paragraph 31(g) of the Franchise Agreement to the contrary notwithstanding, you will not be required to submit personal information to us as a condition to signing the Franchise Agreement.

8.    <u>Conditions to Occurrence of Effective Date</u>. Anything in Paragraph 6(b) of the Franchise Agreement to the contrary notwithstanding, you do not need to meet the conditions in Paragraphs 6(b)(1), (2), or (5) in order for the Effective Date to occur.

~~9.    Exhibit D. If the blanks in Paragraphs (e), (g) or (h) of Exhibit D to the Franchise Agreement are not completed when you sign the Franchise Agreement, we will use any similar provisions of the Old~~ Agreement, as applicable, to carry out the intent of such items.

10.    <u>Retail Book Inventory</u>. Anything in the Franchise Agreement to the contrary notwithstanding, you acknowledge and agree that you accept the Store "As Is" and that the current Retail Book Inventory for the Store, as reflected on the Bookkeeping Records for the Store for the Accounting Period immediately preceding the Effective Date of the Franchise Agreement, will be transferred to the Bookkeeping Records for the Store under the Franchise Agreement.

11.    <u>Franchise Fee</u>. Anything in Paragraph 27(b)(2) to the contrary notwithstanding, because you are not paying us a Franchise Fee in connection with entering into the Franchise Agreement and because you are a renewing franchisee, you are not entitled to receive a refund of the Franchise Fee pursuant to Paragraph 27(b)(2) of the Franchise Agreement. If you previously signed an Amendment to 7-Eleven Store Franchise Agreement and Promissory Note (the "Note") in connection with the Old Agreement, the terms of the Note will continue in effect, notwithstanding the expiration of the Old Agreement and your execution of the Franchise Agreement.

12.    <u>Close Out Audit</u>. You acknowledge and agree that we will not conduct a close out audit for the Store pursuant to the Old Agreement in connection with the expiration of the Old Agreement.

13.    <u>Final Financial Summaries</u>. You acknowledge and agree that (i) we will not prepare final Financial Summaries for the Store's operation pursuant to the Old Agreement in connection with the expiration of the Old Agreement; (ii) we will not remit any payments to you pursuant to the terms of the Close Out Procedures contained in the Old Agreement and (iii) we will transfer all balances reflected on the Financial Summaries for the Old Agreement upon its expiration to the Financial Summaries prepared under the Franchise Agreement including the current balance in the Open Account.

14.    <u>Financing Statements</u>. You acknowledge that all financing statements relating to the Old Agreement shall remain valid and shall relate to all security interests granted by you to us under the Franchise Agreement. You shall execute all documents related to the security interests granted to us that we request, in a form acceptable to us, as required by the Franchise Agreement.

15.    <u>Your Representations; Construction</u>. You represent that the execution of this Amendment is free and voluntary; that no inducements, threats, representations or influences of any kind were made or exerted by or on behalf of us, and that prior to the execution of this Amendment your were given the opportunity, if desired, to consult with counsel. Except to the extent expressly set forth in this Amendment, the terms of the Franchise Agreement control.

7-ELEVEN-00390

IN WITNESS WHEREOF, you and we have executed this Existing Franchisee Amendment to Franchise Agreement.

7-ELEVEN, INC.

By _Tom Lesser_
    Tom Lesser
Name
    Market Manager
Title

Date _3/14/04_

By _Michael Tucker_
    Michael Tucker
Name

Date _3-13-04_

FRANCHISEE

By _Jami Tucker_
    Jami Tucker
Name

Date _3-13-04_

MARKET/STORE #2131 - 22818 B

# CALIFORNIA STORAGE TANK AMENDMENT

THIS CALIFORNIA STORAGE TANK AMENDMENT (the "Amendment") is signed by the undersigned franchisee(s) ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in the last paragraph of this Agreement,

## BACKGROUND INFORMATION

We own and you operate underground storage tanks at a retail motor fuels outlet (the "outlet") located at the premises of 7-Eleven Store No. 2131 - 22818 B                                    ;

You sell gasoline at the outlet on consignment from us pursuant to a Consigned Gasoline Amendment dated _____ (the "Consigned Gasoline Amendment");

You and we are subject to Federal, State and local requirements governing the operation of underground storage tanks at the outlet including, but not limited to, those set forth in Chapter 6.7 of Division 20 of the California Health and Safety Code (the "Act") and regulations promulgated under the Act and codified in Subchapter 16 of Chapter 3, Title 23, California Administrative Code (the "Regulations"); and

Section 25923 of the Act and Section 2610(b) of the Regulations provide that an operator of underground tanks at a facility who is not the owner of said tanks must sign a written contract with the owner to perform certain responsibilities under the Act and the Regulations.

NOW THEREFORE, in consideration of the above recitals and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

(1)     This Agreement will begin as of the date stated in the last paragraph of this Amendment and will continue until expiration or termination of the Consigned Gasoline Amendment.

(2)     You will monitor the underground storage tanks at the outlet in accordance with Section 2644 of the Regulations and any applicable permit, rule or order issued pursuant to the Regulations or any other applicable Federal, State or local authorities.

(3)     You will maintain appropriate records in accordance with Section 2712 of the Regulations and any applicable permit, rule or order issued pursuant to the Regulations or any other applicable Federal, state and local authorities.

(4)     You will implement reporting procedures as required by any permit, rule or order issued pursuant to the Regulations or any other applicable Federal, State and local authorities.

(5).     At our expense, we will train you in the monitoring of the underground storage tanks, the maintenance of appropriate records and the implementation of reporting procedures as set forth in paragraphs 2, 3 and 4 of this Amendment, and you agree to attend such training.

7-ELEVEN-00392

(6)    We will properly close the underground tanks at the outlet as required by any permit, rule or order issued pursuant to the Regulations.

(7)    We will indemnify you against any liability for civil penalties assessed as a result of a failure to comply with the Act or the Regulations, except that no indemnification will be provided where such noncompliance is caused in whole or in part by your negligence or willful misconduct.

(8)    This Amendment may not be modified, altered, amended or revoked except in writing duly executed by the parties.

(9)    Your material breach of this Amendment may constitute a ground for termination or nonrenewal of the 7-Eleven Store Franchise Agreement between you and us, and will constitute a ground for termination or nonrenewal of the 7-Eleven Store Franchise Agreement if the breach is otherwise a breach of the 7-Eleven Store Franchise Agreement.

(10)    If a dispute or controversy arises out of this Agreement or the breach of this Amendment, the dispute resolution provisions of the 7-Eleven Store Franchise Agreement will apply.

You and we have signed this Amendment effective as of _____3/13/04_____.

**7-ELEVEN, INC.**

By _____

Name ___Tom Lesser_____

Title ___Market Manager_____

Date ___3/14/04_____

**FRANCHISEE**

By _____          By _____

Name ___Michael Tucker_____          ___Jami Tucker_____

Date ___3-13-04_____          Date ___3-13-04_____

7-ELEVEN-00393

## CONSIGNED GASOLINE AMENDMENT

THIS CONSIGNED GASOLINE AMENDMENT ("Amendment") is signed by the undersigned franchisee(s) ("you" or "your") and 7-Eleven, Inc. ("we", "us", or "our") as of the date stated in the last paragraph of this Amendment (the "Effective Date").

BACKGROUND INFORMATION

You and we signed a 7-Eleven Store Franchise Agreement (the "Franchise Agreement"), covering 7-Eleven Store No. 2131 - 22818 B (the "Store"); and

You and we desire to amend the Franchise Agreement to provide for the sale of consigned gasoline at the Store.

The parties agree as follows:

(1)     Term. The term of this Amendment will end at the earlier of (i) fifteen (15) years from the Effective Date, or (ii) the expiration or termination of the Franchise Agreement, or (iii) the date on which Consigned Gasoline sales are discontinued pursuant to Paragraph 10 of this Amendment.

(2)     Gasoline Sales Area. We reserve from your lease described in the Franchise Agreement the following areas at the Store: (a) The area of the parking lot designated for self-service gasoline on the plot plan attached as Exhibit A to this Amendment; (b) additional areas necessary, in our sole discretion, to install, maintain, repair and operate the Gasoline Equipment (defined below); and (c) the unobstructed nonexclusive ingress and egress over and across the property leased to you for the operation of the Store (together the "Gasoline Sales Area").

(3)     Gasoline Equipment. At our expense, we have installed or will install in the Gasoline Sales Area, and may from time to time replace, delete or add to, gasoline storage tanks, pumps, lights, intercommunication systems, elevated concrete islands, parking strips, or pads, signage and related electrical and piping systems as we, in our sole discretion, may desire (the "Gasoline Equipment"). We will periodically prepare a listing of the Gasoline Equipment, to be dated and initialed by you and us for verification.

(4)     Consigned Gasoline. You must operate the Gasoline Equipment in compliance with all procedures that we establish as part of your operation of the Store. You must use the Gasoline Equipment solely for the sale at retail of gasoline and related motor fuel products we provide on consignment (the "Consigned Gasoline"). You must use your best efforts to promote the retail sales of the Consigned Gasoline in accordance with all procedures that we establish from time to time during all hours the Store is open for business. You acknowledge and agree that we may change the brand and/or type of Consigned Gasoline offered and sold at the Store at any time in our sole discretion, and you agree to cooperate fully with us regarding any change, including, without limitation, executing amendments to the Check Collection Amendment, Credit Card Amendment Stores Without Gasoline, and/or Credit Card Amendment, as applicable, reflecting change in brand and/or type of Consigned Gasoline.

Uniform 4400062 1/04 Uniform
Page 1 of 4 – Consigned Gas

7-ELEVEN-00394

(5)   Sale of the Consigned Gasoline; Accounting and Advertising.

a.     We retain title to the Consigned Gasoline until you sell it. The Consigned Gasoline will at all times be subject to our direction and control. All sales of the Consigned Gasoline must be for cash unless we, in our sole discretion, authorize you to accept designated credit cards for such sales and then only to the credit limits that we establish. You must sell the Consigned Gasoline at retail prices that we establish, in our sole discretion, from time to time. We retain title to the proceeds of all sales of the Consigned Gasoline at all times. You will hold proceeds from Consigned Gasoline sales as trustee solely for our use and benefit. You may not use the proceeds for Purchases or Operating Expenses. The value and sales of the Consigned Gasoline will not be included in Retail Book Inventory, Cost of Goods Sold, or Net Sales, and the Consigned Gasoline will not be a part of Inventory.

b.     You must account to us for the Consigned Gasoline and record and report to us all sales of the Consigned Gasoline and the receipt of all proceeds of those sales on forms we provide, and you must deposit all proceeds from all sales of the Consigned Gasoline, all in the same manner as you record, report and/or deposit Purchases and Receipts. You must permit us to conduct Audits of the Consigned Gasoline and the related records at any time during normal business hours. If the proceeds from your sales of the Consigned Gasoline, as you report and deposit, are less than the sales of the Consigned Gasoline reflected by the pump meter readings, the difference will be your sole responsibility and will be included in Operating Expenses, except for the amount of the difference attributable to customer theft where you obtain the license number of the vehicle, report the theft to us on forms and within the time we specify, and report the theft to the police within 30 minutes of the occurrence.

c.     You may not make, or permit your employees, agents or representatives to make, any representations concerning the Consigned Gasoline unless we have previously approved in writing the representations. We will have full and complete control of all trade names, trademarks, service marks, signage, and all other materials used to describe, promote or sell the Consigned Gasoline, and you must display all of these items in the manner we prescribe. Any advertising by you related to the promotion or sale of the Consigned Gasoline must be submitted to us for our prior written approval before it is used or disseminated.

(6)   Your Responsibilities. You will be responsible, at your expense, for all labor required to promote and sell the Consigned Gasoline, including, but not limited to, that necessary to operate the Gasoline Equipment. You agree to clean and care for the Gasoline Sales Area, to measure the gasoline in the tanks before and after each delivery, to conduct pricing surveys of gasoline competitors, to change the posted prices of gasoline at the Store, and to conduct other functions we require to promote and sell Consigned Gasoline.

(7)   Our Responsibilities. We will pay, at our expense, for all utilities you use in connection with the Gasoline Sales Area, all taxes relating to the Gasoline Sales Area and Gasoline Equipment, all permits necessary to install or operate the Gasoline Equipment, all labor and materials necessary to maintain and repair the Gasoline Equipment (unless occasioned by the negligence or willful misconduct of you or your agents, representatives or employees), and all loss or damage to the Consigned Gasoline resulting from fire, theft from gasoline storage tanks, adulteration, seepage, acts of God and other causes (unless caused by the negligence or willful misconduct of you or your agents, representatives or employees). We will have no liability for any failure to provide gasoline to you, regardless of the reason for the failure and even if there is no reason for the failure.

Uniform 4400062  1/04  Uniform
Page 2 of 4 - Consigned Gas

7-ELEVEN-00395

(8)     Indemnification.  We will indemnify you and hold you harmless from and against all claims, losses, liabilities, damages, obligations and expenses (excluding civil and criminal penalties, except as otherwise provided herein) that may be made by third parties or may arise relating to third parties, resulting from your operation of the Gasoline Equipment, your promotion and retail sale of the Consigned Gasoline, the presence of the Consigned Gasoline in the Gasoline Sales Area, or any discharges or releases of the Consigned Gasoline from the Gasoline Equipment, to the extent that such claim, loss, liability, damage, obligation or expense was not created or contributed to by your failure to comply with any provisions of this Amendment, and provided (a) that such claim, loss, liability, damage, obligation or expense is not one that would be covered by your worker's compensation insurance, including employer's liability coverage, (b) that you used your best efforts to minimize such claim, loss, liability, damage, obligation or expense after you became aware, or should have become aware, of the event(s) giving rise to the claim, loss, liability, damage, obligation or expense, and (c) that such claim, loss, liability, damage, obligation or expense did not result in whole or in part from the negligence or willful misconduct of you or your agents, employees or representatives.  In addition, we will indemnify you against any liability for civil penalties assessed against you as a result of your failure to comply with any federal, state, or local statute, ordinance or regulation relating to the operation of the Gasoline Equipment, including, but not limited to, the monitoring of underground storage tanks, the maintenance of records relating to the monitoring of underground storage tanks, or the reporting of unauthorized releases from the underground storage tanks (provided in each case that the underground storage tanks are part of the Gasoline Equipment and are used solely for the storage of the Consigned Gasoline), except that no indemnification will be provided where the noncompliance is caused in whole or in part by the negligence or willful misconduct of you or your agents, employees or representatives.

(9)     Gasoline Commission.  As compensation for your promotion and sale of the Consigned Gasoline and for your responsibilities related to the Gasoline Sales Area and the Gasoline Equipment, we will pay you a commission (the "Gasoline Commission") each Accounting Period.  The Gasoline Commission will be an amount equal to the number of gallons of the Consigned Gasoline you sell during each Accounting Period (as reflected by the pump meter reading) times $.01.  We will credit the Gasoline Commission to your Open Account at the end of each Accounting Period.

(10)    Discontinuation of Consigned Gasoline Sales.  If your sales of the Consigned Gasoline for any Accounting Period are not satisfactory to us, in our sole discretion, or if at any time we determine in our sole discretion that we should discontinue the sale of Consigned Gasoline at the Store, then immediately upon our request, you must stop selling Consigned Gasoline.  We have the right to make any other arrangements for gasoline sales that we, in our sole discretion, may desire, including, but not limited to, operating the Gasoline Equipment and the Gasoline Sales Area ourselves or closing or removing the Gasoline Equipment.  If we remove the Gasoline Equipment or we stop selling Consigned Gasoline at the Store, we will not pay you any compensation.

(11)    Termination.  If you fail to perform any of the provisions of Paragraphs 4, 5 or 6 of this Amendment, your failure will be a Material Breach of the Franchise Agreement (which you hereby acknowledge constitutes good cause for termination of the Franchise Agreement).

(12)    Construction.  Except as otherwise expressly provided in this Amendment, each provision of the Franchise Agreement will be construed as applicable to the Gasoline Sales Area, the Gasoline Equipment and the Consigned Gasoline.  Initially capitalized terms used, but not defined in this Amendment, will have the meanings given to those terms in the Franchise Agreement.  This Amendment supersedes

and replaces all other agreements, if any, between you and us relating to the matters covered in this Amendment. The Franchise Agreement, as amended or supplemented by this Amendment, remains in full force and effect.

You and we have signed this Amendment effective as of _____ 3/18/04 _____

### 7-ELEVEN, INC.

By _____

Name    Tom Lesser

Title    Market Manager

Date    3/14/04

### FRANCHISEE

By _____          By _____

Name   Michael Tucker                        Name   Jami Tucker

Date _____          Date    3-13-04

Uniform 44O0062 1/04 Uniform
Page 4 of 4 - Consigned Gas

7-ELEVEN-00397

MARKET/STORE #2131 - 22818 B

# COIN OPERATED VENDING EQUIPMENT AMENDMENT

THIS COIN OPERATED VENDING EQUIPMENT AMENDMENT (the "Amendment") is signed by the undersigned franchisee ("you" or "your") and 7-Eleven, Inc. ("we", "us", or "our") as of the date stated in the last paragraph of this Amendment.

## BACKGROUND INFORMATION

You and we signed a 7-Eleven Store Franchise Agreement (the "Franchise Agreement" covering 7-Eleven Store Number    2131 - 22818 B         (the "Store").

We and AIR-serv, Inc. ("Operator") signed an agreement (the "Vending Equipment Agreement") covering Operator's installation of ____Air Unit with Stand and Retractor____ (the "Equipment") at certain 7-Eleven stores.

You and we desire for the Store to offer the Equipment.

The parties agree as follows:

(1)     Installation of Equipment. You agree that Operator has the right and obligation to deliver and install, at Operator's sole cost and expense, all necessary and related materials to provide the Equipment at the Store. We and Operator will determine the exact placement of the Equipment at the Store. You recognize that we may, without liability, terminate this Amendment and the Vending Equipment Agreement covering the Store immediately upon notice to you and Operator if we determine that state or local laws, ordinances, regulations or leases or amendments to leases prohibit the Equipment or require us to make structural changes in connection with the Equipment. We will furnish suitable space and an electrical source at the Store for Operator's installation of the Equipment. We will provide, during all hours of operation at the Store, required electricity for the operation of the Equipment, but we and you will incur no other maintenance or installation costs in connection with the operation of the Equipment. We will not be responsible for any interruption of any electrical service.

(2)     Exclusive Rights. During the term of this Amendment, you will not install or operate or permit any other person, firm or corporation other than Operator to install or operate any equipment similar or identical to the Equipment at the Store.

(3)     Compensation. Operator has agreed to pay us 25% of the Revenues that the Equipment generates at the Store. We will credit your Open Account at the end of each Accounting Period with the Revenues that Operator pays us. These Revenues, which constitute Receipts, will be subject to the 7-Eleven Charge pursuant to the Franchise Agreement. Operator has agreed to pay us a $30.00 deposit for each location covered by the Vending Equipment Agreement. If Operator complies with the Vending Equipment Agreement, these deposits will be returned to Operator following expiration of the Vending Equipment Agreement. You agree that the deposits the Operator pays us pursuant to the Vending Equipment Agreement will not be defined as Receipts under the Franchise Agreement, nor credited to your Open Account.

(4)     Title and Risk of Loss. You acknowledge that the Equipment will remain the property of Operator and that Operator will bear the entire risk of loss of the Equipment.

Form 4400855 1/04 Uniform
Page 1 of 3 - Coin Op Equipment

7-ELEVEN-00398

(5)     Removal of Equipment. You must not remove the Equipment or cause the Equipment to be removed from the Store while this Amendment is in effect. When the Vending Equipment Agreement covering the Store termiantes, Operator will have 30 days to remove all Equipment and repair, at its sole cost and expense, any damage arising from the removal of the Equipment. If Operator fails to remove the Equipment within the 30-day period, we may dispose of the Equipment in whatever manner we deem appropriate.

(6)     Maintenance and Service. Operator has agreed to provide, at its sole cost and expense, complete service for the Equipment, including maintenance, repair and replacement. You agree that Operator will have the right to enter the Store premises during normal business hours to service and maintain the Equipment. You must notify us of any need for service of the Equipment. After receiving notice from you that the Equipment is in need of service, we will notify Operator to perform the required service. We will not be responsible for Operator's failure to perform its maintenance and service obligations under the Vending Equipment Agreement.

(7)     Accounting for Revenues. Operator will exercise its best efforts to remove all revenue, receipts, funds or monies deposited into or in any way generated by the Equipment (the "Revenues") on a periodic basis mutually acceptable to us and Operator, and upon terms and conditions as we may reasonably require. To assure the accuracy of reported Revenues from the Equipment, Operator has agreed to install, at its expense, a meter in or attached to the Equipment. This coin counter meter will be visible from the outside of the Equipment at all times. Operator will ensure on a periodic basis that a verified coin counter reading is obtained from the coin counter meter. If we so request, you will provide coin counter readings to Operator. In addition, upon our request, you and a representative of Operator, will jointly count and verify the Revenues and meter readings.

(8)     Theft, Vandalism, Refunds. Operator has agreed to be responsible for all losses resulting from vandalism or theft to the Equipment and for refunds to customers for loss of coins in the Equipment. Operator will give us customer refund forms, which we will make available to you. To obtain reimbursement from Operator for refunds paid to customers, you must obtain the customer's signature on a refund form and furnish such documentation to Operator. Operator will also be responsible for all losses from theft of coins.

(9)     Term. This Amendment will be effective from the date of execution by both parties until the earlier of: (i) the date the Vending Equipment Agreement covering the Store expires or terminates; (ii) the date the Franchise Agreement expires or terminates; or (iii) the date this Amendment terminates.

(10)     Termination. We may immediately terminate this Amendment upon notice to you if you fail to cure any default under this Amendment within 30 days of receiving notice of such default from us. If this Amendment expires or terminates, we and (the Operator) will have the right to enter the Store premises to remove the Equipment. You must cooperate fully with our representatives and Operator's representatives in connection with removal of the Equipment. Any expense associated with the removal of the Equipment will be allocated between Operator and us pursuant to the Vending Equipment Agreement. If the removal results from termination of this Amendment due to your default, you will be responsible for the direct expenses related to the removal of the Equipment.

7-ELEVEN-00399

MARKET/STORE #2131 – 22818 B

(11)    Notices.  Unless otherwise provided in this Amendment, notices under this Amendment must be delivered as provided for in the Franchise Agreement.

(12)    Definitions.  Unless otherwise defined in this Amendment, the terms used in this Amendment will have the meanings set forth in the Franchise Agreement.

IN WITNESS WHEREOF, you and we have executed this Amendment effective _____3/13/04_____.

7-ELEVEN, INC.

By _Tom Lesser_____    By _____

Name_Tom Lesser_____    Name _Steve Bonnville_____

Title_Market Manager_____    Title _Vice President/Assistant Secretary_

FRANCHISEE

By _____    By _Jami Tucker_____

Name_Michael Tucker_____    Name _Jami Tucker_____

Date _3-13-04_____    Date _3-13-04_____

**MARKET/STORE #2131 - 22818 B**

# CREDIT CARD AMENDMENT

THIS CREDIT CARD AMENDMENT (the "Amendment") is signed by the undersigned Franchisee(s) ("you" and "your") and 7-Eleven, Inc. ("we", "us", and "our") as of the date stated in the last paragraph of this Agreement.

BACKGROUND INFORMATION

You and we signed a 7-Eleven Franchise Agreement (the "Franchise Amendment"), covering 7-Eleven Store No.____2131 - 22818 B_____ (the "Store");

We have arranged with credit card processing companies to make credit card charge services available to us ("Arrangement");

Under the Arrangement, we are able to make credit card charge services available to you; and

You and we will amend the Franchise Agreement to permit you to transact business with customers of the Store who desire to make purchases with Visa, MasterCard or Discover, American Express or other similar bank cards or Citgo cards (the Visa, the MasterCard and the Discover, American Express, or other similar bank cards and the Citgo cards are referred to collectively in this Card Amendment as the "Credit Cards" and are sometimes referred to individually in this Card Amendment as the "Credit Card").

The parties agree as follows:

(1) This Amendment supersedes and replaces all other agreements, if any, between you and us relating to the acceptance of credit cards at the 7-Eleven Store.

(2) By accepting the Credit Cards under this Amendment, you agree to comply with the terms and conditions of the Credit Card Guide and Regulations issued and amended from time to time by Citgo in its sole discretion (the "Credit Card Guide and Regulations"), to the extent such terms and conditions apply to you, this Amendment, the Franchise Agreement and all procedures we establish from time to time. We will give you the most recent copy of the Credit Card Guide and Regulations. For purposes of this Amendment, the term "Retailer," as used in the Credit Card Guide and Regulations, means you and not a dealer authorized by Citgo or by a franchised CITGO® distributor to market gasoline under the CITGO® trademark. If any term(s) or condition(s) of the Credit Card Guide and Regulations at any time conflicts with any term(s) or condition(s) of this Card Amendment, the Franchise Agreement or any procedures we establish, the term(s) or condition(s) of this Amendment, the Franchise Agreement and the procedures we established will control. If there is any conflict between this Amendment and the procedures we establish, this Amendment will control. If there is any conflict between this Amendment or the procedures we establish and the Franchise Agreement, the Franchise Agreement will control.

(3) You agree to accept the Credit Cards for the retail purchase of merchandise (excluding gasoline, except as provided in this Amendment) and services by customers using the Credit Cards (the "Cardholders").

7-ELEVEN-00401

(4) If you sell Consigned Gasoline (as defined in the Consigned Gasoline Amendment between you and us) at the 7-Eleven Store, we authorize you to, and you agree to, accept the Credit Cards for the retail purchase of Consigned Gasoline. Notwithstanding anything in this Amendment to the contrary, we may terminate your ability to accept Credit Cards for purchases of Consigned Gasoline at any time by giving you written notice of such termination.

(5) The CITGO® trademark will be used in connection with the sale of Consigned Gasoline only if we prescribe it.

(6) The word "gasoline" is used in this Amendment, as in the Franchise Agreement, to mean all types of motor fuels that we, in our sole discretion, may decide to offer for sale from the Gasoline Sales Area (defined in this Card Amendment as in the Franchise Agreement), including, but not limited to, gasoline, blends of gasoline and alcohol, and diesel fuel.

(7) You agree to:

    (a) properly complete and submit all copies of Credit Card sales slips (the "Sales Slips") as required, including, but not limited to, the merchant copy, with the Cash Report;

    (b) attempt to resolve disputes with the Cardholders regarding the use of the Credit Cards, to the extent proper and necessary;

    (c) accept the Credit Cards for only lawful and appropriate sales of Credit Card authorized merchandise and services in the Store;

    (d) accept the Credit Cards for only lawful and appropriate sales of Credit Card authorized Consigned Gasoline from the Store;

    (e) indemnify us from all claims or losses arising out of your failure to comply with this Agreement; and

    (f) assign to us and, as appropriate, Citgo, the Sales Slips.

(8) You must retain appropriate copies of all Sales Slips (which will constitute "Receipts," as defined in the Franchise Agreement) from customer purchases made using the Credit Cards and attach them to your Cash Report, and otherwise handle and account for them as required by the Daily Cash Report Procedures for Store Operations we establish and amend in our sole discretion.

(9) You agree to pay us a fee (the "Credit Card Fee") for each of the Sales Slips you present under this Amendment, unless otherwise specified in this Amendment. The Credit Card Fee will be the amount stated in Exhibit A of this Amendment, and such amount will not exceed the actual amount charged by the applicable Credit Card issuer. The Credit Card Fee will be either a) a fixed cost per transaction (the "Fixed Fee"), or b) an amount equal to the product of a percentage (the "Fee Percentage") of Credit Card authorized sales of merchandise and services (excluding Consigned Gasoline and certain other merchandise as set forth in Paragraph 11 of this Amendment) multiplied by the difference between 100% and the percentage used to calculate the 7-Eleven Charge under the Franchise Agreement. The Credit Card Fee based upon the Fee Percentage is expressed in the following mathematical equation:

7-ELEVEN-00402

MARKET/STORE #2131 – 22818 B

| Credit | Fee Percentage X Amount | | (100% - the 7-Eleven |
|---|---|---|---|
| Card = | of Credit Card Authorized | X | Charge under the Franchise |
| Fee | sales of merchandise and | | Agreement) |
| Using | services | | |
| Fee | | | |
| Percentage | | | |

At the end of each Accounting Period, we will charge the Credit Card Fee to your Credit Card Expense Account (or another appropriate account) that we maintain for you under the Franchise Agreement, all in accordance with the 7-Eleven System. We may change the Fee Percentage at any time in our sole discretion by giving you 30 days written notice. Currently, we are not charging this Credit Card Fee to any franchisee. We will notify you if we intend to resume charging these fees.

(10) We may change the Credit Cards at any time in our sole discretion by giving you 30 days written notice. You agree to accept the Credit Cards as they may be changed from time to time.

(11) You will not pay any fees under this Amendment on Credit Card authorized sales of Consigned Gasoline or on any other Credit Card authorized sales of merchandise sold from the 7-Eleven Store under a consignment arrangement between us, as consignor, and you, as consignee.

(12) You will not be required to pay any additional Credit Card Fee under this Card Amendment for any reconciliation and/or summary reports (monthly statements relative to the 7-Eleven Store and Credit Card activity there) that may be provided pursuant to the Arrangement, for any warning bulletins regarding invalid Credit Card numbers that may be provided pursuant to the Arrangement, for use of the toll free telephone number for authorizations for purchases where the amount is above the Authorization Amount (as defined in Section 13 of this Card Amendment), or for expenses related to charge/credit supplies.

(13)     No Credit Card transaction may equal or exceed the lesser of $ 150.00   (or such other amount as may be specified in writing by us to you from time to time) or the amount requiring authorization as set forth in the Credit Card Guide and Regulations (the lesser of which is referred to in this Card Amendment as the "Authorization Amount") unless you obtain a credit authorization number pursuant to the Credit Card Guide and Regulations or procedures we establish.

Sales to any one Cardholder within any 24-hour period that were reported on separate Sales Slips but, when accumulated, exceed the Authorization Amount, will be considered one Credit Card transaction that required authorization under this Section if, in our opinion you or your agents, representatives or employees reported the sales on separate Sales Slips so that the amount reported on each of the Sales Slips would not equal or exceed the Authorization Amount.

(14) You agree to be, and will be, charged back by charge to the Open Account for any and all Credit Card purchases that are not properly accepted, processed, handled, authorized and supported by legible Sales Slips, all in accordance with this Card Amendment, and for which Citgo charges back pursuant to the Arrangement.

7-ELEVEN-00403

(15) We may install, or cause to be installed, equipment relating to the acceptance of the Credit Cards (the "Credit Card Equipment"), on and across the property leased to you under the Franchise Agreement and in the 7-Eleven Store in any areas we consider appropriate in our sole discretion. We, from time to time and in our sole discretion, may replace, delete or add to the Credit Card Equipment. We, from time to time, may utilize any additional areas in our sole discretion that are necessary to install, maintain, repair and operate the Credit Card Equipment. You agree to cooperate fully with us in obtaining all consents that may be required to install, maintain, repair or operate the Credit Card Equipment. We may prepare a list of the Credit Card Equipment periodically to be dated and initialed by the parties for verification.

(16) You agree to properly safeguard the Credit Card Equipment until the Credit Card Equipment is returned to us.

(17) You agree to operate the Credit Card Equipment as a service incidental to the business of the 7-Eleven Store.

(18) We will be responsible, at our expense, for all utilities used at the 7-Eleven Store in connection with the Credit Card Equipment, all taxes relating to the Credit Card Equipment, and all labor and materials necessary for the maintenance and repair of the Credit Card Equipment, unless occasioned by the negligence or willful misconduct of you or your agents, representatives or employees.

(19) We may require that any merchandise offered for sale from the Store under a consignment arrangement between us, as consignor, and you, as consignee, be sold at a discounted price for cash sales. If we establish a discounted price for cash sales of such merchandise, you will not represent, nor will you allow your agents, representatives or employees to represent, such discounted price as the regular or standard selling price for such merchandise.

(20) Your failure to comply with any of the terms or conditions of this Amendment may result in the termination of this Amendment by us immediately upon the mailing or posting of notice to you. Upon a termination, you agree, upon request, to turn over immediately to us all unprocessed charge slips and the Credit Card Equipment. In addition, you will turn in immediately for processing all Sales Slips that have been used for purchases and will cease accepting the Credit Cards.

(21) This Amendment will remain in full force and effect, and its term will be, until the earlier of: (i) the expiration or termination of the Franchise Agreement, (ii) the expiration or termination of this Amendment, (iii) the expiration or termination of the Arrangement, or (iv) 30 days prior written notification of termination by either party.

(22) If you include a reference to the acceptance of any specific credit cards at the Store in any advertising for the Store, such advertising must include a reference to each of the credit cards that are accepted at the 7-Eleven Store.

(23) The Franchise Agreement, as amended or supplemented by this Amendment, will remain in full force and effect.

(24) This Amendment and the writings and documents incorporated into this Card Amendment by reference comprise the entire agreement between the parties regarding Credit Card transactions. No

7-ELEVEN-00404

MARKET/STORE #2131 – 22818 B

representation or statement regarding Credit Card transactions not expressly contained in this Amendment or incorporated into this Amendment by reference will be binding upon you or us as a warranty or otherwise. This Amendment may be amended or supplemented only by a writing executed by duly authorized representatives of the parties.

The words or terms used in this Amendment will have the meanings set forth in the Franchise Agreement unless otherwise defined in this Amendment, in which case the words or terms will have the meanings set forth in this Amendment.

You and we have signed this Amendment effective as of _____3/13/04_____.

**7-ELEVEN, INC.**

By _____Tom Lesser_____

Name _____Tom Lesser_____

Title _____Market Manager_____

Date _____3/14/04_____

**FRANCHISEE**

By _____

Name _____Michael Tucker_____

Date _____3-13-04_____

By _____Jami Tucker_____

Name _____Jami Tucker_____

Date _____3-13-04_____

Form 4400268  1/04  Uniform
Page 5 of 6 – Credit Card

7-ELEVEN-00405

## EXHIBIT A

### CREDIT CARD FEE

Visa            -       3      % Fee Percentage if transaction processed manually
                        3%     Fixed Fee if transaction processed electronically

MasterCard      -       3      % Fee Percentage if transaction processed manually
                        3%     Fixed Fee if transaction processed electronically

Discover        -       3      % Fee Percentage if transaction processed manually
                        3%     Fixed Fee if transaction processed electronically

Citgo Plus      -       3      % Fee Percentage if transaction processed manually
                        N/A    Fixed Fee if transaction processed electronically

American        -       3      % Fee Percentage if transaction processed manually
Express                 3%     Fixed Fee if transaction processed electronically

_____        -       _____% Fee Percentage if transaction processed manually
                        _____ Fixed Fee if transaction processed electronically

_____        -       _____% Fee Percentage if transaction processed manually
                        _____ Fixed Fee if transaction processed electronically

Form 4400268  1/04  Uniform
Page 6 of 6 - Credit Card

7-ELEVEN-00406

MARKET/STORE #2131 - 22818 B

# CHECK COLLECTION AMENDMENT

THIS CHECK COLLECTION AMENDMENT (the "Amendment") is signed by the undersigned franchisee ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in the last paragraph of this Amendment.

BACKGROUND INFORMATION

You and we signed a 7-Eleven Store Franchise Agreement (the "Agreement") covering 7-Eleven Store No. 2131 - 22818 B _____ (the "Store");

We and LML Payment Systems ("LML") have signed a Check Collection Agreement (the "Check Collection Agreement"), in which LML will provide our convenience stores with a system for verifying checks written by customers, and a collection service for dishonored checks written by customers;

You and we desire to amend the Agreement to permit you to accept personal checks for merchandise and Consigned Gasoline (as defined in the Consigned Gasoline Amendment between you and us) purchases by customers of the Store, and allow you access to LML's check verification and collection services.

The parties agree as follows:

The terms used in this Check Amendment will have the meanings defined in the Agreement.

(1) CHECK ACCEPTANCE. You desire to accept personal checks for purchases of merchandise, and gasoline if Consigned Gasoline is sold by you, from the Store, and LML has developed a system for the verification of checks and the handling and collection of returned checks. You agree to and will accept checks at the Store only in accordance with our Check Acceptance Policy we issue and amend from time to time in our sole discretion (the "Check Acceptance Policy"). The current Check Acceptance Policy is set forth in Exhibit "A" attached to this Amendment. You must deposit all checks accepted at the Store in the Bank, along with other merchandise receipts. Notwithstanding anything in this Amendment to the contrary, we may terminate your ability to accept personal checks for the purchase of merchandise or Consigned Gasoline at any time upon providing you written notification of such termination.

(2) CHECK VERIFICATION. We will provide you with access to the Check Approval System (the "System"), which is a System developed and operated by LML for verification of checks prior to acceptance. We and LML make no representations that a check verified through the System will be honored by a bank. The System only contains information on the check-writing history of the individual presenting the check. You agree to obtain verification through the System at the time of check acceptance, and otherwise comply with all of the then-current provisions of the Check Acceptance Policy, for each check you accept for the purchase of merchandise or Consigned Gasoline.

(3) EQUIPMENT. Access to the System will be provided by an appropriate communication device, which will either be a stand alone unit or an integrated part of the cash register (the "Communication Device"), as we designate, to be installed in a Store location we determine in our sole expense. If the Communication Device is a stand alone unit and it malfunctions or fails to provide the information available under the System, you must immediately contact LML at the location and telephone number provided to you. Upon receipt of such notification, LML will send a replacement unit by overnight mail service for the next business day. You must send the failed device to your local 7-Eleven market office in the just-received shipping container for the replacement unit within 5 days of receipt. Your failure to comply with this requirement will result in you being billed for the replacement cost of the replacement unit. If the Communication Device is an integrated part of the cash register and it

7-ELEVEN-00407

malfunctions or fails to provide the information available under the system, you must immediately notify us of the malfunction. The Communication Device is and will remain our property. You will reimburse us for the cost of any damage or defect to the Communication Device caused by your negligent or willful mistreatment. Reimbursement will be at the lower of replacement cost or the cost of repair.

(4) CHECK ACCEPTANCE NOTICE. We will provide you with a decal notifying your customers of your acceptance of personal checks for the retail purchase of merchandise, and Consigned Gasoline if applicable (the "Check Acceptance Notice"). You must affix the Check Acceptance Notice to a conspicuous portion of the checkout counter in the Store (as agreed by you and our representative). In addition, we will provide you with 1 decal of the notice providing for a service charge on all returned checks (the "Returned Check Notice") and 2 decals of the notice providing that all personal checks are verified and handled through LML (the "Verification Notice"). You must affix the Returned Check Notice and one of the Verification Notices to a conspicuous portion of the checkout counter and the remaining Verification Notice must be affixed on the front Store door (as agreed by you and our representative). From time to time, we or LML may revise the Returned Check Notice or Verification Notice, or add new notices, at any time and in our sole discretion. We will provide any revised decals to you, which you must affix to a location we require. You must also purchase an endorsement stamp in a form we approve, and use the stamp to complete the necessary information of the customer on all checks as required by the Check Acceptance Policy.

(5) DISHONORED CHECKS. All dishonored checks that are returned by the Bank (the "Returned Items") are not guaranteed by us and will be charged back to you in the Accounting Period in which LML enters the returned check into its system. LML will retain and pursue the collection of the Returned Items. Any recovery of the actual face amount of the Returned Items will be credited back to you, and any additional charges collected, including, but not limited to, any returned checks service charges, will belong to and remain our property or the property of LML.

If LML pursues the collection of Returned Items but is unsuccessful in its collection efforts, LML will retain possession of the Returned Items and information on the Returned Items will remain on LML's active file for a period of approximately 2 years, during which time information on the writer of the Returned Items will remain on the System.

(6) TERM AND TERMINATION. This Check Amendment will commence on the earlier of the Effective Date of the Agreement or the date in the last paragraph of this Amendment, and continue until the earlier of: (i) the expiration or termination of the Agreement for any reason, (ii) the expiration or termination of the Check Collection Agreement, or (iii) 30 days prior written notification of termination by either party for any reason, unless sooner terminated as provided below. If we determine that you or your agents fail to abide by the Check Acceptance Policy, or otherwise fail to comply with the requirements of this Amendment, we will have the right, at any time, to terminate this Amendment immediately upon written notice to you. The monthly Network Fee will be prorated to the effective date of termination. Upon expiration or termination of this Agreement, we or any of our agents, representatives or employees may enter the Store during the hours the Store is open for business to remove the Communication Device and any other materials provided to you pursuant to this Check Amendment.

(7) FEES.
A. If the Store is equipped with a CITGO terminal, you will be charged a monthly Network Fee (the "Network Fee") of ___$12.00_____ each Accounting Period. If the Store is not equipped with a CITGO terminal, you will be charged a Network Fee of_____N/A_____ each Accounting Period. We will charge the fees described above to your Check Cashing Expense Account at the end of each applicable Accounting Period. We have agreed that the Network Fee will be temporarily waived from the execution of this Check Amendment until such time as we notify you that the Network Fee will be reinstated.

7-ELEVEN-00408

MARKET/STORE #2131 - 22818 B

B. In addition to the Network Fees described above, if the Communication Device is a stand alone unit, you will be charged a monthly maintenance fee as provided on Exhibit B to this Check Amendment based on the type of equipment in the Store. These fees will be charged each Accounting Period to cover the cost of all maintenance of the equipment provided pursuant to this Check Amendment. We will charge the maintenance fee to your Maintenance Account at the end of each applicable Accounting Period. This maintenance fee does not cover, and you must reimburse us for the cost of, those repairs caused by your negligent or willful mistreatment of the equipment. There will be no maintenance fee under this Check Amendment if the Communication Device is an integrated part of the cash register (normal maintenance charges for the cash register will apply).

C. We may change any of the fees described in this paragraph 7 from time to time in our sole discretion upon 30 days written notification by us to you.

D. We are currently not charging the Network Fee or maintenance fee to any franchisee. We will notify you if we intend to resume charging these fees.

(8) REPORTS. We will provide you with such reports regarding the collection program as we deem appropriate.

(9) ASSIGNABILITY. You man not assign or otherwise transfer this Check Amendment without our written consent.

(10) In all other respects, this Check Amendment is ratified and reaffirmed.

You and we have signed this Amendment effective as of _____ 3/13/04 _____.

### 7-ELEVEN, INC.

By _____

Name  Tom Lesser

Title  Market Manager

Date  3/14/04

By _____

Name  Michael Tucker

Date  3-13-04

**FRANCHISEE**

By _____

Name  Jami Tucker

Date  3-13-04

Form 4400852 1/04 Uniform
Page 3 of 6 – Check Collection

7-ELEVEN-00409

# EXHIBIT "A"

## CHECK POLICY PROGRAM

1.     Check must be preprinted with:

     A.    Customer's full name.

     B.    Residence street address (P.O. Box or general delivery is not acceptable).

2.     Customer must provide:

     A.    Residence telephone number.

     B.    Employment telephone number or second phone number required only on checks numbered under 500 and on out-of-state checks (otherwise optional).

     C.    Driver's license number or state issued I.D. card number (write on back of check).

3.     Only personal and business checks are accepted. All other checks, including counter checks and two-party checks, are considered out-of-policy.

4.     Checks may be accepted for amount of purchase with up to $10.00 cash back.

5.     No checks for cash only.

6.     All checks must be authorized and a valid authorization number entered on the endorsement stamp.

7.     Limit on checks accepted are:

| | |
|---|---|
| 24 Hours  (1 day) | $150.00 |
| 72 Hours  (3 days) | $200.00 |
| 120 Hours  (5 days) | $300.00 |

7-ELEVEN-00410

MARKET/STORE #2131 - 22818 B

## EXHIBIT "B"

## CHECK COLLECTION/CREDIT CARD PROGRAMS
## YOUR MONTHLY MAINTENANCE CHARGES

### GAS STORES

IF STORE SIGNS UP FOR THE CHECK COLLECTION PROGRAM THEN IT REQUIRES NO
ADDITIONAL EQUIPMENT AND THE MONTHLY MAINTENANCE CHARGE IS:
$ 0.00

### NON-GAS STORES

IF STORE SIGNS UP FOR **BOTH THE CHECK AND CREDIT CARD PROGRAMS** THEN IT REQUIRES
A TRANZ 330 TERMINAL PLUS A PRINTER AND THE MONTHLY MAINTENANCE CHARGE IS:
$ 7.50

IF STORE SIGNS UP FOR **BOTH THE CHECK AND CREDIT CARD PROGRAMS** AND *THE STATE'S
DRIVERS LICENSE NUMBERS CONTAIN ALPHANUMERIC CHARACTERS* THEN IT REQUIRES A
TRANZ 330 TERMINAL PLUS A PRINTER PLUS A MICR READER AND THE MONTHLY MAINTENANCE
CHARGE IS:                                            $12.50

IF STORE SIGNS UP FOR THE **CHECK PROGRAM ONLY** THEN IT REQUIRES A ZON JR. XL TERMINAL
AND THE MONTHLY MAINTENANCE CHARGE IS:                     $ 2.50

IF STORE SIGNS UP FOR THE **CHECK PROGRAM ONLY** AND *THE STATE'S DRIVERS LICENSE
NUMBERS CONTAIN ALPHANUMERIC CHARACTERS* THEN IT REQUIRES A TRANZ 330 PLUS A
MICR READER AND THE MONTHLY MAINTENANCE CHARGE IS:
$ 7.50

IF STORE SIGNS UP FOR THE **CREDIT CARD PROGRAM ONLY** THEN IT REQUIRES A TRANZ 330
TERMINAL PLUS A PRINTER AND THE MONTHLY MAINTENANCE CHARGE IS:
$ 7.50

Form 4400852  1/04 Uniform
Page 5 of 6 – Check Collection

7-ELEVEN-00411

# EXHIBIT C

| **Check & Credit Card Program Sign Up Sheet** | | |
|---|---|---|
| **Client Name:** 7-Eleven, Inc. | | |
| **Adding New Location:** Y | **Adding Service:** Y | **Existing Equip:** Y |
| Store # 22818 B | Market # 2131 | Gas Store: Y | Franchise Store: Y |

| Store Address:<br>580 S 1St St | City:<br>Brawley | State:<br>CA | Zip:<br>922272317 |
|---|---|---|---|
| Store Telephone: | Store Telephone # for Terminal Connection: | | |
| Bank Name: | Bank Account: | | |

## Program Requested

☐ Check & Credit Cards    ☐ Checks Only    ☐ Credit Cards Only

Person requesting service:

Michael Tucker
Name

Signature

Jami Tucker
Name

Signature

## LML Payment Systems USE ONLY

| CAS #: 1-888-474-0711 | | Credit Phone #: | |
|---|---|---|---|
| Series 1#: | | | |
| Received @CFD: | | Verify Updated: | |
| Log Updated: | | Zon Talk Updated: | |

| Stamps: | Ordered: | Received: | Series One: | Ordered: | Received: |
|---|---|---|---|---|---|

| CITGO Notified: | | Cash Mgmt Notified: | |
|---|---|---|---|
| FACS Updated: | | Equipment Shipped: | |

| 01 | Zon Jr. XL<br>(checks only) | SLC: | | |
|---|---|---|---|---|
| | | S/N: | | |
| 02 | Tranz & Mag Tek<br>(Wa.-cks only) | SLC: | S/N: | |
| 03 | Tranz, Printer & Imp<br>(cks & cc) | SLC: | S/N: | |
| | | SLC: | S/N: | |
| 04 | Tranz, Printer<br>MagTek & Imp | SLC: | SLC: | SLC: |
| | | S/N: | S/N: | S/N: |
| 06 | Tranz, Printer & Imp<br>(Credit only) | SLC: | SLC: | |
| | | S/N: | S/N: | |
| 99 | CITGO Terminal | No equipment to be shipped | | |
| | Other | | | |

*Fax or Mail to:*   **LML Payment Systems**
**Attn: Client Relations**
**1330 River Bend Drive, Suite 600**
**Dallas, TX  75247**
**Phone:**   800-727-4556
**Fax:**     214-689-9571

7-ELEVEN-00412



**MARKET/STORE #2131 - 22818 B**

Electronic Federal Tax Payment System

---

**Tax Form 9779 with Instructions** (OMB 1545-1467)           **Department of the Treasury**

---

## Business Enrollment Form for EFTPS —
This form contains instructions to complete the Electronic Federal Tax Payment System (EFTPS) Enrollment Form for Business Taxpayers. It is to be used either for initial enrollment in the system or to add financial institution information. If you wish to use multiple accounts in one financial institution, or accounts in multiple financial institutions, you will need to provide multiple copies of the enrollment form.

For *questions regarding EFTPS or this Enrollment Form please call:*

Visit our web site at www.EFTPS.gov to enroll online.
24 hours a day, 7 days a week

EFTPS Customer Service          1-800-555-4477 or 1-800-945-8400
For TDD (hearing impaired) support   1-800-733-4829 or 1-800-945-8900
en español                     1-800-244-4829 or 1-800-945-8600

When your form is *completed*, please *mail* to:      **EFTPS Enrollment Processing Center**
**P.O. Box 4210**
**Iowa City, Iowa 52244-4210**

You should receive your Confirmation/Update Form and instructions on using EFTPS approximately two to four weeks after we receive your Enrollment Form.

---

**INSTRUCTIONS**

**1. Employer Identification Number (EIN).** Enter your nine-digit Employer Identification Number. *Enter the EIN on the back of the form in the upper right corner as well.*

**2. Business Taxpayer Name.** Print your business name exactly as it appears on the tax return. The only valid characters are A-Z, 0-9, -, &, and blank.

**3. Business Address.** This address should be the address as it appears on the business tax return.

☞ *Note: If the address has been pre-printed and is incorrect, it can only be changed by submitting an IRS Change of Address (Form 8822) to the Internal Revenue Service. The address on your EFTPS enrollment will automatically be updated when Form 8822 is submitted. See the back of Form 8822 to determine where the form should be mailed.*

Marking Instructions:
- Use black or blue ink only.
- Please print legibly. Use one character per block. Use only capital letters. Keep all printing within the boxes.
- Do not make any stray marks on this form.

MARKING EXAMPLE:

| I A | 5 2 4 7 1 |
|-----|-----------|
| State | Zip Code |

## Taxpayer Information

**1. Employer Identification Number (EIN)** -- (Please enter EIN on reverse side also.)

**2. Business Taxpayer Name:**
M I C H A E L   T U C K E R   &   J A M I   T U C K E R

**3. Business Street Address:**
5 8 0   S   1 S T   S T

City: B R A W L E Y          State: C A          ZIP Code: 9 2 2 2 7 3 1 7

International: Province, Country, and Postal Code:

---

## Contact Information

**4. Primary Contact Name:**
7 - E L E V E N   I N C

**5. Primary Contact Mailing Street Address (if different from #3 above):**
P O   B O X   7 1 1

City: D A L L A S          State: T X          Zip Code: 7 5 2 2 1 0 7 1 1

International: Province, Country, and Postal Code:

**6. Primary Contact Phone Number:**
US  Area Code: 2 1 4 / 8 2 8 - 7 5 6 6          International 011-   Country Code    City Code

**7. Primary Contact E-mail Address** (use as many spaces as needed up to 60):

**4. Primary Contact Name.** Print the name of a person, company, or third party who can be contacted in the event questions arise regarding this enrollment or tax payments. All EFTPS mailings will be sent to your primary contact.

**5-6. Primary Contact Mailing Address and Phone Number** (if different from #3 above). You need not complete the address area if your contact's address is the same as the business address. If an address is provided here, it will be used to mail confirmation materials and instruction booklets.

**7. Primary contact E-mail Address.** (optional)

---

NCS No. 111104
IRS-136          Form 4401017   1/04          ■ ■ ■          *(over)*

7-ELEVEN-00413

For side 2 please fill in
Employer Identification Number (EIN)

EIN: _____

*(continued)*

## Payment Information

**8. Payment Method.** Choose the payment method(s) by placing an "X" in the box(es). The options available are: EFTPS-Direct and EFTPS-Through A Financial Institution.

When choosing EFTPS-Direct you can use EFTPS-Phone or EFTPS-OnLine.

**8. Payment Method**

☐ **EFTPS-Direct:** check here if you will instruct EFTPS to transfer payment from your account. (The EFTPS Payment Input Methods for EFTPS-Direct are interchangeable: EFTPS-Phone and EFTPS-OnLine)

☐ **EFTPS-Through A Financial Institution:** check here if you will instruct your financial institution to forward the payment to EFTPS. You must check with your financial institution to determine if they are capable of providing this service.
NOTE: If you will only be using EFTPS-Through A Financial Institution as a payment method, skip to item #23.

*Note: For EFTPS-Direct, complete the additional information required about your financial institution. Enrollment in the EFTPS-Direct payment method will automatically enroll you for EFTPS-Through A Financial Institution as well as Same-Day Payment.*

*For EFTPS-Through A Financial Institution, you initiate a tax payment through a financial institution. You must contact your financial institution to insure the institution is capable of making and EFTPS payment through the Automated Clearing House (ACH) or a Same-Day Payment method. If you enroll for EFTPS-Through A Financial Institution or Same-Day Payment, you may also enroll for EFTPS-Direct by providing the financial institution information requested on items 19 through 23.*

### Tax Form Payment Amount Limits (EFTPS-Direct only)

**9-18. Optional Tax Form Payment Amount Limits (For EFTPS-Direct only)**

This section is optional. You may set amount limits for each tax type to prevent an overpayment. The system will compare your payment amount against your stated limit and provide a warning if you exceed the limit. You may override the warning if you wish.

(19 through 24 must be completed if EFTPS-Direct will be used)

| | | | |
|---|---|---|---|
| 9. 720 $ | 10. 940 $ | 11. 941 | |
| 12. 943 $ | 13. 945 | 14. 990C | |
| 15. 990PF $ | 16. 990T | 17. 1042 | |
| 18. 1120 | | | |

**19. RTN.** This is the nine-digit number associated with your financial institution. You may contact your financial institution to verify this number.

**20. Account Number.** Enter the number of the account you will use to pay your taxes.

**21. Type.** Please mark one box to indicate whether the account is a checking or savings account.

**22. State and ZIP Code.** Use the two-character letter abbreviation for the state your financial institution is located in and indicate ZIP Code.

### Financial Institution Information (to be completed if EFTPS-Direct will be used)

| 19. RTN: | 20. Account Number: | 21. Type: |
|---|---|---|
| | | ☐ Checking |
| | | ☐ Savings |

22. State: _____    ZIP Code: _____

## Authorization

**23. Authorization.** This section authorizes a Financial Agent of the U.S. Treasury to initiate tax payments from the account(s) you designate if you requested the EFTPS-Direct payment method.

**24. Taxpayer Signature.** The taxpayer **must** sign this section to authorize participation in EFTPS. If there is no signature, a form will be returned.

This section also provides authorization to share the information provided with your financial institution, required for the processing of the Electronic Federal Tax Payment System.

If signed by a corporate officer, partner, or fiduciary on behalf of the taxpayer, the signer certifies that they have the authority to execute this authorization on behalf of the taxpayer.

*Remember to sign and mail your enrollment form to the address on reverse side.*

**23.** For both payment methods: Please read the following Authorization Agreement:

I (as defined as the taxpayer whose signature is below) hereby authorize the contact person (listed in item #4 of this form) and the financial institutions involved in the processing of my Electronic Federal Tax Payment System (EFTPS) payments to receive confidential information necessary to effect enrollment in EFTPS, electronic payment of taxes, and answer inquiries and resolve issues related to enrollment and payments. This information includes, but is not limited to, passwords, payment instructions, taxpayer name and identifying number, and payment transaction details. If signed by a corporate officer, partner, or fiduciary on behalf of the taxpayer, I certify that I have the authority to execute this authorization on behalf of the taxpayer. This authorization is to remain in full force and effect until the designated Financial Agents of the U.S. Treasury have received notification from me of termination in such time and in such manner to afford a reasonable opportunity to act on it.

Only EFTPS-Direct: Please read the following Authorization Agreement:

By completing the information in boxes 19-22 and signing below, I hereby authorize designated Financial Agents of the U.S. Treasury to initiate EFTPS-Direct debit entries to the financial institution account indicated above, for payment of Federal taxes owed to the IRS upon request by taxpayer or his/her representative, using the Electronic Federal Tax Payment System (EFTPS). I further authorize the financial institution named above to debit such entries to the financial institution account indicated above. All debits initiated by U.S. Treasury designated Financial Agents pursuant to this authorization shall be made under U.S. Treasury regulations. This authorization is to remain in full force and effect until the designated Financial Agents of the U.S. Treasury have received written notification from me of termination in such time and in such manner as to afford a reasonable opportunity to act on it.

**24. Taxpayer Signature**

Taxpayer Signature: *Jami Tucker*    Date: 3-13-04

Print Name: Michael Tucker and Jami Tucker    Title: *franchisee*



Paperwork Reduction Act Notice. In accordance with the Paperwork Reduction Act of 1995, we ask for the information in the Electronic Federal Tax Payment System (EFTPS) Enrollment Form in order to carry out the requirements of 26 United States Code 6001, 6011, and 6109. You are not required to provide information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by Code section 6103. This information is used by the Internal Revenue Service to assure that payments are properly credited to the appropriate account(s). Your response is mandatory if you are required by regulations to use Electronic Funds Transfer to make your Federal Tax Deposits. The time needed to provide this information will vary depending on individual circumstances. The estimated average time is ten minutes. If you have comments concerning the accuracy of this time estimate or suggestions for reducing this burden, we would be happy to hear from you. You can write to the IRS Tax Products Coordinating Committee, Western Area Distribution Center, Rancho Cordova, CA 95743-0001. Please do not send the enrollment form to this address. The Privacy Act of 1974 requests that when we ask individuals for information about themselves, we state our legal right to ask for the information, why we are asking for the information, and how it will be used. We must also tell you what could happen if we do not receive all or part of it, and whether your response is voluntary, required to obtain a benefit, or mandatory. Our legal right to ask for information is 5 U.S.C. 301 and Internal Revenue Code sections 6001, 6011, 6012, and information to the Department of Justice and to other Federal agencies, as provided by law. We may also give it to cities, states, the District of Columbia, and U.S. commonwealths or possessions to carry out their laws. We may give it to foreign governments because of tax treaties they have with the United States. Your response is mandatory if you are required by regulations to use electronic funds transfer to make your deposits. If you are not required by regulations to make electronic funds transfer, your response is voluntary. If you do not provide all or part of the information, you may not be eligible to participate in the EFTPS. If you are requested to use electronic funds transfer by regulation, you may be subject to penalties. If you are not required to use electronic funds transfer to pay taxes owed, you may pay the taxes due by another method.

Form 9779 (7/03)

7-ELEVEN-00414

# Form 8655 Reporting Agent Authorization for Magnetic Tape/Electronic Filers    OMB 1545-1058

## Taxpayer's Information

**MARKET/STORE #2131 - 22818 B**

| 1. Employer Identification Number (EIN) | 2. Other ID | 3. Taxpayer Phone Number (optional): | 4. | Check here if EIN is "new" EIN |
|---|---|---|---|---|

Area Code

5. Check here if Seasonal or Intermittent Filer

6. Taxpayer Legal Name:

M I C H A E L    T U C K E R    &    J A M I    T U C K E R

7. Doing Business As (DBA) Name:

8. Address (as on file with the Internal Revenue Service):

5 8 0    S    1 S T    S T

City:

B R A W L E Y

State:    C A

Zip Code:    9 2 2 2 7    3 1 7

## Reporting Agent Information

9. Reporting Agent Name:

7 - E L E V E N    I N C

10. Reporting Agent ID Number:

7 5    1 0 8 5 1 3 1

11. Reporting Agent Phone Number:

2 1 4    8 2 8    7 5 6 6

Area Code

12. Reporting Agent Fax Number:

8 7 7    7 1 1    4 3 2 9

Area Code

13. Reporting Agent Address:

P O    B O X    7 1 1

City:

D A L L A S

State:    T X

Zip Code:    7 5 2 2 1    0 7 1 1

## Reporting Agent Authorization

14. For each federal electronic form to be filed, indicate the filing method: Electronic, Magnetic Tape, or both. Also enter the beginning period as indicated in the instructions for item 15. *If Form 8655 is being submitted only to authorize electronic payments (EFTPS), skip to Item 16.*

| Form | Filing Method | | Beginning Period |
|---|---|---|---|
| 940 | Electronic | Magnetic Tape | _____ |
| 941 | ✔ Electronic | Magnetic Tape | _____ |

15. Reporting Agent is authorized to file the following forms on the Beginning Period indicated:

| Form Number | Beginning Period | Form Number | Beginning Period |
|---|---|---|---|
| Form 940PR | _____ | Form 941SS | _____ |
| Form 941PR | _____ | Form CT-1 | _____ |
| Form 943 | _____ | Form 941NMI | _____ |
| Form 945 | _____ | Form 1042 | _____ |
| Form 943PR | _____ | | |

16. Electronic Federal Tax Deposits and other Federal Payments:

| Form | Starting Period | Form | Starting Period |
|---|---|---|---|
| 940 | 2004 | 1041 | _____ |
| 941 | _____ | CT-1 | _____ |
| 943 | _____ | 990C | _____ |
| 945 | _____ | 990T | _____ |
| 720 | _____ | 990PF | _____ |
| 1042 | _____ | other | _____ |
| 1120 | _____ | | |

17. Check here if the reporting agent is authorized to receive notices, correspondence, deposit requirements, tax rates, and/or transcripts with respect to the authorizations given in Items 14-16.

18. State and Local Forms _____ _____ _____ _____

## Authorization Agreement

19. Please read the following Authorization Agreement:

I understand that this authorization does not absolve me, as the taxpayer, of the responsibility to ensure that all tax returns are filed and all taxes are paid on time. The reporting agent (designee) named above is authorized to sign and file federal employment tax returns transmitted electronically, submitted on magnetic tape (or in special circumstances, submitted on paper) and/or make federal tax deposits (FTDs) and other Federal Tax Payments for the above taxpayer. This authorization applies to the above federal employment tax returns and/or payments beginning with the tax period indicated and remains in effect until the taxpayer or designee notifies the IRS that this authorization is terminated or revoked. I authorize the IRS to disclose otherwise confidential tax information relating to employment tax returns to be filed by the agent (designee) and/or relating to payments to be made by the agent (including deposit requirements). I certify that I have the authority to authorize the disclosure of otherwise confidential tax information on behalf of the taxpayer.

**Franchisee**

Signature (required)    Title (if applicable)    Date (required) 3-13-04

*Jami Tucker*

Form 8655 (Rev. 12-2001)
Catalog Number 10241T

Department of the Treasury
Internal Revenue Service

7-ELEVEN-00415

# Form 8655 with Instructions

# Reporting Agent Authorization for Magnetic Tape/Electronic Filers

Marking Instructions for Tax Form 8655:
- Use black or blue ink only.
- Please print legibly. Use one character per block.
- Use only capital letters.
- Keep all printing within the boxes.
- Do not make any stray marks on this form.

MARKING EXAMPLE:

I A   5 2 4 7 1
State    Zip Code

## Instructions

Please read the following instructions before filling out the information on the reverse side of this form.

**Taxpayer's Information**

**1. Employer Identification number (EIN).** Enter taxpayer business nine-digit Employer Identification number without dashes.

**2. Other ID.** For Reporting Agent use only.

**3. Taxpayer Phone Number.** Provide taxpayer area code and phone number. (optional)

**4. "New" EIN.** Check this box if taxpayer has recently applied for an EIN and has not yet received notice CP 575 (Verification of your EIN) from IRS.

**5. Seasonal or Intermittent.** Check this box if taxpayer business is seasonal or intermittent and there are quarters during the calendar year for which taxpayer will not pay wages.

**6. Taxpayer Legal Name** – Enter the Sole Proprietor/Owner's name. This must match the name on IRS records. Do not abbreviate or omit spaces. Do not use the word "The" as the first word unless it is followed by only one other word. Include legal/formal suffixes with individual names (i.e. MD, PHD, CPA, Jr, Sr, III, etc.)

* Valid characters are A-Z, 0-9, ampersand, hyphen, and only one blank space between each word. Any other punctuation, such as a comma, period, number sign, apostrophe, and multiple blanks is invalid.

**7. Doing Business As (DBA) Name.** Enter the trade name (DBA) of the business if different from the taxpayer name. Follow the same instructions as shown for Item 6 above; however, DO NOT enter "DBA" or "TA" on this line; name only. Use valid character information as defined in Item 6*.

*Note: Partnerships should enter the DBA name in Item 6. Enter the general partner's name or the first partner's name in Item 7. If a Corporation is a general partner, do not include the name in Item 7.*

**8. Address.** Enter address of taxpayer. Use valid character information as defined in Item 6*.

**Reporting Agent information**

**9. Reporting Agent name.** Use valid character information as defined in Item 6*.

**10. Reporting Agent ID Number.**

**11-12. Reporting Agent phone & fax.**

**13. Reporting Agent address.** Use valid character information as defined in Item 6*.

**Reporting Agent Authorization**

**14. Return Filing Method.** Indicate tax return filing method, electronic, magnetic, or both. For Tax Form 941, enter the ending month of the quarter and year (3/1999, 6/2000, etc.). For Tax Form 940, enter the Tax Year (2000, 2001, etc) this agent will begin the annual filing.

**15. Filing Authorization.** Form 8655 can be used to authorize Reporting Agents to file certain tax returns on paper for existing clients who have already authorized the filing of magnetic/electronic Forms 941 and/or Forms 940 by the Reporting Agent. For Forms 941PR, 941SS, and 941NMI, enter the ending month of the quarter and year (3/2000, 6/2000, 9/2000, 12/2000), the Reporting Agent will file this return for the first time. For Forms 940PR, 943, 943PR, 945, 1042 and CT-1, enter the Tax Year (2000, 2001, etc.) the agent will begin the annual filing.

**16. Starting Period.** Enter the first tax period that electronic Federal Tax Deposits (FTDs) or other federal payments will be made. For electronic FTDs, enter the first month and year (2/2000, 3/2000, etc.) the Reporting Agent will begin making any deposit for each authorized tax form.

**17. Correspondence Authorization.** If you wish to have your Reporting Agent receive correspondence, please check here.

**18. State and Local Forms (Optional)**-may be used if accepted by state and local government.

**Authorization Agreement**

**19. Signature.** The taxpayer must sign the form authorization agreement for the Reporting Agent to participate.

**Where to File**

All Forms 8655 should be mailed to :

Internal Revenue Service
MS6748 RAF Team
1160 West 1200 South
Ogden, UT 84201

Do not file the same Authorization twice. Forms 8655 submitted for magnetic tape or e-file may also authorize electronic payments. Forms 8655 submitted for electronic payments may also authorize future participation in e-file or magnetic tape programs. **Be sure to retain a copy.**

*Privacy Act and Paperwork Reduction Act Notice.* Our legal right to ask for information is 5 U.S.C. 301 and Internal Revenue Code Sections 6001, 6011, 6012, and regulations thereunder. Generally, tax returns and return information are confidential, as required by Code section 6103. Routine uses of this information include disclosure to the Department of Justice for civil and criminal litigation and to other federal agencies, as provided by law. We may also give it to cities, states, the District of Columbia, and U.S. Commonwealths or possessions to administer their tax laws. We may give it to foreign governments pursuant to tax treaties. This form is provided for your convenience and its use is voluntary. If you choose to designate a reporting agent to act on your behalf, you must provide all requested information, including your EIN. The principal purpose of this disclosure is to secure proper identification of the taxpayer. If you do not provide all the requested information, the IRS may suspend processing of this form and may not authorize the reporting agent to act on your behalf. Providing false or fraudulent information may subject you to fines or penalties.

You are not required to provide information requested on this form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. The time needed to provide this information will vary depending on individual circumstances. The estimated average time is six minutes. If you have comments concerning the accuracy of this time estimate or suggestions for reducing this burden, we would be happy to hear from you. You can write to the Internal Revenue Service, Tax Forms Committee, Western Area Distribution Center, Rancho Cordova, CA 95743-0001. Please do not send the form to this address.

*(over)*

7-ELEVEN-00416

MARKET/STORE #2131 - 22818 B

Form **2848**
(Rev. January 2002)

Department of the Treasury
Internal Revenue Service

**Power of Attorney**
**and Declaration of Representative**

▶ See the separate instructions.

OMB No. 1545-0150

| For IRS Use Only |
|---|
| Received by: |
| Name _____ |
| Telephone _____ |
| Function _____ |
| Date ___ / ___ / ___ |

### Part I    Power of Attorney (Type or print.)

**1    Taxpayer information.** Taxpayer(s) must sign and date this form on page 2, line 9.

| Taxpayer name(s) and address | Social security number(s) | Employer identification number |
|---|---|---|
| Michael Tucker and Jami Tucker<br>7-Eleven #2131 - 22818 B<br>580 S 1St St<br>Brawley, CA 922272317 | 561133322<br><br>555632906 | |
| | Daytime telephone number<br>(      ) | Plan number (if applicable) |

hereby appoint(s) the following representative(s) as attorney(s)-in-fact:

**2    Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | |
|---|---|
| Marcia Doherty<br>2711 N Haskell Ave  Loc 278<br>Dallas, TX 75204 | CAF No. ........... 7805-4099R<br>Telephone No. ..... 214-828-7566<br>Fax No. ........... 877-711-4329<br>Check if new: Address ☐    Telephone No. ☐ |
| Name and address | |
| Muriel Johnson<br>2711 N Haskell Ave  Loc 278<br>Dallas, TX 75204 | CAF No. ........... 0300-26827R<br>Telephone No. ..... 214-828-7232<br>Fax No. ........... 877-711-4329<br>Check if new: Address ☐    Telephone No. ☐ |
| Name and address | |
| | CAF No. ...........<br>Telephone No. .....<br>Fax No. ...........<br>Check if new: Address ☐    Telephone No. ☐ |

to represent the taxpayer(s) before the Internal Revenue Service for the following tax matters:

**3    Tax matters**

| Type of Tax (Income, Employment, Excise, etc.)<br>or Civil Penalty (See the instructions for line 3.) | Tax Form Number<br>(1040, 941, 720, etc.) | Year(s) or<br>Period(s) |
|---|---|---|
| Withholding | 941, 941C, SSA | 2004, 2005, 2006 |
| Employment | 940 | 2004, 2005, 2006 |
| | | |

**4    Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for Line 4. Specific uses not recorded on CAF. . . . . . . . . . ▶ ☐

**5    Acts authorized.** The representatives are authorized to receive and inspect confidential tax information and to perform any and all acts that I (we) can perform with respect to the tax matters described on line 3, for example, the authority to sign any agreements, consents, or other documents. The authority does not include the power to receive refund checks (see line 6 below), the power to substitute another representative, the authority to execute a request for a tax return, or a consent to disclose tax information unless specifically added below, or the power to sign certain returns. See the instructions for Line 5. Acts authorized.

List any specific additions or deletions to the acts otherwise authorized in this power of attorney: ...........................
Authorization to obtain Federal Identification Number on behalf of Franchisee(s) .......................................
.................................................................................................................................

**Note:** In general, an unenrolled preparer of tax returns cannot sign any document for a taxpayer. See Revenue Procedure 81-38, printed as Pub. 470, for more information.

**Note:** The tax matters partner of a partnership is not permitted to authorize representatives to perform certain acts. See the separate instructions for more information.

**6    Receipt of refund checks.** If you want to authorize a representative named on line 2 to receive, **BUT NOT TO ENDORSE OR CASH**, refund checks, initial here _____ and list the name of that representative below.

Name of representative to receive refund check(s) ▶ Marcia Doherty

For Paperwork Reduction and Privacy Act Notice, see the separate instructions.        Cat. No. 11980J        Form **2848** (Rev. 1-2002)

Form 4401015    1/04
Page 1 of 2

7-ELEVEN-00417

Page 2

**7** **Notices and communications.** Original notices and other written communications will be sent to you and a copy to the first representative listed on line 2 unless you check one or more of the boxes below.

**a** If you want the first representative listed on line 2 to receive the original, and yourself a copy, of such notices or communications, check this box . . . . . . . . . . . . . . . . . . . . . . . . ► ☒

**b** If you also want the second representative listed to receive a copy of such notices and communications, check this box. ► ☐

**c** If you do not want any notices or communications sent to your representative(s), check this box . . . . . . . . . ► ☐

**8** **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same tax matters and years or periods covered by this document. If you **do not** want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . ► ☐

YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.

**9** **Signature of taxpayer(s).** If a tax matter concerns a joint return, both husband and wife must sign if joint representation is requested, otherwise, see the instructions. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the authority to execute this form on behalf of the taxpayer.

► IF NOT SIGNED AND DATED, THIS POWER OF ATTORNEY WILL BE RETURNED.

| Signature | Date 3-13-04 | Title (if applicable) franchisee |
|---|---|---|

Michael Tucker

Print Name

| Signature | Date 3-13-04 | Title (if applicable) franchisee |
|---|---|---|

Jami Tucker

Print Name

---

**Part II**    **Declaration of Representative**

**Caution:** *Students with a special order to represent taxpayers in Qualified Low Income Taxpayer Clinics or the Student Tax Clinic Program, see the separate instructions for Part II.*

Under penalties of perjury, I declare that:

- I am not currently under suspension or disbarment from practice before the Internal Revenue Service;
- I am aware of regulations contained in Treasury Department Circular No. 230 (31 CFR, Part 10), as amended, concerning the practice of attorneys, certified public accountants, enrolled agents, enrolled actuaries, and others;
- I am authorized to represent the taxpayer(s) identified in Part I for the tax matter(s) specified there; and
- I am one of the following:

**a** Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.

**b** Certified Public Accountant—duly qualified to practice as a certified public accountant in the jurisdiction shown below.

**c** Enrolled Agent—enrolled as an agent under the requirements of Treasury Department Circular No. 230.

**d** Officer—a bona fide officer of the taxpayer's organization.

**e** Full-Time Employee—a full-time employee of the taxpayer.

**f** Family Member—a member of the taxpayer's immediate family (i.e., spouse, parent, child, brother, or sister).

**g** Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Service is limited by section 10.3(d)(1) of Treasury Department Circular No. 230).

**h** Unenrolled Return Preparer—an unenrolled return preparer under section 10.7(c)(1)(viii) of Treasury Department Circular No. 230.

► IF THIS DECLARATION OF REPRESENTATIVE IS NOT SIGNED AND DATED, THE POWER OF ATTORNEY WILL BE RETURNED.

| Designation—Insert above letter (a-h) | Jurisdiction (state) or Enrollment Card No. | Signature | Date |
|---|---|---|---|
| | | Marcia Doherty | |
| | | Muriel Johnson | |
| | | | |

Form 4401015   1/04
Page 2 of 2

Form **2848** (Rev. 1-2002)

7-ELEVEN-00418

MARKET/STORE #2131 - 22818 B

**POWER OF ATTORNEY**

*Check below to indicate the appropriate agency. Please note that a separate form must be completed and provided to each agency checked.*

| ☐ **STATE BOARD OF EQUALIZATION** | ☐ **FRANCHISE TAX BOARD** | ☑ **EMPLOYMENT DEVELOPMENT DEPARTMENT** |
|---|---|---|
| PO BOX 942879 | PO BOX 2828 | PO BOX 826880, MIC 28 |
| SACRAMENTO CA 94279-0001 | RANCHO CORDOVA CA 95741-2828 | SACRAMENTO CA 94280-0001 |
| 800-400-7115 | FAX (916) 845-0523 | (916) 654-7263  •  FAX (916) 654-9211 |

| TAXPAYER'S NAME | BUSINESS OR CORPORATION NAME | TELEPHONE NUMBER | FAX NUMBER |
|---|---|---|---|
| Michael Tucker and Jami Tucker | | ( ) | ( ) |

| SOCIAL SECURITY NUMBER *(See Form BOE-324-A, for SS Number disclosure information.)* | FEDERAL EMPLOYER IDENTIFICATION NUMBER(S) | CALIFORNIA SECRETARY OF STATE NUMBER(S) |
|---|---|---|
| | | |

| BOARD OF EQUALIZATION ACCOUNT/PERMIT(S) | EDD EMPLOYER ACCOUNT NUMBER |
|---|---|
| | |

MAILING ADDRESS *(street & number, city, state, zip code)*
7-Eleven # 2131 - 22818 B    580 S 1St St, Brawley, CA 922272317

☐ **INDIVIDUAL**      ☐ **PARTNERSHIP**      ☐ **CORPORATION**      ☐ **LIMITED LIABILITY COMPANY**

☑ **OTHER** _____

*As owner, officer, receiver, administrator, or trustee for the taxpayer, or as a party to the tax or fee matter before the*

☐ State Board of Equalization      ☐ Franchise Tax Board      ☑ Employment Development Department

*I hereby appoint: [enter below the individual appointee(s) name(s), address(es) (including zip codes), telephone number(s) and FAX number(s). Do not enter names of accounting or law firms, partnerships, corporations, etc., as the appointee name]*

| APPOINTEE NAME(S) | APPOINTEE NAME(S) |
|---|---|
| Marcia Doherty | Wanda Smith |
| APPOINTEE BUSINESS NAME *(if applicable)* | APPOINTEE BUSINESS NAME *(if applicable)* |
| | |
| APPOINTEE ADDRESS *(street & number)* | APPOINTEE ADDRESS *(street & number)* |
| 2711 N Haskell Ave | 2711 N Haskell Ave |

| (city) | (state) | (zip code) | (city) | (state) | (zip code) |
|---|---|---|---|---|---|
| Dallas | TX | 75204 | Dallas | TX | 75204 |
| TELEPHONE NUMBER | FAX NUMBER | | TELEPHONE NUMBER | FAX NUMBER | |
| ( 214 ) 828-7566 | ( 214 ) 711-4329 | | ( 214 ) 841-6510 | ( 214 ) 711-4329 | |

*As attorney(s)-in-fact to represent the taxpayer(s) for the following tax or fee matters: [specify type(s) of tax]*

| | | |
|---|---|---|
| ☐ Franchise and Income Tax Law | ☑ Payroll Tax Law |
| ☐ Sales & Use Tax Law | ☐ Benefit Reporting |
| ☐ Use Fuel Tax Law | ☐ Other: _____ |

SPECIFY THE TAX OR FEE YEAR(S) OR PERIOD(S) [IF ESTATE TAX, INDICATE DATE OF DEATH] *(for Board of Equalization and Franchise Tax Board purposes)*

*The attorney(s)-in-fact (or any of them) are authorized, subject to revocation, to receive confidential tax information and to perform on behalf of the taxpayer(s) the following acts for the tax or fee matters described above: [Check the box(es) for the powers granted.]*

☑ General Authorization (including all acts described below).

☐ Specific Authorization (selected acts described below).

    ☐ To confer and resolve any assessment, claim or collection of a deficiency or other tax or fee matter pending before the identified agency and attend any meetings or hearings thereto for the specified law identified above.

    ☐ To receive, but not to endorse and collect, checks in payment of any refund of taxes, penalties or interest.

    ☐ To execute petitions, claims for refund and/or amendments thereto.

    ☐ To execute consents extending the statutory period for assessment or determination of taxes.

    ☐ To execute closing agreements under section 19441 of the California Revenue & Taxation Code.

    ☐ To execute settlement agreements under section 19442 of the California Revenue & Taxation Code.

***(The back of this form must be completed)***

Form 4401029    1/04

7-ELEVEN-00419

☐ To represent the taxpayer for changes to their mailing address for any and all Payroll Tax Law, Benefit Reporting, both Payroll Tax Law and Benefit Reporting.

☐ To execute settlement agreements under section 1236 of the California Unemployment Insurance Code.

☐ To delegate authority or to substitute another representative.

☐ Other acts *(specify):* _____

Franchise Tax Board (FTB) will send you and your first representative listed a copy of FTB computer generated notices as they become available.

☐ Check this box if you do not want FTB to send copies of available FTB computer generated notices to your first representative listed.

*(Note: Not all FTB processing systems are capable of generating representative copies at this time.)*

**This power of attorney revokes all earlier Power(s) of Attorney on file with the California State Board of Equalization, the Employment Development Department, or the Franchise Tax Board as identified above for the same matters and years or periods covered by this form, except for the following: [Specify to whom granted, date and address, or refer to attached copies of earlier power(s)]**

NAME
N/A

DATE POWER OF ATTORNEY GRANTED

ADDRESS *(street & number, city, state, zip code)*

**Unless limited, this Power of Attorney will remain in effect until the final resolution of all tax matters specified herein. (If limited term, specify expiration date.)**

TIME LIMIT/EXPIRATION DATE *(for Board of Equalization and Franchise Tax Board purposes)*

**Signature of Taxpayer(s)** — If a tax matter concerns a joint return, **both** husband and wife must sign if joint representation is requested. If you are a corporate officer, partner, guardian, tax matters partner/person, executor, receiver, administrator, or trustee on behalf of the taxpayer, by signing this Power of Attorney you are certifying that you have the authority to execute this form on behalf of the taxpayer.

▶ **IF THIS POWER OF ATTORNEY IS NOT SIGNED AND DATED BY AN AUTHORIZED INDIVIDUAL, IT WILL BE RETURNED AS INVALID.**

| SIGNATURE | TITLE (if applicable) | DATE |
|---|---|---|
| ☒ Michael Tucker | Franchisee | 3-13-04 |
| PRINT NAME | | TELEPHONE 760 344-4409 |
| ☒ Jami Tucker | Franchisee | 3-13-04 |
| PRINT NAME | | TELEPHONE (760) 351-1000 |

Form 4401029   I/04

7-ELEVEN-00420