1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT D



# FRANCHISE OFFERING CIRCULAR

# 7-ELEVEN, INC.

A Texas Corporation
2711 North Haskell Avenue
Dallas, Texas 75204
(214) 828-7011

The franchisee will operate an extended-hour retail convenience store under the tradename and service mark "7-Eleven®" which sells groceries, take-out foods and beverages, dairy products, non-food merchandise, specialty items and selected services. The stores generally operate every day of the year (except Christmas Day), usually 24 hours a day.

The initial franchise fee is a percentage of the store's annual gross profit, but not less than $10,000. Other initial payments range from $29,600 to $104,530. The estimated initial investment required is from $163,460 to $770,870.

Information comparing franchisors is available. Call the state administrators listed in Exhibit B or your public library for sources of information.

Registration of this franchise by a state does not mean that the state recommends it or has verified the information in this offering circular. If you learn that anything in the offering circular is untrue, contact the Federal Trade Commission and the state administrator listed in Exhibit B.

The date of this Offering Circular is March 25, 2003.

California 3/03

7-ELEVEN-00851

# STORE FRANCHISE AGREEMENT

FRANCHISEE recognizes the advantages of the 7-Eleven System and desires to obtain a franchise for a 7-Eleven Store. In connection therewith, FRANCHISEE wants to lease the Store and Equipment designated in Exhibits A and B and operate the Store in a manner which will enhance the 7-Eleven Image and pursuant to the 7-Eleven System, as from time to time determined by 7-ELEVEN in its sole discretion (whether or not any changes therein are within the present contemplation of the parties). 7-ELEVEN, in reliance on the representations made by FRANCHISEE, is willing to provide certain training and continuing services and grant a License and Lease, but only on the terms of this Agreement, which terms are acceptable to FRANCHISEE and are acknowledged by the parties to be material and reasonable. Therefore, in consideration of this Agreement, the parties agree as follows:

**1.    Definitions.** Defined words in this Agreement and in the Exhibits have the meanings set forth in Exhibit E or, if not defined in Exhibit E, the meanings set forth in context.

**2.    Franchise Fee and Down Payment.** FRANCHISEE has paid 7-ELEVEN a Franchise Fee. FRANCHISEE shall be obligated to pay 7-ELEVEN the amount of the unpaid balance in the Open Account and has made a Down Payment. The amounts paid are set forth in Exhibit D.

**3.    Training and Qualification.** 7-ELEVEN shall provide its then current training program for operating a franchised 7-Eleven Store, to FRANCHISEE. If FRANCHISEE is only one individual, the training program will be provided to FRANCHISEE and one individual that FRANCHISEE has designated in Exhibit D. 7-ELEVEN shall reimburse or pay the training expenses set forth in Exhibit D. 7-ELEVEN at any time may discontinue training, may decline to certify, or may revoke the certification of any participant who fails to evidence an understanding of the training satisfactory to 7-ELEVEN, or otherwise by acts or omissions, at any time prior to the Effective Date, is, in any way unsatisfactory to 7-ELEVEN. If participation of a FRANCHISEE or any participant is discontinued by 7-ELEVEN or 7-ELEVEN does not certify or revokes the certification of a FRANCHISEE or any participant: (i) the business relationship, if any, between FRANCHISEE and 7-ELEVEN shall immediately terminate; (ii) this Agreement shall not become effective and shall be null and void; and (iii) 7-ELEVEN shall refund without interest an amount equal to the Down Payment (less any amount due 7-ELEVEN) and the Franchise Fee.

Notwithstanding the foregoing, in the event that any participant discontinues training upon FRANCHISEE's initiative, 7-ELEVEN may deduct from the amounts refunded to FRANCHISEE those training expenses set forth in Exhibit D which have been reimbursed or paid by 7-ELEVEN. Any expenses incurred or reliance by FRANCHISEE in connection with FRANCHISEE's efforts to obtain a franchise for a 7-Eleven store, including, but not limited to, out-of-pocket expenses, other than those which may be reimbursed to FRANCHISEE pursuant to the terms of this Paragraph, shall be solely at FRANCHISEE's own risk, upon FRANCHISEE's own judgment, and not in reliance upon any statements or representations whatsoever.

Uniform 3/02 Agree.

7-ELEVEN-00959

Exhibit F (cont'd)

4.    **Conditions Precedent.** 7-ELEVEN shall use its best efforts to make the Store available within a reasonable time. As of the date the Store is available, the following are conditions precedent to the Effective Date: (i) satisfactory completion of all training by FRANCHISEE and continued certification of FRANCHISEE until and including the Effective Date; (ii) availability (and, where possible, the obtaining) of all licenses, permits, and bonds that are required by any regulation or law or 7-ELEVEN for the operation of the Store or any portion thereof; and (iii) the absence of any security interest other than 7-Eleven's Security Interest, any misrepresentation, and any action that would be or is a breach of this Agreement. If such conditions have not been met, or the Store is not available within 60 days after satisfactory completion of training, or if the Effective Date is not within 90 days from the date this Agreement is signed by all parties (or, if the Store is under construction, 30 days after construction is completed if such date is later), 7-ELEVEN may, or upon written request shall, refund without interest the Down Payment (less any amount due 7-ELEVEN), and the Franchise Fee, and this Agreement shall be null and void.

5.    **License.** 7-ELEVEN licenses the Service Mark, the 7-Eleven System, and the Trade Secrets, and the Proprietary Products to FRANCHISEE for use only in connection with operation of the Store pursuant to this Agreement. 7-ELEVEN shall defend claims arising from FRANCHISEE's use of the Service Mark pursuant to this Agreement. FRANCHISEE acknowledges that: (i) the License is only for the Store; (ii) FRANCHISEE is not obtaining any exclusive territory whatsoever; (iii) 7-ELEVEN may locate other stores or businesses, which may be operated by 7-ELEVEN or by FRANCHISEES, wherever it determines, including in near proximity to the Store; (iv) 7-ELEVEN is not obligated to grant any additional franchises to FRANCHISEE; and (v) FRANCHISEE will promptly notify 7-ELEVEN of any uses of the Service Mark, the Related Trademarks and/or Trade Secrets which appear to be improper and which come to FRANCHISEE's attention.

6.    **Lease.** 7-ELEVEN leases the Store and Equipment to FRANCHISEE for use only in connection with operation of the Store pursuant to this Agreement. Neither party shall cause a breach of any master lease referred to in Exhibits A or B. 7-ELEVEN is not assigning to FRANCHISEE any exclusive, non-compete, or other rights under the master lease and the parties do not intend for FRANCHISEE to be a third party beneficiary under the master lease. FRANCHISEE shall take all of the premises leased hereunder subject to all documents of record on the property and 7-ELEVEN makes no warranty, express or implied, of non-disturbance. FRANCHISEE must use all equipment currently in the store, or added by 7-ELEVEN, at all times and as required by 7-ELEVEN. With respect to the Lease, it is the intention of the parties to create only a landlord-tenant relationship. In the event of a breach of this Agreement by FRANCHISEE, 7-ELEVEN shall be entitled, in addition to any other rights under this Agreement: to invoke all rights and remedies, judicial and otherwise, available to a landlord, including summary proceedings for possession of leased property, the right to appointment of a receiver or similar remedies; and/or (ii) to terminate, cancel, or declare a forfeiture of the Lease. On any holding over, after notice of breach or non-renewal and effective date of termination as given in the notice, FRANCHISEE shall be only a tenant at sufferance or a trespasser and shall not be entitled to any notice to quit or vacate.

7.    **Term.** The License, Lease, and continuing obligations of the parties shall begin on the Effective Date and continue for a term expiring upon the date 10 years following the Effective Date, unless earlier terminated pursuant to the terms of Paragraph 28 hereof.

8.    **7-Eleven Charge.** FRANCHISEE shall pay 7-ELEVEN the 7-Eleven Charge for the License, Lease, and continuing services. The 7-Eleven Charge shall be due and payable each Collection Period with respect to the Receipts from that Collection Period at the time the deposit of such Receipts is due, and that portion of the Receipts from each Collection Period allocable to the 7-Eleven Charge shall be deemed to be paid to 7-ELEVEN at the time of the deposit of such Receipts; provided that, in the event that the Receipts deposited for any given Collection Period are insufficient to discharge the 7-Eleven Charge for that Collection Period, subsequent Receipts shall be applied first to discharge any such deficiency and then to the current 7-Eleven Charge. In the event that any such deficiency remains at the end of an Accounting Period, the deficiency shall be charged to FRANCHISEE's Open Account. Failure to discharge the 7-Eleven Charge allocable to a given

Uniform                                F-2

7-ELEVEN-00960

Exhibit F (cont'd)

Collection Period from the Receipts for that Collection Period shall not be a Material Breach so long as FRANCHISEE properly accounts for, expends, and deposits the Receipts from such Collection Period in accordance with the terms of this Agreement. The 7-Eleven Charge account reflected in the Financial Summaries may be reconciled on a monthly or other periodic basis at which time appropriate adjustments may be made for Assured Gross Income, changes in hours of operation, or other items necessitating an adjustment to the total 7-Eleven Charge for the Accounting Period.

9.    **Franchisee's Draw.** If FRANCHISEE is not in breach of this Agreement, 7-ELEVEN shall: (i) weekly remit to FRANCHISEE the amount provided in Exhibit D; (ii) within 10 business days (Monday through Friday) after the end of each Accounting Period, inform FRANCHISEE of the available Monthly Draw and Excess Investment Draw for the Accounting Period; and (iii) remit to FRANCHISEE, upon FRANCHISEE's written request, within 10 days after receipt of such request, that amount of Monthly Draw or Excess Investment Draw, or both, specified by the FRANCHISEE in such request, provided that the total amount so requested by FRANCHISEE shall not exceed the greater of the available Monthly Draw or Excess Investment Draw.

10.    **Daily Deposits, Bookkeeping Records and Financial Summaries.** 7-ELEVEN shall have the right, under the terms hereof, to maintain, as part of its records and in accordance with this Agreement, Bookkeeping Records on FRANCHISEE's operation of the Store. FRANCHISEE may perform or obtain any additional bookkeeping FRANCHISEE desires. Either party may inspect records pertaining to the operation of the Store prepared or obtained by the other, where maintained, and during normal business hours. FRANCHISEE shall: (i) properly date and timely submit the Cash Report; (ii) deposit the Receipts for each Collection Period within 24 hours after the end of the Collection Period, in the Bank or night depository designated by 7-ELEVEN, except cash expended by FRANCHISEE from that day's Receipts for Purchases or Operating Expenses paid on that day, which Purchases and/or Operating Expenses shall be properly reported and accompanied by invoices reflecting such payment; and (iii) deliver to 7-ELEVEN, at those times specified by 7-ELEVEN, written verification by the Bank of such deposit which verification must be dated as of the business date next following the end of the Collection Period. If requested by 7-ELEVEN, FRANCHISEE shall deliver the Receipts (net of cash expenditures for authorized Purchases and Operating Expenses) to 7-ELEVEN rather than depositing such Receipts in the Bank. Amounts deposited by FRANCHISEE or delivered by FRANCHISEE to 7-ELEVEN may be withdrawn from the Bank by or otherwise used for the benefit of 7-ELEVEN at any time, without payment by 7-ELEVEN of interest or other compensation to FRANCHISEE.

FRANCHISEE shall prepare and furnish to 7-ELEVEN, on forms and at times acceptable to and as requested by 7-ELEVEN: (i) daily summaries of Purchases; (ii) daily reports of Receipts; (iii) weekly time and wage authorizations for FRANCHISEE's Store employees; (iv) all information requested by 7-ELEVEN regarding the vendors from which FRANCHISEE makes purchases; and (v) all such additional reports as 7-ELEVEN may require from time to time. 7-ELEVEN may require FRANCHISEE to prepare or furnish any required reports by use of in-store computers, then current cash register equipment or other types of equipment in the store. FRANCHISEE also shall deliver or furnish to 7-ELEVEN copies of bank drafts, vendor and other receipts, invoices for Purchases, and receipts and bills for Operating Expenses, and keep 7-ELEVEN currently advised in writing of all of FRANCHISEE's actual retail selling prices (which FRANCHISEE shall solely select) and of all discounts, allowances, and/or premiums received by FRANCHISEE. FRANCHISEE shall use electronic equipment provided by 7-ELEVEN to scan the sale of all products that are capable of being scanned. FRANCHISEE shall retain and make available to 7-ELEVEN any records or other documents relating to the operation of the Store that 7-ELEVEN requests that FRANCHISEE retain and/or make available. FRANCHISEE acknowledges that 7-ELEVEN is relying on the accuracy of all information provided by FRANCHISEE and FRANCHISEE's employees, including, but not limited to, all payroll information. FRANCHISEE agrees that all information provided by FRANCHISEE and FRANCHISEE's employees will be truthful, accurate, complete, and in compliance with all applicable laws and with all policies 7-ELEVEN implements from time to time.

If FRANCHISEE is not in breach of this Agreement, 7-ELEVEN shall: (i) provide Financial Summaries for FRANCHISEE for the Store prepared from the Bookkeeping Records in the form of

F-3

Uniform

**Exhibit F (cont'd)**

an income statement and a balance sheet for each Accounting Period or any portion thereof as 7-ELEVEN may deem necessary and for each calendar year, payroll checks for FRANCHISEE's Store employees, draw checks, and merchandise reports; (ii) timely pay on behalf of FRANCHISEE, upon approval and submission to 7-ELEVEN, bank drafts and invoices for Purchases (as verified by vendor statements), bills for Operating Expenses, and the payroll for FRANCHISEE's Store employees; and (iii) assist FRANCHISEE in the preparation and filing of business tax reports and returns (except FRANCHISEE's income tax and related returns) to the extent the information is available from the Bookkeeping Records.

FRANCHISEE authorizes 7-ELEVEN to collect discounts and allowances, not deducted from the face of invoices, and to charge FRANCHISEE for the market value of any premiums FRANCHISEE receives based upon purchases.

**11.    Open Account and Financing.** As part of the Bookkeeping Records, 7-ELEVEN shall establish and maintain an Open Account for FRANCHISEE. FRANCHISEE's draw, Purchases, Operating Expenses, and amounts owed by FRANCHISEE to 7-ELEVEN which relate directly or indirectly to operation of the Store, shall be charged to the Open Account. All Receipts deposited or delivered to 7-ELEVEN shall be credited to the Open Account, and any amounts due from 7-ELEVEN to FRANCHISEE may be credited to the Open Account. The balance in the Open Account shall be computed on a monthly basis or at any time during an Accounting Period as 7-ELEVEN may deem necessary, shall be computed in a manner 7-ELEVEN may determine to be appropriate, and shall be reflected in the Financial Summaries prepared by 7-ELEVEN for each Accounting Period or any portion thereof as 7-ELEVEN may deem necessary. All Receipts shall be credited to the Open Account for the Accounting Period during which the Cash Report relating to those Receipts is dated (provided such Receipts are properly deposited in the Bank or delivered to 7-ELEVEN as provided herein); and all Purchases, Operating Expenses and amounts owed by FRANCHISEE to 7-ELEVEN shall be charged to the Open Account for the Accounting Period during which invoices, reports or information thereon is received by 7-ELEVEN (regardless of when paid by 7-ELEVEN on behalf of FRANCHISEE).

If FRANCHISEE is not in breach of this Agreement, and so long as 7-ELEVEN has a first lien on the Inventory and the Security Interest, 7-ELEVEN will finance (as a loan) any unpaid balance in the Open Account. FRANCHISEE shall execute a security agreement and financing statement(s) and such renewal or continuation financing statements or other documents relating to the Security Interest as are requested by and acceptable to 7-ELEVEN. If, at any time, in 7-ELEVEN's sole opinion, there has been a Material Breach by FRANCHISEE or 7-ELEVEN believes its Security Interest is threatened 7-ELEVEN may discontinue the financing described above and the unpaid balance in the Open Account shall be immediately due and payable. FRANCHISEE may obtain financing other than from 7-ELEVEN.

The unpaid balance in the Open Account at the beginning of each Accounting Period (the amount financed by 7-ELEVEN) shall bear interest for that Accounting Period at the rate specified in Exhibit D. A credit balance reflected in the Open Account at the end of an Accounting Period shall bear interest for the number of days in the current Accounting Period, at the rate specified in Exhibit D, which interest will be credited to the Open Account; provided, however, 7-ELEVEN may, at its option, limit the credit balance amount upon which 7-ELEVEN will pay interest upon notice to FRANCHISEE.

**12.    Audits.** 7-ELEVEN shall cause at least one Audit to be made each calendar or other designated quarter and, upon FRANCHISEE's request, shall provide additional Audits for a fee of an amount equal to .5% of the Retail Book Inventory. 7-ELEVEN shall have the right, in 7-ELEVEN's discretion, to enter the Store and cause Audits to be made: (i) upon 72 hours notice during normal business hours; (ii) without notice, within 24 hours after 7-ELEVEN learns of a Robbery, Burglary, theft, or mysterious disappearance of Inventory, Receipts, and/or cash register fund, or casualty; or (iii) without notice if Net Worth is less than the minimum determined pursuant to Paragraph 13 hereof, or if the last audit provided by 7-ELEVEN reflected an Inventory Overage

Uniform                                          F-4

Exhibit F (cont'd)

or Inventory Shortage of more than an amount equal to 1% of the Retail Book Inventory. FRANCHISEE may cause Audits to be made by a reputable company upon 24 hours notice to 7-ELEVEN. Both parties shall receive copies of the report on each Audit. Audits shall be binding 24 hours after receipt of such report unless either party gives notice that such party believes the Audit to be incorrect. If such notice is given, either party may cause a re-audit to be made within 24 hours. If any such re-audit for FRANCHISEE becomes binding and results in an adjustment in any Inventory Shortage or Inventory Overage reflected by the last 7-ELEVEN Audit of more than 1% of the Retail Book Inventory reflected by such last Audit, the reasonable cost of such Audit shall be borne by 7-ELEVEN. The parties acknowledge that accurate Audits may be made while the Store is open for business.

   13.    **Loan Repayment Requirement.** FRANCHISEE shall repay the financing provided by 7-ELEVEN pursuant to this Agreement. If FRANCHISEE (i) is not a Previous Franchisee; (ii) is a Previous Franchisee who is executing this Agreement as the result of a request by 7-ELEVEN that FRANCHISEE change locations; (iii) is a Previous Franchisee and is paying 100% of the current Franchise Fee (or, in the case of a Previous Franchisee taking by assignment and paying less than 100% of the then current Franchise Fee pursuant to certain rights granted to the assignor); or (iv) is a Transferring Franchisee; then FRANCHISEE's minimum Net Worth shall be that amount determined in accordance with the following schedule:

| TIME PERIOD | LOAN REPAYMENT SCHEDULE— MINIMUM NET WORTH |
| --- | --- |
| From the first day through the last day of the first Year of Operation | $10,000 |
| From the first day through the last day of the second Year of Operation | An amount equal to thirty percent (30%) of Total Assets |
| From the first day through the last day of the third Year of Operation | An amount equal to thirty-five percent (35%) of Total Assets |
| From the first day through the last day of the fourth Year of Operation | An amount equal to forty percent (40%) of Total Assets |
| From the first day through the last day of the fifth Year of Operation | An amount equal to forty-five percent (45%) of Total Assets |
| From the first day through the last day of the sixth Year of Operation | An amount equal to fifty percent (50%) of Total Assets |
| From the first day through the last day of the seventh Year of Operation | An amount equal to fifty-five percent (55%) of Total Assets. |
| From the first day through the last day of the eighth Year of Operation | An amount equal to sixty percent (60%) of Total Assets. |
| From the first day through the last day of the ninth Year of Operation | An amount equal to sixty-five percent (65%) of Total Assets. |
| From the first day through the last day of the tenth Year of Operation; and thereafter, so long as FRANCHISEE operates the Store. | An amount equal to seventy percent (70%) of Total Assets. |

F-5

Uniform

7-ELEVEN-00963

**Exhibit F (cont'd)**

FRANCHISEE acknowledges that the term of this Agreement shall be determined in accordance with the provisions of Paragraph 7 hereof, and may be less than ten years.

If FRANCHISEE is (i) a Renewing Franchisee; or (ii) a Previous Franchisee paying less than 100% of the current Franchise Fee (except as otherwise provided in this paragraph); and, in either case, FRANCHISEE's previous Agreement included a Loan Repayment Schedule, that Loan Repayment Schedule is deemed incorporated into this Agreement by reference as if set out verbatim herein, and FRANCHISEE's minimum Net Worth shall be determined by reference to that schedule, beginning at the same level on such schedule as was applicable upon the last effective day of FRANCHISEE's previous Agreement.

If FRANCHISEE is (i) a Renewing Franchisee; or (ii) a Previous Franchisee paying less than 100% of the current Franchise Fee (except as otherwise provided in this paragraph); and, in either case, FRANCHISEE's previous Agreement did not include a Loan Repayment Schedule, FRANCHISEE's minimum Net Worth from the first day until the last day of the first Year of Operation, shall be an amount equal to 70% of Total Assets as of the last effective day of FRANCHISEE's previous Agreement, and thereafter through the remaining term of the Agreement, shall be an amount equal to 70% of Total Assets, determined and adjusted annually as herein set out.

Notwithstanding the foregoing, in no event shall FRANCHISEE be required, at any time during the first Year of Operation, to maintain a Minimum Net Worth greater than 85% of total assets (as reflected on the Bookkeeping Records-Balance Sheet prepared for each Accounting Period by 7-ELEVEN for the Store) for the immediately preceding Accounting Period.

**14.     Merchandising and Inventory.**  On or before the Effective Date, 7-ELEVEN shall: (i) procure an initial Inventory (which, except for consigned merchandise, FRANCHISEE shall purchase for an amount equal to the Cost Value of the initial Inventory); (ii) debit FRANCHISEE's Open Account for any prepaid Operating Expenses; (iii) assist FRANCHISEE in cleaning and stocking the Store; and (iv) provide such other services as are required to make the Store ready to open for business. Thereafter, FRANCHISEE shall select, purchase from Bona Fide Suppliers, and stock merchandise that is adequate to provide customers with a type, quantity, quality, and variety consistent with the 7-Eleven Image, and shall carry in the store at all times the Proprietary Products listed on Exhibit G to this Agreement (the importance of which to the 7-Eleven System FRANCHISEE hereby acknowledges). The items listed on Exhibit G may be changed by 7-ELEVEN from time to time, but no more than twice each calendar year, effective on the first day of the Accounting Period beginning 30 days after notice to FRANCHISEE.  Any items for which specifications are set forth in Exhibit G or are otherwise provided by 7-ELEVEN shall meet or exceed those specifications. As to items (such as frozen carbonated beverages, prepared coffee, fountain beverages, deli products, etc.) which are customarily sold in standardized containers, FRANCHISEE shall use only standardized containers which conform to the type, style, and quality, and, where deemed appropriate by 7-ELEVEN, bear the distinctive identification designated by 7-ELEVEN and which are properly accounted for pursuant to the Agreement. 7-ELEVEN shall recommend vendors, merchandise, and supplies, and suggest retail selling prices. FRANCHISEE is not required to purchase merchandise or supplies from 7-ELEVEN or vendors it recommends (provided that Proprietary Products and items bearing the Service Mark shall be purchased by FRANCHISEE only from sources authorized by 7-ELEVEN to produce or deal in such items), to purchase merchandise recommended by 7-ELEVEN (except for FRANCHISEE's obligation to carry at all times the Proprietary Products listed on Exhibit G to this Agreement), or to sell merchandise at retail selling prices suggested by 7-ELEVEN.

**15.     7-Eleven's Indemnity.**  Except as otherwise provided herein, 7-ELEVEN shall be responsible for all fire and casualty loss or damage to the Store building and Equipment (specified in Exhibit B) unless caused by the intentional acts of FRANCHISEE or FRANCHISEE's agents or employees, and shall indemnify FRANCHISEE to the extent and from those losses specified in Exhibit C. This indemnification may be cancelled, and it and any related definition may be changed by 7-ELEVEN once during each calendar year, effective on the first day of the Accounting Period beginning 30 days after notice to FRANCHISEE.

7-ELEVEN-00964

**16.    Franchisee's Indemnity and Insurance.**  FRANCHISEE shall be responsible for and indemnify 7-ELEVEN from all losses, except those specifically the responsibility of or indemnified by 7-ELEVEN. FRANCHISEE may obtain insurance in addition to the contractual indemnification described in Exhibit C. FRANCHISEE shall notify 7-ELEVEN if FRANCHISEE obtains any such insurance policy, and such policy shall name 7-ELEVEN as an additional insured. 7-ELEVEN shall have no obligation to process claims for FRANCHISEE. If FRANCHISEE has obtained such insurance, it shall be primary, and 7-ELEVEN's indemnity shall be secondary to that insurance except for insurance coverage specifically endorsed to cover losses over and above the contractual indemnification. FRANCHISEE shall maintain worker's compensation insurance, including employer's liability coverage, with a reputable insurer or with a state agency, satisfactory to 7-ELEVEN, evidence of which (if with an insurer, reflecting that the premium has been paid and that 30 days prior notice to 7-ELEVEN is required for any cancellation or change) shall be deposited with 7-ELEVEN. FRANCHISEE shall promptly report to 7-ELEVEN all casualty losses and other events covered by indemnification or FRANCHISEE's insurance.

**17.    Franchisee's Additional Covenants.**  FRANCHISEE shall:  (i) devote his best efforts to the business of the Store and maximization of the Store's sales and gross profit, and shall make himself or herself available to meet with 7-ELEVEN at reasonable times, upon request by 7-ELEVEN; (ii) cause the Store to be designated only (and open for business for at least  the hours) as specified in Exhibit D, identified only by the Service Mark, and operated only pursuant to the 7-Eleven System and, where applicable, in accordance with those standards established by 7-ELEVEN from time to time, in a manner that will enhance the 7-Eleven Image; (iii) maintain at all times the minimum Net Worth specified in Paragraph 13 hereof; (iv) permit 7-ELEVEN access to all of the Store, Equipment, Inventory, Receipts, cash register fund, cash register readings, amusement machine, banking and other equipment readings, money order blanks, bank drafts, and Store supplies at any time and for any continuous time during Normal Operating Hours; (v) cause all sales of Inventory to be properly recorded at the time of sale at the retail prices set by FRANCHISEE and generally offered by FRANCHISEE to customers of the Store; (vi) wear, and cause Store employees to wear, apparel approved by 7-ELEVEN while working in the Store; (vii) comply with those minimum standards of operation for the Foodservice Facility as are established by 7-ELEVEN from time to time; and (viii) cause all Store employees to be certified by 7-ELEVEN as qualified to work in the Foodservice Facility prior to beginning work therein and prominently display the certificates evidencing each employee's certification. FRANCHISEE shall not at any time: (i) use, or claim any right to (except pursuant to the terms of this Agreement) the Service Mark or any other trade indicia, including the Related Trademarks, or the goodwill represented by any of them or the 7-Eleven System, the Trade Secrets, or any copyright, copyrighted material or advertising owned or licensed by 7-ELEVEN; (ii) challenge or contest the validity or enforceability of any trade indicia, or rights therein, or any copyright, or copyrighted work, owned, used or licensed by 7-ELEVEN; (iii) make or allow any unauthorized disclosure of any of the Trade Secrets, any elements of the 7-Eleven system or any other confidential information provided to FRANCHISEE under this Agreement; (iv) use any work which is substantially similar to a work subject to a copyright owned or licensed by 7-ELEVEN; or (v) use any name, mark, trade dress or other visual or audible material which is likely to cause confusion with or dilute the distinctiveness of trade indicia owned or licensed by  7-ELEVEN or commit any other act which may adversely affect or be detrimental to 7-ELEVEN, other FRANCHISEES, or any rights of 7-ELEVEN in or to the Service Mark, such trade indicia, including the Related Trademarks, the 7-Eleven Image, the 7-Eleven System, the Trade Secrets or any copyrights or advertising. FRANCHISEE acknowledges that any breach of any of the terms of the covenants contained in the preceding sentence will result in irreparable injury to 7-ELEVEN and that 7-ELEVEN is entitled to injunctive relief to prevent any such breach.

In the event that FRANCHISEE fails to comply with the quality or other reasonable operating standards that 7-ELEVEN establishes from time to time, 7-ELEVEN shall give notice of such breach to FRANCHISEE. If FRANCHISEE fails to cure any such breach after notice by 7-ELEVEN and a reasonable opportunity to cure, 7-ELEVEN may perform or cause to be performed any necessary action to remedy such failure and charge  FRANCHISEE's Open Account for the cost of such

7-ELEVEN-00965

Exhibit F (cont'd)

curative action. If, after having received two previous notices and opportunities to cure, FRANCHISEE receives a third notice of breach, 7-ELEVEN may, in its sole discretion (i) remove such portions, or all, of the Foodservice Facility as 7-ELEVEN deems appropriate, and charge FRANCHISEE's Open Account for the cost of such removal and of restoring the Store to its previous condition, or (ii) pursue all other remedies available to it under this Agreement. Notwithstanding the foregoing or anything in this Agreement to the contrary, in the event that FRANCHISEE's breach involves a grievous failure to comply with any of the standards established by 7-ELEVEN for the Foodservice Facility intended to protect the health of persons consuming items prepared in the Foodservice Facility, or with federal, state, or local health regulations, 7-ELEVEN may, in its sole discretion, cause FRANCHISEE to immediately cease the service of any or all items from the Foodservice Facility, and FRANCHISEE shall not resume such service until such time as that breach has been cured to the sole satisfaction of 7-ELEVEN.

7-ELEVEN may enter upon the premises and take possession of the Store, Equipment, Inventory, Receipts, cash register fund, money order blanks, bank drafts, and Store supplies and continue the operation of the Store for the benefit and account of FRANCHISEE (or applicable heirs or legal representatives) pending the expiration or termination of this Agreement, or resolution of any dispute if: (i) the Store is not open for operation as provided in Exhibit D; (ii) a FRANCHISEE dies or becomes incapacitated (except as otherwise provided in Exhibit F -- "Survivorship"); or (iii) in the opinion of 7-ELEVEN, a divorce, dissolution of marriage, or felony proceeding involving a FRANCHISEE jeopardizes the operation of the Store or the 7-Eleven Image. FRANCHISEE, on behalf of himself, his heirs, and his legal representatives, consents to such operation of the Store by 7-ELEVEN, and releases and indemnifies 7-ELEVEN from any liability arising in connection with its operation of the Store pursuant to the terms of this Paragraph 17.

18.    **Maintenance and Utilities.** Except to the extent otherwise assumed by 7-ELEVEN, FRANCHISEE shall be responsible for all maintenance, repairs, replacements, janitorial services, and expenses relating to the Store and Equipment, including: (i) maintenance of the Store, Equipment, other property in the Store, and landscaped areas in a clean, attractive, orderly, safe, and sanitary condition and in good repair and operating condition, reasonable wear and tear excepted; (ii) replacement of light bulbs, ballasts, vault doors, glass, and door closers on the Store and Equipment; and (iii) cleaning of the parking lot and walk areas (including snow and ice removal), and interior of the Store.

Except to the extent otherwise assumed by 7-ELEVEN or provided pursuant to the terms of any master lease of the Store, FRANCHISEE shall have contracts with reputable firms for maintenance of the Store and Equipment, and, if determined by 7-ELEVEN to be appropriate or necessary, for the landscaped areas outside the Store. Contracts for maintenance of the Store and Equipment (except for the electronic cash register and ordering equipment) shall either be those available through 7-ELEVEN, or shall cover services comparable to those provided under contracts available through 7-ELEVEN. Contracts or services for maintenance and repair of the electronic cash register and ordering equipment must be with a vendor designated by 7-ELEVEN. The maintenance and repair services for the electronic cash register and ordering equipment that FRANCHISEE must use are set forth in Exhibit I. Contracts for maintenance and repair of the Store and Equipment must not include any maintenance services on the HVAC Equipment.

Contracts for maintenance of the Store and Equipment, other than those available through 7-ELEVEN, shall provide for the performance of services, including preventative maintenance services, comparable to those services available from 7-ELEVEN at the time such contract is entered, and be with reputable, financially responsible firms, which (i) maintain adequate insurance and bonding; (ii) have personnel who are factory trained to service equipment of the type in the Store; and (iii) maintain an adequate supply of parts for the Equipment and tools. Contracts for landscape maintenance shall be with reputable, financially responsible firms. FRANCHISEE shall provide 7-ELEVEN with a copy of any contract for maintenance which it enters with any outside maintenance firm.

Uniform                                      F-8

7-ELEVEN-00966

If the Store, the Equipment, or the landscape is not so maintained, and such condition continues 72 hours after notice or exists upon expiration or termination, 7-ELEVEN may cause such maintenance to be performed at FRANCHISEE's expense and/or may obtain maintenance contracts for the Store and Equipment and charge the FRANCHISEE for same. 7-ELEVEN shall, when it deems necessary: (i) repaint and repair the interior and exterior of the Store; (ii) replace Equipment, including, but not limited to, cash registers and point-of-sale computers; (iii) replace plate glass in front windows and front doors; (iv) repair the floor covering, exterior walls, roof, foundation, and parking lot; (v) maintain the structural soundness of the Store; (vi) pay for sewer, water, gas, heating oil, and electricity for operation of the Store; and (vii) maintain the HVAC Equipment; and FRANCHISEE hereby consents to such actions by 7-ELEVEN. 7-ELEVEN may charge the FRANCHISEE for any of the foregoing repairs, if, in 7-ELEVEN's opinion, such repairs are occasioned by FRANCHISEE's abuse or neglect. FRANCHISEE shall not modify, alter, or add to the Store or Equipment or discontinue use pursuant to the 7-Eleven System of any of the Equipment without the prior written consent of 7-ELEVEN.

**19.    Taxes.** 7-ELEVEN shall pay all real and personal property taxes on the Store and Equipment (specified in Exhibits A and B). FRANCHISEE shall be solely responsible for and pay all other taxes, including, but not limited to, sales, inventory, payroll, business, and income taxes.

**20.    Advertising.** 7-ELEVEN shall provide FRANCHISEE with advertising materials included in the 7-Eleven System and may arrange such advertising of the Service Mark, the Related Trademarks, merchandise sold by 7-Eleven Stores, or the 7-Eleven System as 7-ELEVEN in its sole opinion desires. FRANCHISEE shall properly utilize the Foodservice point-of-sale support and layouts designated by 7-ELEVEN in accordance with the design of the Foodservice Facility. 7-ELEVEN may, at its cost and in its discretion, at any time add to or change the signage in the Foodservice Facility. FRANCHISEE may be requested to participate in the costs of certain programs. FRANCHISEE may engage in such advertising as FRANCHISEE desires if that advertising accurately portrays any use of the Service Mark or the 7-Eleven System, does not jeopardize the 7-Eleven Image, pertains only to operation of the Store, is in compliance with all applicable laws, and does not breach any agreement binding on either party. Any advertising or display of the Service Mark by FRANCHISEE must have the prior approval of 7-ELEVEN.

**21.    Independent Contractor.** FRANCHISEE shall be an independent contractor and shall control the manner and means of the operation of the Store and exercise complete control over and responsibility for all labor relations and the conduct of FRANCHISEE's agents and employees, including, but not limited to, the day-to-day operations of the Store and all Store employees. FRANCHISEE and FRANCHISEE's agents and employees shall not (i) be considered or held out to be agents or employees of 7-ELEVEN or (ii) negotiate or enter any agreement or incur any liability in the name or on behalf of, or that purports to bind, 7-ELEVEN. No actions taken by FRANCHISEE or FRANCHISEE's agents or employees shall be deemed to be actions obligating 7-ELEVEN. FRANCHISEE acknowledges that nothing herein shall create a fiduciary or similar relationship with 7-ELEVEN.

**22.    Nonwaiver.** No act or omission by either party shall waive any right under or breach by the other of this Agreement unless such party executes and delivers a written waiver. The waiver by either party of any right under or breach of this Agreement shall not be a waiver of any subsequent or continuing right or breach. Specifically, but not by way of limitation, the acceptance of the 7-Eleven Charge shall not be a waiver of any preexisting breach of the Lease provisions of this Agreement, regardless of 7-ELEVEN's knowledge of such preexisting breach at the time of acceptance of such payment.

**23.    Disclosure.** FRANCHISEE consents to disclosure by 7-ELEVEN to anyone of any information relating to this Agreement or contained in the Bookkeeping Records or Financial Summaries.

Uniform

Exhibit F (cont'd)

24.    **Force Majeure.** Neither party shall be liable in damages to the other for any failure or delay in performance due to any governmental act or regulation, war, civil commotion, earthquake, fire, flood, or other disaster, or similar event, or for any other event beyond such party's control, if such party shall take all reasonable steps to mitigate damages caused by such failure or delay.

25.    **Notices.** Notices shall be in writing and (i) delivered in person; (ii) mailed return receipt requested and postage paid; or (iii) delivered to FRANCHISEE's designee, as set forth in a written notice to 7-ELEVEN thereof or, if FRANCHISEE's designee cannot be promptly located, to an employee of FRANCHISEE at the Store, followed by mailing of such notice to FRANCHISEE, return receipt requested and postage paid. All notices by mail shall be addressed as follows: if to FRANCHISEE, to the address of the Store or the address shown on the signature page; and if to 7-ELEVEN, to the address shown on the signature page. Addresses may be changed by notice. Notices delivered to FRANCHISEE's designee or to an employee of FRANCHISEE shall be deemed received 24 hours after such delivery. Notices by mail shall be deemed received 3 days after mailing. Notwithstanding the foregoing, in the event of the death of FRANCHISEE, if (i) there is no surviving FRANCHISEE, (ii) the FRANCHISEE has not properly given notice to 7-ELEVEN or a person whom the FRANCHISEE believes is qualified and wishes to have the opportunity to franchise the Store after the death of FRANCHISEE, and (iii) there is no heir of FRANCHISEE known to 7-ELEVEN, notices may be given by publication of such notices in a newspaper of general circulation in the county where the Store is located, for a period of five days, to be published not less than five nor more than twenty days after 7-ELEVEN learns of the death of FRANCHISEE.

26.    **Renewal of Franchise.** Upon the Expiration Date of the Agreement, other than termination by FRANCHISEE or by mutual agreement of FRANCHISEE and 7-ELEVEN, 7-ELEVEN will renew the franchise, provided the following conditions have been met: (i) 7-ELEVEN, in its sole discretion unilaterally elects to keep the Store open as a 7-Eleven Store; (ii) renewal and continued operation of the Store is permitted by law; (iii) the FRANCHISEE has met the Current Standards, described below, current at the time of notice (given approximately two years in advance of the Expiration Date), as determined by 7-ELEVEN, utilizing the then current Operational Review; (iv) the FRANCHISEE is not in Material Breach of the Agreement on the Expiration Date; (v) the FRANCHISEE has had a Net Worth in an amount equal to that required by Paragraph 13 hereof, for the one (1) year immediately prior to the Expiration Date; (vi) the FRANCHISEE executes and delivers to 7-ELEVEN the then current class of Agreement available for renewal of franchises, but with no franchise or renewal fee, and a mutual termination of this Agreement and release of claims, in a form substantially similar in all material respects to Exhibit H of this Agreement ; (vii) the FRANCHISEE has not been served with three or more notices of Material Breach of the Agreement within the two (2) years prior to the Expiration Date; and (viii) the FRANCHISEE has completed any additional training requested by 7-ELEVEN, provided that, 7-ELEVEN shall bear those same types of costs for such training as are set forth in Exhibit D, and in reasonable amounts.

Approximately two (2) years prior to the Expiration Date, the FRANCHISEE will be notified in writing of these renewal conditions, and FRANCHISEE shall participate in an Operational Review, which will be performed to determine whether FRANCHISEE's operation meets the Current Standards. The FRANCHISEE will then be informed in writing of those areas of FRANCHISEE's operation which do not meet the Current Standards. Thereafter, FRANCHISEE shall continue to participate in the Operational Review process, and 7-ELEVEN will provide FRANCHISEE with quarterly status reports on whether or not FRANCHISEE is meeting Current Standards. In the event that a FRANCHISEE's operation is determined not to be in compliance with the Current Standards, the FRANCHISEE will be so advised approximately six (6) months (or such longer period as may be required by applicable law) prior to the Expiration Date and the FRANCHISEE will have the opportunity to sell his or her interest in the franchise for a premium in accordance with the provisions contained in the Agreement, within that six (6) month period (or such longer period as may be required).

Uniform                                F-10

In the event that 7-ELEVEN is not, at the time of such renewal, offering a current form of Store Franchise Agreement, and is not at that time attempting to effect a registration of a current form of Store Franchise Agreement, then, if permitted by applicable law, 7-ELEVEN will renew the franchise on the same terms and conditions as set forth herein.

27.     **Assignment.** FRANCHISEE's interest under this Agreement shall not be encumbered, transferred, or assigned in any way, partially or completely, unless, as conditions precedent: (i) FRANCHISEE authorizes 7-ELEVEN to provide the transferee with, and the transferee executes, a disclosure form containing a waiver and a release by the transferee of any claim against 7-ELEVEN for any amount paid to, or representation made by, FRANCHISEE; (ii) FRANCHISEE authorizes 7-ELEVEN to provide the transferee with a list of all 7-ELEVEN convenience stores available for franchise in the Division or general area where the Store is located; (iii) the transferee is offered, and executes, at 7-ELEVEN's option, the then current form of the "7-Eleven Store Franchise Agreement" or an assumption of this Agreement (in either event providing for the then current initial investment, 7-Eleven Charge, Franchise Fee and all other current terms), completes the then required training, and is otherwise determined to be qualified in 7-ELEVEN's sole opinion; (iv) FRANCHISEE executes, at 7-ELEVEN's option, a mutual termination of this Agreement and release of claims, in a form similar in all material respects to Exhibit H of this Agreement, or an assignment of this Agreement and release of claims, in a form similar in all material respects to Exhibit H of this Agreement, and an indemnity for any claim by the transferee; (v) any amount due 7-ELEVEN is paid in full and arrangements satisfactory to 7-ELEVEN are made for the payment of any amount which may become due upon delivery of final Financial Summaries, including, at 7-ELEVEN's option, the payment of all premium monies, to be received by FRANCHISEE for the franchise, into the Open Account; (vi) the Agreement has not been terminated and no termination is pending; and (vii) 7-ELEVEN shall have been given written notice of the terms of the proposed transfer, after which 7-ELEVEN shall have 20 business days (Monday through Friday) to exercise a right of first refusal and purchase FRANCHISEE's interest upon the same terms. All documents must be acceptable to the parties. Subsequent to the assignment of FRANCHISEE's interest under this Agreement, FRANCHISEE shall have no further right, claim or interest in or to the franchise, the Store, or any assets used or acquired in conjunction therewith.

28.     **Termination.** This Agreement may be terminated by 7-ELEVEN (subject to FRANCHISEE's right to cure as set forth below) for the occurrence of any one or more of the following events (each of which FRANCHISEE acknowledges is a Material Breach and constitutes good cause for termination):

a. Upon 45 calendar days notice to FRANCHISEE, and subject to FRANCHISEE's right to cure as set forth herein, in the event that: (i) FRANCHISEE fails to operate the Store at least the hours set forth in Exhibit D or otherwise agreed to, in writing, prior to said reduction, unless said reduction in hours of operation: (A) is the result of governmental regulation, (B) does not result in less than the hours of operation required for a Minimum Hour Operation, and (C) is not directly or indirectly caused by FRANCHISEE's acts or failure to act; (ii) FRANCHISEE fails to use standardized trademarked containers; (iii) FRANCHISEE fails to comply with any agreement (including a master lease pertaining to the Store or Equipment) to which 7-ELEVEN is a party and a copy of the pertinent provisions of which has been provided to FRANCHISEE prior to the execution of this Agreement, or with the usual and normal terms of any lease transaction 7-ELEVEN may enter into regarding the Store or Equipment; (iv) FRANCHISEE fails to use the Store or Equipment solely in connection with FRANCHISEE's operation of the store; (v) FRANCHISEE fails properly to maintain the Store and Equipment; (vi) FRANCHISEE fails to obtain the prior written consent of 7-ELEVEN to make additions to the Store or Equipment or discontinue use pursuant to the 7-Eleven System of any of the Equipment; (vii) FRANCHISEE fails to remit insurance proceeds to 7-ELEVEN, which proceeds are due and owing to 7-ELEVEN pursuant to the terms of this Agreement; (viii) FRANCHISEE fails to indemnify 7-ELEVEN

Uniform

**Exhibit F (cont'd)**

as required under the terms and conditions of Paragraph 16 of this Agreement; (ix) FRANCHISEE fails to provide any records or reports required by 7-ELEVEN or fails to cooperate in obtaining information from FRANCHISEE's vendors; (x) FRANCHISEE fails to comply with any provisions of Paragraph 33 hereof; or (xi) FRANCHISEE fails to comply with the quality or other reasonable operating standards as from time to time established by 7-ELEVEN.

b. Upon 30 calendar days notice to FRANCHISEE, and subject to FRANCHISEE's right to cure as set forth herein, in the event that: (i) Net Worth is less than the minimum determined pursuant to Paragraph 13 of this Agreement, but more than an amount equal to one-half of the dollar amount of FRANCHISEE's minimum Net Worth or $10,000, whichever is greater; (ii) FRANCHISEE improperly uses, through advertising or otherwise, or jeopardizes the Service Mark, the Related Trademarks, or the goodwill represented by any of them, or copyrights or advertising owned or licensed by 7-ELEVEN, the Store, the 7-Eleven System, or the 7-Eleven Image; (iii) FRANCHISEE purchases or sells any Proprietary Product or other product bearing the Service Mark which has been obtained from a source not authorized to produce or deal in such goods, the purchase of which by FRANCHISEE has been duly reported to 7-ELEVEN; (iv) FRANCHISEE fails to pay timely any taxes or debts connected with the Store which FRANCHISEE is obligated to pay or a tax lien is imposed upon the FRANCHISEE which affects the Store; (v) FRANCHISEE fails to maintain worker's compensation coverage; (vi) FRANCHISEE fails to maintain an Inventory of a type, quantity, quality and variety consistent with the 7-Eleven Image or fails to carry in the Store at any time any of the Proprietary Products listed on Exhibit G to this Agreement, as may be amended from time to time; (vii) FRANCHISEE fails to notify 7-ELEVEN in an accurate and timely manner of discounts, allowances or premiums received by FRANCHISEE, or FRANCHISEE's retail selling prices; (viii) FRANCHISEE fails to obtain or continue any license, permit, or bond necessary, in 7-ELEVEN's opinion, for FRANCHISEE's operation of the Store; (ix) FRANCHISEE violates or fails to comply with any governmental law, rule, regulation, ordinance or order relating to the operation of the Store (specifically including, but not limited to, those relating to the sale of alcoholic beverages); (x) FRANCHISEE fails to repay the loan from 7-ELEVEN in accordance with this Agreement in the event the unpaid balance in the Open Account becomes immediately due and payable; (xi) FRANCHISEE fails to pay the 7-Eleven Charge when due.

c. Upon 30 calendar days notice to FRANCHISEE, and with no right to cure, in the event that: (i) a voluntary or involuntary petition in bankruptcy is filed by or against FRANCHISEE, FRANCHISEE makes an assignment for the benefit of creditors, or a receiver or trustee is appointed; (ii) FRANCHISEE attempts to encumber, transfer, or assign, in part or in whole, any interest under the Agreement in breach of the terms and conditions set forth in Paragraph 27 of this Agreement; (iii) FRANCHISEE is convicted of, or pleads "Nolo Contendere" to, a felony not involving moral turpitude; (iv) FRANCHISEE fails to maintain an independent contractor relationship with 7-ELEVEN; (v) FRANCHISEE purchases or sells any Proprietary Product or other product bearing the Service Mark which has been obtained from a source not authorized to produce or deal in such goods, the purchase of which by FRANCHISEE has not been duly reported to 7-ELEVEN; or (vi) FRANCHISEE misrepresents, misstates, or fails or omits to provide material information required as a part of the qualification process.

d. Upon 3 Business Days (excluding weekends and legal holidays) notice to FRANCHISEE, and subject to FRANCHISEE's right to cure as set forth herein, in the event that: (i) FRANCHISEE's Net Worth is less than the minimum determined pursuant to Paragraph 13 of this Agreement and less than an amount equal to one-half of the dollar amount of FRANCHISEE's minimum Net Worth or $10,000, whichever is greater; (ii) FRANCHISEE fails to properly record, deposit, deliver, or expend and report Receipts or to deliver deposit slips, cash reports and all supporting documents, receipts for cash purchases, and invoices or other reports of Purchases; (iii) FRANCHISEE, at any time during

Uniform                                          F-12

Normal Operating Hours, fails to permit any Audit provided for in Paragraph 12 of this Agreement or denies access to any part of the Store, Equipment, Inventory, Receipts, cash register fund, cash register receipts or readings, amusement machine, banking and other equipment readings, money order blanks, bank drafts, or Store supplies.

e. Upon 3 Business Days notice to FRANCHISEE, and with no right to cure, in the event that: (i) FRANCHISEE vacates, deserts or otherwise abandons the Store, provided that immediately upon 7-ELEVEN's determination that the Store has been abandoned, 7-ELEVEN may take possession of the Store pursuant to the provisions of Paragraph 17 hereof and operate the Store for FRANCHISEE's benefit during such notice period; or (ii) a FRANCHISEE is convicted of, or pleads "Nolo Contendere" to any charge which involves moral turpitude.

Unless otherwise specified, and if FRANCHISEE has not previously been served with two notices of termination for any Material Breach within the three (3) years prior to the occurrence of a third Material Breach, FRANCHISEE shall have the right to cure any Material Breach set forth above prior to the expiration of the notice period for termination due to that Material Breach (or such shorter period as may be imposed by law or by any agreement to which 7-ELEVEN is a party), by taking such actions as 7-ELEVEN may reasonably determine to be necessary to restore 7-ELEVEN to substantially the same condition it would have held but for FRANCHISEE's breach.

This Agreement also may be terminated by: (i) agreement between the parties, (ii) by FRANCHISEE upon at least 72 hours (or shorter, if accepted by 7-ELEVEN) notice, or (iii) as provided in Paragraph 27.

This Agreement may also be terminated by 7-ELEVEN upon at least 30 calendar days notice (or longer if required by law) in the event a FRANCHISEE dies or becomes incapacitated (except, if there is more than one FRANCHISEE and only one dies or becomes incapacitated, 7-ELEVEN may continue this Agreement with the survivor or person not so incapacitated, or upon written request by 7-ELEVEN, 7-ELEVEN may execute with same a new "Store Franchise Agreement" for the Store in the then current form, but not differing in any financial terms from this Agreement, for the remainder of the existing term of this Agreement).

This Agreement will terminate prior to the Expiration Date (i) 30 days prior to the loss of 7-ELEVEN's Leasehold Rights, (ii) upon a condemnation or transfer in lieu of condemnation which results in 7-ELEVEN's determination not to continue the Store as a 7-Eleven Store, (iii) upon casualty damage to the Store building or Equipment which cannot reasonably be repaired or replaced within 30 calendar days, or (iv) upon closing of the Store required by law (if such closing was not the result of a violation by 7-ELEVEN). In the event that this Agreement is so terminated, FRANCHISEE may, for a period of 180 days following such termination, elect either to transfer to another 7-Eleven Store available for franchise (a "Transfer") or to receive a refund of a portion of the Franchise Fee paid by FRANCHISEE (a "Refund"), on the terms and conditions set forth below. If at the end of such 180 day period FRANCHISEE has not expressly elected otherwise, FRANCHISEE shall be deemed to have elected the Refund provision.

In order to elect the Transfer, FRANCHISEE shall either sign a Store Franchise Agreement or the Transfer Election Form. Once the election is made, the transfer shall be completed, after reasonable prior notice, within a reasonable time. The following shall be conditions precedent to FRANCHISEE's ability, if eligible, to elect a Transfer: (i) FRANCHISEE may not be selling or assigning FRANCHISEE's interest in the Store for a premium, or transferring such interest to a third party pursuant to any available transfer mechanisms; (ii) the FRANCHISEE must not be in Material Breach of this Agreement at the time of such election; (iii) the FRANCHISEE must have had a Net Worth in an amount equal to that required by this Agreement, for the one (1) year immediately prior to the time of such election; (iv) the FRANCHISEE must execute and deliver to 7-ELEVEN the then current class of Agreement available for 7-Eleven franchises in the area in which the store to which FRANCHISEE wishes to transfer is located, but with no franchise fee, and a mutual termination of

Uniform

7-ELEVEN-00971

**Exhibit F (cont'd)**

this Agreement and release of claims, in a form substantially similar in all material respects to Exhibit H of this Agreement; (v) the FRANCHISEE must not have been served with three or more notices of Material Breach of this Agreement within the two (2) years prior to the time of such election; and (vi) the FRANCHISEE must complete any additional training requested by 7-ELEVEN, provided that 7-ELEVEN shall bear those same types of costs for such training as are set forth in Exhibit D. Provided that these conditions have been satisfied, if FRANCHISEE elects a Transfer, said Transfer may be to any 7-Eleven Store available for franchise that has been open for business as a 7-ELEVEN® convenience store for at least 12 months, and for which FRANCHISEE is qualified. 7-ELEVEN shall not be responsible for any moving or relocation expenses of FRANCHISEE or for the payment of any premium amount, broker's fee, or any other payment to a third party arising in connection with such Transfer. No damages shall be payable by 7-ELEVEN to FRANCHISEE if one of the events giving FRANCHISEE the right to elect a Transfer or Refund occurs prior to the expiration of ten (10) years following the Effective Date of this Agreement, and the Transfer, or the Refund described in the immediately succeeding paragraph in lieu of the Transfer, shall be FRANCHISEE's sole remedy in such event. In the event 7-ELEVEN's Leasehold Rights expire or are terminated (and are not renewed or otherwise extended) as a result of the acts or omissions of FRANCHISEE or FRANCHISEE's employees, the Term shall expire at the expiration or termination of 7-ELEVEN's Leasehold Rights, and FRANCHISEE shall have no right to a Transfer or Refund.

If FRANCHISEE is eligible for and elects a Refund, the amount of said Refund shall be computed by deducting from the Franchise Fee paid by FRANCHISEE upon the execution of this Agreement a Base Fee of $20,000. The remainder after such deduction shall be divided by 120. The resulting amount multiplied by the number of calendar months from the first day of the month next following the time FRANCHISEE elects to receive the refund through the month of the scheduled Expiration Date shall be refunded to FRANCHISEE.

The following shall be conditions precedent to FRANCHISEE's ability, if eligible, to elect a Refund: (i) FRANCHISEE may not be selling or assigning FRANCHISEE's interest in the Store for a premium, or transferring such interest to a third party pursuant to any available transfer mechanisms; (ii) the FRANCHISEE must not be in Material Breach of this Agreement at the time of such election; (iii) the FRANCHISEE must have had a Net Worth in an amount equal to that required by the Agreement, for the one (1) year immediately prior to the time of such election; (iv) the FRANCHISEE must execute a mutual termination of this Agreement and release of claims, in a form substantially similar in all material respects to Exhibit H to this Agreement; and (v) the FRANCHISEE must not have been served with three or more notices of Material Breach of this Agreement within the two (2) years prior to the time of such election. No Transfer or Refund shall be available in the event that the Agreement is terminated by 7-ELEVEN for cause, or in the event FRANCHISEE voluntarily terminates the Agreement. If eligible, the FRANCHISEE may select either a Refund or a Transfer, and in no event shall FRANCHISEE have the right to both a Refund and a Transfer.

29.    **Refund of Franchise Fee.** If FRANCHISEE's interest under this Agreement is not being transferred to a third party, then upon 10 days notice given to 7-ELEVEN, within 80 days from the Effective Date, FRANCHISEE may terminate this Agreement and, upon FRANCHISEE's execution of a mutual termination and release (acceptable to 7-ELEVEN) and compliance with all other terms of this Agreement, 7-ELEVEN shall refund without interest an amount equal to the Franchise Fee less the training expenses set forth in Exhibit D which have been reimbursed or paid by 7-ELEVEN and less the costs set forth in Paragraph 30 upon a termination; provided, however, a previous, existing, or renewing FRANCHISEE, or a FRANCHISEE who was previously a 7-ELEVEN employee, is not eligible for this termination and refund of franchise fee. This right to a refund is in no way related to the Refund right described in Paragraph 28.

30.    **Close Out Procedure.** Upon any expiration or termination of this Agreement, FRANCHISEE shall: (i) peaceably surrender the Store and Equipment (without additional notice, except as required by law and not waivable, all other notices to quit or vacate being expressly waived by FRANCHISEE) in as good condition as when received by FRANCHISEE, normal wear and tear

Uniform                                    F-14

excepted; (ii) transfer the final Inventory (for the Cost Value of the final Inventory), of a type, quantity, quality, and variety consistent with the 7-Eleven Image, to 7-ELEVEN, or, at 7-ELEVEN's option, to the transferee (but only if any amount due 7-ELEVEN is paid in full and arrangements satisfactory to 7-ELEVEN are made for the payment of any amount which may become due 7-ELEVEN upon delivery of final Financial Summaries); (iii) transfer to 7-ELEVEN the Receipts, cash register fund, prepaid Operating Expenses, money order blanks, bank drafts, and Store supplies; (iv) cease using the Service Mark, the Related Trademarks, and the 7-Eleven System, including the Trade Secrets; (v) return FRANCHISEE's copy of the Franchise Operations Manual and other operations manuals provided by 7-ELEVEN to FRANCHISEE; (vi) return all Trade Secrets and other 7-Eleven System material; and (vii) execute all necessary documentation to transfer all licenses and permits relating to the store, to 7-ELEVEN or its designee.

Within 10 days after such surrender and transfer, 7-ELEVEN shall: (i) credit FRANCHISEE for such Receipts, cash register fund, prepaid Operating Expenses, usual and reasonable amounts of Store supplies, the amount received by or due from 7-ELEVEN for transfer of the final Inventory, and $100 if FRANCHISEE's copy of the Franchise Operations Manual and other operations manuals provided by 7-ELEVEN to FRANCHISEE are returned; (ii) charge FRANCHISEE a $200 closing fee; and (iii) remit to FRANCHISEE any amount by which 7-ELEVEN estimates the Net Worth (excluding any amount due FRANCHISEE under Paragraph 29) will exceed the greater of $10,000 or twenty-five percent (25%) of FRANCHISEE's Total Assets. Within 75 days after the last day of the month in which such surrender and transfer occurs, 7-ELEVEN shall deliver to FRANCHISEE final Financial Summaries together with any credit balance in the Open Account. Upon delivery of the final Financial Summaries, any unpaid balance in the Open Account shall be due and payable in full and FRANCHISEE shall immediately pay same to 7-ELEVEN. Any property belonging to FRANCHISEE and left in the Store after such surrender and transfer shall belong to 7-ELEVEN.

31.    **Arbitration.** The parties may, by mutual agreement, provide that any controversy relating to this Agreement shall be settled by individual arbitration. Unless the parties expressly agree otherwise, such arbitration shall be conducted in accordance with the rules of the American Arbitration Association; provided that, if such rules are contrary to this Agreement, this Agreement shall control. The parties shall bear their own expenses and shall share equally all expenses of the arbitrator(s) and the American Arbitration Association. If the parties do not mutually agree to arbitration, each party may pursue any rights and remedies available at law or in equity.

32.    **Governing Laws and Severability.** This Agreement shall be governed by and construed according to the laws of the state where the Store is located. If, however, any provision, or portion hereof in any way contravenes the laws of any state or jurisdiction where this Agreement is to be performed, such provision, or portion thereof, shall be deemed to be modified to the extent necessary to conform to such laws, and still be consistent with the parties' intent as evidenced herein, or if such modification is impossible, to be deleted here from. If any part of this Agreement for any reason shall be declared invalid such decision shall not affect the validity of any remaining portion, which shall remain in full force and effect. In the event that any material provision of this Agreement shall be stricken or declared invalid, 7-ELEVEN reserves the right to terminate this Agreement.

33.    **Personal Qualification.** This Agreement is being entered into by 7-ELEVEN with the person(s) named on the signature page, upon the personal qualifications of, and upon the representation and agreement that the following person(s) will be the FRANCHISEE(S) of and will actively and substantially participate in the operation of the Store and will have full managerial authority and responsibility for the operation of the Store. No changes in the ownership and/or control of the franchise shall be made without the prior written approval of 7-ELEVEN.

34.    **Complete Agreement.** This Agreement, any other agreements specified in **Exhibit D, and the Exhibits, Amendments, and Addenda (which are incorporated herein by this reference and made a part of this Agreement) contain all Agreements between FRANCHISEE and 7-ELEVEN and cover their entire relationship concerning the Store, all prior or contemporaneous promises, representations, agreements, or understandings being**

Uniform

7-ELEVEN-00973

Exhibit F (cont'd)

expressly merged and superseded. No Agent or Employee of 7-ELEVEN is authorized to make any modification, addition, or amendment to or waiver of this Agreement unless in writing and executed by an Assistant Secretary of 7-ELEVEN. FRANCHISEE represents and warrants that all information properly requested has been supplied and that no representations have been made by 7-ELEVEN (or any Agent or Employee) or relied upon by FRANCHISEE as to the future or past income, expenses, sales volume or potential profitability, earnings or income of the Store or any other location, other than the information provided in Item XIX of 7-Eleven's Uniform Franchise Offering Circular and site specific information provided in 7-Eleven's "Here Are The Facts" supplemental disclosure.

   35.   **Savings Clause.** All obligations imposed by Paragraphs 16, 18, 30, and 31 hereof which are not discharged prior to termination or expiration of this Agreement shall remain binding and effective until fully discharged, to the sole satisfaction of 7-ELEVEN.

   IN WITNESS WHEREOF, FRANCHISEE and 7-ELEVEN have executed this Agreement this _____ day of _____, _____.

### 7-ELEVEN, INC.

_____          _____
Signature                                  Signature

_____          _____
Market Manager                             Vice President/Assistant Secretary
Full Name (Typed)                          Full Name (Typed)

7-Eleven Office/Store No._____

_____
Address of Office                          Street

_____          _____
      City                                 State                    Zip

### FRANCHISEE(S)

_____          _____
Signature                                  Signature

_____          _____
Full Name (Typed)                          Full Name (Typed)

Witness:_____          Witness:_____
Witness of Above Signature                 Witness of Above Signature

_____          _____
Address of Franchisee's Residence          Street

_____          _____
City                                       State                    Zip

Uniform  3/02                      F-16

7-ELEVEN-00974